UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JOHN YOUNG,

                                   Plaintiff,

            v.                                          9:15-cv-1222
                                                        (MAD/TWD)
DR. FRICKE[1] and ANTHONY LUCCA,

                                   Defendants.

_____

APPEARANCES:                              OF COUNSEL:

JOHN YOUNG
Plaintiff, *pro se*
16-A-0363
Hudson Correctional Facility, Box 576
Hudson, New York 12534

THUILLEZ, FORD, GOLD, BUTLER               MOLLY C. CASEY, ESQ.
& MONROE, LLP
Attorneys for Defendant Dr. Russell Fricke
20 Corporate Woods Blvd., 3rd Floor
Albany, New York 12211

SHANTIZ & BELKIN                           M. RANDOLPH BELKIN, ESQ.
Attorneys for Defendant Anthony Lucca
26 Century Hill Drive, Suite 202
Latham, New York 12110

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## ORDER AND REPORT-RECOMMENDATION

        This matter has been referred to the Court for a Report and Recommendation by the Hon.

Mae A. D'Agostino, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Northern

District of New York Local Rule 72.3(c).  *Pro se* Plaintiff John Young, an inmate in the custody

---

[1]  The Clerk is directed to amend the docket in this action from "Dr. Fricki" to "Dr. Fricke" to
reflect the correct spelling of Defendant's surname.  (*See* Dkt. No. 45.)

of the New York State Department of Corrections and Community Supervision ("DOCCS"), commenced this action pursuant to 42 U.S.C. § 1983, alleging violations of his constitutional rights. (Dkt. No. 1.) The allegations in Plaintiff's amended complaint, which is the operative pleading, relate to Plaintiff's previous confinement as a pretrial detainee at the Schenectady County Jail ("SCJ"). (Dkt. No. 8.[2]) Plaintiff claims Defendants were aware of Plaintiff's prescribed dietary needs but were "intentionally" and deliberately indifferent to these needs. *Id*. As a result, Plaintiff's medical conditions worsened. *Id*. Plaintiff's medical indifference claims against Dr. Fricke and Anthony Lucca, alleged to be the head kitchen chef, ("chef Lucca") survived initial review pursuant to 28 U.S.C. §§ 1915(e) and 1915A. (Dkt. No. 12.)

Currently pending before the Court is Dr. Fricke's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 45.[3]) Plaintiff opposes the motion. (Dkt. No. 51.) For reasons explained below, the Court recommends that Dr. Fricke's motion for summary judgment be granted. The Court further recommends that Plaintiff's deliberate indifference claim against chef Lucca be *sua sponte* dismissed pursuant to §§ 1915(e) and 1915A.

---

[2] The amended complaint does not specify whether Plaintiff was a pretrial detainee or a convicted inmate during his confinement at the SCJ. (*See* Dkt. No. 8.) The record establishes Plaintiff was a pretrial detainee during his confinement at the SJC. (Dkt. No. 51-2 at ¶ 1.) *See also* http://nysdoccslookup.doccs.ny.gov (DIN 16-A-0363) (last visited Feb. 5, 2018).

[3] Upon review of the docket, it appears the "Supporting Affidavit of Russell Fricke, M.D.," was inadvertently omitted from the electronic filing submitted to the Court via the Clerk's CM/ECF system. (*See* Dkt. Nos. 45, 46.) Plaintiff has, however, attached a copy of Dr. Fricke's affidavit to his opposition (*see* Dkt. No. 51-3), which the Court will reference throughout this Report and Recommendation.

2

# I.    BACKGROUND

## A.    Material Facts

During all times relevant to this action, Plaintiff was being held as pretrial detainee at the SCJ.  (Dkt. No. 51-2 at ¶ 1; Dkt. No. 45-8 at 8-9, 24.)  Prior to his incarceration at the SCJ, Plaintiff was diagnosed with, among other conditions, diabetes mellitus (Type II), ulcers, hepatitis C, and cirrhosis of the liver.  (No. 8 at 4; Dkt. No. 45-8 at 19.)  From the mid-1990s until 2014, Plaintiff was taking Metformin, a medication that is effective in controlling blood sugar levels in diabetic patients.  (Dkt. No. 45-8 at 16; Dkt. No. 51-3 at ¶ 16.)  Thereafter, Plaintiff controlled his diabetes with diet and exercise.  *Id.*

Plaintiff treated with Ellis Primary Care and Family Medicine from February 13, 2013, through March 9, 2015.  (*See generally* Dkt. No. 45-11.)  As of March 9, 2015, Plaintiff had a history of, among other conditions, abdominal pain, aortic stenosis, ascites, asthma, chest pain, cirrhosis, hepatitis C, diabetes mellitus (type II), esophageal varices, gastric ulcer, gastritis, h.pylori, hypertension, latent tuberculosis, losing weight, peripheral neuropathy, sciatica, and valvular heart disease.  *Id.* at 13-14.  Plaintiff has a surgical history of hemorrhoidectomy.  *Id.* at 13.  Plaintiff was prescribed Lotrab for pain, Nadolol for hypertension, and hydrocortisone for hemorrhoids.  *Id.* at 14.  Plaintiff controlled his diabetes with diet and exercise.  *Id.*

According to documents attached to Dr. Fricke's motion for summary judgment, and not specifically opposed by Plaintiff, Plaintiff's medical conditions were being monitored on a regular basis by medical staff during his confinement at the SCJ.  (*See generally* Dkt. No. 45-8; *see also* Dkt. No. 51-3 at ¶ 15; Dkt. No. 51-1 at ¶ 15.)  On March 11, 2015, Plaintiff was booked into the SCJ.  (Dkt. No. 51-2 at ¶ 1.)  During his medical intake, Plaintiff reported controlling his diabetes with diet and exercise.  (Dkt. No. 8 at 4; Dkt. No. 45-9 at 49; Dkt. No. 51-3 at ¶ 9.)

Plaintiff was placed on the diabetic diet and enrolled in the "Chronic Disease Clinic" program. (Dkt. No. 8-1 at 1; Dkt. No. 45-9 at 17, 135-141.)  Plaintiff's blood glucose levels in relation to his diabetes were ordered to be monitored on a daily basis with "finger sticks."  (Dkt. No. 51-3 at ¶13.)

Dr. Fricke serves as the jail physician.  *Id*. at ¶1.  As the jail physician, among other things, Dr. Fricke places inmates on medically indicated diets, when such diets are appropriate given the inmate's history and presentation.  (Dkt. No. 51-3 at ¶¶ 1, 5.)  Dr. Fricke's involvement with respect to inmate diets is limited to determining whether an inmate requires a medical diet, and submitting the paperwork to the jail so that the appropriate meals will be provided by the kitchen.  *Id*. at ¶¶ 5, 6.  Dr. Fricke has no involvement with the formulation of the jail menus.  *Id*. at ¶¶ 7, 8.  The recipes at the SCJ are established by DOCCS and approved by a registered dietician.  (Dkt. No. 45-12 at 2; Dkt. No. 51-3 at ¶ 7.)

On March 17, 2015, Plaintiff was examined by Dr. Fricke.  (Dkt. No. 45-9 at 49; Dkt. No. 51-3 at ¶1.)  Dr. Fricke filled out a "Medical Approved Items/Diet" form indicating Plaintiff was to continue receiving the diabetic diet for the duration of his stay at the SCJ, a copy of which was placed in Plaintiff's medical record.  (Dkt. No. 51-3 at ¶ 5.)

On March 26, 2015, it was noted that Plaintiff was "critical of the diabetic diet."  (Dkt. No. 45-9 at 50.)  Plaintiff was informed that despite what the corrections officers may have told him, Dr. Fricke was not involved in the formulation or approval of the medical diets at the jail. *Id*.

On April 23, 2015, Plaintiff reported abdominal pain and upset stomach which Plaintiff believed was related to the "spicy sauces used to flavor the bean-based meals."  *Id*. at 47. Plaintiff requested a "bland diet, with more variety."  *Id*.  In Dr. Fricke's clinical judgment,

4

Plaintiff's complaints of "stomach upset were not meal linked." (Dkt. No. 51-3 at ¶ 10.) Dr. Fricke placed Plaintiff on the bland diet based on Plaintiff's own request and because it was not contraindicated. (Dkt. No. 51-3 at ¶ 10; Dkt. No. 45-9 at 10.) Plaintiff remained on the diabetic diet and the bland diet while incarcerated at the SCJ. (Dkt. No. 45-9 at 10.)

Plaintiff refused his finger sticks on April 15, April 27, May 2, and May 4, 2015. (Dkt. No. 45-9 at 45, 96-97.) The medical staff cannot force an inmate to have his finger stick done as ordered. (Dkt. No. 51-3 at ¶ 14.)

On May 7, 2015, it was noted that Plaintiff's blood glucose levels were elevated. (Dkt. No. 45-9 at 47.[4]) Dr. Fricke was made aware and suggested discussing Metformin with Plaintiff. (Dkt. No. 51-3 at ¶ 16.[5]) On May 9, 2015, it was also noted that Plaintiff's blood glucose levels were elevated. (Dkt. No. 45-9 at 47.) Plaintiff was not symptomatic and was scheduled to see Dr. Fricke on May 12, 2015. *Id.* Plaintiff refused his finger sticks on May 9, May 10, and May 11, 2015. *Id.* at 94-95.[6]

On May 12, 2015, Dr. Fricke prescribed Metformin to control Plaintiff's blood glucose levels. *Id.* at 42. Plaintiff was prescribed Metformin for the remainder of his stay at the SCJ. *Id.* at 5, 25.[7]

---

[4] For a diabetic adult, the target blood glucose range is 90-130 mg/dL while fasting, and less than 180 mg/dL after a meal. (Dkt. No. 51-3 at ¶ 15.)

[5] The May 7, 2015, encounter note states: "Dr. Fricke instructed to discuss [with] i/m the desire to start Metformin. If Pt. not agreeable, then chart to MD and he will see on Tues. 5/12/15. Spoke [with] Pt., he will wait for MD." (Dkt. No. 45-9 at 47.)

[6] Plaintiff refused finger stick blood glucose testing on thirty (30) other occasions. (Dkt. No. 45-9 at 89-94.)

[7] Plaintiff admits taking Metformin and "did not want to go wrost cause diets was not working. See med. Records." (Dkt. No. 51-1 at ¶ 14 (unaltered text).)

Plaintiff's health conditions and complaints that he had at the time he was transferred out of the SCJ on January 29, 2016, were consistent with the health conditions, symptoms, and complaints that he had when he was booked into the SCJ on March 11, 2015. (Dkt. No. 51-3 at ¶¶ 24, 25; Dkt. No. 51-1 at ¶¶ 24, 25.)

### B.    Plaintiff's Grievance

On May 15, 2015, Plaintiff filed a grievance regarding the bland diet:

> On May 13, 2015, the diet was change, saying that bland diet can eat onions & peppers. This is the second time they change the diet. I have a ulcer and for me eating onions & peppers is very unhealthy for me. How can cook supercede medical. I also had bean & rice for 3 straight days.

(Dkt. No. 45-14 at 9 (unaltered text).) Plaintiff requested the following action:

> To put a menu on each floor. Take onions & peppers out of the bland diet. Stop changing the diet. Have a consistent diet. And stop giving me beans & rice & pasta every day.

*Id*. (unaltered text). In response, the grievance coordinator issued the following decision:

> After speaking with medical staff and kitchen staff only sweet onions and sweet peppers are used in this facility. These food items are constituted as a bland diet and approved by all parties involved. There is a rotating menu for all diets and if the rotating menu is not being utilized please bring this to my attention so that I can address the issue immediately. Your grievance at this point should be satisfied.

*Id*. at 10.[8] Plaintiff appealed his grievance to the New York State Commission of Correction, which was denied September 15, 2015. *Id*. at 29.

---

[8] Plaintiff disputes the truth of the statement. (Dkt. No. 51-1 at ¶¶24, 25.) Plaintiff contends there are no statements from inmates to "back up grievance coordinator claim" and there is no paperwork confining that the onions and peppers were constituted as a bland diet and approved. *Id*.

### C.    Plaintiff's Deposition Testimony

Plaintiff described his numerous encounters with Dr. Fricke as "pleasant" and admitted he never had a conversation with chef Lucca.  (Dkt. No. 45-8 at 101-02.)  Plaintiff testified that it was possible for him to separate out, and remove, the onions and peppers from his meals.  *Id.* at 52.  Plaintiff testified that, while in DOCCS custody, he has worked in the kitchens, and admitted that "cooks don't necessarily get to decide what the menu is" at the facilities.  *Id.* at 43-44, 101.  Plaintiff understood that while he was incarcerated at the SCJ, the meals were "quick chill"[9] and approved by DOCCS.  *Id.*  Plaintiff frequented the commissary weekly and routinely purchased ramen noodles and barbeque potato chips.  *Id.* at 103-114[10]; *see also* Dkt. No. 45-14 at 25-27.

### D.    Dr. Fricke's Opinions

Dr. Fricke is a licensed medical doctor and has worked as a physician in correctional facilities since 2009.  (Dkt. No. 51-3 at ¶ 3.)  Prior to that, Dr. Fricke served as the Commissioner of Public Health for the County of Schenectady.  *Id.*  He also spent many years as a family practice physician.  *Id.*  Dr. Fricke "routinely sees patients with a vast array of medical problems" and is "well versed in all aspects of treating patients based on the history, physical examination, lab values, and other diagnostic test results."  *Id.*  He is "familiar with monitoring and treating patients who have a history that includes conditions such as: diabetes, gastric ulcers, cirrhosis, gastritis, hypertension, latent tuberculosis, and hepatitis C, such as [Plaintiff]."  *Id.*

---

[9]  Plaintiff explained "quick chill" means "everything is boiled in a bag, basically with soy products . . . basically it's a big quick chill bag, like a stew.  Like say if you have curry chicken.  There's vegetables, onions, peppers, everything boiled in the bag, made in another facility, brought here.  They put it in boiling water, heat the bag up, open it up and serve – serve you out of the bag."  (Dkt. No. 45-8 at 43-44.)

[10]  As to his commissary purchases, Plaintiff stated for the record: "Everything that you see [on the receipts] that was purchased, that doesn't mean that I ate it all.  I will say that I did eat the barbeque chips because I love them."  (Dkt. No. 45-8 at 115.)

Dr. Fricke submits the following opinions based on his education, knowledge, and experience, along with his treatment of Plaintiff:

11. It is my understanding that [Plaintiff] is claiming in this lawsuit that his stomach ulcer was bleeding, and that this was a result of the food he was given at the [SCJ]. [Plaintiff] had a history of hemorrhoids. Hemorrhoids can cause blood to appear in the stool, which can be visible to the naked eye. When a stomach ulcer bleeds, the stool can be black and tarry, but the blood is occult, which means that it cannot be seen by the naked eye. A diagnosis of a bleeding ulcer is based on blood tests and/or rectal examination. [Plaintiff] would not have been able to determine, based on the appearance of his stool, that his ulcer was bleeding.

12. There was no evidence that [Plaintiff's] ulcer was bleeding at any time while he was incarcerated in the [SCJ], or thereafter. There is also no clinical support for the notion that the food [Plaintiff] received at the [SCJ] would have caused his stomach ulcer to bleed.

16. On May 7, 2015, I was made aware that [Plaintiff's] glucose levels had risen and I recommended that he be put back on Metformin, a medication that is effective in controlling blood sugar levels. [Plaintiff] had been on Metformin in the past. Metformin is the optimal first-line drug in managing blood glucose levels in diabetic patients. There is no evidence in the medical literature that Metformin is detrimental to liver function, as [Plaintiff] has claimed. In fact, Metformin can be quite beneficial for patients with hepatitis C and cirrhosis. Metformin was an appropriate medication for [Plaintiff], taking into account all of his various health conditions. It was not contraindicated in any way, and did not impact his health negatively in any way.

17. It is my opinion that the food [Plaintiff] received at the jail while he was on the diabetic diet, did not cause or contribute to a rise in his glucose levels. In any event, I have no control over the diet-specific menus at the jail. I also have no control over the inmate's commissary purchases. To the extent that [Plaintiff] was purchasing food from the commissary that did not comport with the diabetic diet, I had no control over this.

18. I am aware that one of the injuries claimed by [Plaintiff] in connection with this lawsuit, is that his liver enzymes went up. There is no support for the notion that [Plaintiff's] diet contributed to a rise in liver enzymes. [Plaintiff] had hepatitis C and cirrhosis

of the liver.  To the extent that [Plaintiff's] liver enzymes rose at all during his incarceration, it would be attributable to his condition of hepatitis C, which I understand he had for decades. [Plaintiff's] liver function was not impeded at all by any diet or medication that he was given at the jail.

21.  There is no evidence in the medical records that the condition of [Plaintiff's] pancreas was negatively impacted during incarceration.  There is no medical support for the claim that taking Ultram or Tramadol would negatively impact [Plaintiff's] pancreas.

23.  I am aware that [Plaintiff] has claimed that I knew of his medical need and gave him drugs to mask the pain, rather than doing something about his diet.  This is not true.  I placed [Plaintiff] on the proper diets, given his conditions.  I also constantly monitored [Plaintiff] during his admission, and adjusted his medications appropriately based on his symptoms and the tests that were constantly being done to monitor his condition.

24.  It is my opinion within a reasonable degree of medical certainty that my care and treatment of [Plaintiff] was at all times within the standard of care.  At no time did I act indifferent to any medical need.  It is also my opinion within a reasonable degree of medical certainty that no medical treatment that [Plaintiff] received while incarcerated at the [SCJ] worsened any of his condition, or had any negative impact on his health whatsoever.

25.  Finally, it is my opinion within a reasonable degree of medical certainty that [Plaintiff] did not suffer any negative impact to his health due as a result of the food that he received while he was incarcerated.  While I personally do not have any control over the food that the inmates received, beyond placing them on medical diets, I do not see any evidence in the medical records that [Plaintiff] suffered any ill effects that could be attributed to the diets at the jail.

(Dkt. No. 51-3 at ¶¶ 11, 12, 16, 17, 18, 21, 23, 24, 25.)

## II.     LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 251-52 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 272-73. The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (citation and internal quotation marks omitted). A plaintiff's verified complaint is to be treated as an affidavit.[11] *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit . . . and therefore will be considered in determining whether material issues of fact exist . . . .") (citations omitted).

In *Jeffreys v. City of New York*, the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will

---

[11]  The Court finds Plaintiff's amended complaint was adequately verified under 28 U.S.C. § 1746 by Plaintiff's declaration under penalty of perjury. (Dkt. No. 8 at 5.)

be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." 426 F.3d 549, 554 (2d Cir. 2005). "To defeat summary judgment, . . . nonmoving parties may not rely on conclusory allegations or unsubstantiated speculation." *Id*. (citation and internal quotation marks omitted). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Id*. (citation and internal quotation marks omitted). "[T]o satisfy Rule 56(e), affidavits must be based upon 'concrete particulars,' not conclusory allegations." *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (citation omitted); *Smith v. Woods*, No. 9:03-CV-480 (DNH/GHL), 2006 WL 1133247, at *3 & n.10 (N.D.N.Y. Apr. 24, 2006).[12] "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP)(JCF), 1999 WL 983876, at *3 (S.D.N.Y. Oct. 28, 1999) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

---

[12]  Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

III.    DISCUSSION

A.    Fourteenth Amendment Due Process Clause

As a pretrial detainee, Plaintiff's deliberate indifference claims are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eighth Amendment.  *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) ("Pretrial detainees have not been convicted of a crime and thus 'may not be punished in any manner— neither cruelly and unusually nor otherwise.'") (quoting, *inter alia*, *Iqbal v. Hasty*, 490 F.3d 143, 168 (2d Cir. 2007)).  Until recently, "this has been a distinction without an analytical difference" because in *Caiozzo v. Koreman*, 581 F.3d 63 (2d Cir. 2009), the Second Circuit instructed that "[c]laims for deliberate indifference to a serious medical condition or other serious threat to the health or safety of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment.'"  *V.W. ex rel. Williams v. Conway*, 236 F. Supp. 3d 554, 582-83 (N.D.N.Y. 2017) (Hurd, J.) (quoting *Caiozzo*, 581 F.3d at 72); *see also* Dkt. No. 7 at 4-5 & n.4.

Indeed, at the time of the November 16, 2015, Decision and Order, neither the Supreme Court nor the Second Circuit had yet addressed the possible implications of the Supreme Court's decision in *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2470 (2015) (holding that a pretrial detainee bringing an excessive force claim under the Fourteenth Amendment "must show only that the force purposely or knowingly used against him was objectively unreasonable"), for deliberate indifference claims brought by pretrial detainees.  (Dkt. No. 7 at 5 n.4.)  Thus, the district courts in this Circuit which had addressed the issue concluded the Eighth Amendment standards applied.  *Id.* (collecting cases).

In 2017, the Second Circuit extended the *Kingsley* standard to a pretrial detainee's allegations related to unconstitutional conditions of confinement. *See Darnell*, 849 F.3d at 35. The *Darnell* Court reasoned, "[u]nlike a violation of the Cruel and Unusual Punishments Clause [of the Eighth Amendment], an official can violate the Due Process Clause of the Fourteenth Amendment without meting out any punishment, which means that the Due Process Clause can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm." *Id*.

Although *Darnell* involved a challenge to conditions of confinement, district courts in this Circuit have applied the *Kingsley* standard to all deliberate indifference claims by pretrial detainees. *See, e.g.*, *Lloyd v. City of New York*, No. 1:14-CV-9968, 2017 WL 1207838, at *8-9 (S.D.N.Y. March 31, 2017) ("The reasoning of *Darnell* applies equally to claims of deliberate indifference to serious medical needs under the Fourteenth Amendment."); *Feliciano v. C.O. Anderson*, No. 15-CV-4106 (LTS)(JLC), 2017 WL 1189747, at *13 (S.D.N.Y. Mar. 30, 2017) ("Applying *Darnell* to claims of deliberate indifference to serious medical needs, the Court concludes that a defendant possesses the requisite *mens rea* when he acts or fails to act under circumstances in which he knew, or should have known, that a substantial risk of serious harm to the pretrial detainee would result."); *Villafane v. Sposato*, No. 16-CV-3674, 2017 WL 4179855, at *19 (E.D.N.Y. Aug. 22, 2017) ("District Courts in this circuit have applied *Kingsley* to claims for deliberate indifference to medical needs) (collecting cases)). This Court will do the same.[13]

---

[13] For the reasons explained herein, inasmuch as Plaintiff cannot meet the lower threshold of "objective deliberate indifference" under the Fourteenth Amendment, Plaintiff would be unable to demonstrate "subjective deliberate indifference" under the Eighth Amendment.

### B.    Deliberate Indifference

To establish a claim for deliberate indifference under the Due Process Clause, a plaintiff must satisfy a two-prong test.  *Darnell*, 849 F.3d at 29.  First, the deprivation must have been "sufficiently serious."  *Salahuddin*, 467 F.3d at 279 (citation and internal quotation marks omitted).  Second, the defendant must have acted or failed to act with "a sufficiently culpable state of mind," which, "in prison conditions cases" is "deliberate indifference to inmate health or safety."  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

Under the Fourteenth Amendment, deliberate indifference is measured from an objective perspective.  *Darnell*, 849 F.3d at 35.[14]  Thus, while the second prong now varies from Eighth Amendment cases, the first prong remains the same.  *See White v. City of New York*, No. 16 Civ. 6183, 2017 WL 3575700, at *3 (S.D.N.Y. Aug. 17, 2017) ("The objective prong is the same regardless of whether the plaintiff is a pretrial detainee or a prisoner."); *Cuffee v. City of New York.*, No. 15 Civ. 8916, 2017 WL 1134768, at *5 (S.D.N.Y. Mar. 27, 2017) (same); *Padilla v. Corr. Care Solutions*, No. 9:17-CV-1150 (MAD/TWD), 2018 WL 550610, at *3 (N.D.N.Y. Jan. 22, 2018) (same).

When an inmate plaintiff claims that the failure to provide him with a special diet amounts to deliberate indifference to a serious medical need, "the claims must be reviewed under the more particularized standards applicable to such medical indifference claims."  *Mejia v. Goord*, No. 9:03-cv-124 (LEK/DEP), 2005 WL 2179422, at *6 (N.D.N.Y. Aug. 156, 2005).  However, "[n]ot every lapse in medical care is a constitutional wrong."  *Salahuddin*, 467 F.3d at 279.  A constitutional wrong requires deliberate indifference, and it is well-settled that the

---

[14]  In *Darnell*, the Second Circuit clarified that the second element of a deliberate indifference claim though often characterized as "subjective" is better understood as an element simply analyzing "*mens rea*" because it is "defined objectively."  *Darnell*, 849 F.3d at 29, 35.

ultimate decision of whether to administer a treatment or medication is a medical judgment that, without more, does not amount to deliberate indifference.  *See Estelle v. Gamble*, 429 U.S. 97, 107 (1976); *Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011).

To determine whether an alleged deprivation of medical care is "sufficiently serious," a court is required to first determine whether the medical care was inadequate and, if so, "to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner."  *Salahuddin*, 467 F.3d at 279-80 (citing *Helling v. McKinney*, 509 U.S. 25, 32-33 (1993)).

As to the first inquiry, "the prison official's duty is only to provide reasonable medical care."  *Id.* (citing *Farmer*, 511 U.S. at 845).  "Thus, 'prison officials who act reasonably [in response to an inmate-health risk] cannot be found liable' . . . and, conversely, failing 'to take reasonable measures' in response to a medical condition can lead to liability."  *Id.* (internal quotation marks and citations omitted; brackets in original).

The second inquiry varies according to the plaintiff's allegations.  *See Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003).  "[I]f the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious."  *Salahuddin*, 467 F.3d at 280.[15]  If, however, the plaintiff alleges that the medical treatment received was inadequate, the inquiry is narrower and the court should focus on the specific inadequacy of the treatment, not the underlying medical condition alone.  *Id.*

---

[15]  Indeed, "there is no need to distinguish between a prisoner's underlying 'serious medical condition' and the circumstances of his 'serious medical need' when the prisoner alleges that prison officials have failed to provide general treatment for his medical condition."  *Smith*, 316 F.3d at 185-86.

Accordingly, the objective prong is satisfied "when (a) the prisoner was 'actually deprived of adequate medical care,' meaning prison officials acted unreasonably in response to an inmate health risk under the circumstances, and (b) 'the inadequacy in medical care is sufficiently serious.'" *Bellotto v. Cty. of Orange*, 248 F. App'x 232, 236 (2d Cir. 2007) (quoting *Salahuddin*, 467 F.3d at 279-80).

For a plaintiff to satisfy the second prong—concerning *mens rea*—the defendant must have behaved in an objectively reckless manner, or "knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 8949 F.3d at 35. "Although *mens rea* is assessed from an objective perspective, as opposed to the more demanding subjective recklessness standard employed in the Eighth Amendment context, negligence is still insufficient to give rise to a valid claim under the Fourteenth Amendment." *Smith v. Outlaw*, No. 15-cv-9961 (RA), 2017 WL 4417699, at *3 (S.D.N.Y. Sept. 30, 2017) (internal citation omitted); *see also Kingsley*, 135 S. Ct. at 2472 ("[L]iability for *negligently* inflicted harm is categorically beneath the threshold of constitutional due process.") (emphasis is original).

## C.    Analysis

Plaintiff alleges Dr. Fricke and chef Lucca were deliberately indifferent to his serious medical needs. (Dkt. No. 8 at 4.) Specifically, Plaintiff claims that chef Lucca, kept giving Plaintiff "peppers and onions and other foods not listed on [his bland] diet." *Id.* Even after filing a grievance, chef Lucca "continued to intentionally give [Plaintiff] foods that made [him] sick, like peppers [and] onions in [his] bland diet, which made [Plaintiff's] ulcers bleed" and caused

his "sugar" to go "hi" (sic).  *Id.*  Plaintiff had to re-start taking Metformin, which "is very bad for [his] liver."  *Id.*  As a result, Plaintiff alleges his medical conditions worsened.  *Id.*[16]

Even viewing the facts and drawing all reasonable inferences in Plaintiff's favor, the Court concludes that no reasonable factfinder could find that Dr. Fricke was deliberately indifferent to Plaintiff's serious medical needs.

As to the first inquiry of the objective component, no reasonable juror could find Plaintiff "was actually deprived of adequate medical care."  Plaintiff's various medical conditions were closely and frequently monitored by Dr. Fricke and medical staff.  (*See generally* Dkt. No. 45-9.) At all times, Plaintiff was prescribed and received a diabetic diet.  *Id.* at 10, 17; Dkt. No. 51-3 at ¶ 5.  Plaintiff was enrolled in the Chronic Care Clinic.  (Dkt. No. 8-1 at 1; Dkt. No. 45-9 at 17, 135-141.)  Plaintiff submitted more than twenty-six (26) sick-call slips during his incarceration and in response to each of these, was seen be either Dr. Fricke or another medical provider. (Dkt. No. 45-9 at 31, 32, 35, 36, 37, 39, 40, 46, 51, 55, 57, 58, 61, 62, 63, 64, 65, 67, 68, 69, 71, 72, 73, 75, 76, and 77.)

Plaintiff was prescribed Metformin to control his blood glucose levels.  (Dkt. No. 45-9 at 42.)  Plaintiff was also prescribed a host of medications to manage and control his various medical conditions and subjective complaints of pain and discomfort, including Tramadol (Ultram), Omeprazole (Prilosec), Anusol (hemorrhoid cream), Motrin (ibuprofen), Baclofen (muscle relaxant), Colace (stool softener and laxative), Bisacodyl (for constipation), Miralax (laxative), Glipizide (type II diabetes), Norvasc (high blood pressure), Clonidine (high blood

---

[16]  Dr. Fricke's memorandum of law does not address *Darnell*, and therefore, addresses the second prong under the Eighth Amendment's subjective analysis.  (Dkt. No. 45-18 at 6-8.)

pressure), Nadolol (high blood pressure), Neurontin (nerve pain), and Amoxicillin (penicillin antibiotic).  (*See* Dkt. No. 45-9 at 3-15, 18.)

Further, Plaintiff was admitted to Ellis Hospital on April 18, 2015, after reporting chest pain (*id*. at 48), had a left shoulder X-ray related to a rotator cuff strain (*id*. at 81), received a hydrocortisone shot in left shoulder to manage pain (*id*. at 64), was prescribed TED knee high stockings (*id*. at 29), and an infected tooth was extracted *(id*. at 118-19).

Based on the foregoing, the Court finds no material issue of fact as to whether Plaintiff was "was actually deprived of adequate medical care."  Therefore, the Court recommends granting Dr. Fricke's motion for summary judgment.  *See, e.g.*, *Dobbins v. Pont*, No. 15-CV-3091 (JMF), 2017 WL 3309726, *6 (S.D.N.Y. Aug. 2, 2107) (granting summary to prison official where undisputed facts showed the pretrial detainee received medical treatment); *Gray v. Kang Lee*, No. 9:13-cv-258 (GLS/DEP), 2015 WL 1724573, at * (N.D.N.Y. Apr. 15, 2015) (finding inmate was not actually deprived of adequate treatment where record demonstrated that the inmate-plaintiff was frequently treated, prescribed pain medication, tested with an x-ray and MRI, and referred to an orthopedic specialist).

Evening assuming, *arguendo*, Plaintiff was actually deprived of adequate medical care, Plaintiff cannot satisfy the second inquiry of the objective prong, which "asks whether the inadequacy in medical care is sufficiently serious."  *Bellotto*, 248 F. App'x at 236.

Here, because the record evidence does not support a finding, and Plaintiff does not allege, that he was denied medical care altogether, the Court's inquiry is narrowed to the question of whether Dr. Fricke's conduct was "inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner."  *Salahuddin*, 467 F.3d at 280.  Stated differently, "it's the particular risk of harm faced by the prisoner due to the challenged deprivation of care,

18

rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for [constitutional] purposes." *Smith*, 316 F.3d 186.[17]

Plaintiff has failed to produce any evidence, admissible or otherwise, that his medical condition worsened or that he was subjected to an unreasonable risk of future harm. According to his testimony, Plaintiff had been living with diabetes since the 1990s, and for approximately twenty years had been taking Metformin to control his blood glucose levels. Dkt. No. 45-8 at 19. Plaintiff was also diagnosed with cirrhosis of the liver in 1990s. *Id*. at 16.

Plaintiff alleges, in wholly conclusory and speculative fashion, that Metformin is "very bad for [his] liver. That [is] why my doctor outside of jail put me on my diet which was working." (Dkt. No. 8 at 4.) Liberally construed, Plaintiff claims his medical conditions worsened. However, "to defeat summary judgment, . . . nonmoving parties may not rely on conclusory allegations or unsubstantiated speculation." *Jeffreys*, 426 F.3d at 554. Indeed, "there must be evidence on which the jury could *reasonably* find for the plaintiff." *Id*. Thus, "[a]t the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Id*. (citation and internal quotation marks omitted). Plaintiff has failed to do so. *See, e.g.*, *Gantt v. Horn*, No. 09 Civ. 7310, 2013 WL 865844, at *9 (S.D.N.Y. Mar. 8, 2013) (granting summary judgment to prison official where the inmate had not alleged, beyond making conclusory claims, that any delay in treatment, or any inadequacy in treatment, put him at an "unreasonable risk of future harm"). In contrast, Dr. Fricke has submitted an uncontroverted medical opinion that:

> Metformin is the optimal first-line drug in managing blood glucose
> levels in diabetic patients. There is no evidence in the medical

---

[17]  In contrast, if the unreasonable medical care is a failure to provide *any* treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious. *Salahuddin*, 467 F.3d at 280.

> literature that Metformin is detrimental to liver function, as
> [Plaintiff] has claimed.  In fact, Metformin can be quite beneficial
> for patients with hepatitis C and cirrhosis.  Metformin was an
> appropriate medication for [Plaintiff], taking into account all of his
> various health conditions.

(Dkt. No. 51-3 at ¶ 16.)

Significantly, Dr. Fricke has also opined to a reasonable degree of medical certainty that Plaintiff's medical treatment in no way "worsened any of his conditions, or had any negative impact on his health whatsoever."  *Id.* at ¶ 24.  Dr. Fricke further opines within a reasonable degree of medical certainty that the food Plaintiff received at the SCJ did not have "any negative impact to his health."  *Id.* at ¶ 25.

As to Plaintiff's assertion that he "was never given a rectal examination to see if [his] ulcer was bleeding (Dkt. No. 51-2 at ¶ 6), such claim amounts to nothing more than a "mere disagreement over the proper treatment."  *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998).  Indeed, "so long as the treatment is adequate, the fact that a prisoner might prefer a different treatment does not give rise to a [constitutional] violation."  *Id.*  Here, Dr. Fricke opines "within a reasonable degree of medical certainty that [his] care and treatment of [Plaintiff] was at all times within the standard of care."  (Dkt. No. 51-3 at ¶ 24.)  Additionally, the Court notes that despite the numerous sick-call slips Plaintiff submitted, not one complains of "ulcer bleeding." Further, Dr. Fricke opines that no medical treatment Plaintiff received while incarcerated at the SCJ worsened any of his conditions, or had any negative impact on his health whatsoever.  *Id.* Significantly, it is undisputed that:

> there are no medical records indicating that [Plaintiff] suffered any
> medical consequences from any food or medications that were
> given to him at the [SCJ].  All of the health conditions, and
> complaints, that he had at the time of he was transferred out of the
> [SCJ] were consistent with the health conditions, symptoms, and

20

complaints that he had when he was booked into that facility.

(Dkt. No. 51-3 at ¶ 29; Dkt. No. 51-1 at 29.)

While Plaintiff contends the spicy food, i.e., peppers and onions, upset his stomach, the record evidence demonstrates Plaintiff received the bland diet based on his personal preferences and because it was not contraindicated. *Id*. at ¶ 10. Further, all medical diets are controlled by DOCCS and approved by a nutritionist. *Id*. at ¶ 7.[18]

Significantly, Plaintiff admits that all of the health conditions and complaints that he had at the time he was transferred out of the SCJ were consistent with his health conditions, symptoms, and complaints that he had when he was booked into the facility. (Dkt. No 51-1 at ¶ 29.)

Based on the forgoing, the Court concludes that no reasonable factfinder could find that, objectively, Plaintiff was deprived of adequate medical care. *See, e.g.*, *Morgan v. Shivers*, No. 1:14-cv-7924-GHW, 2018 WL 618451, at *3 (S.D.N.Y. Jan. 29, 2018) (granting summary judgment to prison official where pretrial detainee could not satisfy the objective prong of the deliberate indifference claim); *Goris v. Breslin*, 402 F. App'x 582, 584 (2d Cir. 2010) (same).

Similarly, based on Dr. Fricke's affidavit and the treatment afforded Plaintiff by Dr. Fricke as documented in Plaintiff's medical records, the Court finds no reasonable factfinder

---

[18] Personal preferences for food does not give rise to a constitutional violation. *See Mejia*, 2005 WL 2179422, at *6 ("While the Eighth Amendment does not elevate to constitutional significance an inmate's dislike for the food served or the portions received, *see, e.g.*, *Word v. Croce*, 169 F. Supp. 2d 219, 226 (S.D.N.Y. 2001), it does require that prisoners be given nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it."). Thus, Plaintiff's complaint regarding peppers and onions does not rise to a constitutional violation. *See Collado v. Sposato*, No. 12-CV-2151 (SJF)(WDW), 2012 WL 3113837, at *4 (E.D.N.Y. July 25, 2012) ("Preference for certain foods and dislike of others cannot be equated with a constitutional guarantee to a custom-tailored menu.").

could conclude that Dr. Fricke acted with deliberate indifference.  There is no record evidence

that Dr. Fricke intentionally deprived Plaintiff of adequate medical care and the evidence does

not support a finding that Dr. Fricke acted recklessly and "'knew or should have known' that his

actions or omissions . . . 'posed an excessive risk to [Plaintiff's] health or safety. '" *Lloyd*, 246 F.

Supp. 3d at 720 (quoting *Darnell*, 849 F.3d at 35).

      The record reflects that on each occasion Plaintiff was seen by Dr. Fricke and the medical

staff, Plaintiff's complaints were noted, his conditions were monitored, and medication

consistent with Dr. Fricke's professional judgment was prescribed.  (Dkt. No. 51-3 at ¶¶ 23-24.)

      In opposition to Dr. Fricke's motion, Plaintiff argues, he was served meals that contained

chili powder, black pepper, mustard, Spanish onions, and vinegar, which, according to Plaintiff,

are "all bad stuff for my gastric ulcers."  (Dkt. No. 51-2 at ¶ 5.)  Plaintiff continues, "the facts

that Dr. Russell Fricke never once look at the ingredients that whenin to the food I was serve on

my diets it is his responsible to make sure the food is healthy and safe for someone like me who

was on a special diet!"  *Id*. at 7 (unaltered text).  However, as set forth above, the record

evidence demonstrates Dr. Fricke was not responsible for the medical diets, which were under

the control of DOCCS and approved by a nutritionist.  (Dkt. No. 51-3 at ¶ 7.)  Here, at most and

which the Court seriously doubts, Plaintiff's claims amount to nothing more than negligence,

which cannot form the basis of a deliberate indifference claim.  *See, e.g.*, *Grimmett v. Corizon

Med. Assocs. of N.Y.*, No. 15-CV-7351 (JPO)(SN), 2017 WL 2274485, at *5 (S.D.N.Y. May 24,

2017) ("[N]egligence alone is insufficient to make out a deliberate indifference claim under the

Fourteenth Amendment."); *Lloyd*, 246 F. Supp. 3d at 720 ("[N]egligence, even if it constitutes

medical malpractice, does not, without more, engender a constitutional claim.") (citation

omitted).

Accordingly, because the record evidence does not reflect a genuine dispute of material fact with respect to either the objective or *mens rea* prongs of Plaintiff's deliberate indifference claim, the Court recommends that Dr. Fricke's motion for summary judgment be granted.

The Court also recommends that the action be *sua sponte* dismissed as against chef Lucca, who is also alleged to have been deliberately indifferent to Plaintiff's medical needs. (Dkt. No. 8 at 4.)  28 U.S.C. § 1915(e) directs that, when a plaintiff seeks to proceed *in forma pauperis*, the court shall dismiss the case *at any time* if the court determines that . . . the action . . . . (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief."  28 U.S.C. § 1915(e)(2)(B); *see also Webster v. Penzetta*, 458 F. App'x. 23, 25 (2d Cir. 2012) ("A district court has inherent authority to dismiss meritless claims *sua sponte*."); *Ramrattan v. Fischer*, No. 13 Civ. 6890 (KPF), 2015 WL 3604242, at *3 (S.D.N.Y. June 9, 2015) ("[E]ven where [the defendants] have not sought dismissal of a particular claim, the Court has the authority to screen *sua sponte* an *in forma pauperis* complaint and must dismiss a complaint, or portion thereof, that is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief.") (citing 28 U.S.C. § 1915(e)(2)(B); *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998)).

Likewise, under 28 U.S.C. § 1915A, a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint . . . is frivolous, malicious, or fails to state a claim upon which relief may be granted; or . . . seeks monetary relief from a defendant who is immune from such relief."  28 U.S.C. § 1915A; *see also Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir.

2007) (stating that both sections 1915 and 1915A are available to evaluate prisoner *pro se* complaints).

Plaintiff's allegations supporting his Fourteenth Amendment due process claim for medical indifference against chef Lucca is essentially the same as that asserted against Dr. Fricke. (Dkt. No. 8 at 4.) Indeed, Plaintiff claims that chef Lucca kept giving him "peppers and onions . . . which made [Plaintiff's] ulcers bleed" and caused his "sugar" to go "hi" (sic). *Id.* Plaintiff had to re-start taking Metformin, which "is very bad for [his] liver." *Id.* As a result, Plaintiff alleges his conditions worsened. *Id.*

Based on the record now before the Court and for the reasons stated above, inasmuch as Plaintiff cannot satisfy the objective prong of his deliberate indifference claim, the Court further recommends *sua sponte* dismissing the action as against chef Lucca pursuant to 28 U.S.C. §§ 1915(e) and 1915A.

## IV.    CONCLUSION

**WHEREFORE**, it is hereby

**ORDERED** that the Clerk is directed to amend the docket in this action from "Dr. Fricki" to "Dr. Fricke" to reflect the correct spelling of Defendant's surname; and it is further

**RECOMMENDED** that Defendant Dr. Fricke's motion for summary judgment (Dkt. No. 45) be **GRANTED**; and it is further

**RECOMMENDED** that Plaintiff's medical indifference claim against Defendant Anthony Lucca be *sua sponte* dismissed pursuant to 28 U.S.C. §§ 1915(e) and 1915A; and it is further

**ORDERED** that the Clerk shall provide Plaintiff with a copy of this Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2008) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[19]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).


Dated:  February 12, 2018
        Syracuse, New York

Therese Wiley Dancks
United States Magistrate Judge

---

[19]  If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

2006 WL 1133247
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jeff SMITH, Plaintiff,
v.
Robert K. WOODS, Deputy Superintendent;
Joseph R. Belarge, Captain; G.J. O'Donnell,
Sergeant; F.S.A. Antonelli; and Wayne
Holt, Correction Officer, Defendants.

No. 9:03-CV-480.
|
April 24, 2006.

**Attorneys and Law Firms**

Jeff Smith Plaintiff, Pro Se, New York, NY.

Hon. Eliot Spitzer, Attorney General of the State of
New York, Kelly L. Munkwitz, Esq., Asst. Attorney
General, of Counsel, Department of Law, Albany, NY,
for Defendants.

**DECISION and ORDER**

DAVID N. HURD, District Judge.

*1 Plaintiff, Jeff Smith, brought this civil rights
action pursuant to 42 U.S.C. § 1983. By Report-
Recommendation dated March 17, 2006, the Honorable
George H. Lowe, United States Magistrate Judge,
recommended that defendants' motion for summary
judgment be granted, and that plaintiff's motion for
partial summary judgment be denied. (Docket No.
51). The plaintiff has filed objections to the Report-
Recommendation. (Docket No. 53).

Based upon a de novo determination of the portions of
the report and recommendations to which the plaintiff has
objected, the Report-Recommendation is accepted and
adopted in whole. See 28 U .S.C. 636(b)(1). Accordingly,
it is ORDERED that
1. Defendants' motion for summary judgment is
GRANTED;

Plaintiff's motion for partial summary judgment is
DENIED. and

The complaint is DISMISSED in its entirety.

The Clerk is directed to enter judgment accordingly.

IT IS SO ORDERED.

GEORGE H. LOWE, Magistrate Judge.

**REPORT-RECOMMENDATION**

This matter has been referred to me for Report and
Recommendation by the Honorable David N. Hurd,
United States District Judge, pursuant to 28 U.S.C. §
636(b) and Local Rule 72.3(c) of the Rules of Practice
for this Court. In this *pro se* civil rights action brought
under 42 U.S.C. § 1983, Jeff Smith ("Plaintiff") alleges
that five employees of Upstate Correctional Facility-
Deputy Superintendent Robert K. Woods, Captain
Joseph R. Belarge, Sergeant G.J. O'Donnel, Food Service
Administrator Richard Antonelli, and Correction Officer
Wayne Holt ("Defendants")-violated his rights under the
First, Fourth, Eighth, and Fourteenth Amendments by
(1) retaliating against him for having previously filed a
complaint, (2) subjecting him to an unreasonable search
and seizure, (3) subjecting him to a damaged bunk bed
while he was housed in the Upstate Correctional Facility
Special Housing Unit, and (4) taking away his "good
time" credits without affording him due process. (Dkt.
No. 5 [Plf.'s Am. Compl.].) [1]

[1] Given my duty to liberally construe a *pro se*
plaintiff's civil rights complaint, I construe Plaintiff's
Amended Complaint as including a claim that
various Defendants violated Plaintiff's rights under
the Fourth Amendment to be free from unreasonable
searches and seizures. See *Phillips v. Girdich*, 408
F.3d 124, 130 (2d Cir.2005) ("We leave it for the
district court to determine what other claims, if any,
[the plaintiff] has raised. In so doing, the court's
imagination should be limited only by [the plaintiff's]
factual allegations, not by the legal allegations set out
in his pleadings.") [citations omitted]. *(See also*
Dkt. No. 5, ¶ 44 [Plf.'s Am. Compl., alleging that
Defendants Woods and Holt "violat[ed] plaintiff's
4th ... Amendment[ ] rights"], ¶ 15 [alleging that

Defendant Belarge "had plaintiff's personal property searched by three officers, one of whom was Holt"]; Dkt. No. 37, Part 23, Ex. A at 26-28 [Munkowitz Decl., attaching transcript of deposition of Plaintiff, in which he explains his claim under the Fourth Amendment based on the alleged unjustified search and seizure of his property].)

Currently before the Court is Defendants' motion for summary judgment (Dkt. No. 37), and Plaintiff's motion for partial summary judgment (Dkt. No. 38), both brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. Because both motions were filed on the same day (February 11, 2005), and neither was filed in response to the other, I construe each motion as a "motion" and neither motion as a "cross-motion." Both Plaintiff and Defendants have responded to each other's motion (Dkt.Nos.42, 45), and replied to the other's response (Dkt.Nos.47, 48).

Generally, Defendants' motion raises six issues: (1) whether Plaintiff has failed to establish (or even state) a First Amendment retaliation claim; (2) whether Plaintiff has failed to state a Fourth Amendment claim, (3) whether Plaintiff has failed to establish (or even state) an Eighth Amendment claim; (4) whether Plaintiff failed to exhaust his available administrative remedies regarding his Eighth Amendment claim; (5) whether Plaintiff has failed to establish (or even state) a Fourteenth Amendment due process claim; (6) whether Plaintiff has failed to establish (or properly state) a conspiracy claim; and (7) whether Defendants are protected by qualified immunity. (Dkt. No. 37, Part 25 [Defs.' Mem. of Law].)

**\*2** Generally, Plaintiff's motion raises three issues: (1) whether Plaintiff is entitled to judgment as a matter of law on his First Amendment retaliation claim; (2) whether Plaintiff is entitled to judgment as a matter of law on his Eighth Amendment claim; and (3) whether Plaintiff is entitled to judgment as a matter of law on his Fourteenth Amendment due process claim. (Dkt. No. 38, Part 3 [Plf.'s Mem. of Law].) Although I liberally construe Plaintiff's Amended Complaint as containing a Fourth Amendment claim, I do not liberally construe his motion as requesting judgment as a matter of law on his Fourth Amendment claim, especially given the burden on a movant under the Federal Rules of Civil Procedure. See Fed.R.Civ.P. 7(b)(1) (requiring that movants "shall set forth the relief or order sought," and "shall state with particularity the grounds [for the relief requested]").

For the reasons discussed below, I answer each of the six questions posed in Defendants' motion in the affirmative, and I answer each of the three questions posed in Plaintiff's motion in the negative. As a result, I recommend that Defendants' motion for summary judgment be granted and that Plaintiff's motion for partial summary judgment be denied.

## I. SUMMARY JUDGMENT STANDARD

Under Rule 56(e) of the Federal Rules of Civil Procedure, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material [2] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir.1997) (citation omitted); Thompson v. Gjivoje, 896 F.2d 716, 720 (2d Cir.1990) (citation omitted).

[2]      A fact is "material" only if it would have some effect on the outcome of the suit. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986). The nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 477 U.S. 574, 585-86 (1986); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Ross v. McGinnis, 00-CV-0275, 2004 WL 1125177, at \*8 (W.D.N.Y. March 29, 2004) [internal quotations omitted] [emphasis added].

Imposed over this general burden-shifting framework is the generous perspective with which the Court must view a pro se plaintiff's pleadings. "[I]n actions in which one of the parties appears pro se, this Court is faced with the ... responsibility of granting significant liberality in

2006 WL 1133247

how *pro se* pleadings are construed." *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 467 (S.D.N.Y.1998); *see Haines v. Kerner,* 404 U.S. 519, 520-21 (1972) *(per curiam)* *(pro se* pleadings held "to less stringent standards than formal pleadings drafted by lawyers."); *Ortiz v. Cornetta,* 867 F.2d 146, 148 (2d Cir.1989). For example, where a plaintiff is proceeding *pro se,* and the defendant has filed a dispositive motion, the Court must construe the plaintiff's complaint and opposition papers liberally so as to raise the strongest arguments that they suggest. *See Weixel v. Bd. of Ed. of City of New York,* 287 F.3d 138, 146 (2d Cir.2002) (motion to dismiss in civil rights case); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (motion for summary judgment in civil rights case); *Thomas v. Irving,* 981 F.Supp. 794, 799 (W.D.N.Y.1997) (motion for summary judgment in civil rights case).

**\*3** However, although "[t]he work product of *pro se* litigants should be generously and liberally construed, ... [a *pro se* litigant's] failure to allege either specific facts or particular laws that have been violated renders [an] attempt to oppose defendants' motion ineffectual." *Kadosh v. TRW, Inc.,* 91-CV-5080, 1994 WL 681763, at \*5 (S.D.N.Y. Dec. 5, 1994). In other words, "[p]roceeding pro se does not otherwise relieve a [party] from the usual requirements to survive a motion for summary judgment ." *Bussa v. Aitalia Line Aeree Italiane S.p.A.,* 02-CV-10296, 2004 WL 1637014, at \*4 (S.D.N.Y. July 21, 2004) (citations omitted), *accord, Durran v. Selsky,* 251 F.Supp.2d 1208, 1211 (W.D.N.Y.2003) (citations omitted).

## II. STATEMENT OF MATERIAL FACTS
The facts set forth in a defendant's Rule 7.1(a)(3) Statement of Material Facts will be taken as true to the extent those facts are supported by the evidence in the record [3] and are not specifically controverted by the plaintiff. [4]

[3]    *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) (citations omitted).

[4]    *See* Local Rule 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."*).

To "specifically controvert[ ]" each of the statements of material fact in a defendant's Rule 7.1(a)(3) Statement of Material Facts, a plaintiff must file a *response* to the Statement of Material Facts that "mirror[s] the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs" *and* that "set[s] forth a specific citation to the record where the factual issue arises." [5]

[5]    Local Rule 7.1(a)(3); *see, e.g., Jones v. Smithkline Beecham Corp.,* 309 F.Supp.2d 343, 346 (N.D.N.Y.2004) (McAvoy, J.) ("[W]here Plaintiff has failed to provide specific references to the record in support of her denials or has otherwise failed to completely deny Defendant's assertions of fact, those assertions will be taken as true."); *Lee v. Alfonso,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at \*15 (N.D.N.Y. Feb. 10, 2004) (Scullin, C.J.) ("Plaintiff does not offer any facts to support his claims that would raise an issue of fact. Nor has he overcome his failure to respond to Defendants' Rule 7.1(a) (3) Statement. Therefore, Defendants' version of the facts remains uncontroverted."); *Margan v. Niles,* 250 F.Supp.2d 63, 67 (N.D.N.Y.2003) (Hurd, J.) ("Plaintiff's Rule 7.1(a)(3) statement, which contains numerous denials, does not contain a single citation to the record. Because plaintiff's response Rule 7.1(a) (3) statement does not comply with the local rules, it has not been considered."); *Mehlenbacher v. Slafrad,* 99-CV-2127, 2003 U.S. Dist. LEXIS 9248, at \*4 (N.D.N.Y. June 4, 2003) (Sharpe, M.J.) ("Since [the plaintiff] has failed to respond to the defendant's statements of material fact, the facts as set forth in the defendants' Rule 7.1 Statement ... are accepted as true."); *Adams v. N.Y. State Thruway Auth.,* 97-CV-1909, 2001 U.S. Dist. LEXIS 3206, at \*2, n. 1 (N.D.N.Y. March 22, 2001) (Mordue, J.) ("[T]o the extent plaintiff's responses violate Local Rule 7. 1, and are not properly admitted or denied, the Court will deem defendant's statement of fact admitted by plaintiff."); *see also Holtz v. Rockefeller,* 258 F.3d 62, 74 (2d Cir.2001) ("[A] Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record.").

Portions of the record sufficient to create a "factual issue" include affidavits or verified complaints (which are treated as affidavits for purposes of summary judgment). [6] However, to be sufficient to create a "factual issue," such an affidavit or verified complaint must, among other things, be based on "personal knowledge." [7] An affidavit

2006 WL 1133247

or verified complaint is not based on personal knowledge if, for example, it is based on mere "information and belief" or hearsay. [8]

6    *See Patterson v. County of Oneida,* 375 F.2d 206, 219 (2d. Cir.2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied,* 536 U.S. 922 (2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") [citations omitted]; *Fed.R.Civ.P.* 56(c) ("The judgment sought shall be rendered forthwith if the ... affidavits ... show that there is no genuine issue as to any material fact....").

7    *Fed.R.Civ.P.* 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to the matters stated therein."); *see also U.S. v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.,* 44 F.3d 1082, 1084 (2d Cir.1995) [citations omitted], *cert. denied sub nom, Ferrante v. U.S.,* 516 U.S. 806 (1995).

8    *See Patterson,* 375 F.3d at 219 ("[Rule 56(e)'s] requirement that affidavits be made on personal knowledge is not satisfied by assertions made 'on information and belief.'... [Furthermore, the Rule's] requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavits also means that the affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial."); *Sellers v. M .C. Floor Crafters, Inc.,* 842 F.2d 639, 643 (2d Cir.1988) ("[Defendant's] affidavit states that it is based on personal knowledge *or* upon information and belief.... Because there is no way to ascertain which portions of [Defendant's] affidavit were based on personal knowledge, as opposed to information and belief, the affidavit is insufficient under Rule 56 to support the motion for summary judgment."); *Applegate v. Top Assoc., Inc.,* 425 F.2d 92, 97 (2d Cir.1970) (rejecting affidavit made on "suspicion ... rumor and hearsay"); *Spence v. Maryland Cas. Co.,* 803 F.Supp. 649, 664 (W.D.N.Y.1992) (rejecting affidavit made

on "secondhand information and hearsay"), *aff'd,* 995 F.2d 1147 (2d Cir.1993).

Similarly, such an affidavit or verified complaint must not be conclusory. [9] Of course, an affidavit may be conclusory because its assertions are too general. [10] However, even where an affidavit's assertions are specific (e.g., with respect to time, place, persons, events, conversation, etc.), that affidavit may still be deemed conclusory if it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." [11] Indeed, it has long been the rule in the Second Circuit that "issues of credibility sufficient to defeat a motion for summary judgment are not created if the contradicting or impeaching evidence is too incredible to be believed by reasonable minds." *Price v. Worldvision Enterprises, Inc.,* 455 F.Supp. 252, 266, n. 25 (S.D.N.Y.1978), *aff'd without opinion,* 603 F.2d 214 (2d Cir.1979).

9    *See* Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate,* 425 F.2d at 97 (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

10   *See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ), *cert. denied,* 474 U.S. 829 (1985);

*Applegate*, 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

11    *See, e.g., Jeffreys v. City of New York*, 426 F.3d 549, 554-555 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner*, 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb. 15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.*, 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), aff'd, 136 Fed. Appx. 383 (2d Cir.2005) (unreported decision).

**\*4** Here, Defendants have a filed Rule 7.1 Statement of Material Facts, and supporting affidavits and exhibits. (Dkt. No. 37, Parts 2-25.) Plaintiff has filed a response to Defendants' Rule 7.1 Statement. (Dkt. No. 42, Part 1.) In addition, Plaintiff has filed (1) declarations and exhibits in opposition to the affidavits of Defendants Woods, Belarge, Holt, Antonelli, and Holden (Dkt. No.

42, Parts 1, 3), and (2) a verified Amended Complaint (Dkt. No. 5). Finally, because Plaintiff is proceeding *pro se* and this is a civil rights action, I will consider, in evaluating Plaintiff's response to Defendants' motion for summary judgment, Plaintiff's declaration and exhibits in support of his motion for partial summary judgment. (Dkt. No. 38, Parts 1, 4.)

I address Plaintiff's responsive documents in more detail below. However, a few general observations are appropriate here. Plaintiff's Rule 7.1 Response contains hardly any citations to the record, much less any citations to admissible evidence; rather, to the extent that Plaintiff's Rule 7.1 Response contains any citations at all, those citations are often to other portions of Plaintiff's Response or to his Amended Complaint (which are, themselves, conclusory), or to exhibits that do not support his denial of the fact asserted. Moreover, his Declarations and verified Amended Complaint are often argumentative in nature (in violation of Local Rule 7.1[a][2] ) and not based on personal knowledge (but only hearsay or pure speculation). Finally, his Declarations and verified Amended Complaint are often conclusory and replete with inconsistencies and improbabilities.

For example, he asserts that "[a]t no time did [he] possess[ ] [Inmate Alcivar's] legal materials other than [the times when he and Inmates Lipman and Robles approached Defendant Holt with such materials]." [12] However, his own letters and deposition testimony contain repeated representations that he was, at other times, in possession of such materials. [13]

12    (Dkt. No. 42, Part 1, ¶ 7 [Plf.'s Response to Woods Aff.].)

13    *(See, e.g.,* Dkt. No. 37, Part 22, Ex. A at 31 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he testifies that, when Defendant Holt failed to take "control" of Inmate Alcivar's legal documents, Defendant Holt left Plaintiff ***"stuck with them*** as well as the other two inmates"], 31-32 [admitting that he did not return the documents to the law clerk's work station in the law library out of a fear that the document may fall into another inmate's hands], 32 [admitting that he took the documents to "honor" Inmate Alcivar's "wishes"], 33 [admitting that he took the documents after Inmate Alcivar's death based on his belief that "they were not supposed to be in the law library after the inmate

was deceased"]; Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff, in which he states, "There is [sic] two inmates that Peter trusted with his papers and other legal documents, that is one inmate that housed [sic] in the same dorm as him and myself.... Peter told me that you have copies of all his papers, those of which are the same as the papers *I have here"];* Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter from Plaintiff, in which he states, "I am going to *hold a copy of the complaint"* in Inmate Alcivar's federal civil rights action]; Dkt. No. 37, Part 7 [Ex. C to Woods Aff., attaching Plaintiff's 8/5/02 letter, in which he states, "in the future if anything should come of a matter of said documents *being in my possession ...* you and the administration cannot take any action against the inmate's family nor myself"] [emphasis added].)

Similarly, he asserts that the documents allegedly discovered by Defendant O'Donnell in Plaintiff's "cube" on August 31, 2002, were in fact "the exact same materials intercepted by Woods through the U.S. mail." [14] However, those documents contained copies of two letters-dated July 4, 2002, and July 16, 2002-from Plaintiff to Inmate Alcivar's two daughters. [15] Plaintiff offers no explanation as to why Inmate Alcivar's daughters would be returning copies of those letters to Plaintiff between August 19, 2006, and August 31, 2002-the time period during which Defendant Woods allegedly intercepted Plaintiff's mail. [16]

[14]    (Dkt. No. 42, Part 1, ¶ 5.B. [Plf.'s Response to Antonelli Aff.].)

[15]    (Dkt. No. 37, Part 18 at 6-8, 10-12 [Ex. B to Antonelli Aff., attaching contraband allegedly found in Plaintiff's "cube".])

[16]    (Dkt. No. 5, ¶ 12 [Am. Compl.].)

Generally, I find such assertions by Plaintiff to be too incredible to be believed by reasonable minds.

Accordingly, the following material facts, even when viewed most favorably to Plaintiff, are supported by evidence in the record, and are not specifically controverted by Plaintiff:

Background

1. From July of 2002 until November of 2002 (the time period relevant to the allegations contained in Plaintiff's Amended Complaint), Plaintiff was an inmate in the care and custody of the New York State Department of Correctional Services ("DOCS"), incarcerated at the Greene Correctional Facility ("Greene C.F."). [17]

[17]    (Dkt. No. 37, Part 2, ¶ 2 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 2 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, ¶ 4 [Am. Compl.].)

*5 At all times relevant to this action, Defendant Robert K. Woods was the Deputy Superintendent for Security at Greene C.F.; Defendant Joseph R. Belarge was a Captain at Greene C.F.; Defendant G.J. O'Donnel was a Sergeant at Greene C.F.; Defendant Richard Antonelli was a Food Services Administrator at Greene C.F.; and Defendant Wayne Holt was a Corrections Officer at Greene C.F. [18]

[18]    (Dkt. No. 37, Part 2, ¶¶ 4-8 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶¶ 4-8 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, ¶¶ 3, 3(a), 3(b), 3(c) [Am. Compl.].)

Plaintiff's Legal Assistance to Inmate Peter Alcivar and Communications with Inmate Alcivar's Daughters

3. At some point in 2001, Inmate Peter Alcivar filed a civil rights action against DOCS and employees of Greene C.F. and Woodbourne C.F. in the United States District Court for the Northern District of New York (civil action number 9:01-CV-1198). [19]

[19]    (Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, "Facts of the Incident," ¶¶ 1-3 [Am. Compl.]; Dkt. No. 37, Part 18, Ex. B at 18-37 [Antonelli Aff., attaching pleading and motion from lawsuit].)

4. On or about May 7, 2002, Plaintiff provided legal assistance to Inmate Alcivar by answering a question regarding an affidavit. [20] At the time, Plaintiff was not an inmate law clerk. [21]

[20]    (Dkt. No. 37, Part 2, ¶ 12 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Rule 7.1 Response, admitting that, on one occasion, Plaintiff answered a question posed by Inmate Alcivar regarding an affidavit, which question and answer

2006 WL 1133247

were communicated with the help of Inmate Law Clerk George Robles]; Dkt. No. 5, "Facts of the Incident," ¶ 2 [Am. Compl.]; Dkt. No. 37, Part 18 [Ex. B. to Antonelli Aff.].)

21      (Dkt. No. 37, Part 2, ¶ 13 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 13 [Plf.'s Rule 7.1 Response].)

5. On or about May 10, 2002, Inmate Alcivar was admitted to Albany Medical Center to receive treatment for cancer. 22

22      (Dkt. No. 1, "Facts of the Incident," ¶ 1 [Am. Compl.]; Dkt. No. 42, Part 1, ¶ 6 [Plf.'s Response to Antonelli Aff., asserting that Inmate Alcivar was "admitted to Albany Medical Center Hospital three days after Robles asked plaintiff the question [about] an affidavit and its contents"].)

6. On or about July 4, 2002, Plaintiff wrote and sent a letter to Inmate Alcivar's two daughters about Inmate Alcivar's pending federal civil rights action. 23 In pertinent part, the letter stated,

23      (Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff to Raida and Raisa Alcivar, and letter dated 6/24/02]; Dkt. No. 37, Part 23, Ex. A at 79-80 [Munkwitz Dec., attaching transcript of Plaintiff's deposition, in which Plaintiff admits having written and sent the letter dated 7/4/02].)

I am writing to inform you of my assistance to Peter [Alcivar] in the above referenced matter [case number 9:01-CV-1198] where he has a Section 1983 of the U.S.C.A. Civil Rights complaint against the Department of Correctional Services now pending in the United States District Court for the Northern District of New York; that is if he (Peter) hasn't already tied both of you that I am helping him with the filing of his motions, etc....
Getting right to the point for the purpose of writing you, and letting you know what is going on with Peter's case. There is [sic] two inmates that Peter trusted with his papers and other legal documents, that is one inmate that housed [sic] in the same dorm as him and myself....

I have already wrote [sic] to the court on June 24, 2002, informing said court as to Peter's current situation.... See copy of the *letter addressed to the court* ... enclosed with this letter I am writing you....

Peter told me that you have copies of all his papers, those of which are the same as the papers I have here....

[I]f you wish ... you all could come to the facility to see me, I would then go over the case with all of you, tell all of you what I know from Peter, the research that I have done for him and the list of cases of authority that I have and would cite in his motions and use at trial; I also could give you all of his legal documents right there....

Both of you should ... let Peter know that he should not worry about the case, it is not going to be dismissed ... because I already wrote to the court for him. 24

24      (Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff to Raida and Raisa Alcivar, and letter dated 6/24/02].)

7. On or about July 6, 2002, Inmate Alcivar died at Albany Medical Center. 25

25      (Dkt. No. 37, Part 2, ¶ 11 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, "Facts of the Incident," ¶ 3 [Am. Compl.].)

**\*6** 8. On or about July 16, 2002, Plaintiff wrote and sent a second letter to Alcivar's two daughters. 26 In pertinent part, the letter states: "The box containing the legal documents should be following this letter, I am going to hold a copy of the complaint so if you should find a lawyer he or she could visit me at the facility and go over the facts the claim is based on." 27 In addition, the last page of the letter states:

26      (Dkt. No. 37, Part 2, ¶ 18 [Defs.' Rule 7.1 Statement, asserting that Plaintiff wrote and sent the letter and memorandum]; Dkt. No. 42, Part 1, ¶ 18 [Plf.'s Rule 7.1 Response, not specifically denying that Plaintiff wrote and sent the letter and memorandum]; Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter, the last page of which refers to an attached "To/From" memorandum]; Dkt. No. 37, Part 23, Ex. A at 81-82 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he admitted writing and sending the letter and memorandum].)

2006 WL 1133247

27
    (Dkt. No. 37, Part 18, Ex. B at 10 [Antonelli Aff., attaching 7/16/02 letter].)

NOTE: Read the "TO/From" memo form note that I made up, get it notarize [sic] and sign it in front of the notary public. Make a copy for your files and send me the *original.*
It is an idea to have that note in my files so non [sic] of the officers and staff members would ask what I am doing with Mr. Alcivar [sic] legal documents if he is no longer here. By doing the above your [sic] are giving me consent to have said documents in my possession. 28

28
    (Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter, the last page of which refers to an attached "To/From" memorandum].)

9. On or about August 8, 2002, Plaintiff wrote and sent a third letter to Alcivar's two daughters. 29 In pertinent part, the letter states: "Please send me that 'To/From' note if you already have it notarized, I told you I need it for the copy of the complaint I told you that I would hold...."

29
    (Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B at 13 [Antonelli Aff., attaching 8/8/02 letter]; Dkt. No. 37, Part 23, Ex. A at 81-82 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he admitted writing and sending the letter].)

### Plaintiff's Communications with Defendant Woods and the Search of Plaintiff's Prison Cell (or "Cube")

10. On or about July 16, 2002, Plaintiff wrote and sent a note to Defendant Woods. 30 The note stated: "Please be advised that I need to talk to you in reference to the above subject inmate [i.e., Inmate Alcivar] which is a matter of importance. This must be in person at your earliest convenience. Thank you for your professional attention to this request." 31

30
    (Dkt. No. 37, Part 3, ¶ 3 [Woods Aff.]; Dkt. No. 37, Part 4, Ex A [Woods Aff.]; Dkt. No. 37, Part 2, ¶ 20 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 20 [Plf.'s Rule 7.1 Response, admitting fact].)

31
    (Dkt. No. 37, Part 4, Ex A [Woods Aff.].)

11. On or about July 21, 2002, Plaintiff wrote and sent a second note to Defendant Woods. 32 The note stated: "Please note that on the above subject date [i.e., July 16, 2002] I wrote to you requesting to see you. I must speak to you before July 23, 2002. This matter is very important. Thank you for your attention." 33

32
    (Dkt. No. 37, Part 3, ¶ 3 [Woods Aff.]; Dkt. No. 37, Part 5 [Ex. B to Woods Aff.]; Dkt. No. 37, Part 2, ¶ 20 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 20 [Plf.'s Rule 7.1 Response, admitting fact].)

33
    (Dkt. No. 37, Part 5 [Ex. B to Woods Aff.].)

12. Defendant Woods did not respond to Plaintiff's notes for two reasons: (1) Defendant Woods did not receive either of the two notes until after the date referenced by Plaintiff (i.e., July 23, 2002) had passed; and (2) Defendant Woods believed that Plaintiff's notes were "cryptic." 34

34
    (Dkt. No. 37, Part 3, ¶¶ 4-5 [Woods Aff.]; Dkt. No. 37, Part 2, ¶ 21 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 21 [Plf.'s Rule 7.1 Response, not specifically controverting either that Defendant Woods did not receive the notes until after July 23, 2003, or that Defendant Woods believed the notes to be "cryptic"]; Dkt. No. 37, Part 8, Ex. D [Woods Aff., attaching Defendant Woods' 8/6/02 memorandum to Plaintiff stating that Plaintiff's two notes were "brief and very vague" and lacked "specifics"].)

13. On or about August 5, 2002, Plaintiff wrote and sent a third note to Deputy Superintendent Woods. 35 The note stated, in pertinent part:

35
    (Dkt. No. 37, Part 3, ¶ 6 [Woods Aff.]; Dkt. No. 37, Part 7, Ex. C [Woods Aff., attaching note]; Dkt. No. 37, Part 2, ¶ 22 [Defs.' Rule 7.1 Statement, asserting that Plaintiff wrote and sent note]; Dkt. No. 42, Part 1, ¶ 22 [Plf.'s Rule 7.1 Response, not specifically controverting that Plaintiff wrote and sent note].)

Please take notice that since you have neglected to answer the above two (2) requests [i.e., dated July 16, 2002, and July 21, 2002] to meet with me about a very serious matter concerning a *<DEAD>* man's legal documents, in the future if anything should come of a matter of said documents being in my possession or the inmate's family should have any questions of same and I answer those questions according to law, you and the administration

2006 WL 1133247

cannot take any action against the inmate's family nor myself. [36]

[36]    (Dkt. No. 37, Part 7 [Ex. C to Woods Aff.].)

**\*7** 14. On or about August 6, 2002, Defendant Woods sent a memorandum to Plaintiff. [37] That memorandum stated, in pertinent part:

[37]    (Dkt. No. 37, Part 3, ¶ 6 [Woods Aff., asserting that he sent this memorandum]; Dkt. No. 42, Part 1, ¶ 6 [Plf.'s Response to Woods Aff., admitting that Defendant Woods sent Plaintiff this memorandum]; Dkt. No. 37, Part 8, Ex. D [Woods Aff., attaching the memorandum].)

Your August 5th letter ... makes reference to legal documents belonging to deceased Inmate Alcivar.... I have directed Law Library Officer Holt to speak to you and recover from you any legal documents of deceased Inmate Alcivar.... In fact, you should have turned over any such documents to Law Library Officer Holt immediately. [38]

[38]    (Dkt. No. 37, Part 7, Ex. D [Woods Aff., attaching the 8/6/02 memorandum].)

15. On August 7, 2002, Plaintiff received Defendant Woods' memorandum. [39]

[39]    (Dkt. No. 5, "Facts of the Incident," ¶ 11 [Plf.'s Am. Compl.].)

16. Meanwhile, on or about August 5, 2002, Defendant Holt asked Plaintiff for Inmate Alcivar's legal documents. [40] Plaintiff denied having such documents. [41]

[40]    (Dkt. No. 37, Part 2, ¶ 24 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 24 [Plf.'s Rule 7.1 Response, not specifically controverting fact]; Dkt. No. 37, Part 29, ¶ 7 [Holt Aff.]; Dkt. No. 5, "Facts of the Incident," ¶ 10 [Plf.'s Am. Compl.].)

[41]    (Dkt. No. 37, Part 2, ¶ 24 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 24 [Plf.'s Rule 7.1 Response, not specifically controverting that Plaintiff denied to Defendant Holt having Inmate Alcivar's legal documents, only citing to Paragraph 12 of Plaintiff's Rule 7.1 Response, which is not material to the asserted fact]; Dkt. No. 37, Part 29, ¶ 7 [Holt Aff.].)

17. As a result, at some point between August 5, 2002, and August 31, 2002, Defendant Woods directed Defendant Belarge to have Plaintiff's cell (or "cube") searched and to interview Plaintiff about his statements made in his August 5, 2002, note. [42]

[42]    (Dkt. No. 37, Part 3, ¶¶ 8, 9 [Woods Aff.]; Dkt. No. 37, Part 8, ¶ 3 [Belarge Aff.]; Dkt. No. 37, Part 2, ¶ 25 [Defs.' Rule 7.1 Statement, asserting that Defendant Woods directed Defendant Belarge to have Plaintiff's cell searched]; Dkt. No. 42, Part 1, ¶ 24 [Plf.'s Rule 7.1 Response, admitting that Defendant Woods directed Defendant Belarge to have Plaintiff's "cube" searched].)

18. At some point on August 31, 2002 (apparently between 8:30 a.m. and 11:00 a.m.), Defendant Belarge had Plaintiff's cell (or "cube") searched by Defendant O'Donnell (and apparently Defendant Holt and two other corrections officers). [43] At some point (apparently during this search), Defendant O'Donnell discovered Inmate Alcivar's legal documents (as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters). [44]

[43]    (Dkt. No. 37, Part 8, ¶ 4 [Belarge Aff.]; Dkt. No. 37, Part 2, ¶¶ 25-26 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶¶ 25-26 [Plf.'s Rule 7.1 Response]; Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching misbehavior report which suggests that Defendants Belarge and O'Donnell had in their possession Inmate Alcivar's legal documents as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters, before those Defendants interviewed Plaintiff at 11:00 a.m. on August 31, 2002]; Dkt. No. 5, "Facts of the Incident," ¶¶ 13-14 [Plf.'s Am. Compl., stating that Defendant Belarge had in his possession a letter that Plaintiff had written to Raisa Alcivar by the time he interviewed Plaintiff at 10:57 a.m. on August 31, 2002].)

[44]    (Dkt. No. 37, Part 2, ¶ 26 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 26 [Plf.'s Rule 7.1 Response, not citing any admissible evidence in support of his denial of this fact]; Dkt. No. 37, Part 8, ¶ 4 [Belarge Aff.]; Dkt. No. 37, Part 3, ¶ 10 [Woods Aff.]; Dkt. No. 37, Part 16, ¶ 5 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B [Antonelli Aff., attaching documents discovered in Plaintiff's cell, and "Chain of Custody" Record indicating that Defendant O'Donnell was the one who

found the documents]; Dkt. No. 38, Part 4 at 90 [exhibit to Plaintiff's motion for summary judgment, attaching Contraband Receipt issued by Defendant O'Donnell]; Dkt. No. 37, Part 22, Ex. A at 31-33 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he admits numerous times that, after Defendant Holt failed to take "control" of Inmate Alcivar's legal documents, Plaintiff, along with two other inmates, retained possession of those documents, out of a fear that those documents would be stolen by another inmate, and out of a sense of duty to Inmate Alcivar]; Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter from Plaintiff, in which he states, "I am going to hold a copy of the complaint" in Inmate Alcivar's federal civil rights action]; Dkt. No. 37, Part 7 [Ex. C to Woods Aff., attaching Plaintiff's 8/5/02 letter, in which he states, "in the future if anything should come of a matter of said documents being in my possession ... you and the administration cannot take any action against the inmate's family nor myself"]; *see also* Dkt. No. 37, Part 19, ¶ 3 [Holden Aff., testifying that at some point in the summer of 2002 Plaintiff told Holden that he was helping an inmate who had been taken to the hospital due to an illness]; Dkt. No. 45, Part 6, ¶¶ 4-5 [Belarge Reply Aff., swearing that evidence in question did not come from any interception of Plaintiff's mail, but from Plaintiff's personal belongings].)

19. At approximately 11:00 a.m. on August 31, 2002, Defendants Belarge and O'Donnell interviewed Plaintiff about his statements in his August 5, 2002, note to Defendant Woods.[45] At approximately 2:50 p.m. on August 31, 2002, Defendant O'Donnell stored Inmate Alcivar's legal documents (as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters) in an evidence locker at Greene C.F.[46]

[45]  (Dkt. No. 37, Part 2, ¶ 28 [Defs.' Rule 7.1 Statement, asserting that interview took place]; Dkt. No. 42, Part 1, ¶ 28 [Plf.'s Rule 7.1 Response, admitting that interview took place despite his blanket statement "Deny"]; Dkt. No. 37, Part 8, ¶ 5 [Belarge Aff.]; Dkt. No. 5, "Facts of the Incident," ¶¶ 13-15 [Plf.'s Am. Compl., stating that interview took place at 10:57 a.m. on 8/31/02]; Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching 8/31/02 misbehavior report, stating that the interview took place at 11:00 a.m. on 8/31/02].)

[46]  (Dkt. No. 37, Part 18, Ex. B [Antonelli Aff., attaching documents discovered in Plaintiff's cell, and "Chain of Custody" Record indicating that Defendant O'Donnell stored the documents in an evidence locker at 2:50 p.m. on 8/31/02]; Dkt. No. 37, Part 17, Ex. A at 2 [Antonelli Aff., attaching 8/31/02 misbehavior report, stating that Defendant O'Donnell stored the documents in an evidence locker on 8/31/02].)

Plaintiff's Misbehavior Report,
Disciplinary Hearing, and Appeal

20. Relying on the documents discovered and the subsequent interview conducted, Defendants Belarge and O'Donnell issued Plaintiff a misbehavior report on August 31, 2002.[47] The misbehavior report charged Plaintiff with three offenses: (1) providing legal assistance to Inmate Alcivar without prior authorization in violation of Inmate Rule 180.17; (2) exchanging legal materials with Inmate Alcivar without authorization in violation of Inmate Rule 113.15; and (3) soliciting materials from Inmate Alcivar's family members without authorization in violation of Inmate Rule 103.20.[48]

[47]  (Dkt. No. 37, Part 8, ¶ 6 [Belarge Aff.]; Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching 8/31/02 misbehavior report].)

[48]  (Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching 8/31/02 misbehavior report]; Dkt. No. 37, Part 2, ¶ 29 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 29 [Plf.'s Response, admitting receipt of the misbehavior report, and not specifically denying that he was charged with the three offenses stated in Defendants' assertion of fact].)

21. During the time period at issue (i.e., May through August of 2002), Rule 180.17 of DOCS' Standards of Inmate Behavior prohibited inmates from providing legal assistance to other inmates without prior approval from the Superintendent or his designee;[49] Rule 113.15 of DOCS' Standards of Inmate Behavior prohibited inmates from exchanging personal property (such as legal materials) with other inmates without authorization;[50] and Rule 103.20 of DOCS' Standards of Inmate Behavior prohibited inmates from requesting or soliciting goods or services from any person other than an immediate

family member without the consent or approval of the Superintendent or his designee. [51]

[49]     (Dkt. No. 37, Part 16, ¶ 7 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 14 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response, not denying this fact, only asserting that he received permission to assist Inmate Alicvar from Defendant Holt].) See also 7 N.Y.C.R.R. § 270.02[B][26][vii].

[50]     (Dkt. No. 37, Part 3, ¶ 7 [Woods Aff.]; Dkt. No. 37, Part 16, ¶ 8 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 10 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 10 [Plf.'s Response, admitting this fact].) See also 7 N.Y.C.R.R. § 270.02[B][14][v].

[51]     (Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 19 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 19 [Plf.'s Response, not specifically denying this fact, only denying that he indeed requested or solicited "goods or services" from Inmate Alcivar's daughters].) See also 7 N.Y.C.R.R. § 270.02[B][4][ii].

**\*8** 22. On September 6, 2002, Plaintiff received a disciplinary hearing, conducted by Defendant Antonelli. [52] Defendant Antonelli found Plaintiff guilty of all three charges, and imposed the following penalties: 90 days in S.H.U., 90 days loss of packages privileges, 90 days loss of commissary privileges, 90 days loss of telephone privileges, and three months loss of "good time" credits . [53] In reaching his finding of guilt, Defendant Antonelli relied on (1) the assertions by Defendants Belarge and O'Donnell in Plaintiff's misbehavior report that Plaintiff had made certain admissions to them during an interview, (2) Defendant Antonelli's belief that Plaintiff had made certain admissions in his correspondence to Inmate Alcivar's daughters, and (3) Defendant Antonelli's understanding that certain legal materials belonging to Inmate Alcivar had been found in Plaintiff's cell (or "cube"). [54]

[52]     (Dkt. No. 37, Part 2, ¶ 30 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 30 [Plf.'s Response, admitting this fact].)

[53]     (Dkt. No. 37, Part 2, ¶ 31 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 31 [Plf.'s Response, admitting this fact].)

[54]     (Dkt. No. 37, Part 16, ¶¶ 4-6, 11 [Antonelli Aff., asserting this fact]; Dkt. No. 42, Part 1, ¶¶ 4-6, 11

[Plf.'s Response to Antonelli Aff., admitting part of this fact, not specifically controverting the rest of this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 38, Part 4 at 43-44 [exhibit to Plaintiff's motion for summary judgment, attaching Defendant Antonelli's written hearing decision]; Dkt. No. 5, ¶ 17 [Am. Compl., acknowledging that Defendant Antonelli had, in reaching his decision, relied on, among other things, Plaintiff's misbehavior report and various letters between Plaintiff and Inmate Alcivar's daughters].)

23. Also on September 6, 2002, Plaintiff appealed Defendant Antonelli's disciplinary decision to Donald Seksky, Director of DOCS' Special Housing/Inmate Disciplinary Program, who affirmed that decision on October 28, 2002. [55] Plaintiff's appeal did not complain about any lack or denial of witnesses at his disciplinary hearing; similarly, Mr. Selky's appellate decision did not address such a complaint. [56]

[55]     (Dkt. No. 37, Part 2, ¶ 32 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 32 [Plf.'s Response, admitting this fact]; Dkt. No. 42, Part 23 at 46-48 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he discusses the appeal]; Dkt. No. 38, Part 3 at 46, 68 [exhibits to Plaintiff's motion for summary judgment, attaching his appeal and Mr. Selsky's affirmance].)

[56]     (Dkt. No. 42, Part 23 at 46-48 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he discusses his one-page appeal and acknowledges that it did not complain about any lack or denial of witnesses]; Dkt. No. 38, Part 3 at 46, 68 [exhibits to Plaintiff's motion for summary judgment, attaching his appeal and Mr. Selsky's affirmance].)

24. On October 24, 2002, Greene C.F. officials conducted a discretionary review of Plaintiff's SHU sentence. [57] Based upon this review, Plaintiff's SHU time was reduced from 90 days to 75 days. [58] However, Plaintiff's good time loss was unaffected by the discretionary review. [59]

[57]     (Dkt. No. 37, Part 2, ¶ 31 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 3 1 [Plf.'s Response, admitting part of this fact, not specifically controverting the rest of this fact, and, in any event not citing any admissible evidence in support of any

2006 WL 1133247

denial of this fact]; Dkt. No. 37, Part 8, ¶ 8 [Belarge Aff.].)

58    (*Id.*)

59    (*Id.*)

### Meetings Between Defendants Woods, Belarge and O'Donnell

25. At some point between August 5, 2002, and August 31, 2002, Defendant Woods met with Defendant Belarge to discuss Plaintiff. [60] Defendant Belarge then met with Defendant O'Donnell to discuss Plaintiff. [61]

60    (Dkt. No. 37, Part 2, ¶ 37 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 37 [Plf.'s Response, not specifically controverting this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 3, ¶¶ 9, 13 [Wood Aff.]; Dkt. No. 37, Part 8, ¶¶ 3, 9 [Belarge Aff.]; Dkt. No. 42, Part 23 at 35-37 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, asserting that such a meeting took place between Defendants Woods and Belarge at some point].)

61    (Dkt. No. 37, Part 2, ¶ 3 8 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 3 8 [Plf.'s Response, admitting this fact]; Dkt. No. 37, Part 8, ¶ 9 [Belarge Aff.]; Dkt. No. 42, Part 22 at 35-37 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, asserting that such a meeting took place between Defendants Belarge and O'Donnell at some point].)

26. Both meetings (which were held *prior* to the issuance of Plaintiff's misbehavior report on August 31, 2002) were held according to standard procedure at Greene C.F. [62] Specifically, the purpose of the meetings was to discuss how to investigate whether Plaintiff had violated prison rules. [63]

62    (Dkt. No. 37, Part 2, ¶ 39 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 39 [Plf.'s Response, not specifically controverting that the pre-misbehavior report meeting between Defendants Woods and Belarge, and the pre-misbehavior report meeting between Defendants Belarge and O'Donnell, were held according to standard procedure at Greene C.F., and, in any event not citing any admissible

evidence in support of any denial of this fact]; Dkt. No. 37, Part 3, ¶ 13 [Wood Aff.]; Dkt. No. 37, Part 8, ¶ 9 [Belarge Aff.]; Dkt. No. 37, Part 19, ¶ 2 [Holden Aff., disclaiming any knowledge about an alleged unlawful meeting between Defendants Woods, Belarge, and O'Donnell concerning Plaintiff].)

63    (Dkt. No. 37, Part 2, ¶¶ 37-39 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶¶ 37-39 [Plf.'s Response, not specifically controverting this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 3, ¶ 13 [Wood Aff.]; Dkt. No. 37, Part 8, ¶ 3, 9 [Belarge Aff.]; Dkt. No. 37, Part 19, ¶ 2 [Holden Aff., disclaiming any knowledge about an alleged unlawful meeting between Defendants Woods, Belarge, and O'Donnell concerning Plaintiff].)

### Plaintiff's Bunk(s) in SHU

27. As a result of his disciplinary conviction, Plaintiff was housed in Greene C.F.'s SHU from approximately September 6, 2002, to November 21, 2002. [64]

64    (Dkt. No. 5, ¶¶ 26, 37 [Am. Comp.]; Dkt. No. 37, Part 23, Ex. A at 57-58 [Munkwitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 42, Part 1, ¶ 43 [Plf.'s Rule 7.1 Response, stating, "Plaintiff left S-Block November 21, 2002...."].)

28. At no point (either during or after the above-described time period) did Plaintiff file any written grievances, or submit any letters of complaint, about an alleged defect in any of the bunk beds that he was assigned while in SHU. [65]

65    (Dkt. No. 37, Part 2, ¶ 41 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 41 [Plf.'s Response, not specifically controverting this fact]; Dkt. No. 37, Part 23, Ex. A at 58-62 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he acknowledged this fact]; Dkt. No. 48, Part 6 [Belin Aff.].)

29. On February 8, 2005, Defendant Belarge had photographs taken of the bunk beds that Plaintiff was assigned while he was in SHU; and on April 22, 2005, Defendant Belarge had photographs taken of the other bunk beds that Plaintiff suggests he may have been assigned. [66] Those photographs are made part of the

record at Exhibit A to the February 10, 2005, Affidavit of Defendant Belarge, and at Exhibits A and B to the April 29, 2005, Affidavit of Kenneth Scattergood. [67] Between September 6, 2002, and February 10, 2005, there was no record of any repairs made to any of the bunk beds that Plaintiff was assigned while in SHU; between September 6, 2002, and April 22, 2005, there was no record of any repairs made to any of the other bunk beds that Plaintiff suggests he may have been assigned while in SHU. [68]

[66]    (Dkt. No. 37, Part 2, ¶ 42 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 42 [Plf.'s Rule 7.1 Response, not specifically controverting this fact, and in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 8, ¶¶ 11-12 [Belarge Aff.]; Dkt. No. 37, Parts 9-12 [Ex. A to Belarge Aff., attaching photographs]; Dkt. No. 48, Parts 4, 8-17 [Defs.' reply affidavits and exhibits, attaching photographs].)

[67]    (Dkt. No. 37, Part 8, ¶¶ 11-12 [Belarge Aff.]; Dkt. No. 37, Parts 9-12 [Ex. A to Belarge Aff., attaching photographs]; Dkt. No. 48, Parts 4, 8-17 [Defs.' reply affidavits and exhibits, attaching photographs].)

[68]    (Dkt. No. 37, Part 2, ¶ 43 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 43 [Plf.'s Rule 7.1 Response, not specifically controverting this fact, and in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 8, ¶¶ 13-14 [Belarge Aff.]; Dkt. No. 37, Parts 13-15, Ex. B [Belarge Aff., attaching work orders]; Dkt. No. 48, Parts 4-5 [Defs.' reply affidavit and exhibits, attaching work orders].)

## III. ANALYSIS

A. Whether Plaintiff Has Failed to Establish (or Even State) a First Amendment Retaliation Claim

**\*9** In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or even state) a First Amendment retaliation claim against Defendant Antonelli because (1) he fails to establish that he had been engaging in speech or conduct that is protected by the First Amendment, and (2) in any event, he fails to establish a causal link between that protected activity and any adverse action against him by Defendant Antonelli. (Dkt. No. 37, Part 25 at 15-16 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) he had a constitutionally protected liberty

right to make an oral and written complaint about Defendant Antontelli's management of the prison mess hall, and (2) as a result of Plaintiff's complaints (and an "encounter" between Plaintiff and Antonelli one week before Plaintiff's disciplinary hearing), Defendant Antonelli retaliated against Plaintiff during Plaintiff's disciplinary hearing by, among other things, depriving Plaintiff of his statutorily protected right to receive "good time" credits (which would have accelerated Plaintiff's release on parole). (Dkt. No. 42, Part 2 at 9 [Plf.'s Response].)

Claims of retaliation like those asserted by Plaintiff find their roots in the First Amendment. See *Gill v. Pidlypchak,* 389 F.3d 379, 380-81 (2d Cir.2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of First Amendment rights. See *Gill,* 389 F.3d at 381-383. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with "skepticism and particular care." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d. Cir.1995); *see also Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), overruled on other grounds, *Swierkewicz v. Sorema N.A.,* 534 U.S. 506 (2002).

To prevail on a First Amendment claim under 42 U.S.C. § 1983, a Plaintiff must prove by the preponderance of

the evidence that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff-namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 [2d. Cir.2001] ). Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

**\*10** Here, Plaintiff's claim fails for several reasons. I acknowledge that the First Amendment protects, not only the filing of written grievances and complaints, but, under some circumstances, the making of oral complaints to corrections officers. [69] However, even assuming Plaintiff had a constitutionally protected right to make both written and *oral* complaints about Defendant Antonelli, no evidence exists establishing (or even suggesting) that any complaints by Plaintiff against Defendant Antonelli impacted Defendant Antonelli's disciplinary decision.

[69]    *See Malik'El v. N.Y. State DOCS,* 96-CV-0669, 1998 U.S. Dist. LEXIS 5471, at *7 & n. 1 (N.D.N.Y. March 4, 1998) (Sharpe, M.J .) (under circumstances, plaintiff's oral complaint to corrections officer might state a First Amendment claim), *adopted by* 1998 U.S. Dist. 5465 (N.D.N.Y. Apr. 8, 1998) (Pooler, D.J.); *but see Rodriguez v. Phillips,* 66 F.3d 470, 479 (2d Cir.1995) ("In the context of the confrontation described in [the plaintiff's] own words, there was no clearly established First Amendment right to approach and speak to Officer Rubin.") (emphasis added); *Garrido v. Coughlin,* 716 F.Supp. 98, 101 (S.D.N.Y.1989) (plaintiff's "verbal confrontation" with corrections officer was not protected speech or conduct under the First Amendment).

For example, no evidence exists that Plaintiff submitted any grievances or complaints against Defendant Antonelli, only that he submitted a letter to Deputy Superintendent Eldred complaining about "Mess Hall Dishwashing Machines" approximately three weeks

before the disciplinary hearing. [70] Plaintiff's letter did not mention Defendant Antonelli. [71] In any event, no evidence exists indicating that Defendant Antonelli knew about any grievances against him by Plaintiff at the time of Plaintiff's disciplinary hearing. [72] Similarly, no evidence exists that he ever confronted Defendant Antonelli with an oral complaint about the mess hall-other than Plaintiff's vague and uncorroborated assertions that he "met" with, or had an "encounter" with, Defendant Antonelli about the mess hall before the disciplinary hearing. [73] Finally, the record evidence establishes that Defendant Antonelli could, and indeed would, have reached the same disciplinary hearing decision (and imposed the same penalties) despite any such complaints or grievances by Plaintiff (i.e., based upon the evidence as presented to him at Plaintiff's disciplinary hearing decision). [74]

[70]    (Dkt. No. 48, Parts 6-7, ¶ 6 [Berlin Aff., testifying that the only grievance on file from Plaintiff, from between August 2002 to December 2002 was a grievance dated 8/8/02 about the legal mail limit at Greene C.F., attaching that grievance at Exhibit A]; Dkt. No. 37, Part 24 [Munkowitz Decl., attaching Plaintiff's 8/16/02 letter of complaint to Deputy Superintendent Eldred regarding the "Mess Hall Dishwashing Machines"]; Dkt. No. 37, Part 23, Ex. A at 86-90 [Munkwitz Decl., attaching transcript of Plaintiff's deposition].)

[71]    (Dkt. No. 37, Part 24 [Munkowitz Decl., attaching Plaintiff's 8/16/02 letter of complaint to Deputy Superintendent Eldred regarding the mess hall dishwashing machines, not mentioning any specifics, much less the name or position of Defendant Antonelli]; Dkt. No. 37, Part 23, Ex. A at 86-90 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff admits this fact].)

[72]    (Dkt. No. 37, Part 17, ¶ 13 [Antonelli Aff., testifying that "I ... understand that plaintiff alleges that I retaliated against him based upon a grievance that plaintiff made against me. I am not aware of any grievances filed by plaintiff against me"]; Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Response to Antonelli Aff., containing no response to Paragraph 13 of Antonelli's affidavit, and asserting conclusorily that "[the tier office] had chosen Antonelli to preside over plaintiff's tier hearing on September 6, 2002 ... and that was due to Antonelli's encounter with plaintiff one week prior to holding said hearing," without providing any specifics about the alleged "encounter," without

providing any assertion that it was Antonelli who was motivated by the alleged "encounter," and without providing reason to believe Plaintiff had personal knowledge of the Tier Office's motivation in assigning Antonelli as the hearing officer].)

73    (Dkt. No. 42, Part 1¶ 12 [Plf.'s Response to Antonelli Aff., asserting that, one week before the disciplinary hearing, Plaintiff had an "encounter" with Defendant Antonelli]; Dkt. No. 37, Part 23, Ex. A at 89 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff states that, days before the disciplinary hearing, he "met" with Defendant Antonelli about the condition of the "utensils, dish washing machines, et cetera" in the mess hall].)

74    *(See, supra,* Statement of Fact Nos. 22-23 [stating evidence upon which Defendant Antonelli based his hearing decision, and fact that the decision was affirmed on appeal].)

As a result, I recommend that the Court dismiss Plaintiff's First Amendment retaliation claim.

### B. Whether Plaintiff Has Failed to State a Fourth Amendment Claim

I do not construe Defendants' memorandum of law as expressly arguing that any Fourth Amendment claim asserted by Plaintiff should be dismissed for failure to state a claim under Rule 12(b)(1) of the Federal Rules of Civil Procedure, which permits motions to dismiss for "lack of jurisdiction over the subject matter" of a claim. However, I do construe that memorandum of law, as well as defense counsel's questions of Plaintiff during his deposition, as *suggesting* that Plaintiff has failed to assert a Fourth Amendment claim (regarding the search of his property by Defendants at Greene C.F.) over which federal courts have subject matter jurisdiction. 75

75    (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law, addressing the conclusory nature of Plaintiff's claims about a "conspiracy" against him, the subject of which included the search of his property]; Dkt. No. 37, Part 22, Ex. A at 14 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which defense counsel stated, "I don't see how the [F]ourth [A]mendment gives you a right to be free from harmful situations. So I would like you to explain that to me," and Plaintiff stated, "[T]he [F]ourth [A]mendment does not apply to the specific paragraph that you are referring to," i.e., Paragraph 43 of the Amended Complaint], 22 [in which defense

counsel asked, "Is there anything else in your second cause of action ..." other than a due process claim, and Plaintiff answered, "Not at this point, ma'am" even though that cause of action cites the Fourth Amendment], 26 [in which defense counsel asked, "You have a constitutional right to be free from search and seizure as an inmate?" and Plaintiff answered, "As an inmate, no, ma'am"].) *See Clissuras v. CUNY,* 359 F.3d 79, 81 n. 3 (2d Cir.2004) (treating a "suggestion" to the court, in the form of a letter, that subject matter jurisdiction was lacking as a request for a dismissal order under Rule 12[h][3] ).

Under Rule 12 of the Federal Rules of Civil Procedure, "[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." Fed.R.Civ.P. 12(h)(3). Thus, the Court has a duty to examine whether or not it has subject matter jurisdiction over Plaintiff's attempted Fourth Amendment claim.

Here, I find that the Court does not have subject matter jurisdiction (pursuant to 42 U.S.C. § 1983 or otherwise) over that claim, which is asserted in Paragraphs 44 and 15 of Plaintiff's Amended Complaint. 76 Specifically, the allegations contained in *Paragraph 15* of his Amended Complaint are the sole *factual* basis for Plaintiff's Fourth Amendment claim. 77 In pertinent part, that paragraph alleges that on "August 31, 2002, 11:20 A.M., Belarge ... had plaintiff's personal property searched [for Alcivar's materials] by three officers, one of whom was Holt...." 78

76    *(See* Dkt. No. 5, ¶ 44 [Plf.'s Am. Compl., alleging that Defendants Woods and Holt "violat[ed] plaintiff's 4th ... Amendment [ ] rights"], ¶ 15 [alleging that Defendant Belarge "had plaintiff's personal property searched by three officers, one of whom was Holt"]; Dkt. No. 37, Part 23, Ex. A at 14-22, 26-28 [Munkowitz Decl., attaching transcript of deposition of Plaintiff, in which he explains his claim under the Fourth Amendment based on the alleged unjustified search and seizure of his property].)

77    (Dkt. No. 37, Part 22, Ex. A at 14 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff stated, "[T]he [F]ourth [A]mendment does not apply to" Plaintiff's first cause of action], 22 [in which defense counsel asked, "Is there anything else in your second cause of action ..." other than a due process claim, and Plaintiff answered, "Not at this point, ma'am" even though the cause of action cites

2006 WL 1133247

the Fourth Amendment], 28 [in which defense counsel asked, "Are you alleging that the facts in paragraph 15 give rise to a constitutional claim for search and seizure?" and Plaintiff answered, "Yes, ma'am"].)

78      (Dkt. No. 5, ¶ 14 [Am. Compl.].)

**\*11** The problem with Plaintiff's Fourth Amendment claim is that, even if the search occurred as Plaintiff alleged, that search was of a prisoner's cell (or "cube"). "[T]he Fourth Amendment proscription against unreasonable searches does not apply within the confines of a prison cell." *Hudson v. Palmer,* 468 U.S. 517, 526 (1984). [79] Nor does the Fourth Amendment proscription apply within the confines of a prison "cube." [80] Indeed, Plaintiff appears to recognize this point of law. [81]

79      *See also Tinsley v. Greene,* 95-CV-1765, 1997 WL 160124, at \*7 (N.D.N.Y. March 31, 1997) ("Plaintiff thus may assert no cause of action here based on an alleged violation of his Fourth Amendment rights."); *Demaio v. Mann,* 877 F.Supp. 89, 95 (N.D.N.Y.) ("Searches of prison cells, even arbitrary searches, implicate no protected constitutional rights."), *aff'd,* 122 F.3d 1055 (2d Cir.1995).

80      *See Freeman v. Goord,* 02-CV-9033, 2005 U.S. Dist. LEXIS 32019, at \*5 & n. 4 (S.D.N.Y. Dec. 7, 1995) (granting defendants' motion for summary judgment, in part because plaintiff had no reasonable expectation of privacy, under the Fourth Amendment, in his cell, which plaintiff referred to as his "cube"); *Rodriguez v. Coughlin,* 795 F.Supp. 609, 611, 613 (W.D.N.Y.1992) (granting defendants' motion for summary judgment, in part because prison officials have same need, and right, to search prisoner's "cell" as his "cubicle").

81      (Dkt. No. 37, Part 22, Ex. A at 26 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which defense counsel asked, "You have a constitutional right to be free from search and seizure as an inmate?" and Plaintiff answered, "As an inmate, no, ma'am"].)

I note that I do not liberally construe Plaintiff's Amended Complaint as asserting a Fourth Amendment claim against Defendant Woods for (allegedly) unreasonably searching and seizing various pieces of Plaintiff's outgoing and incoming mail in August of 2002. However, even if I did so construe that Amended Complaint, I would conclude that this Court would not have subject matter jurisdiction over that claim. The only portion of Plaintiff's Amended Complaint that regards such a search and

seizure by Defendant Woods of Plaintiff's mail is vague and conclusory. [82] Even taking as true Plaintiff's allegations, the mail in question consisted of clearly identifiable contraband (e.g., legal materials belonging to Inmate Alcivar in packages to, or from, persons bearing the last name of Alcivar). [83] I fail to see how any search and confiscation of such contraband would have violated the Fourth Amendment. Indeed, such a search and confiscation would appear to have been expressly authorized by DOCS Directive No. 4422 (which regards the Inmate Correspondence Program). [84]

82      (Dkt. No. 5, ¶ 12 [Am. Compl.].)

83      I note that the alleged "interception" by Defendant Woods of these packages was preceded by a letter from Plaintiff to Woods referring to "documents [belonging to Inmate Alcivar] being in [Plaintiff's] possession" and referring to Inmate Alcivar's family members. Furthermore, I note that the alleged contents of these packages would have reasonably appeared (at the very least) to consist of contraband (i.e., allegedly being the same documents that later gave rise to three disciplinary charges against Plaintiff, which charges resulted in a conviction that was affirmed on appeal).

84      *See, e.g.,* DOCS Directive No. 4422, § III.B.17. ("Inmates shall not be permitted to use their correspondence privileges to solicit ... services, or goods."), § III.G.1. ("All incoming general correspondence will be opened and inspected for ... photocopied materials, or contraband.") (5/18/02).

As a result, I recommend that the Court dismiss Plaintiff's Fourth Amendment claim.

## C. Whether Plaintiff Has Failed to Establish (or Even State) an Eighth Amendment Claim

In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or even state) an Eighth Amendment claim because (1) Plaintiff has not established (or even alleged) a deprivation that is "sufficiently serious" for purposes of the Eighth Amendment, and (2) he has not established that Defendants were *deliberately* indifferent to Plaintiff's health or safety. (Dkt. No. 37, Part 25 at 11, 13-14 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) he has established a deprivation that is "sufficiently serious" through his evidence that he experienced a back injury while in SHU

as a result of his "twisted bunk," and (2) he has established such deliberate indifference through his testimony that he orally complained to Defendants Woods and Belarge (as well as others) of his back injury and the fact that they "ignored" his complaints. (Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response].)

"[A] prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation must be, objectively, 'sufficiently serious'.... [Second,] a prison official must have a 'sufficiently culpable state of mind.' " *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). "In prison-conditions cases that state of mind is one of deliberate indifference to inmate health or safety...." *Farmer,* 511 U.S. at 834.

 **\*12** With regard to the first element, "the plaintiff must demonstrate that the conditions of his confinement resulted in 'unquestioned and serious deprivations of basic human needs' or 'deprive inmates of the minimal civilized measures of life's necessities.' " *Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W .D.N.Y.2005) (citing *Rhodes v. Chapman,* 452 U.S. 337, 347 [1981] ). "As recognized by the Supreme Court in *Rhodes,* 'the Constitution does not mandate comfortable prisons,' ... and conditions that are 'restrictive and even harsh ... are part of the penalty that criminal offenders pay for their offenses against society.' " *Davidson,* 371 F.Supp.2d at 370 (quoting *Rhodes,* 452 U.S. at 347, 349).

With regard to the second element, "[i]n prison-conditions cases [the requisite] state of mind is one of deliberate indifference to inmate health or safety...." *Farmer,* 511 U.S. at 834. "[D]eliberate indifference describes a state of mind more blameworthy than negligence." *Id.* at 835. "Deliberate indifference" exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

 1. Sufficiently Serious Deprivation
Plaintiff alleges that he was diagnosed with "spondylolisthesis"[85] in September of 2002 as a result of sleeping on a defective bed.[86] As far as I can tell from available reported decisions, all federal courts faced with evidence of such an injury on a dispositive motion in a

prisoner civil rights case explicitly or implicitly assume, for the sake of argument, that the injury constitutes a serious medical need.[87] I do not make such an assumption here because, unlike the prisoners in those other civil rights cases, Plaintiff does not allege that his Eighth Amendment deprivation consisted of his "spondylolisthesis" but his defective (or "twisted") bunk bed. In addition to being supported by the express language of Plaintiff's Amended Complaint,[88] this reading of Plaintiff's allegations is supported by his testimony in his deposition that he is not asserting a claim that the medical staff was deliberately indifferent to any serious medical need.[89]

85    "Spondylolisthesis" is defined as "forward movement of the body of one of the lower lumbar vertebrae on the vertebra below it, or upon the sacrum." *Rowland v. Hildreth,* 92-CV-6140, 1993 U.S. Dist. LEXIS 10233, at \*35, n. 6 (S.D.N.Y. July 27, 1993) (citing *Stedman's Medical Dictionary* at 1456 [25th ed.1990] ).

86    (Dkt. No. 5, ¶ 27 [Am. Compl.]; Dkt. No. 38, Part 4 at 58-62 [Plf.'s Motion for Summary Judgment, attaching medical records repeatedly stating "spondylolisthesis"]; Dkt. No. 37, Part 23 at 54-58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff describes his injury generally].)

87    *See Villante v. N.Y. State DOCS,* 96-CV-1484, 2002 U.S. Dist. LEXIS 26279, at \*4, 8-9 (N.D.N.Y. March 28, 2002) (Mordue, J.), *adopting report-recommendation,* 2002 U.S. Dist. LEXIS, at \*11-12 (N.D.N.Y. Oct. 26, 2001) (Homer, M.J.); *Rowland,* 1993 U.S. Dist. LEXIS 10233, at \*13-16, 30; *Smith v. Umar,* 89-CV-6988, 1989 U.S. Dist. LEXIS 14170, at \*4-6, 8-10 (E.D.Pa. Nov. 28, 1989).

88    (Dkt. No. 5, ¶¶ 35, 37, 38, 43 [Am. Compl., alleging that Defendants-who are non-medical personnel-violated Plaintiff's Eighth Amendment rights by placing him in, and keeping him in, SHU, despite knowing of the allegedly substandard conditions there, which included his allegedly defective bunk].)

89    (Dkt. No. 37, Part 23 at 42-43, 53, 58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he was not asserting any claim regarding the medical treatment that he received, or that the medical staff was deliberately indifferent to a serious medical need].)

This is apparently why Defendants, in their motions papers, do not challenge Plaintiff's allegation that he

suffered from "spondylolisthesis," but do challenge his allegation that he was assigned a bunk bed that was in any way defective. [90] In support of that argument, Defendants submit evidence that none of the bunk beds to which Plaintiff was assigned while in SHU (1) showed any visible defects (much less the defect that Plaintiff alleges, i.e., being "twisted") at or after the time in question, and (2) were either complained about by other inmates or repaired at or after the time in question. [91]

[90]     (Dkt. No. 37, Part 25 at 14 [Defs.' Mem. of Law, arguing that "plaintiff cannot demonstrate that his bunk was 'damaged' in any manner," citing record evidence in an attempt to support that argument].)

[91]     (*See, supra,* Statement of Fact No. 29.)

 **\*13**   More convincing, however, is the temporal disconnect between the onset of Plaintiff's back injury and his assignment to the allegedly defective bunk bed in question. Although Defendants do not appear to argue that the onset of Plaintiff's injury pre-dated his assignment to the allegedly defective bunk bed, [92] there is evidence indicating that Plaintiff's back injury existed *before* he was assigned to the allegedly defective bunk bed (i.e., Bunk Number "OS-A1-20(b)") on September 23, 2002. [93] There is even evidence indicating that Plaintiff's back injury existed before he was admitted to SHU on September 6, 2002. [94]

[92]     (Dkt. No. 37, Part 25 at 11, 13-14 [Defs.' Mem. of Law].)

[93]     (*Compare* Dkt. No. 42, Part 1, ¶¶ 10(a), 11 [Plf.'s Response to Belarge Aff., swearing that he was assigned to the allegedly "dilapidated" bunk in question-Bunk Number "OS-A1-20(b)"-on **9/23/02**, after having been assigned to two different SHU cells, i.e., first in Cell "SH-0013" and then in Cell "B1-18"] *with* Dkt. No. 5, ¶¶ 26-27 [Plf.'s Am. Compl., containing a sworn allegation that the onset of his back injury was on or before **9/13/02**, and that the date of diagnosis was **9/20/02**] *and* Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff., swearing that he orally complained to Belarge about the bunk on **9/18/02**] *and* Dkt. No. 37, Part 23 at 58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he first requested sick call on **9/9/02**, or three days after his admission to SHU].)

[94]     (Dkt. No. 38, Part 4 at 58-62 [Plf.'s Motion for Summary Judgment, attaching medical record printed on **9/9/02** containing a typed notation, apparently entered on 8/23/02 stating, "Reason for Consultation: H/O sciatica type pain which has responded to PT **in the past.** I request a **repeat treatment** series for 6 weeks" and noting that Plaintiff was 51 years old at the time] [emphasis added].)

Even if Plaintiff were alleging that his back injury existed before September 6, 2002, but that his injury was *exacerbated* by his various bunk beds while in SHU, I would reach the same conclusion. As I described above, the first element of the Eighth Amendment's two-part test is "objective," not "subjective." Simply stated, the Eighth Amendment does not mandate "comfortable" bunk beds. [95] For these reasons, I find that Plaintiff has failed to establish a "sufficiently serious" deprivation for purposes of the Eighth Amendment.

[95]     *See Faunce v. Gomez,* No. 97-16943, 1998 U.S.App. LEXIS. 22703, at *3 (9th Cir. Sept. 14, 1998) (affirming district court's grant of summary judgment to defendants in part because the plaintiff's Eighth Amendment claim was premised on his complaint that his mattress was uncomfortable and his bedding was insufficient); *Page v. Kirby,* 314 F.Supp.2d 619, 620 (N.D.W.Va.) (dismissing prisoner's Eighth Amendment claim premised on complaint that his mattress was uncomfortable); *Levi v. District of Columbia,* 92-CV-2653, 1993 U.S. Dist. LEXIS 1948, at *5 (D.D.C. Feb. 24, 1993) dismissing prisoner's Eighth Amendment claim premised on complaint that his mattress was uncomfortable).

    2. Deliberate Indifference

Even if Plaintiff had established a "sufficiently serious" deprivation for purposes of the Eighth Amendment, I would find that he has not established that Defendants acted with deliberate indifference to Plaintiff's health or safety.

To the extent that Plaintiff alleges that any of the Defendants "knew" that Plaintiff would be assigned to an allegedly defective bunk (Bunk Number "OS-A1-20(b)" in Cell "A1-20") *before* Plaintiff began his incarceration in the Greene C.F. SHU on September 6, 2002, I find that those allegations are wholly conclusory and without any evidentiary support whatsoever in the record. (Dkt. No. 5, ¶¶ 3 5, 37, 39, 43 [Am. Compl.].)

2006 WL 1133247

However, Plaintiff also asserts (rather conclusorily) that Defendants knew about the allegedly defective bunk *after* Plaintiff was assigned to it.[96] More specifically, Plaintiff submits testimony that (1) he orally complained to Defendant Woods about the bunk in question on or about September 27, 2002, (2) Plaintiff orally complained to Defendant Belarge about the bunk in question on September 18, 2002, and (3) Plaintiff orally complained to other corrections officers about the bunk in question at various other times.[97] Setting aside the lack of any testimony (of which I am aware) that Plaintiff ever orally complained to Defendants O'Donnell, Antontelli or Holt, there is a fatal flaw with Plaintiff's reliance on this evidence.

[96]    (Dkt. No. 5, ¶ 38 [Am. Compl.].)

[97]    (*See, e.g.,* Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff., swearing that he orally complained to Belarge about the bunk on September 18, 2002]; *compare* Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response to Woods Aff., swearing that his oral complaint to Woods was made on September 27, 2002] *with* Dkt. No. 42, Part 2 at 13 [Mem. of Law, arguing that his oral complaint to Woods was made on September 12, 2002].)

The problem is that, even if this evidence is true, there is no evidence that Defendants or *anyone* "ignored" Plaintiff's oral complaints. Indeed, the evidence shows that Plaintiff was assigned to the allegedly defective bunk bed for only about two weeks (between September 23, 2002, and October 7, 2002), and that he was then moved in response to his oral complaints.[98] Any assertion by Plaintiff that Defendants Woods and Belarge, upon hearing Plaintiff orally complain about the bunk, told Plaintiff to "[t]ell the officer about it" or "tell it to the officer on the unit" does not indicate deliberate indifference by supervisors such as Defendants Woods or Belarge, especially given that Plaintiff was subsequently then purposely assigned to a different bunk.[99]

[98]    (Dkt. No. 37, Part 8, ¶ 11 [Belarge Aff., identifying second bunk Plaintiff was assigned while in "S-Block" as Bunk Number "OS-A1-20(b)"]; Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Response to Belarge Aff., admitting that fact], ¶ 10(a) [swearing that he was assigned to the allegedly "dilapidated" bunk in question on 9/23/02], ¶ 10(b) [swearing that, at 9:45 p.m. on or about 10/7/02-fourteen days after 9/23/02-he was purposely

moved to a cell "with a better bunk," i.e., Cell "B2-40"].) Any assertions by Plaintiff to the contrary are purely conclusory, self-contradictory, and frankly too incredible to be believed by reasonable minds. (Dkt. No. 5, ¶ 28 [Am. Compl., alleging conclusorily that his verbal complaints about his bunk bed "went unsolved"]; *compare* Dkt. No. 37, Part 23 at 58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he was assigned to the same bunk bed during his entire stay in SHU] *with* Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Response to Belarge Aff., admitting that he served his time in SHU in four different cells], ¶ 10(a) [swearing that he was not assigned to the allegedly "dilapidated" bunk in question until 9/23/02, despite his admission to SHU on 9/6/02, and that it was the *third* such bunk to which he had been assigned in SHU], ¶ 10(b) [swearing that, at 9:45 p.m. on or about 10/7/02-fourteen days after 9/23/02-he was purposely moved to a cell "with a better bunk," i.e., Cell "B2-40"].)

[99]    (*Compare* Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response to Woods Aff.] *and* Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff.] *with* Dkt. No. 42, Part 1, ¶ 10(c) [Plf.'s Response to Belarge Aff.].)

**\*14** In addition, the evidence shows that no one at Greene C.F. in any way interfered with the prompt and adequate medical care provided to Plaintiff regarding his back. Plaintiff acknowledges that his medical care at Greene C.F. included the following: (1) a CAT scan on October 17, 2002, and second CAT scan at some point between October 22, 2002, and December 11, 2002, (2) physical therapy on October 24, November 5, November 8, and November 18, 2002; (3) an MRI examination on January 10, 2003; and (4) being provided "pain killers" on September 13, 2002, five packets of Naproxen (500 mg. each) on December 11, 2002, and more "pain killers" on or after January 10, 2003, along with a back brace.[100]

[100]    (Dkt. No. 5, ¶¶ 26-33 [Am. Compl.].)

Finally, I note that the evidence shows that, on October 24, 2002, Greene C.F. officials shortened Plaintiff's stay in SHU 15 days (reducing his sentence in SHU from 90 days to 15 days).[101] Under the circumstances, I find that no reasonable fact-finder could conclude, based on the record before me, that Defendants acted with deliberate indifference to Plaintiff's health or safety

[101]    (*See, supra,* Statement of Fact No. 24.)

As a result, I recommend that the Court dismiss Plaintiff's Eighth Amendment claim.

### D. Whether Plaintiff Has Failed to Exhaust His Available Administrative Remedies Regarding His Eighth Amendment Claim

In their memorandum of law, Defendants argue Plaintiff has failed to established that he exhausted his available administrative remedies regarding his Eighth Amendment claim because he acknowledges that he did not file a written administrative grievance with respect to the alleged condition of his bunk bed. (Dkt. No. 37, Part 25 at 11-13 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) no administrative remedy was available because a complaint about a defective bunk bed is not a grievable matter, (2) even if a complaint about a bunk bed were a grievable matter, he was misled by the Supervisor of the Inmate

Grievance Resolution Committee ("IGRC") into believing that the matter was not grievable, and (3) in any event, although he did not file a written grievance regarding his bunk, he filed several oral complaints regarding the bunk (i.e., to Defendant Woods, Defendant Belarge, the IGRC Supervisor, and various other corrections officers and/or sergeants). (Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response].)

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e. The Department of Correctional Services ("DOCS") has available a well-established three-step grievance program:

> First, an inmate is to file a complaint with the Grievance Clerk. An inmate grievance resolution committee ("IGRC") representative has seven working days to informally resolve the issue. If there is no resolution, then the full IGRC conducts a hearing and documents the decision. Second, a grievant may appeal the IGRC decision to the superintendent, whose decision is documented. Third, a grievant may appeal to the central office review committee ("CORC"), which must render a decision within twenty working days of receiving the appeal, and this decision is documented.

**\*15** *White v. The State of New York,* 00-CV-3434, 2002 U.S. Dist. LEXIS 18791, at \*6 (S.D.N.Y. Oct 3, 2002) (citing N.Y. Comp.Codes R. & Regs. Tit. 7, § 701.7). Generally, if a prisoner has failed to follow each of these steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Rodriguez v. Hahn,* 209 F.Supp.2d 344, 347-48 (S.D.N.Y.2002); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002).

However, the Second Circuit has recently held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *See Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004). First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotations omitted).

### 1. Availability of Administrative Remedies

Plaintiff admits (repeatedly) that he filed no written grievance about his bunk bed.[102] He argues, however, that no written grievance could have been filed, because a defective bunk bed is not a grievable matter. In support of this argument, he offers only conclusory assertions,

testimony containing (at best) inadmissible hearsay, and documents that are completely immaterial to the fact in question.[103]  Defendants, on the other hand, offer the affidavit of IGRC Supervisor Marilyn Berlin, who swears, *inter alia,* that "[c]omplaints about maintenance issues and cell conditions [such as defective bunk beds] are proper subjects of grievances." (Dkt. No. 48, Part 6, ¶ 3 [Berlin Aff.].) As a result, I must reject Plaintiff's unsupported assertion that a defective bunk bed is not grievable.

[102]   (Dkt. No. 37, Part 23 at 58, 61, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition].)

[103]   *(See, e.g.,* Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response Mem. of Law, in which Plaintiff appears to argue-without any citation to evidence-that he orally complained about his bunk bed to an unidentified IGRC Supervisor, whom Plaintiff alleges orally informed him that a defective bunk bed is not a grievable matter]; Dkt. No. 37, Part 23 at 60, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, apparently alluding to the same hearsay remark by the IGRC Superintendent]; Dkt. No. 38, Part 4 at 50, 52, 54, 66 [Plf.'s Motion for Summary Judgment, attaching, as exhibits, documents regarding Plaintiff's grievance about the grounds for his disciplinary conviction and not his allegedly defective bunk bed].)

This does not end the inquiry, however, because "a remedy that prison officials prevent a prisoner from utilizing is not an 'available' remedy under [the Prison Litigation Reform Act]." *Miller v. Norris,* 247 F.3d 736, 740 (8th Cir.2001), *cited by Abney v. McGinnis,* 380 F.3d 663, 669 (2d Cir.2004) (holding that "[t]he defendants' failure to implement the multiple rulings in [plaintiff's] favor rendered administrative relief 'unavailable' under the PLRA."). More specifically, case law exists supporting the proposition that, assuming plaintiff was instructed by prison officials, contrary to prison regulations, that he could not file a grievance, *and plaintiff indeed did not initiate the grievance process by filing that grievance in reliance on that misrepresentation,* "the formal grievance proceeding required by [the prison grievance system] was never 'available' to [plaintiff] within the meaning of [the PLRA]." *See Brown v. Croak,* 312 F.3d 109, 112-113 (3d Cir.2002), *cited by Giano v. Goord,* 380 F.3d 670, 677 n. 6 (2d Cir.2004).

**\*16**  Here, however, I can find absolutely no evidence in the record before me that IGRC Supervisor Berlin (or any prison official at Greene C.F.) at any time advised Plaintiff that a defective bunk bed is not a grievable matter. Again, in support of his argument that the IGRC made such a remark to him, Plaintiff offers only vague testimony containing (at best) inadmissible hearsay, and documents that are immaterial to the fact in question.[104] Plaintiff's vague and conclusory argument is made even more incredible in light of IGRC Supervisor Berlin's sworn statement denying that Plaintiff ever orally complained to her about his (allegedly) defective bunk bed, or that she told him that the matter was not grievable.[105]

[104]   *(See, e.g.,* Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response Mem. of Law]; Dkt. No. 37, Part 23 at 60, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 38, Part 4 at 50, 52, 54, 66 [Plf.'s Motion for Summary Judgment, attaching exhibits regarding a grievance about a different matter].)

[105]   (Dkt. No. 48, Part 6, ¶¶ 4-5, 8-11 [Berlin Aff.].)

2. Estoppel

Defendants have preserved their affirmative defense of non-exhaustion by raising it in their Answer. (Dkt. No. 17, ¶ 29 [Defs.' Answer] ) Moreover, no evidence (or even an argument) exists that any *Defendant* is estopped from raising this defense because of his or her actions inhibiting Plaintiff's exhaustion of remedies; Plaintiff merely argues that a non-party to this action (the IGRC Supervisor) advised him that his allegedly defective bunk bed was not a grievable matter.

3. "Special Circumstances" Justifying Failure to Exhaust

Finally, Plaintiff provides no evidence that "special circumstances" exist justifying his failure to exhaust his available administrative remedies. Plaintiff alleges that, on several occasions during the relevant time period, he made oral complaints about his allegedly defective bunk bed to various employees of Greene C.F., including Defendants Woods and Belarge. For the sake of argument, I will set aside the vagueness of this allegation, its incredibility given numerous other inconsistencies and improbabilities in Plaintiff's papers, and its total lack of support by any corroborating evidence. The problem with Plaintiff's reliance on this allegation is that, even if it were true, it would not justify Plaintiff's failure to file a written grievance about his bunk bed.

2006 WL 1133247

Plaintiff was 51 years old at the time of this incident; he had been incarcerated in several New York State correctional facilities before the incident; and he had even attended a year of law school. [106] He admits that, at the time of the incident, he was familiar with the grievance process at Greene C.F. [107] Indeed, he had filed grievances immediately before and during this very time period. [108] Simply stated, it would have been unreasonable for Plaintiff to believe that he could fulfill the grievance requirement-which included a requirement that the IGRC's decision be appealed to the Greene C.F. Superintendent and then to CORC before exhaustion had occurred-by making some oral complaints to various passers by, whomever they might be.

[106]    (Dkt. No. 37, Part 23 at 6-11 [Munkowitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 38, Part 4 at 58 [Plf.'s Motion for Summary Judgment, attaching medical record showing his date of birth].)

[107]    (Dkt. No. 37, Part 23 at 59 [Munkowitz Decl., attaching transcript of Plaintiff's deposition].)

[108]    (Dkt. No. 38, Part 4 at 50 [Plf.'s Motion for Summary Judgment, attaching Plaintiff's grievance dated 9/18/02, about the grounds for his disciplinary conviction]; Dkt. No. 48, Part 7 [Defs. Reply, attaching grievance dated 8/7/02, about mail room, and appeal from decision regarding that grievance].)

As a result of Plaintiff's failure to exhaust his available administrative remedies, I recommend that his Eighth Amendment claim be dismissed.

E. Whether Plaintiff Has Failed to Establish (or Even State) a Fourteenth Amendment Due Process Claim

**\*17**  In their memorandum of law, Defendants argue that Plaintiff's due process claim (which is based on the manner in which his disciplinary hearing was conducted, and which sought damages only and not injunctive relief) is not cognizable because a judgment in his favor would necessarily imply the invalidity of his disciplinary conviction (which resulted in a loss of good-time credits and thus affected the overall length of Plaintiff's confinement) and Plaintiff has not established that that conviction has been reversed, expunged, or invalidated. (Dkt. No. 37, Part 25 at 10-11 [Defs.' Mem. of Law, citing, *inter alia, Heck v. Humphrey,* 512 U .S.

477 (1994) and *Edwards v. Balisok,* 520 U.S. 641 (1997)].) Liberally construed, Plaintiff's response papers argue (without any legal support) that, even though Plaintiff's loss of his good-time credits had not been invalidated on appeal, for Defendants to obtain summary judgment "they must prove their innocence beyond a shadow of a reasonable doubt," which (he argues) they have not done. (Dkt. No. 42, Part 2 at 10-13 [Plf.'s Response].)

I reject Plaintiff's argument, and specifically his proffered legal standard on this motion for summary judgment. Under the circumstances, Defendants have met their modest threshold burden with regard to this issue. [109] To avoid dismissal on summary judgment grounds, Plaintiff must introduce evidence raising a question of fact as to (1) whether or not his disciplinary conviction affected the overall length of Plaintiff's confinement by resulting in a loss of good-time credits or (2) whether or not his disciplinary conviction has been reversed, expunged, or invalidated. [110] He has not done so. Indeed, the evidence shows (and Plaintiff concedes) that (1) Plaintiff's disciplinary conviction affected the overall length of Plaintiff's confinement by resulting in a loss of good-time, and (2) his disciplinary conviction was not reversed, expunged, or invalidated. [111]

[109]    See *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-324 (1986); *Ciaprazi v. Goord,* 02-CV-0915, 2005 WL 3531464, at *8 (N .D.N.Y. Dec. 22, 2005) (Sharpe, J.) (adopting Report-Recommendation by Peebles, M.J.) ("[D]efendants' decision to rely ... upon the lack of evidentiary support for plaintiff's retaliation claims ... is sufficient to cast the burden upon the plaintiff to come forward with evidence demonstrating the existence of genuinely disputed material issues of fact at trial with regard to those claims.") [citations omitted].

[110]    See *Griffin v. Selsky,* 326 F.Supp.2d 429, 430 (W.D.N.Y.2004); *McNair v. Jones,* 01-CV03253, 2003 U.S. Dist. LEXIS 15825, at *7-8 (S.D.N.Y.2003); *Dawes v. Dibiase,* 91-CV-0479, 1997 WL 376043, at *7-8 (N.D.N.Y. July 3, 1997) (McAvoy, J.).

[111]    *(See, e.g.,* Dkt. No. 5, ¶ 18 [Am. Compl., containing sworn allegation that Plaintiff was sentenced to three months loss of good-time credits]; Dkt. No. 42, Part 1 [Plf.'s Response to Belarge Aff., admitting Defendants' assertion that the discretionary review of Plaintiff's disciplinary sentence did not affect

Plaintiff's loss of good-time credits]; Dkt. No. 38, Part 4 at 32 [Plf.'s Motion for Summary judgment, attaching disciplinary hearing decision, showing sentence imposed]; Dkt. No. 42, Part 2 at 13 [Plf.'s Response, arguing that "even though plaintiff's good time was not reversed, expunged, or declared invalid, that by itself does not make plaintiff's claims 'not cognizable'...."].)

As a result, I recommend that Plaintiff's Fourteenth Amendment due process claim be dismissed.

### F. Whether Plaintiff Has Failed to Establish (or Even State) a Claim for Conspiracy

In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or even state) a claim for conspiracy because (1) such a claim falls not under 42 U.S.C. § 1983 but 42 U.S.C. § 1985, which applies specifically to conspiracies, (2) to succeed on a conspiracy claim under 42 U.S.C. § 1985, Plaintiff must allege and show "a meeting of the minds," and (3) Plaintiff has not alleged and shown such a meeting of the minds but has offered mere speculative and conclusory allegations of conspiracy, see, e.g., Dkt. No. 5, ¶¶ 21-22 (Am.Compl.). (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response argues that the evidence does establish such a meeting of the minds because (1) in their affidavits, Defendants Woods, Antonelli, and Belarge all swear that they met to plan a strategy regarding Plaintiff, and (2) that strategy clearly violated DOCS' policies and procedures, which never involve a group of high-ranking officials (such as a deputy superintendent, captain, and sergeant) meeting to plan a strategy regarding an inmate, but which involve merely letting a disciplinary charge be filed and decided by a hearing officer. (Dkt. No. 42, Part 2 at 7-8 [Plf.'s Response].)

*18 I agree with Defendants largely for the reasons stated, and based upon the cases cited, in their memorandum of law. (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law].) Plaintiff's attempted conspiracy claim, which is asserted under 42 U.S.C. § 1983, should actually be asserted under 42 U.S.C. § 1985. See Webb v. Goord, 340 F.3d 105, 110 (2d. Cir.2003) (construing Section 1983 claim styled as "Conspiracy to Violate Civil Rights" as Section 1985 claim). To maintain an action under Section 1985, a plaintiff "must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the

unlawful end." Webb, 340 F.3d at 110 [internal quotation marks and citations omitted]. Where a plaintiff does not provide such a factual basis, but only conclusory, vague or general allegations, such a conspiracy claim fails. Id. (dismissing conclusory allegation "that any such meeting of the minds occurred among any or all of the defendants"); Boddie v. Schneider, 105 F.3d 857, 862 (2d. Cir.1997) (dismissal of "conclusory, vague or general allegations of conspiracy to deprive a person of constitutional rights" is proper).

Here, Plaintiff's conspiracy claim is conclusory, vague and general. It is uncontroverted that, at some point between August 5, 2002, and August 31, 2002, a meeting took place between Defendant Woods and Defendant Belarge, and a meeting took place between Defendant Belarge and Defendant O'Donnell, and that the purpose of both meetings was to discuss Plaintiff. (See, supra, Statement of Fact Nos. 25-26.) The issue is whether the purpose of that meeting was "to achieve an unlawful end" or to simply investigate whether Plaintiff had violated prison rules.

Defendants offer evidence that the purpose of the meeting was to lawfully investigate Plaintiff, and Plaintiff has offered no evidence to the contrary. Plaintiff merely argues that DOCS' policies and procedures would never involve a group of high-ranking officials (such as a deputy superintendent, captain, and sergeant) meeting to discuss a Plaintiff. Even if Plaintiff had made this assertion in an affidavit or declaration rather than in a memorandum of law, I would have difficulty imagining how Plaintiff (despite his legal training and considerable experience as an inmate) could possibly have personal knowledge of such a fact. Furthermore, as a matter of common sense, it seems to me that where (as here) an inmate has made a mysterious representation to a deputy superintendent implying that he has possession of a deceased inmate's legal materials, it would be entirely conceivable (and appropriate) for the deputy superintendent to initiate an investigation of the matter, which investigation would involve lawful meetings with subordinates.

In any event, I need not base my recommendation on Plaintiff's lack of personal knowledge or on my common sense: the fact is that Plaintiff has adduced absolutely no evidence in support of his vague and conclusory allegation that Defendants Woods, Belarge and O'Donnell entered into an agreement to achieve an unlawful end. As a result,

I recommend that the Court dismiss Plaintiff's conspiracy claim.

### G. Whether Defendants Are Protected by Qualified Immunity

**\*19** In their memorandum of law, Defendants argue that they are entitled to qualified immunity because they could not have reasonably known that their conduct was in violation of a clearly established statutory or constitutional right. (Dkt. No. 37, Part 25 at 17 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response argues (without citing any evidence) that, under the circumstances, any reasonable person would have reasonably known their conduct was violating Plaintiff's clearly established constitutional rights. (Dkt. No. 42, Part 2 at 15-17 [Plf.'s Response].)

Again, I must reject Plaintiff's conclusory argument. "Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Williams,* 781 F .2d at 322 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ). Regarding the issue of whether a particular right was *clearly established,* courts in this circuit consider three factors:

> (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jeremosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) (citations omitted), cert. denied, 503 U.S. 962 (1992).[112] Regarding the issue of whether *a reasonable person would have known* he was violating such a clearly established right, this "objective reasonableness"[113] test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." *Malley v. Briggs,* 475 U.S. 335, 341 (1986); *see also Malsh v. Correctional Officer Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995)

(citing cases); *Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996). As the Supreme Court explained,

[112]   *See also Calhoun v. N.Y.S. Div. of Parole,* 999 F.2d 647, 654 (2d Cir.1993); *Prue v. City of Syracuse,* 26 F.3d 14, 17-18 (2d Cir.1994).

[113]   *See Anderson v. Creighton,* 107 S.Ct. 3034, 3038 (1987) ( "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' ") (quoting *Harlow,* 457 U.S. at 819); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

[T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law.... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized.

*Malley,* 475 U.S. at 341. Furthermore, courts in the Second Circuit recognize that "the use of an 'objective reasonableness' standard permits qualified immunity claims to be decided as a matter of law." *Malsh,* 901 F.Supp. at 764 (citing *Cartier v. Lussier,* 955 F.2d 841, 844 [2d Cir.1992] [citing Supreme Court cases] ).

Here, based on my liberal construction of all of Plaintiff's motion papers and response papers, I will assume, for the sake of argument, that Plaintiff is claiming he had, among others, the following rights: (1) a right to have Defendant Holt take control of Inmate Alcivar's legal materials when Plaintiff offered those materials to Defendant Holt, and to later acknowledge his failure to take control of those materials; (2) a right to have Defendant Woods personally visit Plaintiff in his "cube," and not launch a disciplinary investigation against him, following Plaintiff's notes to Defendant Woods; (3) a right to have Defendants Belarge and O'Donnell not open or read Plaintiff's correspondence to and from Inmate Alcivar's two daughters, following Plaintiff's notes to Defendant Woods; (4) a right to have Defendant Antonelli recuse himself based on the (alleged) fact that Plaintiff and Defendant Antonelli, one week before the disciplinary hearing, had had an "encounter"

regarding the conditions of the equipment in the prison mess hall; and (5) a right to be either transferred to a new cell in SHU, or provided with a new bunk bed in SHU, *immediately* upon making an oral complaint about his bunk bed to Defendants Woods, Belarge, O'Donnell, Antonelli and/or Holt (or upon the observations of that bunk bed by those Defendants).

**\*20** As an initial matter, it is unclear to me that any of these rights were "clearly established" in the summer and fall of 2002 (or are clearly established now). In any event, even if these rights were clearly established, it appears entirely reasonable to me for Defendants to have concluded that their treatment of Plaintiff did not violate these rights (or any rights). Simply stated, I can find no *evidence* in the record that Defendants Holt, Woods, Belarge, O'Donnell or Antonelli did anything wrong. At the very least, officers of reasonable competence could have disagreed as to the lawfulness of Defendants' actions..

As a result, even if the Court does not dismiss all of Plaintiff's claims for the reasons stated earlier in this Report-Recommendation, I recommend that the Court dismiss all of Plaintiff's claims based on qualified immunity.

H. Plaintiff's Motion for Partial Summary Judgment
Based on the above reasons, I find that Plaintiff's motion for partial summary judgment-which (at best) contains arguments regarding the issues discussed above-is without merit. I reach this conclusion for the independent reason that Plaintiff's Rule 7.1 Statement of Material Facts (Dkt.

No. 38, Part 2) generally does not contain any citations to the record; and, to the extent that Rule 7.1 Statement does contain citations to the record, the record generally does not actually support the facts asserted. *See* N.D .N.Y. L.R. 7.1(a)(3) ( *"Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion."*) [emphasis in original].

As a result, I recommend the denial of Plaintiff's motion for partial summary judgment.

**ACCORDINGLY,** it is

RECOMMENDED that Defendants' motion for summary judgment (Dkt. No. 37) be *GRANTED;* and it is further

RECOMMENDED that Plaintiff's motion for partial summary judgment (Dkt. No. 38) be *DENIED.*

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Svcs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 1133247

1999 WL 983876
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Craig COLE, Plaintiff,

v.

Christopher P. ARTUZ, Superintendent, Green
Haven Correctional Facility, R. Pflueger, A.
Glemmon, Sgt. Stevens, Lt. Haubert, Capt.
W.M. Watford, Capt. T. Healey, and John
Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.
|
Oct. 28, 1999.

**Attorneys and Law Firms**

Mr. Craig Cole, Bare Hill Correctional Facility, Malone,
New York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the
Attorney General of the State of New York, New York,
New York, for Defendant.

*MEMORANDUM & ORDER*

PAULEY, J.

 **\*1**  The remaining defendant in this action, Correction
Officer Richard Pflueger, having moved for an order,
pursuant to Fed.R.Civ.P. 56, granting him summary
judgment and dismissing the amended complaint, and
United States Magistrate Judge James C. Francis IV
having issued a report and recommendation, dated
August 20, 1999, recommending that the motion
be granted, and upon review of that report and
recommendation together with plaintiff's letter to this
Court, dated August 28, 1999, stating that plaintiff does
"not contest the dismissal of this action", it is

ORDERED that the attached report and
recommendation of United States Magistrate Judge
James C. Francis IV, dated August 20, 1999, is adopted in
its entirety; and it is further

ORDERED that defendant Pflueger's motion for
summary judgment is granted, and the amended
complaint is dismissed; and it is further

ORDERED that the Clerk of the Court shall enter
judgment accordingly and close this case.

*REPORT AND RECOMMENDATION*

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven
Correctional Facility, brings this action pursuant to 42
U.S.C. § 1983. Mr. Cole alleges that the defendant
Richard Pflueger, a corrections officer, violated his First
Amendment rights by refusing to allow him to attend
religious services. The defendant now moves for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure. For the reasons set forth below, I recommend
that the defendant's motion be granted.

*Background*

During the relevant time period, Mr. Cole was an
inmate in the custody the New York State Department
of Correctional Services ("DOCS"), incarcerated at the
Green Haven Correctional Facility. (First Amended
Complaint ("Am.Compl.") ¶ 3). From June 21, 1993 to
July 15, 1993, the plaintiff was in keeplock because of
an altercation with prison guards. (Am.Compl.¶¶ 17–
25). An inmate in keeplock is confined to his cell for
twenty-three hours a day with one hour for recreation.
(Affidavit of Anthony Annucci dated Dec. 1, 1994 ¶
5). Pursuant to DOCS policy, inmates in keeplock must
apply for written permission to attend regularly scheduled
religious services. (Reply Affidavit of George Schneider
in Further Support of Defendants' Motion for Summary
Judgment dated September 9, 1996 ("Schneider Aff.") ¶
3). Permission is granted unless prison officials determine
that the inmate's presence at the service would create
a threat to the safety of employees or other inmates.
(Schneider Aff. ¶ 3). The standard procedure at Green
Haven is for the captain's office to review all requests
by inmates in keeplock to attend religious services.
(Schneider Aff. ¶ 3). Written approval is provided to the
inmate if authorization is granted. (Affidavit of Richard
Pflueger dated April 26, 1999 ("Pflueger Aff.") ¶ 5). The
inmate must then present the appropriate form to the

gate officer before being released to attend the services. (Pflueger Aff. ¶ 5).

**\*2** On June 28, 1993, the plaintiff submitted a request to attend the Muslim services on July 2, 1993. (Request to Attend Scheduled Religious Services by Keep–Locked Inmate dated June 28, 1993 ("Request to Attend Services"), attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

A. *Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at *\*3 (S.D .N.Y. July 22, 1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at *\*5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se*'s] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

B. *Constitutional Claim*
It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent prisoners posing an active threat to security from being released. The procedure is not overbroad since it does not permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated. [1]

[1]    In light of this finding, there is no need to consider the defendant's qualified immunity argument.

*Conclusion*
For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall

1999 WL 983876

have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 983876

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

246 F.Supp.3d 704
United States District Court,
S.D. New York.

Alyssa LLOYD, Plaintiff,

v.

The CITY OF NEW YORK, New York City
Police Department Officers Gregory Graves,
James Rufle, David Mills, Paul Byrne,
and Undercover Officer 137, and, Corizon
Health, Inc., Mohammad Alam, Defendants.

1:14–cv–9968–GHW
|
Signed 03/31/2017

**Synopsis**
**Background:** Detainee brought action against city, police sergeant, police officers, and prison doctor, asserting claims under § 1983 for deliberate indifference to serious medical needs, excessive force, failure to intervene, and municipal liability, claims for violations of the Americans with Disabilities Act (ADA) and Rehabilitation Act, and state law claims for assault and battery, respondeat superior liability, intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence. Defendants moved for summary judgment.

**Holdings:** The District Court, Gregory H. Woods, J., held that:

[1] officers were not deliberately indifferent to detainee's serious medical needs;

[2] prison doctor was not deliberately indifferent to detainee's serious medical needs;

[3] fact issues regarding reasonableness of use of force precluded summary judgment on detainee's excessive force claim against sergeant;

[4] undercover police officer was not liable for failure to intervene to prevent sergeant's allegedly excessive use of force;

[5] fact issue as to whether keeping detainee in handcuffs for three to five hours was objectively reasonable

precluded summary judgment on excessive force claim; and

[6] defendants were not liable for intentional infliction of emotional distress.

Motion granted in part and denied in part.

West Headnotes (34)

[1]  **Constitutional Law**
  **Medical treatment**

Claims of deliberate indifference to serious medical needs, when brought by pretrial detainees, are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eighth Amendment, because pretrial detainees have not been convicted of a crime and thus may not be punished in any manner, neither cruelly and unusually nor otherwise. U.S. Const. Amends. 8, 14.

7 Cases that cite this headnote

[2]  **Arrest**
  **Custody and Disposition of Prisoner**
**Constitutional Law**
  **Conduct**

Police officers offered detainee medical assistance, and thus were not deliberately indifferent to her serious medical needs in violation of the Fourteenth Amendment; officers involved in detainee's arrest and detention gave detainee option to be taken to the hospital to take her antibiotics and to secure healthcare for complications related to her breast reconstruction surgery prior to her transfer to jail. U.S. Const. Amend. 14.

5 Cases that cite this headnote

[3]  **Constitutional Law**
  **Medical treatment**
**Prisons**

🔑 **Health and Medical Care**

Prison doctor who performed detainee's new admission examination was not deliberately indifferent to her serious medical needs in violation of the Fourteenth Amendment; although detainee, who had recently undergone breast reconstruction surgery, asserted that doctor did not immediately provide her with antibiotics or a dressing change, or examine her chest, doctor prescribed antibiotic, made plastic surgery and oncology referrals, and ordered daily wound care, and doctor had no further contact with detainee after examination. U.S. Const. Amend. 14.

2 Cases that cite this headnote

[4]    **Arrest**
       🔑 Use of force

Fourth Amendment prohibits the use of excessive force in making an arrest, and whether the force used is excessive is to be analyzed under Fourth Amendment's reasonableness standard. U.S. Const. Amend. 4.

3 Cases that cite this headnote

[5]    **Arrest**
       🔑 Use of force

To determine whether the force used in a given arrest is reasonable under the Fourth Amendment, courts pay careful attention to the facts and circumstances of each particular case, and judge the reasonableness of the use of force from the perspective of a reasonable officer on the scene, rather than with the $^{20}/_{20}$ vision of hindsight. U.S. Const. Amend. 4.

Cases that cite this headnote

[6]    **Arrest**
       🔑 Use of force

Law enforcement officers violate the Fourth Amendment if the amount of force they use is objectively unreasonable in light of the facts

and circumstances confronting them. U.S. Const. Amend. 4.

Cases that cite this headnote

[7]    **Arrest**
       🔑 Use of force

Under the Fourth Amendment, calculus of reasonableness of amount of force used by law enforcement officers must embody allowance for the fact that police officers are often forced to make split-second judgments, in circumstances that are tense, uncertain, and rapidly evolving, about the amount of force that is necessary in a particular situation. U.S. Const. Amend. 4.

Cases that cite this headnote

[8]    **Arrest**
       🔑 Use of force

Under the Fourth Amendment, reasonableness of the amount of force used must be judged from the perspective of a reasonable officer on the scene at the moment the force is used. U.S. Const. Amend. 4.

Cases that cite this headnote

[9]    **Arrest**
       🔑 Use of force

Not every push or shove by a law enforcement officer, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. U.S. Const. Amend. 4.

Cases that cite this headnote

[10]   **Federal Civil Procedure**
       🔑 Civil rights cases in general

Genuine issues of material fact as to whether detainee was compliant with police officers' requests that she open apartment door, whether undercover officer was visible to sergeant as he entered apartment, and whether detainee was in sergeant's way or was standing to the side with her hands raised when police entered apartment to secure detainee's

arrest in undercover operation precluded summary judgment on detainee's excessive force claim against sergeant, based on fact that sergeant pushed detainee to the ground, which caused rip in stitches and aggravated complications related to detainee's recent breast reconstruction surgery. U.S. Const. Amend. 4.

Cases that cite this headnote

**[11]** **Federal Civil Procedure**
🔑 Civil rights cases in general

Police sergeant was not entitled to qualified immunity at summary judgment stage of litigation of detainee's § 1983 claim for excessive force against sergeant, where facts material to a determination of the reasonableness of sergeant's use of force against detainee were in dispute. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[12]** **Civil Rights**
🔑 Sheriffs, police, and other peace officers

Police officers are entitled to qualified immunity in § 1983 suits brought against them in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[13]** **Civil Rights**
🔑 Arrest and detention

Undercover police officer was not liable under § 1983 for failure to intervene to prevent sergeant's allegedly excessive use of force against detainee, where scene unfolded quickly, and officer had no opportunity to intervene to stop sergeant from pushing detainee to the ground. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[14]** **Civil Rights**
🔑 Use of force in general

A police officer is under a duty to intercede and prevent fellow officers from subjecting a citizen to excessive force, and may be held liable under § 1983 for his failure to do so, if he observes the use of force and has sufficient time to act to prevent it. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[15]** **Civil Rights**
🔑 Use of force in general

In order for a law enforcement officer to be held liable under § 1983 for another officer's use of excessive force, there must have been a realistic opportunity for the former to intervene to prevent the harm from occurring. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[16]** **Arrest**
🔑 Restraints
**Civil Rights**
🔑 Arrest and detention

For purposes a § 1983 claim of excessive force in violation of the Fourth Amendment, merely handcuffing a suspect and requiring her to place her hands behind her back is not a constitutional violation. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[17]** **Arrest**
🔑 Restraints

In evaluating the reasonableness of handcuffing under the Fourth Amendment, for purposes of excessive force claim, courts typically consider evidence that: (1) the handcuffs were unreasonably tight; (2) the defendants ignored the plaintiff's pleas that the handcuffs were too tight; and (3) the degree of injury to the wrists. U.S. Const. Amend. 4.

1 Cases that cite this headnote

**[18]**    **Federal Civil Procedure**
    ⚷  Civil rights cases in general

Genuine issue of material fact as to whether keeping detainee in rear double cuffs for three to five hours while en route to and while waiting in line to be booked in to jail, despite detainee's repeated complaints to detectives about the pain and discomfort from the rear double-cuffing, and in light of fact that detainee had recently undergone breast reconstruction surgery, was objectively reasonable amount of force under the circumstances precluded summary judgment on detainee's excessive force claim against police officers based upon handcuffing. U.S. Const. Amend. 4.

Cases that cite this headnote

**[19]**    **Federal Civil Procedure**
    ⚷  Civil rights cases in general

Police officers were not entitled to qualified immunity from detainee's § 1983 claim alleging excessive force in violation of the Fourth Amendment, based on extended period in which detainee was kept in rear double handcuffs, at summary judgment stage of litigation, where there were unresolved factual questions concerning what officers knew regarding the effect the rear handcuffing was having on detainee's physical condition, which bore on the reasonableness of their conduct. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[20]**    **Federal Civil Procedure**
    ⚷  Civil rights cases in general

Genuine issue of material fact as to whether police officers' use of more than one set of handcuffs and their removal of the handcuffs at various points during detainee's detention was a reasonable accommodation precluded summary judgment on detainee's claims under the ADA and Rehabilitation Act.

Rehabilitation Act of 1973 § 504, 29 U.S.C.A. § 794(a); Americans with Disabilities Act of 1990 § 202, 42 U.S.C.A. § 12132.

Cases that cite this headnote

**[21]**    **Civil Rights**
    ⚷  Discrimination by reason of handicap, disability, or illness

To establish a violation of Title II of ADA or Rehabilitation Act, a plaintiff must demonstrate that: (1) he is a qualified individual with a disability; (2) the defendant is subject to one of the Acts; and (3) he was denied the opportunity to participate in or benefit from the defendant's services, programs, or activities, or was otherwise discriminated against by the defendant because of his disability. Rehabilitation Act of 1973 § 504, 29 U.S.C.A. § 794(a); Americans with Disabilities Act of 1990 § 202, 42 U.S.C.A. § 12132.

Cases that cite this headnote

**[22]**    **Civil Rights**
    ⚷  Accommodations in general

Hallmark of a reasonable accommodation under the ADA and Rehabilitation Act is effectiveness. Rehabilitation Act of 1973 § 504, 29 U.S.C.A. § 794(a); Americans with Disabilities Act of 1990 § 202, 42 U.S.C.A. § 12132.

Cases that cite this headnote

**[23]**    **Federal Civil Procedure**
    ⚷  Civil rights cases in general

Genuine issue of material fact as to whether municipal policy of rear handcuffing all arrestees irrespective of their physical conditions was moving force behind police officers' use of excessive force against detainee precluded summary judgment on detainee's § 1983 claim for municipal liability. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[24]** **Civil Rights**
🔑 Governmental Ordinance, Policy,
Practice, or Custom

**Civil Rights**
🔑 Issues, proof, and variance

To hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right. 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[25]** **Civil Rights**
🔑 Acts of officers and employees in general; vicarious liability and respondeat superior in general

Municipality cannot be made liable under § 1983 by application of the doctrine of respondeat superior, but rather the plaintiff must demonstrate that, through its deliberate conduct, the municipality was the moving force behind the alleged injury. 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[26]** **Damages**
🔑 Government;criminal justice

Detainee failed to establish that police sergeant and officers engaged in extreme and outrageous conduct following her arrest, and thus city, police sergeant, and officers were not liable for intentional infliction of emotional distress under New York law; although detainee alleged that defendants refused medical treatment to detainee, who had post-surgery open wound related to her recent breast reconstruction surgery, defendants presented detainee with numerous opportunities to visit the hospital to have her medication administered and to change her dressings, all of which she refused.

Cases that cite this headnote

**[27]** **Damages**
🔑 Nature of conduct

Damages for intentional infliction of emotional distress are available under New York law where a defendant engages in extreme and outrageous conduct, which so transcends the bounds of decency so as to be regarded as atrocious and intolerable in a civilized society.

Cases that cite this headnote

**[28]** **Damages**
🔑 Elements in general

To prevail on a claim for intentional infliction of emotional distress under New York law, a plaintiff must establish that there was extreme and outrageous conduct, that the conduct was undertaken with intent to cause, or disregard of a substantial probability of causing, severe emotional distress, and that the conduct did in fact cause severe emotional distress.

1 Cases that cite this headnote

**[29]** **Damages**
🔑 Intentional or Reckless Infliction of Emotional Distress;Outrage

Intentional infliction of emotional distress is a highly disfavored tort under New York law, and it is to be invoked only as a last resort.

1 Cases that cite this headnote

**[30]** **Damages**
🔑 Negligent Infliction of Emotional Distress

**Damages**
🔑 Injury or Threat to Another;Bystanders

Under New York law, a plaintiff may establish a claim for negligent infliction of emotional distress in one of two ways: (1) the bystander theory; or (2) the direct duty theory.

1 Cases that cite this headnote

**[31]** **Damages**

Injury or Threat to Another;Bystanders

Under New York law, a defendant may be held liable under bystander theory of negligent infliction of emotional distress if a defendant's conduct is negligent as creating an unreasonable risk of bodily harm to a plaintiff, and such conduct is a substantial factor in bringing about injuries to the plaintiff in consequence of shock or fright resulting from his or her contemporaneous observation of serious physical injury or death inflicted by the defendant's conduct on a member of the plaintiff's immediate family in his or her presence.

Cases that cite this headnote

[32]   Damages
       Nature of Injury or Threat

Under the direct duty theory of negligent infliction of emotional distress under New York law, a plaintiff suffers emotional distress caused by defendant's breach of a duty which unreasonably endangered plaintiff's own physical safety.

Cases that cite this headnote

[33]   Damages
       Particular cases

Police officers had no duty to procure medical care for detainee, as would support claim for negligent infliction of emotional distress, where detainee was not incapacitated, was able to make her own healthcare decisions, and officers offered detainee medical assistance, which she declined.

1 Cases that cite this headnote

[34]   Negligence
       Elements in general

Under New York law, a plaintiff must establish three elements to prevail on a negligence claim: (1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof.

Cases that cite this headnote

**Attorneys and Law Firms**

*709 Robert Thomas Perry, Brooklyn, NY, for Plaintiff.

Elissa Beth Jacobs, New York City Law Department, David Rosen, Heidell, Pittoni, Murphy & Bach, LLP, New York, NY, Ana Maria Vizzo, John Charles O'Brien, Jr., Heidell, Pittoni, Murphy & Bach, LLP, White Plains, NY, for Defendants.

MEMORANDUM OPINION AND ORDER

GREGORY H. WOODS, United States District Judge:

**1 Ms. Alyssa Lloyd worked for a number of years coordinating appointments for escorts. She asserts that the liaisons that she arranged were not sexual, but nonetheless, she was caught up in an undercover sting targeting suspected prostitution in her workplace. The officers who rushed in to arrest her and others did not know at first that Ms. Lloyd was a recovering breast cancer survivor. They did not know when they pushed her to the ground that her breasts had recently been removed, and that her surgical breast reconstruction had not healed and was fragile. Ms. Lloyd says that the officers did know those facts, however, when they handcuffed her behind her back, tearing the stitches in her chest. In this case, Ms. Lloyd brings a claim of excessive force against the officers who pushed her to the ground and handcuffed her. She also claims that the officers, and the doctor who later evaluated her in jail, were indifferent to her medical needs. Because there are disputed issues of fact regarding the circumstances of her arrest and the officers' handcuffing of Plaintiff, the officers' motion for summary judgment for her claims of excessive force are denied. Ms. Lloyd's constitutional claims related to deliberate indifference to her medical needs, however, are dismissed, principally because the officers offered her treatment after her arrest which she declined.

**I. BACKGROUND**

**A. Factual Background** [1]

1    These facts are not disputed for purposes of this motion, or are taken in the light most favorable to Plaintiff. *See Mitchell v. City of New York*, 841 F.3d 72, 75 (2d Cir. 2016) (at summary judgment, a court "views the evidentiary record in the light most favorable to ... the non-moving party").

### 1. Ms. Lloyd's Cancer Diagnosis and Treatment

Plaintiff, Ms. Alyssa Lloyd, worked "arranging dates" for women who advertised their services as escorts—booking appointments by telephone. At the time of the events in this case, she was in her early 40s. She had arrived at her job as a liaison between escorts and their customers after a long path, dropping out of New York University, taking massage classes, and working for some time as a nanny in Westchester.

Ms. Lloyd's life changed in August 2012, when she was diagnosed with breast cancer. Plaintiff's Response to Medical Defendants' Local Rule 56.1 Statement (Dkt. No. 111) ("Pl. Med. 56.1") ¶¶ 88–90. After her diagnosis in late 2012, Ms. Lloyd was treated with chemotherapy, which significantly improved her condition. *Id.* ¶¶ 91–92. However, in order to treat her cancer, Ms. Lloyd also decided to undergo a double **\*710** mastectomy—surgical removal of both of her breasts. *Id.* ¶ 96.

In the early summer of 2013, with her mastectomy approaching, Ms. Lloyd began to consult with a plastic surgeon about options to reconstruct her breasts. On June 6, 2013, Ms. Lloyd met for the first time with her plastic surgeon, Dr. Cherry Chang, M.D. *Id.* ¶¶ 93, 96. After conferring with Dr. Chang, Ms. Lloyd decided to reconstruct her breasts immediately after their removal, using surgically-implanted breast expanders which would be inflated through injections of saline. *Id.* ¶¶ 101, 112. Breast implantation, like any surgery, comes with risks. And Dr. Chang reviewed the risks associated with breast reconstruction generally, and particularly the issues associated with breast implants. The risks were significant: infection, wound healing issues, unfavorable scarring, asymmetry, implant failure, and the possibility of requiring future corrective surgery, among others. *Id.* ¶¶ 103–06. Because Ms. Lloyd would also need radiation therapy even after the mastectomy, she was at risk for still further complications. *Id.* ¶ 107.

**\*\*2** Ms. Lloyd's breasts were removed during an operation on June 17, 2013. *Id.* ¶ 108. During the same surgery, Dr. Chang inserted two tissue expanders and implants into her breasts—the first of many steps in Plaintiff's breast reconstruction. *Id.* ¶ 109. The next step —inflation of the tissue expanders using saline injections —began in July 2013 and continued through September 2013. *Id.* ¶¶ 112–137. Unfortunately, early in her treatment, Ms. Lloyd began to experience complications from the procedure. Beginning in early August 2013, Plaintiff began to complain that saline was leaking from her right tissue expander. *Id.* ¶ 114. Dr. Chang reacted promptly; in a surgical procedure on August 23, he removed Ms. Lloyd's right implant and exchanged her right tissue expander. *Id.* ¶¶ 129–30.

Following the surgery, Ms. Lloyd was allowed to exercise "a little." Plaintiff's Response to City Defendants' Local Rule 56.1 Statement ("Pl. City 56.1") ¶ 218. But the repair proved fragile. In mid–September, the stitches in Ms. Lloyd's chest ripped while she was making her bed, doing nothing more than stretching her arm to spread a comforter. Pl. City 56.1 ¶ 219. Sticky, salty fluid that Ms. Lloyd believed to be saline leaked from the wound, irritating her skin. *Id.* ¶ 220.

So only four weeks after the replacement of her right expander, on September 17, Plaintiff was back in Dr. Chang's office. Pl. Med. 56.1 ¶ 138. That very morning, Plaintiff had noticed some leakage from her right breast incision. *Id.* ¶ 139. During her visit, Dr. Chang found that some of Ms. Lloyd's sutures were coming apart, and, perhaps, some leakage. Dr. Chang sutured the incision closed. *Id.* ¶ 140. He also prescribed Cefadroxil, an antibiotic. Ms. Lloyd was directed to take two pills of the medication per day over the course of one week. *Id.* ¶¶ 142–43.

But the problems did not end. Ms. Lloyd returned to Dr. Chang's office two days later, on September 19, 2013, again reporting persistent saline leakage. *Id.* ¶ 144–45. Dr. Chang decided that an operation was necessary to again replace Ms. Lloyd's right tissue expander. *Id.* ¶ 146. He scheduled the surgery to take place four days later— September 23, 2013. *Id.* ¶ 149. Ms. Lloyd would not make it to her surgery that day. Instead, because of the events that unfolded next, she would be on Rikers Island.

### 2. The Events of September 20, 2013

#### a. Plaintiff's Arrest

Detective James Rufle worked for the New York City Police Department Vice Major Case Squad. As its name suggests, the squad targets prostitution and vice- **\*711** related crimes. In September 2013, Detective Rufle was investigating Ms. Lloyd and the business where she worked at 408 East 64th Street in Manhattan. Pl. City. 56.1 ¶¶ 1–2. As described above, Ms. Lloyd worked as a liaison, connecting men and women who, occasionally, met at her workplace. The police suspected that Ms. Lloyd was running a website that was promoting prostitution. *Id.* ¶ 3. On September 20, 2013, the police organized a "buy and bust" tactical operation at Ms. Lloyd's place of work. The team assembled for the operation included Detective Rufle, together with Detectives Paul Byrne and David Mills, Sergeant Gregory Graves, and one undercover officer—known here only by his codename, UC 137. *Id.* ¶¶ 4–5.[2]

[2]    These officers, along with the City of New York, are at times referred to in this opinion as the "City Defendants."

Early in the operation, UC 137 called Ms. Lloyd using a number provided by Detective Rufle. *Id.* ¶ 11. The parties dispute whether UC 137 and Plaintiff discussed exchanging sex for money, or whether they merely discussed a paid arrangement for non-sexual companionship. It is undisputed, however, that Ms. Lloyd made an appointment for UC 137 to meet with a woman in the apartment on East 64th Street where Ms. Lloyd worked the phones. *Id.* ¶ 12.

**\*\*3** A short time later, UC 137 arrived at the apartment. Ms. Lloyd let him in. *Id.* ¶ 14. Soon thereafter, UC 137 signaled to the other members of the field team, likely by text message, that there was an agreement to exchange sex for money, although as noted, Plaintiff disputes that she ever entered into any such an agreement. *Id.* ¶ 16.

Triggered by UC 137's signal, a number of officers entered the apartment to secure the undercover officer and make their arrests. How the police entered the apartment, and what they did upon entry are the subject of material dispute. The officers take the position that they knocked on the door, announced that they were police, and made numerous requests that the tenants of the apartment open the door. Because no one opened the door voluntarily, the officers forcibly breached the door using a ram. *Id.* ¶¶ 18–20. As Sergeant Graves testified at his deposition "whoever was behind the door, refused to open.... We heard movement inside. At that point our undercover's safety was in question" so he "instructed Detective Mills" to "breach the door" with a heavy breaching ram. Deposition of Gregory Graves, annexed as Ex. C to Jacobs Decl., at 37:24–38:6.

Ms. Lloyd, on the other hand, asserts that the ramming began immediately, at the same time police announced themselves. In her version of events, Ms. Lloyd told the officers repeatedly that she would open the door if they would only stop ramming it. But the officers continued to ram the door until it broke. Pl. City 56.1 ¶¶ 19–20. Ms. Lloyd's account is supported by her deposition testimony. There, she testified that she went to open the door to the apartment, and that "right before I opened the door, the door slammed, and they said, this is the police." Deposition of Alyssa Lloyd, annexed as Ex. A to Declaration of Elissa B. Jacobs (Dkt. No. 87) at 141:15–17. "They took the ram and they smashed the door" but Ms. Lloyd "kept saying, listen, I'm behind the door, there's not—not much room, if you want me to open it, you need to stop slamming the door." *Id.* at 141:22–142:2.

As much as the parties dispute how the officers entered the apartment, they disagree about what happened afterward —particularly about where Ms. Lloyd and **\*712** the undercover officer were at various times after the named officers entered the apartment. According to Sergeant Graves, Ms. Lloyd obstructed him after he entered. Sergeant Graves testified that after the officers breached the door and entered the apartment, "we encountered a female who was in the hallway in close proximity to the front door...." He "entered further with this female in front of me and observed in the back more movement of an unknown person in a back room." Graves Dep. at 38:16–24. "I was trying to make my way to the ... back of the apartment" but the "[f]emale in front of me would not allow me to pass...." *Id.* at 39:12–17. Sergeant Graves claims that he did not know where UC 137 was after he entered the apartment and was concerned about his safety, testifying that after his interaction with Ms. Lloyd, he "continue[d] on to the back room, at that time [I] did not know the location of the undercover." *Id.* at 39:21–23.

Ms. Lloyd says that she knew the location of the undercover. In her telling, UC 137 was standing near her, in plain sight of any officer entering: Sergeant Graves must have seen UC 137 when he entered and known that he was safe. Pl. City 56.1 ¶ 22. She testified as much at her deposition. She said that throughout the time officers were slamming on the door, UC 137 was "standing by the door, watching me ... Yelling at the people." Lloyd Dep. at 142:7–10. She has also submitted an affidavit stating that "UC 137 was standing near to me in plain sight of any officer entering the apartment" and that "Sergeant Graves must have seen UC 137 on entry to the apartment and known UC 137 was safe. Indeed, Sergeant Graves rushed past UC 137 to reach me." Affidavit of Alyssa Lloyd (Dkt. No. 102) ("Lloyd Aff.") ¶¶ 7, 9.

**4 Ms. Lloyd disputes Sergeant Graves' contention that she obstructed him as the officers entered the apartment. Much to the contrary, she asserts in her response to the City Defendants' 56.1 statement, she "had stepped back and to the side, into the kitchen area beyond the hallway, before the officers entered the apartment." Pl. City 56.1 ¶ 23. And in her deposition, Ms. Lloyd testified that when officers opened the door "I stepped away in the little hallway and my—they smashed the door." Lloyd Dep. at 142:11–14. Previous testimony by Ms. Lloyd pursuant to New York General Municipal Law § 50–H was consistent: When police were attempting to enter the apartment, she "stood in the kitchen with my hands up and waited for them to open the door" and that she "stayed in the kitchen area, hallway area, with my hands up waiting for them to open the door with the battering ram;" she "didn't want to be next to the door in case they hit me with it." 50–H Hearing, annexed as Ex. Q to Declaration of Ana Maria Vizzo (Dkt. No. 91) at 29:9–22; see also Lloyd Aff. ¶ 6.

It is undisputed, however, that after Sergeant Graves entered the apartment he pushed Ms. Lloyd's right arm. As a result, she fell to the ground, where she remained for approximately one minute. Id. ¶¶ 28–29. Ms. Lloyd asserts that the push injured her; it "caused a further rip in the stitches on the right side of my chest, aggravating the saline leakage from my right expander, which, in turn, further irritated my skin." Lloyd Aff. ¶ 11.[3]

[3]  The City Defendants have taken the position that Ms. Lloyd has not claimed any injuries as a result of the push from Sergeant Greaves. Id. ¶ 30. This despite Ms.

Lloyd's factual contentions and the allegations in her complaint.

After she was pushed down, Plaintiff told the officers repeatedly that she had cancer. She even showed them the bandaged *713 area around her chest. Pl. City 56.1 ¶ 31. Now, for the first time, Sergeant Graves was aware of Ms. Lloyd's breast cancer diagnosis. Id. ¶ 32. Once the officers saw Ms. Lloyd's condition, they helped her up and put her on a bed. Id. ¶ 33. She was then placed under arrest. Ms. Lloyd did not know it yet, but she had been arrested for promotion of prostitution—a felony. Id. ¶ 34.

Ms. Lloyd was then handcuffed by an unidentified officer. Id. ¶ 35. The officers were now aware of her medical condition. As a result, rather than using one set of handcuffs to cuff her hands behind her back, the officers used at least two sets of handcuffs. The parties refer to that practice as "double cuffing," and the Court will adopt the term. Id. ¶ 36. The Court presumes that double cuffing allows an officer to link two sets of handcuffs in series, creating more space between an arrestee's hands, and reducing the strain on her chest and shoulders when her arms are pulled behind her back. Whatever its palliative effect, from Ms. Lloyd's perspective, double cuffing was not enough. She protested even double cuffing behind her back because of her medical condition, and asked that the officers handcuff her in front with single handcuffs. Id. ¶¶ 235–36. Ms. Lloyd asserts that the rear double cuffing caused stitches on the right side of her chest to rip further, aggravating the saline leakage from her right expander and further irritating her skin. Id. ¶ 237.

**b. The 19th Precinct**

Officers transported Ms. Lloyd to the 19th Precinct station house. There, the rear handcuffs were removed, and she was secured by one wrist to a bench. Id. ¶ 44. Ms. Lloyd's purse was also brought to the 19th Precinct. It contained antibiotics and dressing changes to treat her chest. Id. ¶ 242. While waiting on the bench, Ms. Lloyd asked several officers if she could take her medication, and also asked too if she could change her bandages. Id. ¶ 45. The officers told Plaintiff to wait for her arresting officers. Id. ¶ 46.

After her wait on the bench, officers again placed Ms. Lloyd in handcuffs, then escorted her to the station's squad room to be interviewed. Id. ¶ 48. Two of her

arresting officers, Detective Mills and Detective Rufle, met Ms. Lloyd inside the squad room. Detective Rufle removed Ms. Lloyd's handcuffs "because she had an injury." *Id.* ¶¶ 49–50. Ms. Lloyd asked Detective Rufle to let her take her medication. Detective Rufle told Ms. Lloyd that he was unable to administer medicine because he was not a doctor. *Id.* ¶¶ 51–52.

 **\*\*5** It is undisputed that the detective also told her, however, that she could go to the hospital to have her medication administered. *Id.* ¶ 52. It is also undisputed that Ms. Lloyd elected to continue being processed in her criminal proceeding, rather than go to the hospital to have her medication administered. Check *Id.* ¶ 55. But Ms. Lloyd asserts that she decided not to go to the hospital because she was told by the officers that a trip to the hospital would delay her criminal processing and her release from jail. As Ms. Lloyd asserts in an affidavit, Detective Rufle told her a trip to the hospital would "delay my arraignment and release on my own recognizance on a misdemeanor charge, in time to make my surgery." Lloyd Aff. ¶ 21; *accord* Lloyd Dep. at 161:7–9; 162:8–13.

Believing that she would be released on her own recognizance on a misdemeanor charge in time to make her scheduled surgery, Ms. Lloyd declined to visit the hospital and opted to continue with processing. *Id.* ¶ 55. She even signed a medical treatment of prisoner form, indicating her refusal to obtain medical treatment and go to the hospital, although Plaintiff again asserts that she did so in reliance on officers' false assurances that she would be released **\*714** on her own recognizance on a misdemeanor charge in time to make her scheduled surgery. *Id.* ¶ 56.

At some point during her time in the 19th Precinct, Ms. Lloyd explained to Detectives Rufle and Mills that she needed to change the dressing on her chest to stave off and limit infection. *Id.* ¶ 247. In response, Detective Mills allowed Plaintiff to use the restroom to "address something with her chest." Ms. Lloyd replaced dressing on her chest, now soaked with saline, with sanitary napkins she found in the restroom. *Id.* ¶ 249. An officer also "snuck" her an antibiotic from her purse. *Id.* ¶ 246.

### c. Plaintiff's Arraignment

Late in the evening of September 20, 2013, Ms. Lloyd was again placed in rear double cuffs for transport from the 19th Precinct to Central Booking. *Id.* ¶ 61. Ms. Lloyd remained in rear double cuffs for three to five hours during the trip to Central Booking, and while she stood in line there. *Id.* ¶ 252. She complained repeatedly to Detectives Byrne and Mills about pain and discomfort from the handcuffs. But they ignored her complaints. *Id.* ¶ 253.

The parties dispute whether Ms. Lloyd received treatment during her stop at Central Booking. The officers assert that Ms. Lloyd was seen by EMS at Central Booking and refused to be treated. *Id.* ¶ 64. Ms. Lloyd rejects that version of events, and states in her affidavit that "[h]ad someone from EMS seen me, he or she would have removed the sanitary napkins from my chest and replaced them with a proper dressing." Lloyd Aff. ¶ 31. Ms. Lloyd asserts that the intake officer at Central Booking "refused to take" her because she had an open wound on her chest, telling Detectives Byrne and Mills that she needed to go to a hospital. Pl. City 56.1 ¶ 254. Instead, the detectives brought Ms. Lloyd to the 7th Precinct, to be held overnight until her arraignment. *Id.* ¶¶ 65, 255.

On September 21, 2013, Ms. Lloyd was arraigned in New York City Criminal Court on charges of promoting prostitution in the third degree, a felony, and permitting prostitution, a misdemeanor. *Id.* ¶ 257. The presiding judge set bail at $10,000 bond or $5,000 cash. Pl. Med. 56.1 ¶ 156. The Court presumes that Ms. Lloyd was unable to meet those requirements for release, because later that day, she was transported again—this time to Rikers Island.

### d. Rikers Island

Plaintiff was transferred to Rikers Island in the evening of September 21, 2013. Pl. Med. *Id.* ¶ 157. Early the next morning, a nurse evaluated Ms. Lloyd, taking her vitals and administering a series of tests. *Id.* ¶ 158. Later, Ms. Lloyd was seen by Dr. Mohammad Alam, M.D., who performed a "new admission" examination. *Id.* ¶ 160. Dr. Alam documented Ms. Lloyd's preexisting medical conditions and treatment, in particular her breast cancer diagnosis, chemotherapy, mastectomy, and reconstructive surgery. *Id.* ¶¶ 161–62. Ms. Lloyd told Dr. Alam that she was taking oral antibiotics and required daily dressing changes. She also told the doctor that she had a follow-up

Lloyd v. City of New York, 246 F.Supp.3d 704 (2017)
Case 9:15-cv-01222-MAD-TWD    Document 59    Filed 02/12/18    Page 65 of 231
2017 WL 1207838

procedure scheduled with Dr. Chang the following day. *Id.* ¶¶ 163–64.

**\*\*6** The parties dispute whether Dr. Alam examined Plaintiff's breasts. *Id.* ¶¶ 168–69. Dr. Alam cites to a portion of his deposition where he testified, when asked if Plaintiff "at any point pull[ed] up her shirt to show you what was underneath" that "I opened it and I looked at what is there." Deposition of Mohammed Alam, M.D. (annexed as Ex. T to Vizzo Decl.) at 38:9–13. He also cites to his physical examination notes which reflect that he recorded that Ms. Lloyd had a suture in place on her right breast with redness around the tape site, and mild discharge on the dressing. Vizzo Decl., Ex. E at 9. On the other hand, **\*715** Ms. Lloyd maintains that she lifted her shirt to show Dr. Alam "the sanitary napkins covering my chest, which by now were not only saline-soaked but also pus-filled" but that "Dr. Alam did not examine my chest." Affidavit of Alyssa Lloyd (Dkt. No. 107) ("Lloyd Aff. 2") ¶¶ 17, 19.

Ms. Lloyd maintains that she "asked Dr. Alam for antibiotics and a dressing change *immediately*," but he did not do so, and that she did not "hear Dr. Alam ask or instruct" anyone to provide her with the same. Lloyd Aff. 2 ¶¶ 20–22 (emphasis added). But it is undisputed that during his examination and thereafter, Dr. Alam took a number of steps to provide future treatment for Ms. Lloyd. Dr. Alam made referrals to Plastic Surgery and Oncology at Elmhurst Hospital. Pl. Med. 56.1 ¶ 174. He directed that Plaintiff's dressings be changed daily for seven days. He prescribed a number of additional medications and treatments: hydrocortisone cream for dermatitis of the right breast to be applied twice daily, and Librium as a replacement for Diazepam, which Plaintiff had been taking outside of jail for muscle spasms under her breasts. *Id.* ¶ 175. Dr. Alam realized that the antibiotic she had been taking prior to her arrest was not available in the facility's pharmacy. *Id.* ¶ 171. He prescribed a "STAT" dose of Keflex as an alternative antibiotic. *Id.* ¶ 172. Ms. Lloyd does not dispute these facts, but points out that Dr. Alam did not electronically sign his notes until 3:46 p.m., which was several hours after he physically examined her. Vizzo Decl., Ex. E at 12.

Plaintiff had no further contact with Dr. Alam. Pl. Med. 56.1 ¶ 176. Records indicate that Dr. Henry Thurka, M.D., another doctor at the facility, changed Plaintiff's antibiotic from Keflex to Augmentin shortly after Dr.

Alam's consultation because Keflex was not available in the facility's pharmacy. *Id.* ¶ 177–178. There is a dispute regarding whether Ms. Lloyd received her antibiotic on September 22. Records from Pyxis, a medication dispensing system, state that a dose of Augmentin was distributed to Plaintiff at 10:12 p.m. on September 22, 2013. *Id.* ¶ 179. However, Plaintiff maintains that she never received antibiotics at Rikers on Sunday, September 22, 2013. Lloyd Aff. 2 ¶ 27. It is undisputed, however, that Ms. Lloyd received medical treatment, including the dressing changes ordered by Dr. Alam, wound care, and antibiotics, on a daily basis throughout the rest of her period of detention on Rikers Island. *Id.* ¶¶ 181–83.

#### e. Release from Rikers Island

Ms. Lloyd was released from Rikers Island on September 26, 2013, six days after her arrest, and three days after her originally scheduled surgery date. *Id.* ¶ 193. Five days after her release, on October 1, 2013, Ms. Lloyd returned to Dr. Chang's office. *Id.* ¶ 194. Dr. Chang's notes documented the reason Ms. Lloyd had missed her operation as "due to sudden death of relative." *Id.* Dr. Chang examined Ms. Lloyd and found that her surgical incision wound was in "breakdown" and noted drainage in her right breast. *Id.* ¶ 195. During that visit, Dr. Chang deflated Ms. Lloyd's right tissue expander. *Id.* ¶ 197. But she needed additional surgery. On October 3, 3013, Ms. Lloyd went to New York Hospital Queens for a procedure to remove her right tissue expander and explore the reconstruction of her right breast. *Id.* ¶ 198. During the operation, Ms. Lloyd's right breast was found to be infected, requiring that it be washed out with fluid and removal of the tissue expander. *Id.* ¶ 200.

**\*\*7** Ms. Lloyd did not immediately pursue additional reconstructive surgery, in part because she was to commence radiation therapy. From December 2013 to May 2014, she received radiation treatment. *Id.* ¶ 208. Since completing radiation, Dr. **\*716** Chang has recommended that Ms. Lloyd reconstruct her right breast using tissue from other parts of her body. *Id.* ¶ 211. But as of May 31, 2016, Ms. Lloyd had not yet undertaken additional reconstruction surgery. *Id.* ¶ 213.

#### B. Procedural History

The amended complaint in this matter was filed on May 14, 2015. Dkt. No. 15. On August 8, 2016, the parties entered into a Stipulation and Order of Dismissal, pursuant to which Plaintiff withdrew a number of claims asserted in the amended complaint, namely: false arrest under 42 U.S.C. § 1983 and under New York law, malicious prosecution under 42 U.S.C. § 1983 and under New York law, violation of the right to a fair trial under 42 U.S.C. § 1983, deliberate indifference to serious medical needs under New York law, negligent screening, hiring and retention under New York law, and negligent training and supervision under New York law. Dkt. No. 85.

Plaintiff also withdrew a number of claims to the extent they were asserted against Corizon Health, Inc. and Dr. Alam, and withdrew her claims under the Americans with Disabilities Act and Rehabilitation Act against all Defendants except the City of New York. *Id.* Finally, Plaintiff dismissed the following named defendants from this case: Achille Antoine, Yvette Avery–Hughes, Adrian Campos, Dominique Georges, Shalonda Gonzalez, Rachelle Hogans–Blair, Bernadette James, Cynthia Lallemand, Raquel Murphy, Esperance Ndayishimiye, Annie Panis, Lisa Polite, Sean Ryan, Undercover Officer C146, and Scott Velasquez. *Id.*

The remaining Defendants are the City of New York, Sergeant Gregory Graves, UC 137, Detectives James Rufle, Paul Byrne, and David Mills, Corizon Health, Inc. and Dr. Mohammad Alam. The remaining claims against the City Defendants are: deliberate indifference to serious medical needs under 42 U.S.C. § 1983, excessive force under 42 U.S.C. § 1983, failure to intervene under 42 U.S.C. § 1983, municipal liability under 42 U.S.C. § 1983, claims under the Americans with Disabilities Act and Rehabilitation Act of 1973, assault and battery under New York law, *respondeat superior* liability under New York law, intentional infliction of emotional distress under New York law, negligent infliction of emotional distress under New York law, and negligence under New York law.

After entry of the stipulation and order, the remaining claims against Corizon Health, Inc. and Dr. Alam were: deliberate indifference to serious medical needs under 42 U.S.C. § 1983, intentional infliction of emotional distress under New York law, and negligent infliction of emotional distress under New York law. In Plaintiff's memorandum of law opposing the Medical Defendants' motion for summary judgment, however, Plaintiff stated

that she "withdraws her Section 1983 claim against Corizon Health, Inc. and her claims under New York law against Corizon Health[,] Inc. and Dr. Alam." Plaintiff's Memorandum of Law in Opposition to Medical Defendants' Motion for Summary Judgment (Dkt. No. 106) at 13. Accordingly, the only remaining claim Plaintiff asserts against any of the defendants involved in the events that took place on Rikers Island is a claim for deliberate indifference to serious medical needs under § 1983, against Dr. Alam.

**\*8** The City Defendants filed a motion for summary judgment on August 25, 2016 (Dkt. No. 93) ("City Def. Mem.") which Plaintiff opposed on September 26, 2016 (Dkt. No. 101) ("Pl. City Mem."). Dr. Alam filed a motion for summary judgment on August 29, 2016 (Dkt. No. 97) ("Med. Def. Mem."), Plaintiff opposed that motion on **\*717** September 26, 2016 (Dkt. No. 106) and Dr. Alam replied on October 11, 2016 (Dkt. No. 113).

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), a party is entitled to summary judgment if it "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the burden of showing that it is entitled to summary judgment. *See id.* at 256, 106 S.Ct. 2505.

In evaluating a motion for summary judgment, the Court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003) (quoting *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997)). "[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009) (quoting *Raskin v. Wyatt Co.*, 125 F.3d 55, 65 (2d Cir. 1997)). The Court's job is not to "weigh the evidence or resolve issues of fact; it is confined to deciding whether a rational juror could find

in favor of the non-moving party." *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 254 (2d Cir. 2002) (citing *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505). "Summary judgment is improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citing *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000)).

### III. DISCUSSION

#### A. Deliberate Indifference to Serious Medical Needs

[1]    A claim of deliberate indifference to serious medical needs has typically been analyzed under a two-pronged standard. "The first requirement is objective: 'the alleged deprivation of adequate medical care must be 'sufficiently serious.' " *Spavone v. New York State Dep't of Correctional Servs.*, 719 F.3d 127, 139 (2d Cir. 2013) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006)). "The second requirement is subjective: the charged officials must be subjectively reckless in their denial of medical care." *Id.* These claims, when brought by pretrial detainees "are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eighth Amendment." *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017). This is because "pretrial detainees have not been convicted of a crime and thus may not be punished in any manner— neither cruelly and unusually nor otherwise." *Id.* (citation and internal quotation marks omitted).

Prior to addressing the motions for summary judgment on Plaintiff's claims for deliberate indifference to serious medical needs, the Court will first review a recent change in the law applicable to such claims. In *Caiozzo v. Koreman*, 581 F.3d 63 (2d Cir. 2009), the Second Circuit held that the "the standard for deliberate indifference is the same under the Due Process Clause of the Fourteenth Amendment as it is under the Eighth Amendment." *Id.* at 70; *see also id.* at 72 ("Claims for deliberate indifference to a serious medical condition  **\*718** or other serious threat to the health or safety of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment."). Consistent with that view, the Second Circuit held that to satisfy the second prong of a claim for deliberate indifference to serious medical needs, a pretrial detainee would be required to prove "that the government-employed defendant disregarded a risk of

harm to the plaintiff *of which the defendant was aware.*" *Id.* at 71 (emphasis added); *see also Nielsen v. Rabin*, 746 F.3d 58, 64 (2d Cir. 2014) ("Deliberate indifference is a mental state equivalent to subjective recklessness.... This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result.") (quoting *Salahuddin*, 467 F.3d at 280).

 **\*9**    Last month, however, the Second Circuit concluded that the Supreme Court's decision in *Kingsley v. Hendrickson*, ——— U.S. ———, 135 S.Ct. 2466, 192 L.Ed.2d 416 (2015) "has undercut the reasoning in *Caiozzo*." *Darnell*, 849 F.3d at 33. *Kingsley* examined whether, to prove an excessive force claim under the Fourteenth Amendment, "a pretrial detainee must show that the officers were *subjectively* aware that their use of force was unreasonable, or only that the officers' use of that force was *objectively* unreasonable." 135 S.Ct. at 2470 (emphasis in original). The Supreme Court concluded that "excessive force claims brought under the Fourteenth Amendment do not require the same subjective intent standard as excessive force claims brought under the Eighth Amendment." *Darnell*, 849 F.3d at 33. The Second Circuit reasoned in *Darnell* that, "[f]ollowing the Supreme Court's analysis in *Kingsley*, there is no basis for the reasoning in *Caiozzo* that the subjective intent requirement for deliberate indifference claims under the Eighth Amendment ... must apply to deliberate indifference claims under the Fourteenth Amendment." *Id.* at 33–34. The Second Circuit therefore overruled *Caiozzo* "to the extent that it determined that the standard for deliberate indifference is the same under the Fourteenth Amendment as it is under the Eighth Amendment." *Id.* at 35.

Observing that the "subjective prong" of a deliberate indifference claim is "perhaps better classified as a '*mens rea* prong' or 'mental element prong,' " *id.* at 29, in *Darnell* the court of appeals instructed, in light of *Kingsley*, that a "pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Id.* at 35. After *Darnell*, "deliberate indifference" is now "defined objectively," and the "Due Process Clause can be violated when an official does

not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm." *Id.*

The reasoning of *Darnell* applies equally to claims of deliberate indifference to serious medical needs under the Fourteenth Amendment. *Darnell* involved claims of deliberate indifference in the context of a challenge to conditions of confinement. However, as the Second Circuit noted there, *Caiozzo*, the case which *Darnell* overruled in part

> involved a claim for deliberate indifference to medial needs under the Fourteenth Amendment. Nevertheless, the Court's interpretation of 'deliberate indifference' applied to any pretrial detainee claim for deliberate indifference to 'serious threat to ... health or safety'— such as from unconstitutional conditions **\*719** of confinement, or the failure-to-protect—because deliberate indifference means the same thing for each type of claim under the Fourteenth Amendment.

*Id.* at 33, n.9 (quoting *Caiozzo, 581 F.3d at 68, 72*). The Court therefore reads *Darnell* to require that the "*mens rea* prong*"* of deliberate indifference to serious medical needs claims under the Fourteenth Amendment be analyzed objectively: rather than ask whether the charged official "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety," courts are to instead determine whether the official "knew, or should have known" that his or her conduct "posed an excessive risk to health or safety." *Id.* at 33, 35.

### 1. City Defendants

**[2]**  The City Defendants do not contest that the asserted deprivation in this case was "sufficiently serious," only that the officers did not act with the requisite *mens rea.* City Def. Mem. at 6. Applying the standard clarified by the Second Circuit in *Darnell* to the facts of this case, the City Defendants are entitled to summary judgment on Plaintiff's claim of deliberate indifference to her serious medical needs, because Plaintiff cannot show that they knew or should have known that their acts or omissions posed an excessive risk to her health or safety.

A reasonable jury could not find that the City Defendants were deliberately indifferent to Plaintiff's serious medical needs, because they repeatedly offered her medical

assistance. The undisputed facts show that on numerous occasions, the officers involved in Plaintiff's arrest and detention prior to her transfer to Rikers Island gave her the option to be taken to the hospital to take her antibiotics and to change her dressings. On each occasion, Plaintiff refused.

**\*\*10**  Plaintiff concedes that she refused the offers made to her. However, she takes the position that, notwithstanding her decision to continue with her post-arrest processing rather than visit the hospital, the City Defendants were deliberately indifferent because they falsely assured her that she would be released on her own recognizance on a misdemeanor charge, in time to make her scheduled surgery. Pl. City Mem. at 8. Plaintiff maintains that, absent these "false assurances," she would have chosen to go to the hospital. *Id.*

Plaintiff's assertions do not permit a reasonable jury to conclude that the officers were deliberately indifferent to her medical needs. Plaintiff concedes that officers provided her with the ability to visit the hospital to secure healthcare for her condition. Her complaint, therefore, is not that officers were deliberately indifferent to her medical needs; rather that officers provided her inaccurate information about the likely disposition of her criminal case. Based upon the evidence in the record, however, a reasonable jury could not conclude that the officers "knew, or should have known" that their provision of information to Plaintiff about her criminal case "posed an excessive risk" to Plaintiff's "health or safety," even assuming that the information they provided to Plaintiff about the likely disposition of her criminal case was incorrect—they offered her treatment, which she refused. *Darnell, 849 F.3d at 36.*

The facts of this case are materially different from those in *Hathaway v. Coughlin, 37 F.3d 63 (2d Cir. 1994)*, the principal case on which Plaintiff relies. In *Hathaway*, the Second Circuit concluded that a rational jury could find the defendant was deliberately indifferent to the plaintiff's medical needs where the defendant failed to inform the plaintiff, over a period of more than two years, that the **\*720**  plaintiff had two broken pins in his hip. *37 F.3d at 65.* The Second Circuit reasoned that the plaintiff's failure to request surgery during that time period was "understandable, given that crucial information bearing on his condition was never disclosed to him," because the "presence of broken pins in a hip is information

that would give most people pause to consider surgery." *Id.* at 67–68. Here, by contrast, Plaintiff was aware of her condition, and the City Defendants did not withhold or misrepresent information bearing upon her medical condition as in *Hathaway*. Unlike in *Hathaway*, the City Defendants were not responsible for, and did not contribute to, any ignorance on Plaintiff's part of her own condition or the need for treatment. Indeed, the City Defendants provided Plaintiff with the opportunity to go to the hospital to obtain treatment after learning of her medical condition. Summary judgment is granted to the City Defendants on Plaintiff's claim of deliberate indifference to serious medical needs.

### 2. Dr. Alam

[3] Dr. Alam, the Rikers Island physician who treated Plaintiff on one occasion, when he performed her new admission examination, also seeks summary judgment on Plaintiff's claim of deliberate indifference to serious medical needs. First, he argues that Plaintiff's asserted deprivation of medical care was not sufficiently serious to prove such a claim. Second, Dr. Alam asserts that even if Plaintiff could show that the asserted deprivation was sufficiently serious, he did not act with the state of mind necessary to prove this claim. Med. Def. Mem. at 12, 18. The Court concludes that summary judgment in Dr. Alam's favor is warranted because a reasonable jury could not conclude that Dr. Alam acted with the requisite state of mind.

**11 In this case, Plaintiff asserts that Dr. Alam did not immediately provide her with antibiotics or a dressing change, or examine her chest, on September 22, 2013. It is undisputed, however, that Dr. Alam prescribed Keflex as an alternative antibiotic to Cefadroxil, made plastic surgery and oncology referrals, and ordered daily wound care. It is also undisputed that Plaintiff had no further contact with Dr. Alam after her new admission examination, and that she received antibiotics and wound care on a daily basis during the remainder of her detention at Rikers Island. Based upon the evidence in the record, a reasonable jury could not conclude that Dr. Alam "knew or should have known" that his actions or omissions pertaining to a single examination of Plaintiff "posed an excessive risk to [her] health or safety." *Darnell*, 849 F.3d at 35.

Moreover, Plaintiff does not assert that she was deprived of treatment, only that her treatment was delayed by one day. This delay does not support the inference that Dr. Alam was deliberately indifferent to her medical needs. Assuming the delay was in any way attributable to Dr. Alam, this amounts to negligent conduct at most, and "negligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim." *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998). Summary judgment is granted to Dr. Alam on Plaintiff's claim for deliberate indifference to serious medical needs.

### B. Excessive Force

Plaintiff brings excessive force claims against the City Defendants based upon two principal incidents. First, she argues that Sergeant Graves used unconstitutional excessive force when he pushed her to the ground after officers entered the apartment where UC 137 came to meet K.B., and that UC 137 failed to intervene to prevent this use of force. Second, she argues that Detectives Mills and Byrne's **721 use of rear double handcuffs to restrain her subsequent to her arrest and prior to her transfer to Rikers Island was also an unconstitutional use of excessive force. Because both claims involve disputed issues of material fact relevant to a determination of whether the officers' conduct was reasonable, the Court denies Sergeant Graves, Detective Mills, and Detective Byrne's motions for summary judgment; however, UC 137's motion for summary judgment on Plaintiff's failure to intervene claim will be granted.

[4] [5] "The Fourth Amendment prohibits the use of excessive force in making an arrest, and whether the force used is excessive is to be analyzed under that Amendment's 'reasonableness' standard." *Brown v. City of New York*, 798 F.3d 94, 100 (2d Cir. 2015) (quoting *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)) (internal quotation marks omitted). To determine whether the force used in a given arrest is reasonable, courts pay "careful attention to the facts and circumstances of each particular case," and judge the "reasonableness" of the use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (quoting *Graham v. Connor*, 490 U.S. at 396, 109 S.Ct. 1865).

[6] [7] It is "well established that law enforcement officers violate the Fourth Amendment if the amount of force they use is 'objectively unreasonable' in light of the

and circumstances confronting them." *Rogoz v. City of Hartford*, 796 F.3d 236, 246 (2d Cir. 2015) (citation omitted). Further,

> [t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments— in circumstances that are tense, uncertain, and rapidly evolving— about the amount of force that is necessary in a particular situation.

*Id.* (quoting *Graham*, 490 U.S. at 396–97, 109 S.Ct. 1865); *accord Jones v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006).

[8] [9] "The 'reasonableness' of the amount of force used thus 'must be judged from the perspective of a reasonable officer on the scene ... at the moment' the force is used." *Rogoz*, 796 F.3d at 246–47 (quoting *Graham*, 490 U.S. at 396, 109 S.Ct. 1865). "In sum, the 'standard' to be applied in determining whether 'the amount of force' used exceeded the amount that was 'necessary' in the particular circumstances is 'reasonableness at the moment.' " *Id.* at 247 (quoting *Graham*, 490 U.S. at 396, 397, 109 S.Ct. 1865). Furthermore, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers ... violates the Fourth Amendment." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865.

### 1. Excessive Force Claim Against Sergeant Graves

**12 [10] There is no dispute that Sergeant Graves pushed Plaintiff to the ground after he entered the apartment. The only question is whether this use of force was excessive under the Fourth Amendment. Sergeant Graves argues that he is entitled to summary judgment on this claim because his use of force was "objectively reasonable." City Def. Mem. at 10. In opposition, Plaintiff maintains that there are disputes "as to the material facts surrounding the circumstances of the push" and that while the City Defendants suggest that Plaintiff refused to open the door to the apartment and that she was blocking access to the back room when officers entered, she actually did offer to open the door, was standing near to UC 137 "in plain sight of any officer entering the apartment," and was "standing to one side, *722 giving Sergeant Graves unimpeded access" to the back room. Pl. City Mem. at 12. Plaintiff also cites record evidence

indicating that she had her hands up in the air when officers entered the apartment, *see id.* and that the push to the ground exacerbated the saline leakage from her right breast expander, increasing the irritation to her skin. *Id.* at 13.

Sergeant Graves argues that the push at issue was a non-actionable *de minimis* use of force and that summary judgment is appropriate on this basis alone. City Def. Mem. at 10. It is not entirely clear whether he intends to argue that Plaintiff's asserted injury from this use of force was *de minimis*, or that the amount of force he employed was *de minimis*. As to Plaintiff's asserted injury, Sergeant Graves' argument must be rejected. Sergeant Graves is correct that some courts require a plaintiff asserting a Fourth Amendment excessive force claim to show a greater than *de minimis* injury. *See, e.g.*, *Marlin v. City of New York*, No. 15-cv-2235 (CM), 2016 WL 4939371, at *12 (S.D.N.Y. Sept. 7, 2016) ("*De minimis* injuries will not usually sustain a claim of excessive force."). However, in this case, he does not dispute that the push, which knocked Plaintiff to the ground, caused a further rip in her stitches and aggravated the saline leak in her right expander, which are certainly greater than *de minimis* injuries.

The essence of Sergeant Graves' argument about the *amount* of force he used is that the amount of force used in a particular incident can be deemed *de minimis* as a matter of law, regardless of the surrounding circumstances. This contention is inconsistent with the standard applicable to Fourth Amendment excessive force claims. As has been discussed, the reasonableness of a use of force is evaluated in light of the facts and circumstances facing the officer at the scene. *See, e.g.*, *Adedeji v. Hoder*, 935 F.Supp.2d 557, 566 (E.D.N.Y. Mar. 27, 2013) ("[Defendant's] claim rests on the premise that there exists a threshold of force or injury below which, irrespective of the surrounding circumstances, an officers' force is reasonable as a matter of law. This approach to the question of excessive force, however, misunderstands the Fourth Amendment analysis.").

The Court concludes that there are disputed issues of material fact that preclude a grant of summary judgment to Sergeant Graves. As noted, the reasonableness of the use of force is to be judged in light of the facts and circumstances with which an officer is presented. And here, there are numerous disputes concerning what the circumstances confronting Sergeant Graves were,

including: whether Plaintiff was compliant with officers' requests that she open the apartment door, whether UC 137 was visible to Sergeant Graves as he entered the apartment, and whether Plaintiff was in Sergeant Graves' way or whether she was standing to the side with her hands raised. Were a jury to credit Plaintiff's version of events, it could reasonably conclude that when Sergeant Graves pushed Plaintiff to the ground, he used an objectively unreasonable amount of force. *See Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 123 (2d Cir. 2004) ("Given the fact-specific nature of the inquiry, granting summary judgment against a plaintiff on an excessive force claim is not appropriate unless no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable.").

### 2. Qualified Immunity for Sergeant Graves

**\*\*13**  **[11]**  Sergeant Graves argues that, even if summary judgment is precluded on Plaintiff's excessive force claim against him, he is nevertheless entitled to qualified immunity on this claim. City Def. Mem. at 12. Because summary judgment on qualified **\*723** immunity grounds is inappropriate where there are disputed issues of fact pertinent to a determination of the reasonableness of an officer's conduct, however, Sergeant Graves' motion for summary judgment on this basis must be denied.

**[12]**  Police officers are entitled to qualified immunity in § 1983 suits brought against them in their individual capacities if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The Second Circuit has explained that "[e]ven where the plaintiff's federal rights and the scope of the official's permissible conduct are clearly established, the qualified immunity defense protects a government actor if it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act." *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995) (quoting *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)); *see also Weyant v. Okst*, 101 F.3d 845, 857 (2d Cir. 1996) ("[P]ublic officials are entitled to qualified immunity if (1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights."). "The objective reasonableness

test is met—and the defendant is entitled to qualified immunity—if 'officers of reasonable competence could disagree' on the legality of the defendant's actions." *Lennon*, 66 F.3d at 420 (quoting *Malley v. Briggs*, 475 U.S. 335, 340–41, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)).

The Second Circuit has held that when

> the factual record is not in serious dispute ...[,] [t]he ultimate legal determination whether ... a reasonable police officer should have known he acted unlawfully is a question of law better left for the court to decide.

*Lennon*, 66 F.3d at 421 (quoting *Warren v. Dwyer*, 906 F.2d 70, 76 (2d Cir. 1990)); *accord Harris v. O'Hare*, 770 F.3d 224, 239 (2d Cir. 2014) (same); *Estate of Jaquez v. City of New York*, 104 F.Supp.3d 414, 434 (S.D.N.Y. 2015) (question of whether a "reasonable police officer should have known he acted unlawfully" is a question of law for the court "[e]ven though a reasonableness inquiry traditionally is a question of fact for the jury"). Conversely, "summary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness." *Husain v. Springer*, 494 F.3d 108, 133 (2d Cir. 2007) (quoting *Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir. 1999)).

The Court cannot conclude that Sergeant Graves is entitled to qualified immunity at this stage of the litigation because facts material to a determination of the reasonableness of his actions are in dispute. Given the disputed issues of material fact surrounding the circumstances of Sergeant Graves' use of force against Plaintiff that bear on the objective reasonableness of his conduct, his request for summary judgment on this ground must be denied.

### 3. Failure to Intervene Claim Against UC 137

**[13]**  UC 137 seeks dismissal of Plaintiff's claim that he failed to intervene to prevent Sergeant Graves' use of excessive force against her. Because Plaintiff's version of events, if credited, demonstrates that UC 137 did not have a realistic opportunity to prevent that use of force, his motion for summary judgment is granted.

**\*\*14** **[14]** **[15]** "A police officer is under a duty to
intercede and prevent fellow officers from subjecting a
citizen to excessive force, and may be held liable for his
failure to do so if he observes the use of force and has
sufficient time to act to prevent it." **\*724** *Figueroa v.
Mazza*, 825 F.3d 89, 106 (2d Cir. 2016) (citation omitted).
However, "[i]n order for a law enforcement officer to be
held liable for another officers' use of excessive force,
'there must have been a realistic opportunity [for the
former] to intervene to prevent the harm from occurring.'
" *Rogoz*, 796 F.3d at 251 (quoting *Anderson v. Branen*, 17
F.3d 552, 557 (2d Cir. 1994)).

Crediting Plaintiff's telling of the relevant events, the scene
unfolded quickly and UC 137 had no opportunity to
intervene to stop Sergeant Graves. As Plaintiff states in
her affidavit, "Sergeant Graves rushed past UC 137 to
reach me." Lloyd Aff. ¶ 9. To be sure, she also states
that "UC 137 was standing near to me." *Id.* ¶ 7. But
the fact that UC 137 was standing near Plaintiff when
Sergeant Graves rushed past him and pushed Plaintiff
does not constitute sufficient evidence for a reasonable
jury to conclude that UC 137 had a realistic opportunity
to prevent Sergeant Graves from pushing Plaintiff to the
ground. *Cf. Scalpi v. Town of East Fishkill*, No. 14-cv-2126
(KMK), 2016 WL 858944, at \*14 (S.D.N.Y. Feb. 29,
2016) (no realistic opportunity to intervene where use of
force occurred quickly). Accordingly, summary judgment
is granted to UC 137 on Plaintiff's failure to intervene
claim against him.

## C. Excessive Force Claim Based Upon Rear Double Handcuffing

### 1. Liability

**[16]** **[17]** "[M]erely handcuffing a suspect and requiring
her to place her hands behind her back is not a
constitutional violation." *Washpon v. Parr*, 561 F.Supp.2d
394, 407 (S.D.N.Y. 2008). However, "[c]ourts have found
that handcuffing can give rise to a § 1983 excessive force
claim where plaintiff suffers injury as a result." *Usavage
v. Port Auth. of N.Y. and N.J.*, 932 F.Supp.2d 575,
592 (S.D.N.Y. 2013) (quoting *Gonzalez v. City of New
York*, No. 98-cv-3084, 2000 WL 516682, at \*4 (E.D.N.Y.
Mar. 7, 2000)). "[I]n evaluating the reasonableness of
handcuffing" courts typically consider "evidence that: 1)

the handcuffs were unreasonably tight; 2) the defendants
ignored the [plaintiff's] pleas that the handcuffs were too
tight; and 3) the degree of injury to the wrists." *Case v. City
of New York*, 233 F. Supp. 372, 2017 WL 571530, at \*7
(S.D.N.Y. Feb. 10, 2017) (quoting *Lynch ex rel. Lynch v.
City of Mount Vernon*, 567 F.Supp.2d 459, 468 (S.D.N.Y.
June 13, 2008)).

**[18]** Most excessive force claims based upon the use of
handcuffs in this Circuit are a "variation on ... [a] familiar
theme" of handcuffs that are alleged to be excessively
tight and which cause injury to the arrestee as a result of
their tightness. *Usavage*, 932 F.Supp.2d at 594. This case,
however, is not a variation on that theme. Plaintiff does
not complain of excessively tight handcuffs, but rather,
that the use of rear handcuffing as a method of restraint
ripped stitches in her chest, causing significant injury.

"Courts in this Circuit have generally found that
handcuffing does not suffice for an excessive force claim
unless it causes some injury beyond temporary discomfort
or bruising." *Omor v. City of New York*, No. 13-cv-2439
(RA), 2015 WL 857587, at \*7 (S.D.N.Y. Feb. 27, 2015).
In this case, Plaintiff has submitted an affidavit stating
that the "rear double cuffs were too tight and too
heavy, causing my stitches to rip even more, aggravating
the saline leakage from my right expander, and further
irritating my skin." Lloyd Aff. ¶ 17. This injury was
more than just temporary discomfort or bruising.

**\*\*15** The record evidence reflects that Plaintiff remained
in rear double cuffs for three to five hours while en route
to and while waiting in line at Central Booking. She
**\*725** also attests in her affidavit that she "repeatedly
complained to Detectives Byrne and Mills about the pain
and discomfort from the rear double-cuffing, to no avail."
*Id.* ¶ 30. A reasonable jury could find that this extended
period of handcuffing for an arrestee who had not shown a
propensity for violence, in view of Plaintiff's condition and
the injuries Plaintiff claims that rear handcuffing caused,
was not an objectively reasonable amount of force under
the circumstances. Summary judgment is inappropriate on
this claim.

### 2. Qualified Immunity

**[19]** The City Defendants argue that nonetheless, they
are entitled to qualified immunity on this claim and that

summary judgment should be granted to them on that basis. City Def. Mem. at 13–14. However, because there are unresolved facts that bear upon the reasonableness of the officers' conduct regarding the use of rear double handcuffs, summary judgment on qualified immunity grounds is inappropriate.

There are unresolved factual questions concerning what Detectives Mills and Byrne knew regarding the effect the rear handcuffing was having on Plaintiff's physical condition. These facts bear on the reasonableness of their conduct and preclude a grant of summary judgment on qualified immunity grounds. As already noted, Plaintiff attests in her affidavit that she repeatedly complained to them about the pain and discomfort from the rear cuffing. She also cites testimony from her deposition suggesting that, during the period of three to five hours in which she was rear cuffed, the saline leak on her chest was visibly worsening and that the two officers were aware of her deteriorating condition but did not remove the handcuffs or place her in front handcuffs. Lloyd Dep. at 98:16–23, 173:14–21. The City Defendants' submissions are silent on the issue of what the officers knew, if anything, about whether or not the rear handcuffing was exacerbating Plaintiff's condition. Given the facts presented to the Court, the Court cannot conclude as a matter of law at this time that Detectives Mills and Byrne acted in an objectively reasonable manner. Ultimately, therefore, summary judgment on qualified immunity grounds is not appropriate because there are unresolved facts that are material to a determination of the reasonableness of the officers' conduct.

The City Defendants cite to *Shen v. City of New York*, No. 14-cv-7358 (KBF), 2016 WL 4126541 (S.D.N.Y. Aug. 2, 2016) in support of their position that the officers are entitled to qualified immunity on Plaintiff's handcuffing claim. In that case, the plaintiff brought a claim of excessive force because his arresting officers "placed him in rear [double] handcuffs even though they knew he had injured his right arm or shoulder." *Id.* at \*8. The court in that case noted that, even though the plaintiff "complained of his arm being broken and being in pain both before and after he was arrested," there was no evidence in the record indicating that "*after* plaintiff was handcuffed, he told the officers that the double-linked cuffs *exacerbated* his arm pain." *Id.* (emphasis in original). According to the court, "[t]hat the officers accommodated plaintiff's medical injury to his arm vitiates in favor

of reasonableness" and "unquestionably demonstrates that the officers were attempting to alleviate plaintiff's injury." *Id.* at \*9. Further, there was no record evidence demonstrating "that the officers who had handcuffed plaintiff had reason to know that their *accommodation* led to an unreasonable exacerbation of" the plaintiff's injury. *Id.* Ultimately, the court concluded that the officers were entitled to qualified immunity on this claim because "[b]ased on the record evidence, it is clear that the officers used two sets of handcuffs to attempt to minimize the impact of the cuffing on plaintiff's injury" and **\*726** that just because "their efforts nevertheless resulted in some discomfort to plaintiff does not save plaintiff's claim, as it is not 'obvious that no reasonably competent officer would have concluded' the amount of force used in handcuffing plaintiff by using an accommodation of double-linked cuffs violated the law." *Id.* (quoting *Malley*, 475 U.S. at 341, 106 S.Ct. 1092).

**\*\*16** Here, unlike in *Shen*, Plaintiff has cited to record evidence indicating not only that she complained to officers about the rear double cuffing, but also to evidence suggesting that officers were aware that the rear cuffing was exacerbating her pre-existing injuries. The reasoning of *Shen*, therefore, does not provide a basis for the Court to conclude that Detectives Mills and Byrne are entitled to qualified immunity on this claim. If anything, *Shen* supports the notion that officers' awareness of whether the use of handcuffs is exacerbating an existing injury bears on the reasonableness of the officers' conduct for qualified immunity purposes.

### 3. Personal Involvement of Remaining Officers

Plaintiff's handcuffing claim against the other officers, namely Sergeant Graves, Detective Rufle, and UC 137, must be dismissed. The "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016) (quoting *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006) (quotation marks omitted)). Because Plaintiff has only presented evidence regarding the personal involvement of Detectives Mills and Byrne in the relevant events, summary judgment to the remaining officers is appropriate on this claim.

### D. Americans with Disabilities Act and Rehabilitation Act

[20] Plaintiff brings claims under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act against the City of New York based upon the use of rear double handcuffs during her detention by N.Y.P.D. officers. Because the success of these claims depends upon whether officers reasonably accommodated Plaintiff's disability, and facts material to this determination are in dispute, the City's motion for summary judgment is denied.

Title II of the ADA mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Under the ADA, the term "disability" is defined as "a physical or mental impairment that substantially limits one or more major life activities of such individual; a record of such an impairment; or being regarded as having such an impairment." 42 U.S.C. § 12101(1). "Likewise, under Section 504 [of the Rehabilitation Act], '[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.' " B.C. v. Mount Vernon Sch. Dist., 837 F.3d 152, 158 (2d Cir. 2016) (quoting 29 U.S.C. § 794(a)).

[21] "Because the standards adopted by the two statutes are nearly identical, [courts] consider the merits of these claims together." Id. (quoting McElwee v. Cnty. of Orange, 700 F.3d 635, 640 (2d Cir. 2012) (internal quotation marks omitted)). "To establish a violation under Section 504 or Title II, a plaintiff must demonstrate that '(1) he is a qualified individual with a disability; (2) the defendant is subject to one of the Acts; and (3) he was denied the opportunity to participate in or benefit from the defendant's services, programs, *727 or activities, or was otherwise discriminated against by the defendant because of h[er] disability.' " Disabled in Action v. Bd. of Elections in City of New York, 752 F.3d 189, 196 (2d Cir. 2014) (quoting McElwee, 700 F.3d at 640).

The City does not contest the first two elements of the test applicable to Plaintiff's ADA and Rehabilitation Act claims. The City seeks summary judgment on

these claims only on the basis that Plaintiff "has not identified any 'service, program, or activity' from which she was excluded" and that officers "worked to minimize the impact of the handcuffs by placing her in double handcuffs and releasing her from those restraints whenever practicable." City Def. Mem. at 15.

**17 The City's first argument, regarding whether Plaintiff has properly identified a "service, program, or activity," must be rejected. "In the context of arrests, courts have recognized claims alleging a failure to provide reasonable accommodations where police execute a proper arrest but fail to reasonably accommodate a plaintiff's disability during the investigation or arrest, causing h[er] to suffer great injury or indignity than other arrestees." Wagner v. City of New York, No. 14-cv-2521 (VEC), 2015 WL 5707326, at *7 (S.D.N.Y. Sept. 28, 2015) (citations and internal quotation marks omitted); see also Sayers v. City of New York, No. 04-cv-3907 (CPS), 2007 WL 914581, at *8 (E.D.N.Y. Mar. 23, 2007) ("Courts have recognized that the disability statutes apply to prisoners who are transported.") (citing cases).

[22] The City's second argument, regarding the officers' attempt to accommodate Plaintiff's disability, must also be rejected. "The hallmark of a reasonable accommodation is effectiveness." Dean v. Univ. at Buffalo Sch. Of Med. & Biomedical Scis., 804 F.3d 178, 189 (2d Cir. 2015). "Determining the reasonableness of an accommodation is a fact-specific question that often must be resolved by a factfinder." Wright v. New York State Dep't of Corrections, 831 F.3d 64, 72–73 (2d Cir. 2016) (citation, internal quotation marks and brackets omitted). And "[a] defendant is entitled to summary judgment only if the undisputed record reveals that the plaintiff was accorded a plainly reasonable accommodation." Id. (quoting Dean, 804 F.3d at 189) (internal quotation marks omitted).

In this case, the Court cannot conclude as a matter of law that the officers' use of more than one set of handcuffs and their removal of the handcuffs at various points during Plaintiff's detention was a reasonable accommodation. As discussed above in connection with Plaintiff's excessive force claim based on rear double handcuffing, a jury could conclude that the officers' use of rear double handcuffs for three to five hours was not reasonable. For the same reasons discussed in that context, a reasonable jury could conclude that the City failed to offer a reasonable

accommodation to Plaintiff within the meaning of the ADA and the Rehabilitation Act. The City's motion for summary judgment on Plaintiff's ADA and Rehabilitation Act claims is denied.

### E. Municipal Liability for the Use of Rear Double Handcuffs

[23] Plaintiff contends that a municipal policy of the City of New York—the rear handcuffing of all arrestees irrespective of their physical conditions—was the moving force behind the use of excessive force against her. Pl. City Mem. at 19. Plaintiff's claim for municipal liability against the City may proceed to trial because she has raised a triable issue of fact regarding the existence of a municipal policy which caused her asserted constitutional injury.

[24]  [25]  "To hold a city liable under § 1983 for the unconstitutional actions of  *728  its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007) (internal quotation marks and alterations omitted); *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690– 91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Accordingly, "a municipality cannot be made liable [under § 1983] by application of the doctrine of *respondeat superior*," *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), but rather the plaintiff must "demonstrate that, through its deliberate conduct, the municipality was the moving force behind the alleged injury." *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008) (internal quotation marks omitted).

**18 A plaintiff may satisfy the "policy or custom" prong in one of four ways: by proving the existence of (1) a formal policy, *see Monell*, 436 U.S. at 690, 98 S.Ct. 2018; (2) actions taken or decisions made by final municipal policymakers that caused the violation of plaintiff's rights, *see Pembaur*, 475 U.S. at 483–84, 106 S.Ct. 1292; (3) a practice so persistent and widespread that it constitutes a "custom or usage" and implies the constructive knowledge of policymakers, *see Monell*, 436 U.S. at 690–91, 98 S.Ct. 2018; or (4) a failure to properly train or supervise municipal employees that amounts to "deliberate indifference to the rights of those with whom municipal employees will come into contact." *See City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103

L.Ed.2d 412 (1989); *see also Moray v. City of Yonkers*, 924 F.Supp. 8, 12 (S.D.N.Y. 1996).

The City seeks summary judgment on this claim on the ground that a "single incident of unconstitutional activity, by itself, is insufficient to prove" municipal liability. City Def. Mem. at 16–17. The "single incident" principle the City invokes is inapplicable, however, because that rule applies where a plaintiff attempts to establish the *existence* of a municipal policy through evidence of a single incident of unconstitutional activity. *See Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991) ("[A] single incident ... does not suffice to show a municipal policy."). But that is not what Plaintiff is attempting to do here. Instead, Plaintiff relies on the deposition testimony of Sergeant Graves, in which he testified that the City maintains a policy of rear handcuffing all arrestees regardless of their physical condition. Sergeant Graves testified as follows:

Q: Detective, have you ever arrested somebody without handcuffing him or her?

A: No, I have not.

Q: Detective, what if somebody had a broken arm, you arrested somebody with a broken arm, would you handcuff that person?

Ms. Jacobs: Objection. You can answer.

A: Every situation is different, but in some way, shape or form, our policy is all prisoners are handcuffed to the rear.

Q: Irrespective of their physical condition?

Ms. Jacobs: Objection. You can answer.

A: We take all conditions into account, but again, the policy is all prisoners are handcuffed to the rear.

Q. What if somebody had a broken wrist, would you handcuff that person?

Ms. Jacobs: Objection.

A: Again, policy is we will handcuff to the rear. All situations, which are infinite, will be—are dealt with on a case-by-case basis.

Graves Dep. at 44:7–45:3. Sergeant Graves' deposition testimony clearly raises a triable issue of fact with respect

to the existence **\*729** of a municipal policy that caused Plaintiff's asserted constitutional injury.

Of course, in order to prevail on her municipal liability claim at trial, Plaintiff will first need to prove that Detectives Mills and Byrne used unconstitutional excessive force through the use of rear double handcuffs, inasmuch as an underlying constitutional violation is a prerequisite to municipal liability. *See, e.g.*, *City of Los Angeles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986) ("[None] of our cases authorize [ ] the award of damages against a municipal corporation based on the actions of one of its officers ... [i]f a person has suffered no constitutional injury...."); *Segal v. City of New York.*, 459 F.3d 207, 219 (2d Cir. 2006) (where "district court properly found no underlying constitutional violation," it was not necessary to consider claims of municipal liability under *Monell* ); *Levy v. Alfano*, 47 F.Supp.2d 488, 498 (S.D.N.Y. 1999) ("It is well settled that a municipality may not be held liable where there is no underlying constitutional violation by a municipal official.") (citation omitted).

#### F. State Law Assault and Battery
**\*\*19** The City Defendants seek summary judgment on Plaintiff's state law assault and battery claims on the ground that this claim "is identical to his [sic] excessive force claim." City Def. Mem. at 8, n.4. The City Defendants are correct that "with the exception of the state actor requirement, the elements of a Section 1983 excessive force claim and state law assault and battery claims are substantially identical." *Chamberlain v. City of White Plains*, 986 F.Supp.2d 363, 398 (S.D.N.Y. 2013) (citing *Posr v. Doherty*, 944 F.2d 91, 94–95 (2d Cir. 1991)); *see also Kramer v. City of New York*, no. 04–cv–106 (HB), 2004 WL 2429811, at \*11 (S.D.N.Y. Nov. 1, 2004) ("In the context of state officers performing their lawful duties, New York State law regarding assault and battery parallels the federal laws regarding excessive force."). But because Plaintiff's excessive force claims based upon the pushing and handcuffing incidents must be decided by a jury, so too must her state law assault and battery claims. *Cf. Castro v. County of Nassau*, 739 F.Supp.2d 153, 178 n.17 (E.D.N.Y. 2010) (denying summary judgment on state law assault and battery claims where summary judgment was denied on § 1983 excessive force claim because "the same standard applies"). As a result, summary judgment on Plaintiff's state law assault and battery claims is also denied for Sergeant Graves as to

the pushing incident, and denied for Detectives Mills and Byrne as to the use of rear double handcuffs.

#### G. State Law Intentional Infliction of Emotional Distress
**[26]   [27]   [28]** Damages for intentional infliction of emotional distress are available under New York law where a defendant engages in "extreme and outrageous conduct, which so transcends the bounds of decency so as to be regarded as atrocious and intolerable in a civilized society." *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 157 (2d Cir. 2014) (quoting *Freihofer v. Hearst Corp.*, 65 N.Y.2d 135, 143, 490 N.Y.S.2d 735, 480 N.E.2d 349 (1985) (quotation marks omitted)). "To prevail on such a claim, a plaintiff must establish that there was 'extreme and outrageous conduct,' that the conduct was undertaken with 'intent to cause, or disregard of a substantial probability of causing, severe emotional distress,' and that the conduct did in fact cause severe emotional distress." *Id.* at 157–58 (quoting *Howell v. N.Y. Post Co.*, 81 N.Y.2d 115, 121, 596 N.Y.S.2d 350, 612 N.E.2d 699 (1993)); *see also Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999) ("Under New York law, a claim for intentional infliction of emotional distress requires a showing **\*730** of (1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress."). "Whether the conduct alleged may reasonably be regarded as so extreme and outrageous as to permit recovery is a matter for the court to determine in the first instance." *Stuto*, 164 F.3d at 827.

**[29]** Moreover, intentional infliction of emotional distress is a "highly disfavored [tort] under New York law," *Turley*, 774 F.3d at 158 (quoting *Nevin v. Citibank, N.A.*, 107 F.Supp.2d 333, 345–46 (S.D.N.Y. 2000)), and it "is to be invoked only as a last resort." *Id.* (quoting *McIntyre v. Manhattan Ford, Lincoln–Mercury, Inc.*, 256 A.D.2d 269, 270, 682 N.Y.S.2d 167 (1st Dep't 1998)). "[U]nder New York law, an intentional infliction tort may 'be invoked only as a last resort ... to provide relief in those circumstances where traditional theories of recovery do not.' " *Salmon v. Blesser*, 802 F.3d 249, 256 (2d Cir. 2015) (internal citations omitted).

In this case, Plaintiff bases her claim on the contention that Detectives Byrne, Mills, and Rufle "refus[ed] medical treatment to an arrestee with a post-surgery open wound"

and that this constituted "extreme and outrageous" conduct. Pl. City Mem. at 24. But as discussed above, these officers did not in fact refuse medical treatment to Plaintiff; rather, they presented her with numerous opportunities to visit the hospital to have her medication administered and to change her dressings, all of which Plaintiff refused. Given this faulty factual premise, and without needing to decide whether an actual refusal to provide medical treatment could constitute extreme and outrageous conduct, Plaintiff's intentional infliction of emotional distress claim fails. In addition, Plaintiff has not shown the unavailability of traditional theories of tort recovery, so invocation of this "last resort" cause of action is not appropriate. Summary judgment is granted to the City Defendants on this claim.

**H. State Law Negligent Infliction of Emotional Distress**

**20** **[30]** **[31]** **[32]** "Under New York law, a plaintiff may establish [a claim for negligent infliction of emotional distress] in one of two ways: (1) the 'bystander' theory; or (2) the 'direct duty theory.' " *Baker v. Dorfman*, 239 F.3d 415, 421 (2d Cir. 2000) (quoting *Mortise v. United States*, 102 F.3d 693, 696 (2d Cir. 1996)). The "bystander theory" is obviously inapplicable in this case, as it provides that

> a defendant's conduct is negligent as creating an unreasonable risk of bodily harm to a plaintiff and such conduct is a substantial factor in bringing about injuries to the plaintiff in consequence of shock or fright resulting from his or her contemporaneous observation of serious physical injury or death inflicted by the defendant's conduct on a member of the plaintiff's immediate family in his or her presence.

*Id.* (quoting *Bovsun v. Sanperi*, 61 N.Y.2d 219, 224, 473 N.Y.S.2d 357, 461 N.E.2d 843 (1984)). Under the "direct duty" theory, "a plaintiff suffers emotional distress caused by defendant's breach of a duty which unreasonably endangered [plaintiff's] own physical safety." *Id.* (citation and internal quotation marks omitted).

**[33]** Plaintiff appears to pursue the "direct duty" theory, arguing that a "police officer has a duty to procure medical care if he she [sic] knows or should have known that an

arrestee is in need of such care." Pl. City Mem. at 25. But the single case cited in support of the existence of such a duty is dated and, in any event, is not persuasive. In that case, **\*731** *Dunham v. Village of Castro*, 303 N.Y. 498, 104 N.E.2d 872 (1952), the police had "assumed charge of the deceased when he was incoherent and unable to represent himself" and they "knew at least that he was in pain, that he had fallen down, and that he was in need of medical attention." *Id.* at 503, 104 N.E.2d 872. The court found that "[w]ith such knowledge, under the circumstances, the ... authorities were under a duty to obtain medical care for the deceased." *Id.* Here, by contrast, there has been no suggestion that Plaintiff was unable to make her own healthcare decisions like the incapacitated prisoner in *Dunham.* There is therefore no basis to find the existence of a duty on the part of the City Defendants like the one found to exist in *Dunham.* In addition, as discussed above, the officers offered Plaintiff medical assistance, which she declined. Summary judgment must be granted to the City Defendants on this basis.

**I. State Law Negligence**

**[34]** Plaintiff also pursues a claim of negligence against City Defendants, but neither the City Defendants nor Plaintiff discuss this claim in their briefs. "Under New York law ... a plaintiff must establish three elements to prevail on a negligence claim: (1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof." *Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P.*, 737 F.3d 166, 177 (2d Cir. 2013) (quoting *Alfaro v. Wal–Mart Stores, Inc.*, 210 F.3d 111, 114 (2d Cir. 2000)).

The basis for Plaintiff's negligence claim appears to be the same as the basis upon which her negligent infliction of emotional distress claim is based, namely an asserted failure on the part of the police officers involved in her detention to provide medical care. However, as just discussed in connection with Plaintiff's negligent infliction of emotional distress claim, a reasonable jury could not find that the officers owed a duty of care to Plaintiff that they failed to satisfy, and summary judgment on this basis is appropriate with respect to her negligence claim for this reason as well. [4]

[4]    The complaint also asserts a "claim" for "*respondeat superior* liability under New York law." The City

2017 WL 1207838

Defendants have not moved for summary judgment on this issue, and neither they nor Plaintiff address the issue in their briefs. Accordingly, the Court does not discuss it further.

## IV. CONCLUSION

**\*\*21**  For the reasons stated above, the City Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART, and Dr. Alam's motion for summary judgment is GRANTED.

The Clerk of Court is directed to terminate the motions pending at Dkt. Nos. 90, 96, and 98.

SO ORDERED.

## All Citations

246 F.Supp.3d 704, 2017 WL 1207838

---

**End of Document** © 2018 Thomson Reuters. No claim to original U.S. Government Works.

 © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 1189747
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Angel FELICIANO, Plaintiff,

v.

C.O. ANDERSON, et al., Defendants.

15-CV-4106 (LTS) (JLC)
|
Signed 03/30/2017

**Attorneys and Law Firms**

Angel Feliciano, Bronx, NY, pro se.

Richard Bahrenburg, New York City Law Department, New York, NY, for Defendants.

**MEMORANDUM ORDER**

JAMES L. COTT, United States Magistrate Judge.

In this section 1983 action, *pro se* plaintiff Angel Feliciano seeks to amend his complaint to add a claim of deliberate indifference to serious medical needs. Defendants oppose Feliciano's application arguing, among other things, that the amendment would be futile because his proposed amended pleading fails to state a plausible medical deliberate-indifference claim and therefore would be susceptible to a motion to dismiss. For the reasons discussed below, the Court concludes that Feliciano has failed to state a plausible medical deliberate-indifference claim and, accordingly, denies his request to amend his complaint to plead such a claim.[1]

[1]    As an initial matter, I note that I have "the authority to decide plaintiff's [application] to amend pursuant to 28 U.S.C. § 636(b)(1)(A)." *See Corrado v. N.Y. State Unified Court Sys.*, No. 12-CV-1748 (DLI) (MDG), 2014 WL 4626234, at *1 (E.D.N.Y. Sept. 15, 2014) (collecting cases). A denial of a motion to amend by a magistrate judge is "treated as a nondispositive matter" by a district judge, "regardless of whether the denial foreclose[s] potential claims." *MPI Tech A/S v. Int'l Bus. Machines Corp.*, No. 15-CV-4891 (LGS) (DCF), 2017 WL 481444, at *3

(S.D.N.Y. Feb. 6, 2017) (citing *Fielding v. Tollaksen*, 510 F.3d 175, 178 (2d Cir. 2007)).

**I. BACKGROUND**

**A. Procedural History**
Feliciano filed his original complaint on May 19, 2015, seeking damages for injuries that he suffered on January 7, 2015, when a cell door at the Manhattan Detention Complex ("MDC") closed on his head. Complaint, dated Apr. 17, 2015, Dkt. No. 2 ("Initial Complaint" or "Compl."), at 4, 9—10, 13.[2] The Initial Complaint also chronicles defendants' treatment of him for the next six days, that is, through January 13, 2015. *Id.* at 4-8.

[2]    All citations to page numbers of Feliciano's pleadings refer to the pagination generated by this District's Electronic Case Files ("ECF") system. All citations to paragraph (¶) numbers refer to the numeration internal to the document.

In an undated letter, which the Court received on March 7, 2016, Feliciano advised the Court that he intended to file an amended complaint, and he proceeded to submit a proposed amended pleading on May 3, 2016. *See* Pl.'s letter, undated, Dkt. No. 36; Amended Complaint, undated, Dkt. No. 45 ("First Amended Complaint" or "Am. Compl."). Defendants opposed Feliciano's application to file the First Amended Complaint through papers dated June 14, 2016. *See* Memorandum of Law in Opposition to Plaintiffs Request to File an Amended Complaint, dated June 14, 2016, Dkt. No. 51 ("Defs.' Mem."). In response to defendants' opposition, Feliciano requested permission to submit a further amended complaint. Pl.'s letter, dated June 28, 2016, Dkt. No. 52. The Court granted the request (Dkt. No. 53), and Feliciano proceeded to submit a newly amended complaint dated August 12, 2016. See Amended Complaint, dated Aug. 12, 2016, Dkt. No. 57 ("Second Amended Complaint" or "2d Am. Compl.").[3]

[3]    The Court accepted the proposed Second Amended Complaint for consideration, even though it was dated August 12, 2016, more than two weeks after the deadline that the Court had set for its submission. Dkt. No. 58.

**\*2** Despite Feliciano's submission of a further amended pleading, defendants chose to rest on their original opposition papers, even though they were written in

response to the First Amended Complaint, on the ground that the Second Amended Complaint had "not remed[ied] the core issues originally" raised in defendants' opposition papers. Defs.' letter, dated Sept. 23, 2016, Dkt. No. 60. After the Court granted Feliciano two extensions (Dkt. Nos. 62, 64), his reply became due on December 15, 2016. The order granting the second extension (Dkt. No. 64) advised Feliciano that the Court would consider the matter to be fully submitted and ready for decision if he failed to submit his reply papers by this date. As of this writing, more than three months later, Feliciano has not responded to defendants' opposition papers and, consequently, the Court considers this matter to be ready for decision.

**B. Alleged Facts**

The facts set out below, which are drawn from the Initial Complaint and the proposed Second Amended Complaint, are deemed to be true for purposes of this decision. *See, e.g., Polanco v. NCO Portfolio Mgmt., Inc.*, 23 F. Supp. 3d 363, 366 n.1 (S.D.N.Y. 2014). With respect to the factual allegations occurring between January 7 and January 13, 2015, the Second Amended Complaint largely mirrors the Initial Complaint, except that the Second Amended Complaint sometimes includes additional detail. The main distinction between the two pleadings is that, unlike the Initial Complaint, the Second Amended Complaint describes Feliciano's medical treatment (or lack thereof) for approximately six months after his head injury on January 7, 2015. The Second Amended Complaint also names an additional 15 defendants, many of whom are medical professionals, including three doctors, seven physician assistants, a nurse, and an optometrist. *See* 2d Am. Compl. at 1-5. [4]

[4]    The only medical professional named as a defendant in the Initial Complaint was "Dr. Pateo," whom Feliciano refers to as Dr. Mateo in the Second Amended Complaint. Compl. at 8; 2d Am. Compl. ¶ 13.

**1. Original Allegations**

On January 7, 2015, at approximately 2:45 p.m., while Feliciano was incarcerated at the MDC, his cell door in "Unit 8 South" opened unexpectedly. Compl. at 2, 4. Feliciano "peeked out" and "asked what[ ] [was] going on." *Id.* at 4. Other inmates told him that it was "lock in time." *Id.* "Then without warning the door closed on [his]

head for about 10 seconds before two inmates pulled it open." *Id.* Feliciano "immediately reported the incident to [defendant] C.O. Anderson and asked her why she didn't announce that the doors were closing." *Id.* She told him that he " 'should have known they were closing' " as it was " 'lock in time.' " She added that his " 'head shouldn't have been in the door[ ]way' " ' to begin with. *Id.* [5]

[5]    In the Second Amended Complaint, Feliciano further asserts that defendant "C.O. Jane Doe (the female officer who was operating the cell doors.) did not open the cell doors all the way before closing them as per normal procedure." 2d Am. Compl. ¶ 1. Feliciano adds that, after his head injury, C.O. Anderson did not "attempt to get [him] medical attention, or file an Incident Report as per normal procedure" and that she "even threatened to give [him] an infraction if she had to file an Incident Report." *Id.*

Feliciano visited the facility's medical clinic at 4:30 p.m. later that day. Compl. at 4. After complaining about having a "headache, [a] knot above [his] left temple, [and] sensitivity to light and noise," he was prescribed ibuprofen. *Id.* [6]

[6]    In the Second Amended Complaint, Feliciano also states that he had asked defendant C.O. Villalon for medical attention at 4:00 p.m. that day and that C.O. Villalon proceeded to contact the clinic on his behalf. 2d Am. Compl. ¶ 2. Feliciano also specifies that, when he arrived at the clinic, he was seen by physician assistant Charles Appiah, who is named as a defendant in the Second Amended Complaint but not in the Initial Complaint. *Id.* ¶ 3. The amended pleading further adds that, while waiting for a nurse to administer a dosage of ibuprofen to him, Feliciano lay down "with [his] eyes closed, covering both ears, and soon after passed out." *Id.*

**\*3** Feliciano also visited the clinic two days later, on January 9, when he "was seen by [defendant] Bessie Flores-Clemente" and complained about the same symptoms. Compl. at 5. [7] Feliciano further alleges that defendant C.O. Codea never informed the "8 South Officer on duty to write [an] injury report," even though Flores-Clemente had instructed him to do so. Compl. at 5. [8]

[7]    Although the Initial Complaint states that Flores-Clemente is a doctor, the Second Amended

Complaint indicates that she is a physician assistant. *See, e.g.,* 2d Am. Compl. ¶ 4.

[8]   The Second Amended Complaint appears to name this "Unit 8 South" correction officer as a Jane Doe defendant, specifying that she was "operating the cell doors" on January 7, when his cell door closed on his head. 2d Am. Compl. at 2, 3, 6 ¶ 1.

Feliciano appears to complain that, on January 10, defendant C.O. DelaRosa refused to file an injury report for him because she was not " 'present for the injury.' " Compl. at 5. According to the Initial Complaint, defendants C.O. LaBrew, C.O. McCoy, and C.O. Codea did not provide Feliciano with a grievance form on January 11 or 12, despite his requests for such a form on those dates. *Id.* at 5-6.

On January 12 at 6:20 p.m., Feliciano asked C.O. Lumlee to contact the clinic for him because his head was hurting. *Id.* at 6. When Feliciano pointed to his head, C.O. Lumlee told him to "put [his] hands down because she felt threatened." *Id.* She then told him to " 'take some [T]ylenol.' " *Id.* Feliciano said that he had already taken ibuprofen but that his head was still "in pain." *Id.* C.O. Lumlee questioned what the clinic would do for him and asked why he did not go to sick call, which was called every day. *Id.* at 6-7. Feliciano replied that he must be " 'asleep when they call it' " because he " 'work[s] overnight.' " *Id.* at 7. When Feliciano asked her to file an injury report for him, she refused and said that the officer present for the incident should have done that. *Id.*

The next morning, on January 13 at 11:00 a.m., Feliciano "went to sick call and saw" defendant Flores-Clemente, who prescribed him Sumatriptan. *Id.* At 12:25 p.m., Feliciano requested a grievance form from Captain Romero. *Id.* Captain Romero made a note of Feliciano's request and returned with three grievance forms approximately two and a half hours later. *Id.* [9]

[9]   Although the Initial Complaint names Captain Romero as a defendant, the Second Amended Complaint does not. Feliciano annexes a grievance form dated January 15, 2015, as an Exhibit A to the Initial Complaint. Compl. at 15. Feliciano's grievance complains that a "cell door was shut on [his] head for about ten seconds" and that, "instead of writing an injury report," defendant C.O. Anderson "threatened to give [him] an infraction." *Id.* In the *pro se* form complaint that he used to file the Initial

Complaint, Feliciano states that this grievance was "never answered." *Id.* at 10.

At 6:00 p.m. that day, Feliciano complains that defendant C.O. Gason did not permit him to enter his cell to access his medication, stating that " 'we're not opening any cells right now.' " Compl. at 8. Almost an hour later, Feliciano asked defendant C.O. Williams to contact the clinic for him because of a "sharp pain" in his left eye. *Id.* C.O. Williams did so but defendant Dr. Mateo refused to see him at that time and, instead, instructed Feliciano to "rinse [his] eye with cold water" and to "sign up for sick call" the next morning. *Id.*

**2. New Allegations**
**\*4**  According to the Second Amended Complaint, on January 14, Feliciano was escorted to the clinic, where he saw defendant Dr. Brenda Harris. 2d Am. Compl. ¶ 14. After complaining about "a sharp pain behind [his] left eye and a headache (migraine) that felt like a 'band around [his] head,' " Dr. Harris referred Feliciano to neurology. *Id.* [10]

[10]   As explained below, Feliciano's first neurology appointment was on June 8 and his second appointment was on July 8. 2d Am. Compl. ¶¶ 23, 27.

The next day, on January 15, Feliciano "was escorted to sick call and seen by" defendant Flores-Clemente, a physician assistant. *Id.* ¶ 15. Feliciano complained about " 'problems reading' (vision impairment)," and Flores-Clemente referred him to optometry. *Id.*

The next week, on January 23, Feliciano again "was escorted to sick call and seen by" Flores-Clemente. *Id.* ¶ 16. He complained that he was continuing to experience "headaches (migraines)," and Flores-Clemente prescribed him Tylenol. *Id.*

On February 10, Feliciano went to sick call again and was seen by defendant Dr. Landis Barnes. *Id.* ¶ 17. Though Feliciano complained of "dizziness and feeling light headed," Dr. Barnes did not schedule him "for any follow up care." *Id.*

Feliciano was transferred to another facility for an optometry appointment on February 20. *Id.* ¶ 18. After performing an eye examination, defendant Barry Hyman, an optometrist, diagnosed Feliciano "as having astigmatism and prescribed [him] corrective lenses." *Id.*

On March 10, Feliciano "was escorted to sick call and seen by" Flores-Clemente once again. *Id.* ¶ 19. He complained about experiencing "a headache (migraine), pain in [his] left eye, sensitivity to light and noise, and back pain." *Id.* Flores-Clemente prescribed him ibuprofen and Robaxin. *Id.*

On April 24, Feliciano again "was escorted to sick call" and seen by defendant Jeanty Francois, a physician assistant. *Id.* f 20. After Feliciano complained about experiencing "headaches (migraines) and lower back pain," Francois prescribed him ibuprofen and Robaxin. *Id.*

At some point after his April 15 appointment with Francois, Feliciano was transferred from the MDC to the George Motchan Detention Complex. *Id.* ¶¶ 20-21. At this new facility, on May 15, Feliciano "went to sick call and was seen by" defendant Francisco Peguero, a physician assistant. *Id.* ¶ 21. After complaining about "re[ ]curring headaches (migraines) 'off and on', pain in [his] left eye, and vision problems," Peguero prescribed him Naprosyn. *Id.*

On June 4, Feliciano again went to sick call and was seen by defendant Jorge Villalobos, a physician assistant. *Id.* ¶ 22. After Feliciano complained about "migraine headaches and back pain," Villalobos prescribed him ibuprofen. *Id.*

The next week, on June 8, Feliciano was transferred to another facility for a neurology appointment with defendant Dr. Olga Segal. *Id.* ¶ 23. There, Feliciano "complained about headaches, migraines, pain and pressure behind [and] in [his] left eye, and sensitivity to light and noise." *Id.* Dr. Segal "administered neurology tests and referred [him] to optometry." *Id.*

On June 19, defendant Vanessa Jones, a physician assistant, saw Feliciano after he went to sick call. *Id.* ¶ 24. Feliciano complained about "lower back pain and headache pain in the front of [his] head (migraine)," and Jones prescribed him ibuprofen. *Id.*

**\*5** One week later, on June 26, Feliciano again went to sick call, where defendant Vonetta Morris-Georges, a nurse, saw him. *Id.* ¶ 25. Feliciano "requested multi-vitamins" and "complained that the milk being served was

upsetting [his] stomach." *Id.* Georges referred Feliciano to a " 'practitioner' " for these problems. *Id.*

On June 30, Feliciano "went to sick call and was seen" by defendant Scott Parks, a physician assistant, for "complaints about the milk upsetting [his] stomach, [his] request for multi-vitamins and pain medication for [his] re [ ]curring headaches." *Id.* ¶ 26. [11] Parks prescribed Feliciano multivitamins and gave him a "dietary referral for soy milk." *Id.* ¶ 26. He also "educated [Feliciano] on neck stretching exercises to help reduce the frequency of headaches"; "showed [him] some eye exercises" to help him "retain [his] focus when it was lost"; and "explained that [he] need[ed] to wear [his] glasses consistently because [his] eyes would weaken from the straining." *Id.*

[11]    It is unclear whether Parks is the " 'practitioner' " to whom defendant Jones had referred Feliciano. *Id.* ¶¶ 25-26.

On July 8, Feliciano had a second neurology appointment with defendant Dr. Segal, during which Feliciano explained that he still "suffer[ed] from re [ ]curring headaches though wearing [his] corrective lenses seemed to have reduced the frequency" and that he still experienced "pain in [his] left eye." *Id.* ¶ 27. Dr. Segal said that Feliciano was "most likely" suffering from " 'post traumatic headaches,' " but she "did not know what was causing" the eye pain. *Id.* Dr. Segal stated that Feliciano had "no neurological dysfunctions" and referred him "back to optometry." *Id.*

Five days later, on July 13, Feliciano was transported to another facility for a second optometry appointment with defendant Hyman. *Id.* ¶ 28. Feliciano explained that he had lost his glasses, which had helped decreased his "headache frequency." *Id.* Feliciano also said that he "felt constant pressure behind [his] left eye." *Id.* Hyman prescribed Feliciano another pair of glasses and indicated that "the pressure behind [his] eye was sinus related." *Id.* Consequently, he referred Feliciano for a sinus evaluation. *Id.* When Feliciano asked if there was any possibility that the pressure was caused by the January 7 incident, Hyman said that "it was too late to find out because [he] never got an x-ray that would've shown any possible fracture that could have damaged the nasal passage." *Id.*

Finally, on July 15, Feliciano went to sick call and was seen by non-party Dr. Frantz Medard. *Id.* ¶ 29. After Feliciano complained about "pressure behind [his] left

eye," Dr. Medard "said that it could be sinus related and referred [Feliciano] to be x-rayed." *Id.*[12]

[12]    On July 17, 2015, Feliciano was transferred to the Ulster Correctional Facility, which is located in the Northern District of New York. 2d Am. Compl. ¶ 29.

## II. DISCUSSION

Feliciano contends that defendants were deliberately indifferent to his medical needs. *Id.* ¶¶ 33-51.[13] Although Feliciano did not originally plead this claim, he seeks to amend his complaint to add it at this time. Defendants argue that Feliciano's application should be denied on the ground that the proposed amendment would be futile. Defs.' Mem. at 2. Specifically, defendants contend that, if Feliciano were permitted to plead this claim, it would be subject to dismissal on three grounds. First, defendants argue that Feliciano has failed to exhaust his administrative remedies. *Id.* at 5. Second, defendants assert that Feliciano fails to state a plausible claim of deliberate indifference to medical needs. *Id.* at 6. Third, defendants argue that the Second Amended Complaint fails to allege defendants' personal involvement in a constitutional violation, which is a prerequisite for damages under section 1983. *Id.* at 12.

[13]    Feliciano pleads this claim as two separate "counts": "Deliberate Indifference to Medical Needs" and "Failure To Provide Medical Care." 2d Am. Compl. ¶¶ 33-51. The Court, however, treats them as one.

**\*6** As explained below, the Court rejects the first argument because defendants have the burden of demonstrating a plaintiff's failure to exhaust administrative remedies and, here, defendants have failed to meet their burden. Regarding the defendants' second argument, the Court agrees that Feliciano has failed to state a plausible claim of deliberate indifference to serious medical needs and therefore concludes that permitting him to amend his complaint to add such a claim would be futile. Because the Court concludes that Feliciano has failed to state a plausible claim of deliberate indifference, the Court does not reach the question of whether defendants had sufficient personal involvement in the alleged constitutional violation. *See, e.g., Stevens v. City of N. Y.,* No. 10-CV-5455 (PGG), 2011 WL 3251501, at *6 n.6 (S.D.N.Y. July 22, 2011) ("Because this Court finds

that no constitutional violation has been alleged, it does not reach [the personal-involvement] issue.").

### A. Standard to Amend Complaint

" 'A district court has broad discretion in determining whether to grant leave to amend....' " *United States ex rel. Ladas v. Exelis, Inc.,* 824 F.3d 16, 28 (2d Cir. 2016) (citation omitted). Under Rule 15 of the Federal Rules of Civil Procedure, courts should "freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). At the same time, leave to amend "should generally be denied in instances of futility." *Burch v. Pioneer Credit Recovery, Inc.,* 551 F.3d 122, 126 (2d Cir. 2008). Granting leave to amend is considered futile if the newly amended pleading would be subject to dismissal for the failure to exhaust administrative remedies. *See, e.g., Baez v. Kahanowicz,* 469 F. Supp. 2d 171, 180 (S.D.N.Y. 2007) ("Because ... any subsequently amended ... complaint is subject to dismissal for failure to exhaust administrative remedies, it would be futile to grant plaintiff leave to amend...."), *aff'd,* 278 Fed.Appx. 27 (2d Cir. 2008).

Granting leave to amend is also considered futile when "the proposed new pleading fails to state a claim on which relief can be granted." *Krys v. Pigott,* 749 F.3d 117, 134 (2d Cir. 2014). In this situation, the "standard for denying leave to amend based on futility is ... the same as the standard for granting a motion to dismiss" under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *NECA-IBEW Pension Trust Fund v. Lewis,* 607 Fed.Appx. 79, 80 (2d Cir. 2015), *cert. denied,* 136 S. Ct. 821 (2016). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' " *Id.* (quoting *Twombly,* 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of further factual enhancement.' " *Id.* (quoting *Twombly,* 550 U.S. at 555).

" 'Complaints prepared by *pro se* litigants are held 'to less stringent standards than formal pleadings drafted by lawyers.' " *Liner v. Fischer,* No. 11-CV-6711 (PAC) (JLC), 2013 WL 3168660, at *6 (S.D.N.Y. June 24,

2013) (quoting *Peay v. Ajello,* 470 F.3d 65, 67 (2d Cir. 2006)), *adopted by,* 2013 WL 4405539 (S.D.N.Y. Aug. 7, 2013). Moreover, a *pro se* plaintiff's pleading "must be construed liberally to raise the strongest arguments it suggests." *Walker v. Schult,* 717 F.3d 119, 124 (2d Cir. 2013) (internal quotation marks and alterations omitted). Nonetheless, "the fact that [a party] is proceeding *pro se* 'does not exempt him from compliance with relevant rules of procedural and substantive law.' " *Mallgren v. Microsoft Corp.,* 975 F. Supp. 2d 451, 455 (S.D.N.Y. 2013) (quoting *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir. 1983)) (internal alterations omitted). "A *pro se* complaint, like any other, 'must state a plausible claim for relief.' " *Id.* (quoting *Walker,* 717 F.3d at 124).

**B. Failure to Exhaust**

**\*7** Defendants argue that Feliciano's failure to exhaust administrative remedies bars his medical deliberate-indifference claim. Defs.' Mem. at 5-6. The Prison Litigation Reform Act ("PLRA") "requires that a prisoner exhaust all available administrative remedies before bringing an action regarding his confinement." *Martin v. City of N.Y.,* No. 11-CV-600 (PKC) (RLE), 2012 WL 1392648, at \*4 (S.D.N.Y. Apr. 20, 2012); 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."). However, "failure to exhaust is an affirmative defense under the PLRA" and, thus, "inmates are not required to specially plead or demonstrate exhaustion in their complaints." *Jones v. Bock,* 549 U.S. 199, 216 (2007). Rather, "defendants bear the initial burden of establishing, by pointing to 'legally sufficient source[s]' such as statutes, regulations, or grievance procedures, that a grievance process exists and applies to the underlying dispute." *Hubbs v. Suffolk Cnty. Sheriff's Dep't,* 788 F.3d 54, 59 (2d Cir. 2015) (quoting *Mojias v. Johnson,* 351 F.3d 606, 610 (2d Cir. 2003)) (citation omitted).

Citing the *pro se* form complaint that Feliciano used to file the First Amended Complaint, defendants note that Feliciano admits that the MDC had a grievance procedure. Defs.' Mem. at 6 (citing Am. Compl. at 12). Defendants further observe that the form indicates that Feliciano filed a grievance regarding his "whole claim," but that it was never answered. *Id.* The problem, according

to defendants, is that Feliciano did "not indicate what steps, if any, he took to appeal the non-answer." *Id.* Consequently, defendants argue that "plaintiff has failed to allege that he" exhausted his administrative remedies with respect to his medical deliberate-indifference claims. *Id.*

As an initial matter, by relying on their original opposition papers (which were written in response to the First Amended Complaint, not the Second Amended Complaint), defendants have not addressed the operative allegations regarding Feliciano's exhaustion efforts. In his proposed Second Amended Complaint, Feliciano admits to the existence of a grievance procedure, but indicates that he "Do[es] Not Know" whether that procedure covered any or all of his claims. 2d Am. Compl. at 19. He states, however, that he filed a grievance regarding "Claim #1" (as opposed to the "whole claim"), but that his grievance was never answered. *Id.*[14]

[14]   "Claim #1" appears to refer to the alleged constitutional violations resulting from the January 7 incident, not the ensuing medical treatment. 2d Am. Compl. ¶¶ 30-32 (labeling allegations "Count One"); *see also* Compl. at 15 (grievance form dated Jan. 5, 2015).

Although defendants may be correct that Feliciano never grieved his medical deliberate-indifference claims, defendants have failed to meet their burden of establishing that a "grievance process ... applie[d] to" those claims. *See Hubbs,* 788 F.3d at 59. Given Feliciano's professed ignorance about the scope of the grievance procedure, it is not clear from the face of the complaint that Feliciano left available administrative remedies unexhausted. After all, to the extent that Feliciano's medical deliberate-indifference claims were outside the scope of the existing grievance procedure, or to the extent that Feliciano was not informed of its scope, no administrative remedies were "available" for Feliciano to exhaust. *See, e.g., Abdallah v. Ragner,* No. 12-CV-8840 (JPO), 2013 WL 7118083, at \*3-4 (S.D.N.Y. Nov. 22, 2013) (denying motion to dismiss for failure to exhaust where "complaint suggests that prison officials did not notify [plaintiff] about the scope of the grievance process or the procedure for filing and appealing a grievance" because an "administrative remedy is not 'available' for purposes of the PLRA if prisoners are not informed that the remedy exists"); *Walker v. Vargas,* No. 11-CV-9034 (ER), 2013 WL 4792765, at \*5 (S.D.N.Y. Aug. 26, 2013) ("An administrative remedy is

not 'available' for purposes of the PLRA if prisoners are not fully informed about the existence and operation of the remedy.") (citation omitted); *Leacock v. N.Y.C Health Hosp. Corp.,* No. 03-CV-5440 (RMB) (GWG), 2005 WL 1027152, at *1-2 (S.D.N.Y. May 4, 2005) ("administrative remedies were not 'available' " to plaintiff because DOC grievance procedure did not apply to "claims asserted against medical personnel at City jails").

**\*8** Although it is entirely possible that a grievance procedure applied to Feliciano's medical claims and that Feliciano failed to avail himself of this procedure, defendants have not directed the Court to such a procedure or established its applicability. *Cf. Hilbert v. Fischer,* No. 12-CV-3843 (ER), 2013 WL 4774731, at *4-7 (S.D.N.Y. Sept. 5, 2013) (converting motion to dismiss into motion for summary judgment and partially dismissing complaint where defendants submitted declaration of correctional official establishing plaintiffs failure to exhaust available grievance process); *Murray v. Prison Health Servs.,* 513 F. Supp. 2d 9, 13 (S.D.N.Y. 2007) (granting motion to dismiss where defendants "submitted two declarations from grievance records custodians"). Given that the Second Amended Complaint is at least consistent with the possibility that the available grievance procedure was inapplicable to Feliciano's medical deliberate-indifference claims or that he was not fully informed of the grievance procedure's scope, the Court concludes that defendants have not met their burden to establish this affirmative defense on the present record. *See Walker,* 2013 WL 4792765, at *5 ("In light of the possibility that the Plaintiff was not fully informed about the grievance program, the Plaintiff's allegations do not foreclose the possibility that the Court should excuse the Plaintiffs failure to exhaust."). [15]

---

[15]    Courts have repeatedly concluded that the DOC's Inmate Grievance and Request Program ("IGRP") applies to medical deliberate-indifference claims and have taken judicial notice of this grievance process. *See, e.g., Johnson v. Stevens,* No. 12-CV-5186 (RRM) (MDG), 2014 WL 4722711, at *3 n.8 (E.D.N.Y. Sept. 22, 2014). By the IGRP's own terms, claims alleging that DOC personnel "have interfered with the inmate's timely access to medical care" are subject to the IGRP, but claims alleging "that a medical professional employed to provide services to inmates has failed to provide adequate medical care" are "not subject to the IGRP process." *See* Inmate Grievance and Request Program, effective

Sept. 10, 2012, wwwl.nyc.gov/assets/doc/downloads/directives/Directive_ 3376_Inmate_Grievance_Request_Program.pdf (last visited Mar. 30, 2017). Here, defendants have not even directed the Court to the IGRP, much less demonstrated that it applies to the claims against the named defendants in this action. Given defendants' silence on the subject, and given the Court's conclusion that Feliciano's application to amend should be denied on a separate ground, the Court will not undertake to decide the extent to which the IGRP applies to Feliciano's claims.

## C. Deliberate Indifference to Medical Needs

### 1. General Framework

In section 1983 actions, parties may seek redress for "the deprivation of any rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983. "A convicted prisoner's claim of deliberate indifference to his medical needs by those overseeing his care is analyzed under the Eighth Amendment because the right the plaintiff seeks to vindicate arises from the Eighth Amendment's prohibition of cruel and unusual punishment." *Caiozzo v. Koreman,* 581 F.3d 63, 69 (2d Cir. 2009) (footnote and quotation marks omitted), *overruled on other grounds, Darnell v. Pineiro,* 849 F.3d 17, 35 (2d Cir. 2017). "In the case of a person being held prior to trial, however, the cruel and unusual punishment proscription of the Eighth Amendment ... does not apply, because as a pre-trial detainee the plaintiff is not being punished." *Id.* (internal citations, alterations, and quotation marks omitted). Instead, a pretrial detainee's claim of deliberate indifference is "properly brought under the Due Process Clause of the Fourteenth Amendment." *Id.* Here, although neither side has expressly stated as much, Feliciano appears to have been a pretrial detainee at all times relevant here. *See* 2d Am. Compl. ¶ 29 (noting that Feliciano was transferred from a city to a state correctional facility on July 17, 2015); Defs.' Mem. at 8, 9 n.l, 11 (citing law applicable to pretrial detainees).

Regardless of whether a deliberate-indifference claim is brought by a convicted prisoner under the Eighth Amendment or by a pretrial detainee under the Fourteenth Amendment, the plaintiff must satisfy a two-prong test. First, the plaintiff must establish that he suffered a sufficiently serious constitutional deprivation. Second, the plaintiff must demonstrate that the defendant acted with deliberate indifference. *See, e.g., Darnell,* 849

F.3d at 29 (pretrial detainee); *Taylor v. Goorde,* 548 Fed.Appx. 696, 698 (2d Cir. 2013) (convicted prisoner).

### 2. Effect of *Darnell v. Pineiro*

**\*9** Until recently, the analysis of these prongs was identical regardless of whether the plaintiff was a convicted prisoner claiming deliberate indifference under the Eighth Amendment or a pretrial detainee claiming deliberate indifference under the Fourteenth Amendment. *See, e.g., Simpson v. Town of Warwick Police Dep't,* 159 F. Supp. 3d 419, 443 (S.D.N.Y. 2016) (" 'Claims for deliberate indifference to a serious medical condition or other serious threat to the health or safety of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment." ') (quoting *Caiozzo,* 581 F.3d at 72); *Darnell,* 849 F.3d at 33. Indeed, defendants' opposition papers, which were submitted before the Second Circuit's decision in *Darnell v. Pineiro,* assert that the standards are the same irrespective of whether the inmate's claim is rooted in the Eighth or Fourteenth Amendment. *See* Defs.' Mem. at 8, 9 n.l.

After *Darnell,* however, the second prong of the test may be defined objectively or subjectively, depending on the inmate's status. In *Darnell,* a case in which pretrial detainees claimed deliberate indifference based on conditions of their confinement, the Second Circuit concluded that the Supreme Court's recent decision in *Kingsley v. Hendrickson* undercut the rationale for treating pretrial detainees like convicted prisoners for purposes of the second prong of the deliberate-indifference test. *Darnell,* 849 F.3d at 33-34 (citing *Kingsley v. Hendrickson,* 135 S. Ct. 2466 (2015)). In *Kingsley,* the Supreme Court determined that, unlike a prisoner bringing an excessive-force claim under the Eighth Amendment, a pretrial detainee asserting such a claim under the Fourteenth Amendment was not required to establish the defendant's subjective mental state. *Kingsley,* 135 S. Gt. at 2472-73. Instead, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable," meaning that "the defendant's state of mind is not a matter that a plaintiff is required to prove." *Id.*

The rationale for requiring a prisoner to prove the defendant's subjective state of mind to satisfy the second prong of the deliberate-indifference test is grounded in the text of the Eighth Amendment's Cruel and Unusual Punishments Clause. "According to the Supreme Court, 'punishment' connotes a subjective intent on the part of the official, which also requires awareness of the punishing act or omission." *Darnell,* 849 F.3d at 32-33 (citing *Farmer v. Brennan,* 511 U.S. 825, 836-37 (1994)). "Unlike a violation of the Cruel and Unusual Punishments Clause, an official can violate the Due Process Clause of the Fourteenth Amendment without meting out any punishment, which means that the Due Process Clause can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm." *Id.* at 35.

Although *Kingsley* involved a claim of excessive force by a pretrial detainee, the Second Circuit concluded that the "same objective analysis should apply to an officer's appreciation of the risks associated with an unlawful condition of confinement in a claim for deliberate indifference under the Fourteenth Amendment." *Id.* Accordingly, to establish such a claim, the Second Circuit determined that "the pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Id.*

After *Darnell,* the so-called subjective prong of the deliberate-indifference test under the Fourteenth Amendment has become a misnomer, as it is now "defined objectively." *Id.* Consequently, as the Second Circuit itself observed, the prong "might better be described as the '*mens rea* prong' or 'mental element prong.' " *Id.* at 32.

**\*10** Although *Darnell* involved a challenge to conditions of confinement, the holding of the decision is broad enough to extend to medical deliberate-indifference claims. Indeed, the Second Circuit stated that "deliberate indifference means the same thing for each type of claim under the Fourteenth Amendment." *Id.* at 33 n.9 (citing *Caiozzo,* 581 F.3d at 72). Further, the appellate court noted that its decision overruled its previous decision in *Caiozzo* "to the extent that it determined that the standard for deliberate indifference is the same under the Fourteenth Amendment as it is under the Eighth Amendment." *Id.* at 35. And *Caiozzo* involved a claim of deliberate indifference to medical needs. *Id.* at 33

n.9 (citing *Caiozzo,* 581 F.3d at 68). [16] Consequently, even though *Darnell* did not involve claims of deliberate indifference to serious medical needs, the Court concludes that *Darnell's* holding with respect to the so-called subjective prong of the deliberate-indifference test applies here. For this reason, when deciding whether Feliciano has met this prong (which the Court will refer to as the *mens rea* or mental-element prong as suggested by the Second Circuit), the Court will employ an objective analysis.

[16] A similar pattern underlies a Ninth Circuit opinion on which the Second Circuit relied, namely, *Castro v. Cnty. of L.A.,* 833 F.3d 1060 (9th Cir. 2016) (en banc), *cert. denied,* 137 S. Ct. 831 (2017). *See Darnell,* 849 F.3d at 35 n.14. *Castro* involved a pretrial detainee's claim of deliberate indifference based on a failure-to-protect theory. *Castro,* 833 F.3d at 1064. Relying on *Kingsley,* the Ninth Circuit concluded that an objective standard governed deliberate-indifference claims. *Id.* at 1068—72. In doing so, the Ninth Circuit overruled *Clouthier v. Cnty. of Contra Costa,* 591 F.3d 1232, 1240 (9th Cir. 2010), a case involving medical deliberate-indifference claims that had stood for the proposition that pretrial detainees were required to establish defendants' subjective intent. *See id.* at 1070. Some but not all Ninth Circuit district courts have applied *Castro* to medical deliberate-indifference claims, even though *Castro* did not adjudicate such a claim. *See, e.g., Borges v. City of Eureka,* No. 15-CV-846 (YGR), 2017 WL 363212, at *9 (N.D. Cal. Jan. 25, 2017) (applying *Castro* to medical deliberate-indifference claim); *Guerra v. Sweeny,* No. 13-CV-1077 (AWI), 2016 WL 5404407, at *3 (E.D. Cal. Sept. 27, 2016) (applying *Castro* to medical claim but citing other cases that did not). In any event, the Second Circuit's reliance on a Ninth Circuit failure-to-protect case (*Castro*) and a Supreme Court excessive-force case (*Kingsley*) is some further indication that *Darnell's* holding extends beyond conditions-of-confinement claims.

### a. Objective or "Deprivation" Prong: Sufficiently Serious Deprivation

As the Court reads *Darnell,* the objective prong of a deliberate-indifference claim is the same regardless of whether the inmate is a convicted prisoner or a pretrial detainee. *See Darnell,* 849 F.3d at 30 (reciting standard to establish an objective deprivation under "both the Eighth and Fourteenth Amendments"). [17] This requirement—which in this case asks whether the deprivation of medical care was sufficiently serious—can be divided into subparts: " 'The first inquiry is whether the prisoner was actually deprived of adequate medical care,' keeping in mind that only 'reasonable care' is required." *Barnes v. Ross,* 926 F. Supp. 2d 499, 505 (S.D.N.Y. 2013) (quoting *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir. 2006)). " '[P]rison officials who act reasonably [in response to an inmate-health risk] cannot be found liable....' " *Salahuddin,* 467 F.3d at 279—80 (quoting *Farmer,* 511 U.S. at 845). The second inquiry "asks whether the inadequacy in medical care is sufficiently serious." *Id.* at 280. "[I]n cases of delayed or inadequate care, 'it's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant....' " *Sledge v. Fein,* No. 11-CV-7450 (PKC), 2013 WL 1288183, at *5 (S.D.N.Y. Mar. 28, 2013) (quoting *Smith v. Carpenter,* 316 F.3d 178, 186 (2d Cir. 2003)); *see also Bellotto v. Cnty. of Orange,* 248 Fed.Appx. 232, 236 (2d Cir. 2007) ("When a prisoner alleges denial of adequate medical care, we evaluate the seriousness of the prisoner's underlying medical condition. When a prisoner alleges 'a temporary delay or interruption in the provision of otherwise adequate medical treatment,' we focus on the seriousness of the particular risk of harm that resulted from 'the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.' ") (quoting *Smith,* 316 F.3d at 185) (internal citation omitted).

[17] Now that both parts of the two-part deliberate-indifference test are defined objectively, it is not particularly helpful to label the first part the "objective prong" or "objective requirement." Yet because most relevant precedent still uses this terminology, the Court does so here. Following *Darnell,* this part of the test might be more appropriately called the "deprivation prong" or the "deprivation requirement."

**\*11** Feliciano has failed to plead facts in his proposed Second Amended Complaint sufficient to meet the objective or "deprivation" prong of the deliberate-indifference test. Even if the Court were to assume that Feliciano went without adequate medical care at times (which is not apparent from his allegations), he has not established that any deprivation of care was serious enough to rise to the level of a constitutional violation.

On January 7, 2015, Feliciano was at the clinic within two hours of his head injury, and only a half hour after he first requested medical attention. 2d Am. Compl. ¶¶ 1-3. That day, Feliciano received a prescription for ibuprofen. *Id.* ¶ 3. Over the next two weeks, Feliciano visited the clinic five times—specifically, on January 9, 13, 14, 15, and 23. *Id.* ¶¶ 4, 9, 14-16. He received a prescription for sumatriptan on January 13, a referral to neurology on January 14, a referral to optometry on January 15, and a prescription for Tylenol on January 23. *Id.* ¶¶ 9, 14-16. Over the next several months, medical professionals saw him repeatedly, including twice in February; once each month in March, April, and May; five times in June; and three times in July. *Id.* ¶¶ 17-29. In total, Feliciano received prescriptions for five types of pain medication (ibuprofen, sumatriptan, Tylenol, Robaxin, and Naprosyn). *Id.* ¶¶ 2, 9, 14-16, 18-22, 24. He also had two appointments with a neurologist, and two appointments with an optometrist. *Id.* ¶¶ 18, 23, 27-28. According to Feliciano, corrective lenses prescribed to him reduced the frequency of his headaches. *Id.* ¶ 27. And when he lost those glasses, defendant Hyman ordered him a new pair. *Id.* ¶¶ 27-28. When Feliciano complained that "milk being served [to him] was upsetting [his] stomach," he received a "dietary referral for soy milk" four days later. *Id.* ¶¶ 25-26. The amount of care that Feliciano received, and its continual, if not entirely seamless, nature, while not necessarily dispositive, militates against the notion that he suffered an objectively serious deprivation. *See, e.g., Morrison v. Mamis,* No. 08-CV-4302 (PAC) (AJP), 2008 WL 5451639, at *8 (S.D.N.Y. Dec. 18, 2008) (recommending dismissal of deliberate-indifference claim where plaintiff received medical care on numerous occasions over several months) (collecting cases), *adopted by,* 2009 WL 2168845 (S.D.N.Y. July 20, 2009); *Joyner v. Greiner,* 195 F. Supp. 2d 500, 502 (S.D.N.Y. 2002) (granting motion to dismiss where plaintiff received "continuous medical care").

Feliciano complains that he did not immediately receive medical attention when he told C.O. Lumlee on January 12 that his "head was hurting" and when he informed C.O. Williams on January 13 that he was experiencing "sharp pain" in his left eye. 2d Am. Compl. ¶¶ 8, 13. Feliciano also takes issue with C.O. Gason's refusal to let him retrieve pain medication from his cell on January 13, telling him that " 'we're not opening our cells right now.' " *Id.* ¶ 12. Yet Feliciano visited the clinic within 24 hours of each incident. *Id.* ¶ 9, 14. "Although a delay in providing necessary medical care

may in some cases constitute deliberate indifference, [the Second Circuit] has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment; ignored a 'life-threatening and fast-degenerating' condition for three days; or delayed major surgery for over two years." *Demata v. N.Y. State Corr. Dep't of Health Servs.,* 198 F.3d 233 (2d Cir. 1999) (unpublished) (citations omitted).

Feliciano's conditions may be considered " 'sufficiently serious' " to warrant constitutional protection. *See, e.g., De Jesus v. Albright,* No. 08-CV-5804 (DLC), 2011 WL 814838, at *9 (S.D.N.Y. Mar. 9, 2011) ("chronic migraine headaches are often found to be 'sufficiently serious' to warrant constitutional protection"). But the circumstances in which his treatment for these conditions was allegedly delayed fall short of the high bar set by the Second Circuit for delay-based deliberate-indifference claims. *Demata,* 198 F.3d at 233. There are, for example, no allegations that his conditions were life-threatening and fast-degenerating, or that they worsened because of the delay, or that the delay was punitive. *See id.* Consequently, the Court concludes that any alleged delay was not serious enough to violate Feliciano's constitutional rights. *See, e.g., Ferguson v. Cai,* No. 11-CV-6181 (PAE), 2012 WL 2865474, at *4 (S.D.N.Y. July 12, 2012) ("The Second Circuit has held that a short interruption of care, even if the underlying medical condition is serious, does not constitute a serious medical need where 'the alleged lapses in treatment are minor.' ") (quoting *Smith,* 316 F.3d at 186).[18]

---

[18]  See also *Vansertima v. Dep't of Corr.,* No. 10-CV-3214 (RJD) (RER), 2012 WL 4503412, at *6 (E.D.N.Y. Sept. 28, 2012) (24-hour delay in treatment was "minor and inconsequential" and "no more than the inconvenience all patients face in receiving medical care, particularly when, [as in this case], their medical condition is not grave") (alteration in original) (internal quotation marks omitted); *Rahman v. AMKC Warden,* No. 10-CV-4402 (BMC), 2010 WL 4025614, at *2 (E.D.N.Y. Oct. 13, 2010) ("Plaintiffs claim that his headaches, back problems, and mental health issues were not addressed for a period of three days fails to meet this standard."); *Alster v. Goord,* 745 F. Supp. 2d 317, 335 (S.D.N.Y. 2010) (no deliberate indifference where prison "waited two days after [plaintiff] complained of abdominal pain to take him to the hospital and failed to transport him to" at least one other appointment); *Brown v.*

*Wright,* No. 04-CV-462 RWS, 2005 WL 3305015, at *6 (S.D.N.Y. Dec. 6, 2005) ("Several courts have held that the temporary deprivation of treatment for pain as [plaintiff] alleges does not rise to the level of constitutional significance.") (collecting cases); *Thomas v. Nassau Cnty. Corr. Ctr.,* 288 F. Supp. 2d 333, 339 (E.D.N.Y. 2003) ("[E]ven assuming that the plaintiffs treatment and/or his seeing a hand specialist was delayed, the plaintiff has not alleged that his hand injury became worse, or that his general condition deteriorated as a result of this delay."); *cf. De Jesus,* 2011 WL 814838, at *10 (objective requirement met where "there is no record of any treatment being given for ... headaches" until 11 months after plaintiffs initial complaint); *Moriarty v. Neubould,* No. 3:02-CV-1662 (RNC), 2004 WL 288807, at *2 (D. Conn. Feb. 10, 2004) (objective requirement met where plaintiff went two weeks without medical attention during which time he suffered multiple "intense migraines" and made "repeated requests" to see doctor).

**\*12** A primary complaint of Feliciano, which he repeats no fewer than 18 times, is that defendants did not schedule him for "diagnostic tests such as a CAT-scan or x-ray." 2d Am. Compl. 3-4, 9, 14-28. But the "law is clear that a medical decision about whether to order a test ... is 'at most medical malpractice,' which can be properly redressed under state tort law." *Youmans v. City of N.Y.,* 14 F. Supp. 3d 357, 363 (S.D.N.Y. 2014) (quoting *Estelle v. Gamble,* 429 U.S. 97, 99 (1976)); *see also Flemming v. Velardi,* No. 02-CV-4113 (AKH), 2003 WL 21756108, at *3 (S.D.N.Y. July 30, 2003) (dismissing deliberate-indifference claim where plaintiff argued that "he was denied adequate treatment because he was not given a full-body x-ray, an MRI, a CT scan, or a referral to a neurologist").

Further, "mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to" a constitutional violation. *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir. 1998); *see also, e.g., Gumbs v. Dynan,* No. 11-CV-857 (RRM), 2012 WL 3705009, at *14 (E.D.N.Y. Aug. 26, 2012) (" 'Whether to order an MRI or similar diagnostic treatments is a classic example of a matter for medical judgment, [ ] and where the treatment provided is responsive to the prisoner's condition, ... the fact that a prisoner might prefer different treatment does not give rise to' a Constitutional violation.") (quoting

*Victor v. Milicevic,* 361 Fed.Appx. 212, 215 (2d Cir. 2010)); *Cecilio v. Kang,* No. 02-CV-10010 (LAK) (GWG), 2004 WL 2035336, at *10 (S.D.N.Y. Sept. 14, 2004) ("While the medical care received by a prisoner must be adequate, a prisoner is not entitled to receive treatment by every medical alternative."), *adopted by,* 2004 WL 2158007 (S.D.N.Y. Sept. 27, 2004). Although Feliciano may have preferred an x-ray or CAT scan over the treatment that he received, his disagreement with the medical professionals caring for him is insufficient to demonstrate that he suffered a serious deprivation of medical care. For these reasons, the Court concludes that Feliciano has failed to plead facts sufficient to meet the objective or "deprivation" prong of the deliberate-indifference test.

### b. *Mens Rea* or Mental-Element Prong: Sufficiently Culpable State of Mind

Because Feliciano has failed to plead facts sufficient to meet the first prong, Feliciano's application to amend his complaint may be denied on that basis alone. As explained below, however, the facts alleged in his proposed Second Amended Complaint also fail to satisfy the second prong, which provides an independent basis to deny his application.

To the Court's knowledge, no other decisions in this Circuit have yet applied *Darnell* to a claim of deliberate indifference to serious medical needs.[19] Before *Darnell,* to satisfy the subjective prong of the deliberate-indifference test, a pretrial detainee, like a convicted prisoner, was required to demonstrate that "the charged official ... act[ed] with a sufficiently culpable state of mind." *Salahuddin,* 467 F.3d at 280. The official's mental state did not have to "reach the level of knowing and purposeful infliction of harm; it suffice[d] if the plaintiff prove[d] that the official acted with deliberate indifference to inmate health." *Id.* This mental state, which was akin to "subjective recklessness, as the term is used in criminal law," "require[d] that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm [would] result." *Id.*; *see also Nielsen v. Rabin,* 746 F.3d 58, 63 n.3 (2d Cir. 2014) (explaining that the subjective standard articulated in *Salahuddin* applied to pretrial detainees suing under the Fourteenth Amendment, even though

*Salahuddin* concerned a prisoner suing under the Eighth Amendment.

19    In *Cuffee v. City of New York,* No. 15-CV-8916 (PGG) (DF), 2017 WL 1134768 (S.D.N.Y. Mar. 27, 2017), the court addressed *Darnell* but did not apply it to the plaintiff's medical deliberate-indifference claim because the court dismissed the claim solely for failure to meet the objective element.

**\*13** After *Darnell,* the requisite *mens rea* more closely resembles recklessness as the term is used in the civil context, which does not require the defendant to be subjectively aware of the harm resulting from his acts or omissions. *See Darnell,* 849 F.3d at 32 ("[R]ecklessness could be defined according to an objective standard akin to that used in the civil context, which would not require proof of an official's actual awareness of the harms associated with the challenged conditions, or according to a more exacting subjective standard akin to that used in the criminal context, which would require proof of such subjective awareness.") (citing *Farmer,* 511 U.S. at 836-37). Applying *Darnell* to claims of deliberate indifference to serious medical needs, the Court concludes that a defendant possesses the requisite *mens rea* when he acts or fails to act under circumstances in which he knew, or should have known, that a substantial risk of serious harm to the pretrial detainee would result. *See Darnell,* 849 F.3d at 35 ("[T]o establish a claim for deliberate indifference to conditions of confinement under the Due Process Clause of the Fourteenth Amendment, the pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety."). As was the case before *Darnell,* the defendants' "actions [must be] more than merely negligent." *Salahuddin,* 467 F.3d at 280; *Darnell,* 849 F.3d at 36 ("A detainee must prove that an official acted intentionally or recklessly, and not merely negligently."). "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle,* 429 U.S. at 106. Thus, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim." *Id.*

Here, Feliciano does not allege facts sufficient to demonstrate that any of the medical professionals he has named as defendants acted with deliberate indifference to his health. Though he questions their judgment, Feliciano's "dissatisfaction with [his] treatment ... is insufficient to support the subjective" or *mens rea* "prong of deliberate indifference." *Jones v. Mack,* No. 08-CV-6089 (BSJ) (KNF), 2012 WL 386269, at \*5 (S.D.N.Y. Feb. 3, 2012), *aff'd sub nom. Jones v. Vives,* 523 Fed.Appx. 48 (2d Cir. 2013); *see also, e.g., Joyner,* 195 F. Supp. 2d at 504 ("It is well established that a difference of opinion between a prisoner and prison officials regarding medical treatment does not, as a matter of law, constitute deliberate indifference."). The extensive treatment received by Feliciano undermines the notion that the medical staff disregarded serious risks to his health. *See, e.g., Washington v. City of N.Y.,* No. 10-CV-389 (LTS) (JLC), 2011 WL 566801, at \*2 (S.D.N.Y. Feb. 15, 2011) ("Plaintiff was treated several times by doctors ... and ... was given a narcotic medication when he complained that his pain persisted. The treatment Plaintiff received reflects that the Defendants identified and responded to Plaintiffs injury and his complaints of pain."); *Kee v. Hasty,* No. 01-CV-2123 (KMW) (DF), 2004 WL 807071, at \*22 (S.D.N.Y. Apr. 14, 2004) (plaintiffs "acknowledgment ... that the medical staff provided him with pain medication (Motrin) renders his claim of deliberate indifference insufficient under the subjective prong of the standard").

With respect to the medical personnel sued here, Feliciano perhaps comes the closest to satisfying the *mens rea* requirement when he alleges that Dr. Mateo refused to see him when he complained of sharp pain in his left eye during the evening of January 13. 2d Am. Compl. ¶ 13. Instead of seeing Feliciano immediately, Dr. Mateo instructed him to rinse out his eye with cold water and to sign up for sick call in the morning. *Id.* Although Feliciano did not receive immediate medical care, this fact is insufficient to establish that Dr. Mateo knew, or should have known, that the brief delay put Feliciano's health in jeopardy. *See Hayes v. N.Y.S. D.O.C. Officers,* No. 97-CV-7383 (MBM), 1998 WL 901730, at \*8 (S.D.N.Y. Dec. 28, 1998) ("[P]laintiff alleges that he notified [nurse-defendant] ... that his eye was in pain and tearing and that his vision was becoming worse. ... [T]his evidence is insufficient to establish that [nurse-defendant] should have drawn an inference that a substantial risk of serious harm existed.").

Feliciano also fails to allege facts sufficient to suggest that any correction officers sued here possessed the requisite *mens rea.* "The same standards apply to a claim of deliberate indifference to serious medical needs on the part of nonmedical prison personnel." *Hodge v. Coughlin,* No. 92-CV-622 (LAP), 1994 WL 519902, at *11 (S.D.N.Y. Sept. 22, 1994), *aff'd,* 52 F.3d 310 (2d Cir. 1995). Non-medical personnel may, for example, be deliberately indifferent if they " 'delay[ ] access to medical care when the inmate [is] in extreme pain and has made his medical problems known to the attendant prison personnel.' " *Stiehl v. Bailey,* No. 08-CV-10498 (CS), 2012 WL 2334626, at *12 (S.D.N.Y. June 19, 2012) (quoting *Hodge,* 1994 WL 519902, at *11).

 **\*14** The facts alleged in the Second Amended Complaint, assumed to be true, do not establish that C.O. Lumlee knew, or should have known, that Feliciano faced a serious health risk when he complained that his "head was hurting"—especially given that Feliciano had informed the officer that he had previously received medical treatment and was prescribed ibuprofen. 2d Am. Compl. ¶ 8. Likewise, although C.O. Gason denied Feliciano's request to enter his cell to retrieve his pain medication, there is no indication that he disregarded a serious threat to Feliciano's health. *Id.* ¶ 12. Indeed, Feliciano does not even allege advising C.O. Gason of his symptoms, let alone notifying him that his health was at serious risk. *Id.* Finally, when Feliciano asked C.O. Williams for medical attention for his eye pain, C.O. Williams responded by calling the clinic and following Dr. Mateo's instructions. *Id.* ¶ 13. Correction officers who defer to the judgment of medical professionals on such matters are only liable if the plaintiff pleads facts demonstrating that the "nonmedical defendant should have challenged the medical professionals' decisions," which Feliciano has failed to do here. *Smith v. Wilson,* No. 9:12-CV-1152 (MAD), 2013 WL 5466857, at *9 (N.D.N.Y. Sept. 30, 2013) (citing *Gonzalez v. Sarreck,* No. 08-CV-3661, 2011 WL 5051341, at *14 (S.D.N.Y. Oct. 24, 2011)); see *also Gomez v. Chill,* No. 11-CV-6844 (CM) (JLC), 2015 WL 1853110, at *17 (S.D.N.Y. Apr. 17, 2015) (correctional superintendent permitted to rely on medical staff) (collecting cases), *adopted by,* 2015 WL 3862709 (S.D.N.Y. June 9, 2015); *Allen v. Ford,* 880 F. Supp. 2d 407, 411 (W.D.N.Y. 2012) (no deliberate indifference where correction officer "advised [plaintiff] to sign up for sick call in the morning instead of receiving immediate emergency care"). Consequently, the Court concludes that

Feliciano has failed to allege facts to meet the *mens rea* element of a deliberate-indifference claim as well.

### D. Operative Pleading and Remaining Defendants

Because Feliciano fails to allege facts sufficient to state a plausible claim of deliberate indifference to serious medical needs, his application to amend the complaint to plead this claim is denied. However, because the first 13 paragraphs of the Second Amended Complaint, [20] which cover the period of January 7 to January 13, 2015, merely restate the Initial Complaint's core factual allegations with additional detail, the Court will permit Feliciano to amend his complaint to include the facts contained in these paragraphs. *See* 2d Am. Compl. ¶¶ 1-13. As defendants have not opposed this request, the Court also permits Feliciano to plead paragraphs 30 to 32 of the Second Amended Complaint, in which Feliciano alleges that the January 7 incident gives rise to a claim for "Breach Of Duty Of Care." *Id.* ¶¶ 30-32.

[20]    The paragraphs referred to here are in the "Statement of Claim" section of the Second Amended Complaint.

Finally, Feliciano asserts a claim for "Refusal To File An Incident Report" in paragraphs 52 to 62 of the Second Amended Complaint given several defendants' alleged refusal to file a report memorializing the January 7 incident. *Id.* ¶¶ 52-62. The factual allegations relevant to this claim are contained in paragraphs 1 to 13, which the Court has already noted Feliciano may plead. Defendants have not opposed (or even addressed) Feliciano's application to add this claim. Accordingly, the Court will permit Feliciano to plead it and add the newly named defendants implicated by it (Charles Appiah, Bessie Flores-Clemente, and C.O. Williams). *Id.* ¶¶ 54, 55, 61.

Plaintiff is also permitted to add as a defendant "C.O. Jane Doe," whom Feliciano identifies as the "Female C.O. who was operating the cell doors in Unit 8 South on January 7, 2015 at approximately 2:45 pm." Compl. at 3. Pursuant to *Valentin v. Dinkins,* 121 F.3d 72, 76 (2d Cir. 1997), defendants are directed to identify this correction officer forthwith so that Feliciano may serve her and so that her name may be substituted in the caption. Feliciano's application to add the remaining newly named defendants is denied given that their involvement is limited to Feliciano's medical deliberate-indifference claim, which will not be included in the case. Further, Dr. Mateo (who

Feliciano v. Anderson, Slip Copy (2017)

2017 WL 1189747

was named in the Initial Complaint as "Dr. Pateo") is terminated from this action given that his involvement was limited to the same claim. Finally, because the proposed Second Amended Complaint does not name Captain Romero as a defendant, he is eliminated from this case.

In summary, the operative complaint will be the Initial Complaint, along with paragraphs 1-13, 30-32, and 52-62 of the Second Amended Complaint. This will be considered the Operative Complaint in this case going forward. <u>Feliciano is hereby directed to file the Operative Complaint as a standalone document within 30 days of this Memorandum Order</u>. Feliciano is permitted to add Charles Appiah, C.O. Jane Doe, Bessie Flores-Clemente, and C.O. Williams as defendants, but not the other newly named defendants. Lastly, Captain Romero and Dr. Mateo, who were named as defendants in the Initial Complaint, are terminated.

## III. <u>CONCLUSION</u>

**\*15** For the reasons set forth above, Feliciano's application to amend the complaint is denied except as set forth in section 11(D) above. The defendants remaining in this case are: C.O. Anderson, Charles Appiah, C.O. Codea, C.O. Jane Doe, C.O. DelaRosa, Bessie Flores-Clemente, C.O. Gason, C.O. LaBrew, C.O. McCoy, C.O. Lumlee, C.O. Villalon, and C.O. Williams. The Clerk is directed to terminate the other named defendants and remove them from the caption.

<u>The remaining defendants are directed to file their response to the Initial Complaint as amended within 60 days of the date of this Memorandum Order</u>. The Court will hold a case management conference on **June 14, 2017** at **10:30 a.m.** in Courtroom 21D, United States Courthouse, 500 Pearl Street, New York, New York to discuss a revised discovery schedule.

**SO ORDERED.**

**All Citations**

Slip Copy, 2017 WL 1189747

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 4179855
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Carlos VILLAFANE, Pro Se Plaintiff,

v.

Michael SPOSATO, Nassau County Sheriff, and
Armor Correctional Health Service, Defendants.

CV 16-3674 (JFB) (AKT)
|
Signed 08/22/2017

**Attorneys and Law Firms**

Carlos Villafane, New York, NY, pro se.

John J. Doody, Dale Nicholson McLaren, Lewis Brisbois
Bisgaard & Smith, LLP, New York, NY, Liora M. Ben-
Sorek, Nassau County Attorney's Office, Mineola, NY,
for Defendants.

## REPORT AND RECOMMENDATION

A. KATHLEEN TOMLINSON, U.S. Magistrate Judge

## I. PRELIMINARY STATEMENT

**\*1** *Pro se* Plaintiff Carlos Villafane ("Villafane" or
"Plaintiff") brings this civil rights action, pursuant to 42
U.S.C. § 1983, alleging violations of the Fifth, Eighth and
Fourteenth Amendments, as well as the Prison Litigation
Reform Act. *See generally* Complaint ("Compl.") [DE
1]. Defendants Michael Sposato and Armor Correctional
Health Services of New York s/h/a Armor Correctional
Health Service (collectively, "Defendants") have moved to
dismiss the Complaint pursuant to Rule 12(b)(6) of the
Federal Rules of Civil Procedure and the Prison Litigation
Reform Act, 42 U.S.C. § 1997e(a). Notice of Motion [DE
19]. Judge Bianco referred Defendants' Motion to Dismiss
to this Court for a Report and Recommendation as to
whether the motion should be granted. DE 33.

## II. BACKGROUND

### A. Factual Background
The following factual allegations have been taken from
Plaintiff's Complaint and the Plaintiff's Opposition to

Defendants' motion to dismiss. Because Plaintiff is
proceeding *pro se*, the Court is obligated to construe his
pleadings liberally "to raise the strongest arguments that
they suggest." *See Triestman v. Fed. Bureau of Prisons*,
470 F.3d 471, 474–75 (2d. Cir. 2006) (per curiam) (quoting
*Pabon v. Wright*, 459 F.3d 241, 248 (2d. Cir. 2006))
(collecting cases) (internal quotation marks omitted). [1]
All facts alleged by Plaintiff are assumed to be true
for purposes of deciding the motion to dismiss and are
construed in a light most favorable to Plaintiff as the non-
moving party. *See, e.g., LaFaro v. N.Y. Cardiothoracic
Grp.*, 570 F.3d 471, 475 (2d Cir. 2009) (quoting *Miller v.
Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir.
2003)); *Matthews v. City of N.Y.*, 889 F.Supp.2d 418, 425
(E.D.N.Y. 2012) (citing *LaFaro*, 570 F.3d at 475–76).

[1]     In construing a *pro se* plaintiff's pleadings liberally,
        "the Court may 'consider factual allegations in
        the plaintiff's opposition papers to supplement
        the allegations in the complaint.' " *Williams v. Wellness
        Med. Care, P.C.*, No. 11-5566, 2013 WL 5420985, at
        *1 n.1 (S.D.N.Y. Sept. 27, 2013) (quoting *Salvatierra
        v. Connolly*, No. 09-3722, 2010 WL 5480756 at *25 n.
        3 (S.D.N.Y. Sept. 1, 2010) (internal quotation marks
        omitted)) (citing *Frith v. Hill*, No. 07-CV-5899, 2009
        WL 3073716, at *19 n. 1 (S.D.N.Y. Sept. 23, 2009)),
        *report and recommendation adopted*, 2011 WL 9398
        (S.D.N.Y. Jan. 3, 2011); *see Smolen v. Fischer*, No.
        12-1856, 2012 WL 3609089, at *1 (S.D.N.Y. Aug.
        23, 2012) (citing *Erickson v. Pardus*, 551 U.S. 89, 94,
        127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007)) ("Although
        certain factual allegations in Smolen's opposition
        affidavit are not contained in the complaint, this
        Court will deem the complaint amended to include
        those allegations since Smolen is a pro se plaintiff.");
        *Sommersett v. City of New York*, 09-5916, 2011 WL
        2565301, at *3 (S.D.N.Y. 2011); *Green v. City of
        N.Y. Dep't of Corr.*, No. 6-4978, 2008 WL 2485402,
        at *4 (S.D.N.Y. June 19, 2008); *Ibok v. Sector*, No.
        05-6584, 2006 WL 302336, at * 1, n.1 (S.D.N.Y. Feb.
        9, 2006) (citing *Fox v. Fischer*, No. 04-6718, 2005 WL
        1423580 at *2 n.1 (S.D.N.Y. June 14, 2005), *aff'd*, 242
        Fed.Appx. 759 (2d Cir. 2007); *Verley v. Goord*, No.
        02 Civ. 1182, 2004 WL 526740, at *4–5, 2004 U.S.
        Dist. LEXIS 857, at *15-17 (S.D.N.Y. Jan. 22, 2004))
        ("The Court may consider the factual allegations
        in plaintiff's Response to supplement those in his
        complaint because of the liberal standard afforded to
        the pleadings of pro se litigants.").

### *1. Plaintiff's Medical Issues*

**\*2** On or about September 11, 2013, Plaintiff was taken to the Nassau County Correctional Center ("NCCC"), referred to by Plaintiff in his Complaint as the "Nassau County Jail." *See* Compl. § III.B. At that time, Plaintiff had a broken left forearm. *Id.* § III.C. Despite informing the "medical department" about his condition, Plaintiff was "neglected intentionally without pain medication." *Id.* On September 14, 2013, Plaintiff was taken to the "Nassau County University Hospital, where the doctor had [Plaintiff] x-rayed set [his] arm in a soft cast." *Id.* A doctor advised Plaintiff that he needed surgery and told "the officials" to bring Plaintiff back to the hospital for surgery on September 17, 2013. *Id.* The NCCC did not produce Plaintiff for the surgery on that date and "still refused to give [Plaintiff] the said prescribed ... pain medication." *Id.*

On September 24, 2013, Plaintiff was examined at the NCCC by a visiting orthopedist "who expressed shock" that Plaintiff "had not received any surgery." *Id.* According to Plaintiff, the orthopedist "entered an order on my medical chart by directing a nurse to write down that it was extremely urgent that I have surgery." *Id.* Once again, however, the NCCC "knowingly ignored, and intentionally did denied [sic] [Plaintiff] the proper medical procedures and also continued to deny ... the pain medication or any type of medication to aliviate [sic] the pain." *Id.* On October 9, 2013, Plaintiff was transported to Nassau University Medical Center where his arm was again x-rayed. *Id.* The doctor told him that his arm was in fact broken. *Id.* The doctor also told him that because he had not received surgery, his arm would have to be rebroken "and that the surgery cost too much money and the facility wouldn't pay." *See id.* Plaintiff's arm was then set in a hard cast and Plaintiff complained again about the pain. *Id.*

Around the end of October 2013, Plaintiff appeared before Judge Hurley in connection with his criminal case. *See id.* Plaintiff complained to his lawyer about the NCCC's treatment of him. *Id.* Plaintiff states that his lawyer spoke to Judge Hurley and that Judge Hurley recommended that Plaintiff "be transferred to the Metropolitan Detention Center in Brooklyn, New York." *Id.*

On November 5, 2013, Plaintiff was transferred to the Metropolitan Detention Center ("MDC"). *Id.* Sometime thereafter, MDC officials transported Plaintiff to the "[B]rooklyn Medical Center and Kingsbrook Hospital from 2014 through 2015." *Id.* At the Brooklyn Medical Center, Plaintiff underwent the surgery that he needed— his arm was rebroken and set with two metal plates and metal screws. *Id.* According to Plaintiff, "my arm is not the same I don't have 100% use of my left wrist and my left hand and I am in constant pain." *See id.*

### *2. Grievances*

In his Opposition to the Defendants' Motion to Dismiss, Plaintiff states that while detained at the NCCC, he lodged numerous complaints about his left arm as well as other issues, through grievance forms and sick-call requests. *See* Plaintiff's Opposition ("Pl's. Opp'n") [DE 30] at 4-5. Plaintiff represents that he could not tell what the officer wrote on most of the complaint forms and that there were times when the officer informed Plaintiff that he "had to sign the form because soon [he would] be taken to the Hospital." *Id.* at 4. Plaintiff further maintains that on "some of the forms the officer wrote that the Plaintiff Refuse [sic] to sign while writing a later date." *Id.* Plaintiff asserts that those statements are not true because he had, in fact, signed the form on an earlier date. *Id.* Plaintiff points out that defendants' counsel referred to the Prison Litigation Reform Act ("PLRA") in the motion papers. *Id.* According to Plaintiff, the PLRA "makes it harder for prisoners to file lawsuits in federal court." *Id.* Plaintiff adds that

> the fact is that the Plaintiff was <u>Transferred</u> from a county holding facility to a Federal Transcient [sic] facility which is A different jurisdiction, with different Rules and Regulation, to wit your complaints go to Washington D.C. <u>besides</u> <u>your</u> Honor <u>the</u> <u>Plaintiff</u> <u>was</u> <u>Released</u>, he was <u>Free</u> <u>when</u> <u>he</u> <u>submitted</u> <u>this</u> <u>Law</u> <u>Suits</u> <u>so</u> I am Asking your Honor to Please don't dismiss my lawsuit Please Allow a jury to decide.

**\*3** *Id.* at 6.

### 3. Claims Set forth in the Instant Action and Relief Sought

Plaintiff represents that he has filed the instant action against Armor Correctional Health Services of New York ("Armor") for intentionally failing to provide him with "prop[ ]er medical care" and against Sheriff Michael Sposato for "allowing [Armor] to do so" and for not "monitoring [the] medical department." Compl. § II.D. According to Plaintiff, Defendants' conduct constitutes violations of the Eighth and Fifth Amendments of the Constitution, the Equal Protection Clause and the Prison Litigation Reform Act. *Id.* § II.B. Plaintiff seeks $5,000,000 in monetary damages to compensate him for his pain and suffering, mental anguish and inability to have full use of his left hand. *Id.* § IV.

### B. Procedural History

*Pro se* Plaintiff Villafane commenced this action by filing a Complaint on June 24, 2016. *See* DE 1. By Order entered July 6, 2016, Judge Bianco who was assigned to this civil case, granted Plaintiff's Motion for Leave to Proceed *in Forma Pauperis.* DE 5. The Nassau County Attorney's Office, on behalf of Nassau County Sheriff Michael Sposato, filed an Answer to the Complaint on September 9, 2016. DE 12. On October 6, 2016, the law firm of Lewis Brisbois Bisgaard and Lewis ("Lewis Brisbois") filed a letter application to Judge Bianco seeking a pre-motion conference for purposes of moving to dismiss the Complaint against Armor. DE 15. On October 12, 2016, Judge Bianco issued an Order waiving the pre-motion conference requirement and setting a briefing schedule on Armor's motion to dismiss. DE 16. Lewis Brisbois filed the motion to dismiss on November 14, 2016 on behalf of <u>both</u> defendants. DE 19. Pursuant to Judge Bianco's Scheduling Order, Plaintiff's Opposition to the motion was due to be filed by December 28, 2016, and Defendants' Reply, by January 11, 2017. DE 16.

On December 19, 2016, Plaintiff notified the Court of a change in his address. DE 22. Judge Bianco posted an Electronic Order on December 23, 2017 stating that due to Plaintiff's address change, Defendants were unable to serve him with a copy of their motion. *See* 12/23/2016 Electronic Order. Judge Bianco set a revised briefing schedule, directing Plaintiff to file his Opposition by January 25, 2017 and Defendants to file their Reply by February 8, 2017. *Id.*

On January 9, 2017, Plaintiff filed a motion for extension of time to file his Opposition, which Judge Bianco granted. DE 26, 27. The deadline for Plaintiff to submit his Opposition was extended to February 24, 2017. The filing date for the Reply was extended to March 10, 2017. DE 27. On March 3, 2017, Judge Bianco issued an Order directing Plaintiff to file his Opposition by March 20, 2017, or alternatively, to send a letter communicating to the Court why no Opposition had been filed. DE 28. The Court warned Plaintiff that a failure to respond may result in dismissal of his case, with prejudice, for failure to prosecute his claims. *Id.* On March 17, 2017, Plaintiff filed a letter explaining that he mailed a copy of his Opposition to Defendants via Fedex on February 24, 2017. DE 29. Plaintiff further stated that he requested additional time to respond to Defendants' motion so that he could obtain medical records from two hospitals where he received treatment. *Id.* Plaintiff's Opposition was filed with the Clerk's Office on March 23, 2017. DE 30. In addition to arguing the merits of his case, Plaintiff informed the Court that the 87 pages of unpublished opinions provided to him by the Defendants were not legible. *Id.* Plaintiff also requested more time to respond to Defendants' Motion to Dismiss. *Id.*

**\*4** Judge Bianco issued an Order on March 23, 2017 (1) informing Plaintiff that the Court was in receipt of his Opposition and (2) directing Defendants to file their Reply by April 7, 2017. *See* DE 31. Defendants' Reply was filed on April 3, 2017. DE 32. By Order dated April 6, 2017, Judge Bianco referred Defendants' Motion to Dismiss to this Court for a Report and Recommendation as to whether the motion should be granted. DE 33.

On April 12, 2017, the Court received a letter from Plaintiff requesting additional time to research, gather further evidence and respond to Defendants' motion to dismiss. DE 34. The Court directed counsel for Defendants to promptly serve Plaintiff with new, legible copies of the unpublished opinions, and/or opinions exclusively on computerized databases, in accordance with Local Civil Rule 7.2. *See* 4/19/2017 Electronic Order. Those opinions were mailed to Plaintiff at 400-430 30[th] Street, Room 3028, New York, NY 10016. *See* April 28, 2017 Affidavit of Service [DE 35].

In light of Plaintiff's asserted efforts to obtain his medical records, as set forth in his requests for additional time

to respond to Defendants' motion, the Court issued an Order on May 1, 2017 directing Defendants to furnish the Court and Plaintiff with copies of various medical records concerning the care/treatment of Plaintiff by Armor, the NCCC, Nassau University Medical Center, the Metropolitan Detention Center, and the Brooklyn Medical Center and/or Kingsbrook Hospital. *See* DE 36.

On May 8, 2017, counsel for Defendants filed a letter explaining that the unpublished opinions which were previously mailed to Plaintiff had been returned to their office by the postal service. DE 38. A copy of the envelope in which the opinions were sent reflects two stamps—"Return to Sender" and "Unable to Forward." DE 38. In response to this filing, efforts were made to set up a conference call between counsel for the Defendants, Plaintiff and the Court. Defendants' counsel tried reaching Plaintiff via telephone using the number listed on the docket: (516) 244-7329. *See* DE 22. Counsel was transferred to Plaintiff's voicemail. Subsequently, on May 15, 2017, this Court's Law Clerk called Plaintiff at the same number and was also forwarded to Plaintiff's voicemail. At the Court's direction, the Law Clerk left a message advising Plaintiff to contact Chambers immediately or risk having his case dismissed. When the Court did not receive a return call from Plaintiff, the undersigned, along with the Law Clerk, personally called Plaintiff on June 1, 2017 and was forced to leave a voicemail directing Plaintiff to call Chambers immediately. By Order dated June 19, 2017, the Court issued an Order to Show Cause directing Plaintiff to appear on July 11, 2017 and show cause why this case should not be dismissed for his failure to prosecute his claims and failure to comply with the Court's Orders. DE 39.

Plaintiff appeared before the Court at the July 11, 2017 Show Cause Hearing and provided the Court with an updated telephone number and a corrected address. *See* DE 45. During that conference, Plaintiff reiterated his request for additional time to respond to Defendants' motion. *Id.* He explained to the Court that he was in the process of obtaining medical records from St. Barnabas Hospital as well as the minutes from a 2013 appearance before Magistrate Judge Brown in his criminal case. *Id.* The Court directed Plaintiff to send a letter to the Court within one week of the Court's conference (1) setting forth why he should be permitted to add information to his response at this time, and (2) identifying the particular

documents he wishes to use and why those documents support his claims. *Id.*

**\*5** Counsel for the defendants filed an Affidavit of Service on July 11, 2017 stating that Plaintiff had been served by mail with copies of the unpublished opinions at Plaintiff's corrected address. DE 44. By letter dated July 19, 2017, Plaintiff confirmed that he had received copies of the medical records from the Defendants. *See* DE 48. In addition to arguing the merits of his case, Plaintiff responded to the directives given during the July 11, 2017 Show Cause Hearing. *See id.* Plaintiff stated that he is once again requesting an extension of time to supplement his Opposition so that he may gather all of his medical records. *Id.* According to Plaintiff, this process is taking him a long time because he is representing himself and is still searching for an attorney to assist him with his case. *Id.* Plaintiff referred to certain records from St. Barnabas Hospital and explained that they demonstrate that the injury to his left forearm occurred sometime in "June/July or August 6th 2013." *Id.* at 2. In addition, Plaintiff is still attempting to get a copy of the minutes from his September 11, 2013 arraignment before Judge Brown. *Id.* According to Plaintiff, Judge Brown told him "don't worry Mr. Villafane we are sending you to a facility to [immediately] take care of your injuries." *Id.* Defendants initially providing him with illegible copies of the unpublished opinions slowed his ability to read and research Defendants' motion. *Id.* at 3

In the balance of DE 48, Plaintiff stated that (1) the seriousness of the surgery he had on his wrist now "interferes with the movement of his left elbow and inner forearm"; (2) he has played the drums since age 8 or 9 and now it is impossible for him "to play music, keep a beat or roll, my wrist constantly goes numb and I have to keep moving it as to get blood flow"; (3) the size of the Defendants' motions "would take years because I have the right to read and research every cited or uncited case ..."; (4) he has continued to look for a lawyer and feels that "as a pro se litigant, I have been stripped of my own defense. I am praying that this court would allow me to continue to fight this case. My body's been Reconstructed, I have screws on my Right knee because I don't have no Right Knee Caps"; (5) "I also have movement problems because of all the metal rods and screws, then I don't have any balance or else I'll fall I just had 2 eye surgery it isn't easy for me to run around and do all this work because I need help going down and up the stairs. Then I had to beg for

money to get copies remember so I could put all these legal arguments and papers together with the defendants motion to dismiss because I didn't know the law and I had no one to help me...." *Id.* at 3-5. According to the Plaintiff, the only thing he was still missing were the minutes of his arraignment before Magistrate Judge Brown. *Id.* at 5.

On August 2, 2017, Defendants filed their Opposition to Plaintiff's request. DE 52. Counsel urges the Court to deny Plaintiff's request to supplement his Opposition at this time. *Id.* Counsel points out that although Plaintiff alleges Defendants are asserting that his broken left forearm originated from a 2004 motor vehicle accident, Defendants make no such allegation in their motion papers. *Id.* Instead, Defendants state that Plaintiff arrived at the NCCC ***with*** the broken left forearm, which Plaintiff himself concedes in his Complaint. *Id.* According to Defendants, establishing that Plaintiff's injury occurred in 2013 as opposed to during a motor vehicle accident in 2004 "does absolutely nothing to bolster his claim as to whether or not Armor provided him with inadequate medical treatment." *Id.* Defendants maintain that Plaintiff is "simply employing a delay tactic to prolong the action for as long as possible until he either finds an attorney or the Armor defendants settle." *Id.*

Having reviewed and considered Plaintiff's July 19, 2017 request, as well as Defendants' opposition, the Court is denying Plaintiff's application to further supplement his Opposition at this time. Plaintiff is free to continue to seek his records from St. Barnabas Hospital. However, the Court will not further delay the progress of this case waiting for them. The St. Barnabas records, even assuming they show that Plaintiff's injury originated in 2013, do not impact the issues underlying Defendants' Motion to Dismiss.

With respect to Plaintiff's reference to the unpublished opinions, the Court had Defendants mail legible copies to Plaintiff on April 19, 2017. *See* 4/19/2017 Electronic Order. The mailing was done on April 28, 2017. DE 35. On May 8, 2017, Defendants notified the Court that those opinions had been returned as undeliverable. *See* DE 38. First the Defendants and then the Court itself attempted to contact Plaintiff over the course of several weeks to ensure that he had received copies of the opinions. *See* DE 39. As noted, it was not until the July 11, 2017 Show Cause Hearing that Plaintiff provided the Court with his updated telephone number and correct address. DE

45. Defendants mailed the unpublished opinions to the corrected address that same day. *See* DE 44.

**\*6** In his most recent request for additional time, however, Plaintiff fails to substantively discuss anything from those cases which would convince the Court to further extend the time to oppose Defendants' motion. Given all of these factors, there is no justification for further delay. The Court is terminating the outstanding requests that Plaintiff be provided still more time to oppose Defendants' motion to dismiss. *See* DE 29, 34, 41, 50.

### III. STANDARD OF REVIEW

Defendants move for dismissal pursuant to Rule 12(b)(6). Defendant Sposato, however, filed an Answer to Plaintiff's Complaint on September 8, 2016, prior to filing the instant motion. The pleadings with respect to Defendant Sposato are therefore closed and as such his motion should have been brought as a Motion for Judgment on the Pleadings, pursuant to Rule 12(c). Fed. R. Civ. P. 12(c). However, the Court applies the same standard of review when analyzing a motion to dismiss pursuant to Rule 12(b)(6) as it does when reviewing a motion for judgment on the pleadings pursuant to Rule 12(c). *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006) (citing *Karedes v. Ackerley Group, Inc.*, 423 F.3d 107, 113 (2d Cir. 2005)); *Stern v. City of New York*, No. 12-5210, 2015 WL 918754, at *2 (E.D.N.Y. Mar. 3, 2015) (citing *Ziemba v. Wezner*, 366 F.3d 161, 163 (2d Cir. 2004)) ("The same legal standard applies to a Rule 12(b)(6) motion as a Rule 12(c) motion."); *Rubino v. Town of Babylon*, No. 09-5187, 2012 WL 928252, at *1 (E.D.N.Y. Mar. 19, 2012) (citing *Livant v. Clifton*, 272 Fed.Appx. 113, 115 (2d Cir. Apr. 7, 2008); *Burnette v. Carothers*, 192 F.3d 52, 56 (2d Cir. 1999)) (finding that although the County filed a motion for judgment on the pleadings pursuant to Rule 12(c) when it had not answered the Complaint, the Court "need not decide the issue" since the standard for Rule 12(c) and Rule 12(b)(6) motions are the same); *Transamerica Fin. Life Ins. Co. v. Session*, No. 10-1328, 2010 WL 4273294, at *2 (S.D.N.Y. Oct. 28, 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009)) (citing *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010)) ("To survive a motion under Rule 12(c) or Rule 12(b)(6), 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.' "); *Scott v. J. Anthony Cambece Law Office, P.C.*, 600 F.Supp.2d

479, 481 (E.D.N.Y. 2009) (citing *Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126–27 (2d Cir. 2001)) (noting that "the standard for granting a Rule 12(c) motion is identical to that employed when analyzing a Rule 12(b)(6) motion."). Notwithstanding Defendant Sposato's filing of his motion under Rule 12(b) instead of Rule 12(c), the Court will review the motion on its merits.

In deciding a motion to dismiss pursuant to Rule 12(b) (6), the Court must liberally construe the claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *See Aegis Ins. Servs., Inc. v. 7 World Trade Co.*, L.P., 737 F.3d 166, 176 (2d Cir. 2013) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)) (internal quotation marks omitted); *Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013) (quoting *Chase Group Alliance LLC v. City of New York Department of Finance*, 620 F.3d 146, 148 (2d Cir. 2010); *Harris v. City of New York*, 607 F.3d 18, 24 (2d Cir. 2010)) (citing *Sims v. Blot*, 534 F.3d 117, 133 (2d Cir. 2008)). The plaintiff must satisfy "a flexible 'plausibility standard.' " *Iqbal v. Hasty*, 490 F.3d 143, 157-158 (2d Cir. 2007), *rev'd on other grounds sub nom. Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 546, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The Court, therefore, does not require "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Id.* at 570, 127 S.Ct. 1955; *see Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 91 (2d Cir. 2010) (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955) (citing *Ashcroft*, 556 U.S. 662, 129 S.Ct. 1937, 1949-50, 173 L.Ed.2d 868) (holding that a complaint must set forth "a plausible set of facts sufficient 'to raise a right to relief above the speculative level[ ]' ").

**\*7** The Supreme Court clarified the appropriate pleading standard in *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), in which the court set forth a two-pronged approach to be utilized in analyzing a motion to dismiss. District courts are to first "identify[ ] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679, 129 S.Ct. 1937, 1949; *see id.* at 678, 129 S.Ct. 1937, 1949 (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955) ("A pleading that offers 'labels and conclusions' or 'a

formulaic recitation of the elements of a cause of action will not do.' "). Though "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679, 129 S.Ct. 1937, 1949. Second, if a complaint contains "well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678, 129 S.Ct. 1937, 1949 (citing *Twombly*, 550 U.S. at 556-57, 127 S.Ct. 1955) (internal citations omitted).

In adjudicating a Rule 12(b)(6) motion to dismiss, the Court must limit itself to facts alleged in the complaint, which are accepted as true; to documents attached to the complaint as exhibits or incorporated in the complaint by reference; to matters of which judicial notice may be taken; or to documents whose terms and effect are relied heavily upon in the complaint and, thus, are rendered "integral" to the complaint. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002) (quoting *Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)); *see also ASARCO LLC v. Goodwin*, 756 F.3d 191, 198 (2d Cir. 2014) (quoting *In re Thelen LLP*, 736 F.3d 213, 219 (2d Cir. 2013), *certified question accepted sub nom. Thelen LLP. v. Seyfarth Shaw LLP*, 22 N.Y.3d 1017, 4 N.E.3d 359, 981 N.Y.S.2d 349 (2013), *and certified question answered*, 24 N.Y.3d 16, 20 N.E.3d 264, 995 N.Y.S.2d 534 (2014)).

In addition, where, as here, a plaintiff is proceeding *pro se*, the complaint must be considered under a more lenient standard than that accorded "formal pleadings drafted by lawyers." *Bellamy v. Mt. Vernon Hosp.*, No. 07 Civ. 1801, 2009 WL 1835939, at \*3 (S.D.N.Y. June 26, 2009) (quoting *Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)), *aff'd*, 387 Fed.Appx. 55 (2d Cir. 2010). Therefore, a court must construe a *pro se* plaintiff's pleading broadly and interpret it to raise the strongest arguments that it suggests. *See Hughes v. Rowe*, 449 (U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 1980) (quoting *Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 595, 30 L.Ed.2d 652 (1972)); *see also Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008)

(quoting *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004); *Boykin v. KeyCorp*, 521 F.3d 202, 216 (2d Cir. 2008)) (holding that when a plaintiff proceeds pro se, the district court "is obliged to construe his pleadings liberally" and noting that "the dismissal of a pro se claim as insufficiently pleaded is appropriate only in the most unsustainable of cases."). "However, mere conclusions of law or unwarranted deductions need not be accepted." *Alston v. Sebelius*, No. 13-4537, 2014 WL 4374644, at *5 (E.D.N.Y. Sept. 2, 2014) (quoting *Bobrowsky v. Yonkers Courthouse*, 777 F.Supp.2d 692, 703 (S.D.N.Y. 2011)).

Although "courts generally will not accept factual allegations raised for the first time in opposition to a motion to dismiss, some courts have construed the mandate to read a pro se plaintiff's papers liberally as allowing for consideration of such allegations." *Rolle v. Educ. Bus Transp., Inc.*, No. 13-1729, 2014 WL 4662256, at *9 (E.D.N.Y. Aug. 8, 2014) (collecting cases), *report and recommendation adopted by*, 2014 WL 4662267 (E.D.N.Y. Sept. 17, 2014); *Ibok*, 2006 WL 302336, at * 1, n.1 (citing *Fox v. Fischer*, No. 04-6718, 2005 WL 1423580 at *2, n.1 (S.D.N.Y. June 14, 2005) *aff'd*, 242 Fed.Appx. 759 (2d Cir. 2007); *Verley v. Goord*, No. 02-1182, 2004 WL 526740, at *5 (S.D.N.Y. Jan. 22, 2004)) ("The Court may consider the factual allegations in plaintiff's Response to supplement those in his complaint because of the liberal standard afforded to the pleadings of pro se litigants."). In the instant case, the Court, in furtherance of its obligation to construe *pro se* pleadings liberally, will consider the factual allegations set forth in Plaintiff's opposition papers to the extent such facts are related to and consistent with his Complaint. *Rosario v. New York City*, No. 12-4795, 2013 WL 2099254, at *1-2 n.1 (S.D.N.Y. May 15, 2013) (citing *Braxton v. Nichols*, No. 08-8568, 2010 WL 1010001, at * 1 (S.D.N.Y. Mar. 18, 2010); *Gill v. Mooney*, 824 F.2d 192, 195 (2d Cir. 1987)) ("[B]ecause [the plaintiff] is proceeding *pro se*, the Court also considers factual allegations contained in [his] two submissions in opposition to defendants' motion to dismiss, to the extent consistent with the Complaint."); *see Harris v. NYU Langone Med. Ctr.*, No. 12-0454, 2013 WL 3487032, at *2 n.6 (S.D.N.Y. July 9, 2013) ("[B]ecause Harris is proceeding pro se, the Court may consider factual allegations contained in her submissions in opposition to Defendants' motions to dismiss, to the extent they are consistent with the [Complaint]."), *report and recommendation adopted as modified*, 2013 WL 5425336 (S.D.N.Y. Sept. 27, 2013);

*see also Malik v. City of New York*, No. 11-6062, 2012 WL 3345317, at *5 (S.D.N.Y. Aug. 15, 2012) (collecting cases) ("The mandate to read a *pro se* plaintiff's papers liberally, however, makes it appropriate to consider factual allegations in [the plaintiff's] opposition papers, in addition to those in his Complaint, in resolving the motion to dismiss."); *Aponte v. Buono*, No. 11-1077, 2011 WL 6812924, at *3 (E.D.N.Y. Dec. 28, 2011) (citing *Cusamano v. Sobek*, 604 F.Supp.2d 416, 461 (N.D.N.Y. 2009)); *Sommersett*, 2011 WL 2565301, at *3 (citing *Milano v. Astrue*, No. 05 Civ. 6527, 2007 WL 2668511, at *2 (S.D.N.Y. Sept. 7, 2007)) (" '[W]here a *pro se* plaintiff has submitted other papers to the Court, such as legal memoranda, the Court may consider statements in such papers to supplement or clarify the plaintiff's pleaded allegations.' ").

**\*8** Here, the *pro se* Plaintiff raises certain allegations for the first time in his Opposition to Defendants' motion, which the Court will nonetheless consider since they are related to the Complaint. However, in connection with those allegations, Plaintiff seeks to introduce certain documents for the Court to consider. The Court must therefore determine whether, pursuant to Rule 12(d), Defendants' motions should be converted to motions for summary judgment under Rule 56. *See* Fed. R. Civ. P. 12(d). "The district court's conversion of a Rule 12(b)(6) motion into one for summary judgment is governed by principles of substance rather than form." *M.J.M. Exhibitors, Inc. v. Stern (In re G. & A. Books. Inc.)*, 770 F.2d 288, 295 (2d Cir. 1985). "The essential inquiry in determining whether it is appropriate to convert a motion [to dismiss] into a motion for summary judgment is 'whether the non-movant should reasonably have recognized the possibility that the motion might be converted into one for summary judgment or was taken by surprise and deprived of a reasonable opportunity to meet facts outside the pleadings.' " *Costor v. Sanders*, No. 07-11311, 2009 WL 1834374, at *2 (S.D.N.Y. June 16, 2009) (quoting *Krijn v. Pogue Simone Real Estate Co.*, 896 F.2d 687, 689 (2d Cir. 1990)); accord *Glover v. Greenman*, No. 11-9122, 2013 WL 1294698, at *3 (S.D.N.Y. Apr. 1, 2013). "Resolution of this issue will necessarily depend largely on the facts and circumstances of each case." *M.J.M. Exhibitors*, 770 F.2d at 295 (citing *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 393 (6th Cir. 1975))

"Ordinarily, formal notice is not required where a party should reasonably have recognized the possibility that the motion might be converted into one for summary judgment and was neither taken by surprise nor deprived of a reasonable opportunity to meet facts outside the pleadings." *Hernández v. Coffey*, 582 F.3d 303, 307 (2d Cir. 2009) (quoting *Villante v. Dep't of Corrections of City of New York*, 786 F.2d 516, 521 (2d Cir. 1986)) (brackets and quotation marks omitted); *see Sira v. Morton*, 380 F.3d 57, 68 (2d Cir. 2004) (quoting *Gurary v. Winehouse*, 190 F.3d 37, 43 (2d Cir. 1999)) ("A party is deemed to have notice that a motion may be converted into one for summary judgment if that party 'should reasonably have recognized the possibility' that such a conversion would occur."). However, where, as here, the non-movant is proceeding *pro-se*, "[n]otice is particularly important because the *pro se* litigant may be unaware of the consequences of his failure to offer evidence bearing on triable issues. Accordingly, *pro se* parties must have unequivocal notice of the meaning and consequences of conversion to summary judgment." *Hernández*, 582 F.3d at 307-08 (quoting *Beacon Enters., Inc. v. Menzies*, 715 F.2d 757, 767 (2d Cir. 1983)); *accord Parada v. Banco Indus. De Venezuela, C.A.*, 753 F.3d 62, 68 (2d Cir. 2014) (citing *Hernández*, 582 F.3d at 307).

Rule 12.1 of the Local Civil Rules of the United States District Courts for the Eastern and Southern Districts of New York ("Local Civil Rule 12.1") provides, in relevant part, as follows:

> A represented party moving ... for judgment on the pleadings against a party proceeding pro se, who refers in support of the motion to matters outside the pleadings as described in Fed. R. Civ. P. 12(b) or 12(c), shall serve and file the ... notice [provided therein] with the full text of Fed. R. Civ. P. 56 attached at the time the motion is served. If the Court rules that a motion to dismiss or for judgment on the pleadings will be treated as one for summary judgment pursuant to Fed. R. Civ. P. 56, and the movant has not previously served and filed the notice required by this rule, the movant shall amend the form notice to reflect that fact and shall serve

and file the amended notice within fourteen days of the Court's ruling.

Local Civil Rule 12.1. Courts in this district have held that notice pursuant to Local Civil Rule 12.1 provides sufficient notice to *pro se* parties that a motion to dismiss may be converted to a motion for summary judgment. *See Wiggins v. Figueroa*, No. 13-1731, 2015 WL 729730, at *1 (E.D.N.Y. Feb. 18, 2015) (citing *Hernández*, 582 F.3d at 308 n.2); *Lawrence v. Sharkey*, No. 13-173, 2015 WL 2213274, at *3 (E.D.N.Y. May 8, 2015); *accord Loccenitt v. City of New York*, No. 10-8319, 2012 WL 5278553, at *3 (S.D.N.Y. Oct. 22, 2012) (citing *Goodwin v. Solil Mgmt. LLC*, 10-5546, 2012 WL 1883473, at *2 (S.D.N.Y. May 22, 2012)) ("Courts in this district have concluded that a notice pursuant to Local Civil Rule 12.1 suffices to satisfy the requirement that parties be afforded a chance to offer affidavits and other evidence.").

**\*9** Ultimately, "[a] party cannot complain of lack of a reasonable opportunity to present all material relevant to a motion for summary judgment when both parties have filed exhibits, affidavits, counter-affidavits, depositions, etc. in support of and in opposition to a motion to dismiss [or for judgment on the pleadings]...." *M.J.M. Exhibitors*, 770 F.2d at 295 (citation omitted); *see also Reliance Ins. Co. v. Polwision Corp.*, 474 F.3d 54, 57 (2d Cir. 2007) (finding that it was not error for the district court to consider evidence outside of the complaint in resolving a Rule 12(c) motion "without explicitly giving notice that it was converting the Rule 12 motion to a Rule 56 motion[,]" because it was "clear from the record ... that [the non-moving party] knew additional factual considerations were being considered and, in fact, responded with its own evidentiary submissions"); *Sira*, 380 F.3d at 68 ("By attaching to their motion extensive materials that were not included in the pleadings, defendants plainly should have been aware of the likelihood of such a conversion."). Thus, a party who relies on extrinsic material to oppose the motion cannot later claim "that they were deprived of an adequate opportunity to provide the materials they deemed necessary to support or respond to the motion." *Soller*, 2015 WL 500492, at *8 (citing *Sira*, 380 F.3d at 68).

Here, Defendants have not requested that their motion be converted to one for summary judgment and thus have not provided the Plaintiff with a Local Civil Rule 12.1, which is unnecessary here. Since Plaintiff is proceeding *pro se*, the Court will not assume that his submission of extrinsic materials constitutes proof

that Plaintiff is aware of the summary judgment process and the potential consequences of conversion. *See Hernández, 582 F.3d at 307-308* (citing *Beacon Enters., Inc. v. Menzies, 715 F.2d 757, 767 (2d Cir. 1983)*) (declining to convert the defendants' motion to dismiss to one for summary judgment where the plaintiff submitted "extensive affidavits with supporting documents addressing exhaustion."). For these reasons, the Court declines to convert Defendants' motion to one for summary judgment. *See Environmental Servs., Inc. v. Recycle Green Servs., 7 F.Supp.3d 260, 270 (E.D.N.Y. 2014)* (quoting *Carione v. United States, 368 F.Supp.2d 186, 191 (E.D.N.Y. 2005)* (citations omitted)) ("Federal courts have 'complete discretion to determine whether or not to accept the submission of any material beyond the pleadings' offered in conjunction with a Rule 12(b)(6) motion, and thus complete discretion in determining whether to convert the motion to one for summary judgment.") (internal quotation marks omitted). For purposes of judicial economy, and in fairness to the Plaintiff, the Court will treat the motion to dismiss brought by Defendants as a motion to dismiss under Fed. R. Civ. P. 12(b)(6).

## IV. DISCUSSION

### A. Exhaustion of Administrative Remedies

#### 1. Legal Standard Under the PLRA

The PLRA provides in relevant part that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "The PLRA exhaustion requirement 'applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' Prisoners must utilize the state's grievance procedures, regardless of whether the relief sought is offered through those procedures." *Espinal v. Goord, 558 F.3d 119, 124 (2d Cir. 2009)* (citation omitted) (quoting *Booth v. Churner, 532 U.S. 731, 741, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001)*).

In finding that the PLRA applies to all inmate actions concerning prison life, *see Porter v. Nussle, 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)*, the Supreme

Court "did not distinguish between pretrial and post-trial detainees." *United States v. Khan, 540 F.Supp.2d 344, 349 (E.D.N.Y. 2007)* (citing *Porter, 534 U.S. at 532, 122 S.Ct. 983; George v. Morrisson-Warden, No. 6-3188, 2007 WL 1686321 (S.D.N.Y. 2007)); Baez v. Parks, No. 02-5821, 2004 WL 1052779, at *5 (S.D.N.Y. May 11, 2004)* (citing *United States v. Al–Marri, 239 F.Supp.2d 366, 367–68 (S.D.N.Y. 2002); Rivera v. State of New York, No. 96 Civ. 7697, 1999 WL 13240, at *4–5 (S.D.N.Y. Jan. 12, 1999); Samuels v. Jackson, No. 97 Civ. 2420, 1999 WL 92617, at *2 n.3 (S.D.N.Y. Feb. 22, 1999))* ("[T]he PLRA's strict exhaustion requirement does indeed apply in actions brought by pretrial detainees."). As such, similar to a convicted prisoner, a pre-trial detainee is generally required to exhaust his administrative remedies prior to filing an action in federal court. *See Baez, 2004 WL 1052779, at *5* (citing *Porter, 534 U.S. at 532, 122 S.Ct. 983*).

**\*10** Although the language of Section 1997(e)(a) is mandatory, the "edict contains one significant qualifier: the remedies must indeed be 'available' to the prisoner." *Ross v. Blake, — U.S. —, 136 S.Ct. 1850, 1856, 195 L.Ed.2d 117 (2016); Riles v. Buchanan, 656 Fed.Appx. 577, 580 (2d Cir. 2016)* ("As the Supreme Court recently made clear in holding that courts may not excuse a prisoner's failure to exhaust because of 'special circumstances,' 'mandatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.' "). "[A]side from that exception, the PLRA's text suggests no limits on an inmate's obligation to exhaust—irrespective of any 'special circumstances.' " *Ross, 136 S.Ct. at 1856.* The Second Circuit has held that "[a]n administrative procedure is unavailable when: (1) 'it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates'; (2) it is 'so opaque that is becomes, practically speaking, incapable of use'; or (3) 'prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.' " *Riles, 656 Fed.Appx. at 580* (quoting *Ross, 136 S.Ct. at 1859-60*).

Despite the PLRA's strict application, the Supreme Court has made clear that prisoners "are not required to specially plead or demonstrate exhaustion in their complaints." *Jones v. Bock, 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007).* Rather, "failure to exhaust is an affirmative defense under the PLRA" that must be

raised and proven by defendants. *Id.* "Dismissal under Rule 12(b)(6) for failure to exhaust is thus appropriate only where nonexhaustion is apparent from the face of the complaint." *Roland III v. Smith,* 907 F.Supp.2d 385, 388 (S.D.N.Y. 2012) (citing *McCoy v. Goord,* 255 F.Supp.2d 233, 251 (S.D.N.Y. 2003)); *see Jandres v. Armor Health Care Inc.,* No. 12-3132, 2014 WL 1330655, at *4 (E.D.N.Y. Mar. 31, 2014); *see also Barrett v. Armor Corr. Health, Inc.,* No. 13-1063, 2014 WL 1220756, at *5 (E.D.N.Y. Mar. 20, 2014) (quoting *Rivera v. Anna M. Kross Ctr.,* No. 10-8696, 2012 WL 383941, at *2 (S.D.N.Y. Feb. 7, 2012)) (citing *Butler v. Suffolk Cnty.,* 289 F.R.D. 80, 92 (E.D.N.Y. 2013)).

### *2. Application to the Facts*

Defendants argue that the Complaint must be dismissed on the grounds that "there is no allegation or any indication that [Plaintiff] brought his complaints to the attention of NCCC officials that would have afforded them the time and opportunity to address them." Armor Correctional Health Services of New York, Inc. and Sheriff Michel Sposato's Memorandum of Law in Support of their Motion to Dismiss the Complaint ("Defs.' Mem.") [DE 19-2] at 10. In opposing the motion, Plaintiff states that while at the NCCC, he filed grievance forms and sick call requests in which he complained about his arm as well as other issues. Pl's. Opp'n at 4. Plaintiff explained that he could not figure out what the officer wrote on most of the complaint forms and there were times when the officer informed Plaintiff that he "had to sign the form because soon [he would] be taken to the Hospital." *Id.* at 3. Sometimes the officer would write on the form a note that Plaintiff refused to sign it when, in fact, Plaintiff had signed the form on an earlier date. *Id.* Moreover, in connection with his discussion of the PLRA and his efforts to comply with it, Plaintiff stated that he was transferred from a "county holding facility" to a "federal trans[ ]ient facility, which is a different jurisdiction, with different rules and regulations." *Id.*

In their Reply, Defendants argue that Plaintiff's Opposition fails to set forth a "meaningful rebuttal to the Defendants' position." Reply Memorandum of Law in Further Support of the Defendant's Motion to Dismiss the Complaint ("Defs.' Reply") [DE 32] at 2. Defendants reject what they characterize as Plaintiff's attempt to attribute any deficiencies under the PLRA to his being

transferred to a different facility. *See id.* at 2. They point out that Plaintiff, by his own "admission," arrived at the NCCC on September 11, 2013, and was not transferred to another facility until November 5, 2013. *Id.* Based on this timeline, Defendants argue that Plaintiff had approximately two months to file a grievance and any subsequent appeal. *Id.* They further note that Plaintiff does not challenge the three-tiered prisoner grievance procedure utilized by the NCCC which is set out in detail in Defendants' opening papers. *Id.* at 3.

**\*11** As discussed above, Plaintiff is not required to plead specific facts in the Complaint setting forth exhaustion. *Jones,* 549 U.S. at 216, 127 S.Ct. 910; *Roland v. Smith,* 907 F.Supp.2d 385, 388 (S.D.N.Y. 2012) ("inmates are not required to specially plead or demonstrate exhaustion in their complaints."). Therefore, to the extent Defendants seek dismissal on the grounds that Plaintiff does not allege that he exhausted the administrative remedies available to him, that argument is unavailing. Dismissal is "appropriate only where nonexhaustion is apparent from the face of the complaint." *Zamani v. Nassau Cty.,* No. 14-5606, 2015 WL 9943271, at *3 (E.D.N.Y. Dec. 16, 2015) (quoting *Roland v. Smith,* 907 F.Supp.2d 385, 388 (S.D.N.Y. 2012)) (citing *Cephas v. Nassau Cty. Corr. Ctr.,* No. 12-CV-1445, 2014 WL 537576, at *4 (E.D.N.Y. Feb. 10, 2014)) (rejecting defendants' argument that the plaintiff "failed to exhaust his administrative remedies in that there is no indication or allegation that plaintiff undertook any further action to complain of or appeal any dissatisfaction with any of [his grievances]....") (internal quotation marks omitted), *report and recommendation adopted,* No. 14-5606, 2016 WL 393934 (E.D.N.Y. Jan. 28, 2016). Non-exhaustion has been deemed to be apparent from the face of a Complaint where, for example, the plaintiff explicitly alleged that his grievance was under review by Internal Affairs at the time the Complaint was filed, *Joseph v. Nassau Cty. Corr. Facility,* No. 15-7010, 2016 WL 3033725, at *4 (E.D.N.Y. May 26, 2016), or where the Court determined, through a review of exhibits attached to the plaintiff's Complaint, that the plaintiff failed to properly appeal the outcome of his grievances in accordance with the facility's protocol—the "plaintiff either accepted the grievance coordinator's decision and did not appeal, or refused to sign the reviewed grievance forms and did not appeal." *Young v. Sposato,* No. 12-2850, 2014 WL 109083, at *7 (E.D.N.Y. Jan. 13, 2014).

Unlike the circumstances in *Joseph* and *Young*, the Court finds here that here non-exhaustion is not apparent from the face of Plaintiff's Complaint. At no point does Plaintiff affirmatively state in any of his submissions "that he failed to follow all the required grievance procedures." *Randolph v. N.Y.C. Dep't of Corr.*, No. 05-8820, 2007 WL 2660282, at *7 (S.D.N.Y. Sept. 7, 2007), *report and recommendation adopted*, No. 14-06468, 2016 WL 680822 (S.D.N.Y. Feb. 18, 2016); *see, e.g.*, *Groenow v. Deputy Warden of OBCC Williams*, No. 13-3961, 2014 WL 941276, at *4 (S.D.N.Y. March 11, 2014). In fact, Plaintiff makes no mention in his Complaint of the NCCC's grievance procedure or his compliance with it, likely because the standardized 42 U.S.C. Section 1983 complaint form utilized by *pro se* plaintiffs like Mr. Villafane do not prompt the individual to discuss his efforts to exhaust administrative remedies. It is not until his Opposition that Plaintiff asserts he filed grievance forms and sick call requests while detained at the NCCC. Pl's. Opp'n at 4. Plaintiff states that (1) he often could not read what the officers wrote on the forms, (2) officers told him he had to sign the forms since he would be taken to a hospital, and (3) officers sometimes indicated on the form that Plaintiff refused to sign when, according to Plaintiff, he actually did. *Id.* "Where a prisoner indicates that he has taken some steps toward exhaustion, district courts will normally not infer from his silence that he failed to take the remaining steps that full exhaustion would require." *Huggins v. Schriro*, No. 14-6468, 2015 WL 7345750, at *3 (S.D.N.Y. Nov. 19, 2015) (citing *Rodriguez v. Warden, Metropolitan Correctional Facility*, No. 13-3643, 2015 WL 857817 at *3–4 (S.D.N.Y. Feb. 27, 2015); *Randolph*, 2007 WL 2660282, at *8; *Groenow*, 2014 WL 941276, at *3 (S.D.N.Y. March 11, 2014)); *id.* (quoting *Wesley v. Muhammad*, No. 05-5833, 2008 WL 123812, at *3 (S.D.N.Y. Jan. 10, 2008)), *report and recommendation adopted*, 2008 WL 236974 (S.D.N.Y. Jan. 28, 2008)(" '[A] pro se plaintiff's pleading references to various efforts that he has made to bring alleged prison violations to the attention of the prison authorities cannot be treated as tantamount to an admission that he had not exhausted his remedies.' "); *but see Ghee v. Warden Ramos*, No. 13-632, 2013 WL 7018543, at *1–2 (S.D.N.Y. Dec. 4, 2013) (dismissing the plaintiff's complaint where he left blank a section of the form complaint that set forth the following: "[w]hat steps, if any, did you take to appeal that decision? Describe all appeals to the highest level of the grievance process[ ]").

*12 Moreover, according to Plaintiff, he was instructed to sign a complaint form so that he would be taken to a hospital. Accepting this allegation as true, which the Court must do at this juncture, it is not unreasonable to infer that Plaintiff's request to be taken to a hospital was accepted. Where a grievance is decided in an inmate's favor, but the facility fails to implement the administrative decision and there is no means of appealing that failure, then the inmate is deemed to have fully exhausted his or her remedies for purposes of the PLRA. *See Abney v. McGinnis*, 380 F.3d 663, 669 (2d Cir. 2004) (collecting cases). Plaintiff's allegations raise questions that cannot be answered at this stage with an undeveloped record. *See Cephas*, 2014 WL 537576, at *4 (quoting *Gaines v. Armor Health Care, Inc.*, No. 12-5663, 2013 WL 6410311, at *3 (E.D.N.Y. Dec. 9, 2013)) ("Inquiries regarding exhaustion ... 'typically cannot be determined on an undeveloped record.' "). In light of the foregoing analysis, the Court finds that dismissal on the grounds of non-exhaustion is inappropriate at this time. *See Jandres*, 2014 WL 1330655, at *4; *Joseph*, 2016 WL 3033725, at *4 (citing *McCoy v. Goord*, 255 F.Supp.2d 233, 249 (S.D.N.Y. 2003)) ("Where non-exhaustion is not clear from the face of the complaint, a defendant's motion to dismiss pursuant to 12(b)(6) is not an appropriate vehicle.")

## B. Plaintiff's Claims Arising Under 42 U.S.C. Section 1983

Section 1983 provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured ...

42 U.S.C. § 1983. To state a claim under Section 1983, a plaintiff must " 'allege that (1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States.' " *Rae v. Cty. of Suffolk*, 693 F.Supp.2d 217, 223 (E.D.N.Y. 2010) (quoting *Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999)); *see Cornelio v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010) (quoting *Pitchell v. Callan*, 13

F.3d 545, 547 (2d Cir. 1994)). Section 1983 does not create any independent substantive rights but rather is a vehicle to "redress ... the deprivation of [federal] rights established elsewhere." *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985), *abrogated on other grounds recognized by Collins v. City of San Diego*, 841 F.2d 337 (9th Cir. 1988); *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993)). In addition, as discussed in greater detail below, it is well-settled in this Circuit "that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farid v. Ellen*, 593 F.3d 233, 249 (2d Cir. 2010) (quoting *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006)); *see Pettus v. Morgenthau*, 554 F.3d 293, 300 (2d Cir. 2009).

### 1. *Section 1983 Claims against Defendant Sposato in his Individual Capacity*

Plaintiff sets forth a single allegation concerning Defendant Michael Sposato, the Nassau County Sheriff. In the section of Plaintiff's form Complaint entitled "Basis for Jurisdiction," when prompted to discuss how each defendant acted under color of state or local law, Plaintiff responded "Armor by denying me prop[ ]er medical care intentionally the sheriff by allowing them to do so, and by not monitoring its medical Dept." Compl. § II.D. Plaintiff does not mention Defendant Sposato in either his "Statement of Claim," *see id.* § III, or his Opposition papers. *See generally*, Pl's. Opp'n.

At the outset, the Court notes that a supervisory official like Sheriff Sposato will not be found liable under Section 1983 simply by virtue of his "high position of authority." *Whitenack v. Armor Med.*, No. 13-2071, 2014 WL 5502300, at *5 (E.D.N.Y. Oct. 30, 2014) (quoting *Al–Jundi v. Estate of Rockefeller*, 885 F.2d 1060, 1065 (2d Cir. 1989)) (citing *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 127 (2d Cir. 2004)) (internal quotation marks omitted); *see Morgan v. Dzurenda*, No. 14-966, 2015 WL 5722723, at *6 (D. Conn. Sept. 19, 2015) (citing *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985)) ("Supervisory officials cannot be held liable under section 1983 solely for the acts of their subordinates."). Rather, liability may generally only be predicated upon the individual defendant's personal involvement in the purported constitutional violation. *See Patterson v. Cty.*

*of Oneida, N.Y.*, 375 F.3d 206, 229 (2d Cir. 2004) (citing *Back v. Hastings on Hudson Union Free School District*, 365 F.3d 107, 122 (2d Cir. 2004)); *Morgan*, 2015 WL 5722723, at *6 (citing *Colon*, 58 F.3d at 873). A complaint asserting a § 1983 claim which does not allege facts establishing the requisite personal involvement "fails as a matter of law." *Gaines*, 2013 WL 6410311, at *3 (citing *Costello v. City of Burlington*, 632 F.3d 41, 48–49 (2d Cir. 2011)).

**\*13** According to the Second Circuit in *Colon v. Coughlin*, personal involvement may be found when:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

58 F.3d at 873 (citing *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)); *Donohue v. Manetti*, No. 15-636, 2016 WL 740439, at *3 (E.D.N.Y. Feb. 24, 2016) (quoting *Colon*, 58 F.3d at 873); *Barrett*, 2014 WL 1220756, at *4 (quoting *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996)). Some courts have questioned the continuing applicability of these factors based upon the heightened pleading requirements set forth in *Iqbal*. *See Bellamy v. Mount Vernon Hosp.*, No. 07-1801, 2009 WL 1835939, at *6 (S.D.N.Y. June 26, 2009) ("Only the first and part of the third *Colon* categories pass *Iqbal's* muster —a supervisor is only held liable if that supervisor participates directly in the alleged constitutional violation or if that supervisor creates a policy or custom under which unconstitutional practices occurred."), *aff'd* 387 Fed.Appx. 55 (2d Cir. 2010); *Newton v. City of New York*, 640 F.Supp.2d 426, 448 (S.D.N.Y. 2009) ("[P]assive

failure to train claims pursuant to section 1983 have not survived post-*Iqbal*.). However, the Second Circuit has not yet ruled on the issue. *See Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013) (noting that *Iqbal* "may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations," but declining to resolve the issue); *see also Marom v. City of New York*, No. 15-2017, 2016 WL 916424, at *15 (S.D.N.Y. Mar. 7, 2016) (citing *Reynolds v. Barrett*, 685 F.3d 193, 205 n.14 (2d Cir. 2012) (acknowledging that *Iqbal* has "engendered conflict within our Circuit about the continuing vitality of the supervisory liability test set forth in *Colon v. Coughlin*")); *Raspardo v. Carlone*, 770 F.3d 97, 117 (2d Cir. 2014) (declining to decide the "contours of the supervisory liability test" post *Iqbal*), *on reconsideration in part,* No. 15-CV-2017, 2016 WL 5900217 (S.D.N.Y. July 29, 2016). Notwithstanding the Second Circuit's silence, the majority of courts considering the issue have determined that "even after the U.S. Supreme Court's decision in *Iqbal*, these 'categories supporting personal liability of supervisors still apply as long as they are consistent with the requirements applicable to the particular constitutional provision alleged to have been violated.' " *Hernandez v. Goord*, No. 01-9585, 2013 WL 2355448, at *7 (S.D.N.Y. May 29, 2013) (quoting *Qasem v. Toro*, 737 F.Supp.2d 147, 152 (S.D.N.Y. 2010)) (citing *Iqbal*, 556 U.S. at 676, 129 S.Ct. 1937); *see Ramey v. Perez*, No. 13-00017, 2014 WL 407097, at *4 (S.D.N.Y. Jan. 31, 2014) ("*Colon* remains the standard in this Circuit for deciding whether personal involvement by supervisory officials is sufficiently alleged in the context of the Eighth Amendment."); *see also Morgan v. Comm'r Dzurenda*, No. 14-966, 2015 WL 5722723, at *7 (D. Conn. Sept. 29, 2015) ("Because it is unclear as to whether *Iqbal* overrules or limits *Colon*, the Court will continue to apply the categories for supervisory liability set forth by the Second Circuit."); *Mercier v. Kelly*, No. 10-7951, 2013 WL 4452486, at *6 (S.D.N.Y. Aug. 19, 2013) ("[T]he majority view is where 'the constitutional claim does not require a showing of discriminatory intent ... the personal involvement analysis set forth in *Colon v. Coughlin* may still apply.' ") (quoting *Shepherd v. Powers*, No. 11 Civ. 6860, 2012 WL 4477241, at *10 (S.D.N.Y. Sept. 27, 2012)) (internal quotation marks omitted) (citing *Bertuglia v. City of New York,* 839 F.Supp.2d 703, 720–23 (S.D.N.Y. 2012); *Malik v. City of New York,* No. 11-6062, 2012 WL 3345317, at *14–15 (S.D.N.Y. Aug. 15, 2012)); *Martinez v. Perilli*, No. 09-6470, 2012 WL 75249, at *4 (S.D.N.Y.

Jan. 5, 2012) ("[T]he five *Colon* categories still apply after *Iqbal*.") (citing *Qasem*, 737 F.Supp.2d at 151; *D'Olimpio v. Crisafi*, 718 F.Supp.2d 340, 345–48 (S.D.N.Y. 2010), *aff'd*, 462 Fed.Appx. 79 (2d Cir. 2012); *Sash v. United States*, 674 F.Supp.2d 531, 544 (S.D.N.Y. 2009)). Using the principles set forth above, the Court will now consider whether Plaintiff has established the requisite personal involvement of Defendant Sposato in the underlying circumstances.

**\*14** Plaintiff alleges that Defendant Sposato allowed Armor to deny him medical care and failed to monitor the "medical department." *See* Compl. § II.D. As to the first and second *Colon* factors set forth above, Plaintiff does not allege that Defendant Sposato was directly involved in the alleged constitutional violations or that he failed to remedy the constitutional violations "after being informed of the violation through a report or appeal." Plaintiff may still satisfy the personal involvement requirement by establishing that the defendant was responsible for creating a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, as set forth in the third *Colon* factor. "As currently drafted, the Complaint merely discusses the constitutional violations against Plaintiffs, which is insufficient to assert a policy or custom." *See Tretola v. D'Amico*, No. 13-5705, 2014 WL 2957523, at *8 (E.D.N.Y. July 1, 2014); *see also, e.g., Youngblood v. City of N.Y.*, No. 15-3541, 2016 WL 3919650, at *5 (S.D.N.Y. June 27, 2016) (holding that the pro se "Plaintiff's bare allegations of the existence of a custom and policy and his conclusory assertion that the policy was linked to his constitutional injuries are insufficient to state a *Monell* claim[ ]"); *Carpinone v. City of New York*, No. 11-2074, 2012 WL 760073, at *2 (S.D.N.Y. Mar. 9, 2012) ("Plaintiff offers no facts which would render plausible his allegations of a policy or custom within the New York City Police Department that was affirmatively linked to the purported constitutional violations he suffered."). Here, Plaintiff Villafane has therefore failed to establish personal involvement of Defendant Sposato through the third *Colon* factor.

Turning to the fourth *Colon* factor—which appears to be the factor most directly implicated by Plaintiff's allegations—Plaintiff claims that "the defendant was grossly negligent in supervising subordinates who committed the wrongful acts." *Samuels v. Fischer*, 168 F.Supp.3d 625, 638 (S.D.N.Y. 2016) (quoting *Colon*, 58

F.3d at 873). Courts have held that in order to establish personal involvement in this context, a plaintiff must demonstrate that the defendant "knew or should have known that there was a high degree of risk that his subordinates would behave inappropriately, but either deliberately or recklessly disregarded that risk by failing to take action that a reasonable supervisor would find necessary to prevent such a risk, and that failure caused a constitutional injury to Plaintiff." *Samuels*, 168 F.Supp.3d at 638 (quoting *Frederick v. Sheahan*, No. 10-6527, 2014 WL 3748587, at *8 (W.D.N.Y. July 29, 2014)) (citing *Kucera v. Tkac*, No. 12-264, 2013 WL 1414441, at *6 (D. Vt. Apr. 8, 2013)) (explaining that the defendants' alleged failure to supervise will satisfy the fourth *Colon* factor if the defendants "knew or should have known that there was a high degree of risk that his subordinates would behave inappropriately ... but either deliberately or recklessly disregarded that risk by failing to take action that a reasonable officer would find necessary to prevent such a risk[.]"); *Brooks v. Prack*, 77 F.Supp.3d 301, 313 (W.D.N.Y. 2014) (quoting *Frederick*, 2014 WL 3748587, at *8).

Plaintiff has not provided any salient facts regarding Defendant Sposato's state of mind—whether he knew or should have known that his subordinates were engaging in conduct which violated Plaintiff's or other inmate's constitutional rights. Plaintiff merely makes the conclusory allegation that Defendant Sposato "allowed" Armor to engage in the purportedly unconstitutional conduct. Moreover, even if Plaintiff had alleged that Sheriff Sposato was aware of Armor's inaction through his receipt of complaints and failed to act on those complaints, Plaintiff's allegations might still fail to establish the requisite personal involvement. *See Tafari v. McCarthy*, 714 F.Supp.2d 317, 359 (N.D.N.Y. 2010) (quoting *Rivera v. Goord*, 119 F.Supp.2d 327, 344–45 (S.D.N.Y. 2000)) (citing *Watson v. McGinnis*, 964 F.Supp. 127, 130 (S.D.N.Y. 1997)) ("A prisoner's allegation that a supervisory official failed to respond to a grievance is insufficient to establish that the official 'failed to remedy the violation after learning of it through a report or appeal' or 'allowed the custom or policy to continue after learning of it.' "). As an example, in *Whitenack v. Armor Medical*, No. 13-2071, 2014 WL 5502300 (E.D.N.Y. Oct. 30, 2014), the incarcerated *pro se* plaintiff filed a civil rights Complaint in the Eastern District of New York under 42 U.S.C. § 1983 against Armor, Sheriff Sposato, Nassau County and "the Clerk of the Court of the

Nassau County D.A.'s office." *Id.* at *1. As to Sheriff Sposato, plaintiff Whitenack alleged that Sposato failed to "provid[e] medical needs, even after they learned, through grievances, that Armor was not providing proper medical care" and that he "allows Armor to continue practicing [ ] in the [NCCC] * * *." *Id.* at *6 (alterations in original). The court in *Whitenack* held that "such allegations are insufficient to impose Section 1983 liability upon Sheriff Sposato in a supervisory capacity." *Id.* (collecting cases). The court added that "[s]ince plaintiff 'has pled no facts, beyond [Sheriff Sposato's] presumed receipt of [grievances] and [his] * * *position[ ] atop the [NCCC], implicating [him] in any violation described in [his] [amended] complaint [,] [he] has * * * failed to plausibly plead [Sheriff Sposato's] personal involvement in any infringement of [his] constitutional rights.' " *Id.* at *6 (alterations in original) (quoting *Vogelfang v. Capra, 889 F.Supp.2d 489,* 502 (S.D.N.Y. 2012)). On these grounds, the court granted the defendants' motion seeking dismissal of the plaintiff's Section 1983 claim against Sheriff Sposato. *Id.*

**\*15** The Court also notes that Plaintiff fails to set forth any detail regarding how Defendant Sposato failed to supervise his subordinates or which subordinates he failed to supervise. *See Brooks*, 77 F.Supp.3d at 313. "[T]he mere failure to supervise would not be sufficient to establish liability under § 1983." *Tyler v. Dalsheim*, No. 82-2467, 1985 WL 554, at *1 (S.D.N.Y. Apr. 24, 1985); *McRae v. Gentile*, No. 914-00783, 2015 WL 7292875, at *5 (N.D.N.Y. Oct. 20, 2015) (quoting *White v. Fischer*, No. 09-240, 2010 WL 624081, at *6, 2010 U.S. Dist. LEXIS 15492, at *19 (N.D.N.Y. Feb. 18, 2010)) (citing *Pettus v. Morgenthau*, 554 F.3d 293, 300 (2d Cir. 2009)) (" 'Vague and conclusory allegations that a supervisor' negligently failed to [ ] supervise subordinate employees do not suffice to establish personal involvement so as to give rise to personal liability."), *report and recommendation adopted*, No. 914-783, 2015 WL 7300540 (N.D.N.Y. Nov. 18, 2015).

The Court finds that Plaintiff's claims against Defendant Sposato fare no better under the fifth *Colon* factor: "the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon*, 58 F.3d at 873. For example, in *Holland v. City of New York*, the *pro se* plaintiff alleged that two individual defendants, Commissioner Schriro and Warden Perrino, " 'pursued a

policy and custom of deliberate indifference' in the 'hiring, training and supervision of' Jennings and the correction officer defendants." *See Holland v. City of New York*, 197 F. Supp. 529, 551 (2016). The court determined that plaintiff Holland's claims failed to satisfy the third, fourth and fifth *Colon* factors. *Id.* In doing so, the court explained that "[t]o the extent that the complaint attempts to assert a failure-to-supervise claim, moreover, it lacks any hint that [Schriro and Perrino] acted with deliberate indifference to the possibility that [their] subordinates would violate [Holland's] constitutional rights." *Holland*, 197 F.Supp. at 551 (quoting *Pettus v. Morgenthau*, 554 F.3d 293, 300 (2d Cir. 2009)). Likewise, in *Erdogan v. Nassau County*, this Court found the following allegations to be conclusory:

Specifically, Plaintiff alleges that the "Defendant supervisors," including the Proposed Defendants, "were personally involved in both the deprivation of Ms. Erdogan's constitutional rights and in creating or condoning the policy or custom of failing to take preventative and remedial measures to guard against such constitutional deprivations." PAC ¶ 54. Plaintiff further maintains that (i) the Defendant supervisors were reckless in their failure to supervise Mark Barber, and knew or should have known that Barber was sexually abusing female inmates and that the conduct against Plaintiff was likely to occur; and (ii) the failure of the supervisory defendants to train, supervise, and discipline Barber amounted to gross negligence. *Id.* ¶¶ 55–57.

No. 10-5837, 2014 WL 1236679, *16 (E.D.N.Y. March 25, 2014). As a result, this Court held the plaintiff failed to establish that the defendants were deliberately indifferent or grossly negligent in supervising subordinates. *Id.* In addition, the plaintiff in *Erdogan* failed to set forth "sufficient factual averments as required under *Iqbal*." *Id.* at 16 (collecting cases). Here, too, Plaintiff fails to set forth "sufficient factual averments" to support a claim for deliberate indifference. Plaintiff "must do more than plead '[c]onclusory allegations or legal conclusions masquerading as factual conclusions[.]' " *Andino v. Fischer*, 698 F.Supp.2d 362, 376 (quoting *Gebhardt v. Allspect, Inc.*, 96 F.Supp.2d 331, 333 (S.D.N.Y. 2000)) (second alteration added). Since Plaintiff has failed to meet this standard, the Complaint, as currently drafted, fails to allege Defendant Sposato's personal involvement —a deficiency that is fatal to Plaintiff's claim. *Huggins*, 2015 WL 7345750, at *5.

### 2. *Section 1983* Claims against Defendant Sposato in his Official Capacity

**\*16** Since Plaintiff did not explicitly state that he is suing Defendant Sposato in his individual capacity, the Court will also consider whether Plaintiff has stated a claim against Defendant Sposato in his official capacity as Sheriff of Nassau County. In this regard, the Court points out that "an official-capacity suit is, in all respects other than name, to be treated as a suit against the [governmental] entity [of which the officer is an agent]." *Stancati v. Cty. of Nassau*, No. 14-2694, 2015 WL 1529859, at *2 (E.D.N.Y. Mar. 31, 2015) (citing *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985) (alterations in original); *Castanza v. Town of Brookhaven*, 700 F.Supp.2d 277, 283–84 (E.D.N.Y. 2010)). Therefore, a suit against Defendant Sposato in his official capacity is a suit against the Nassau County Sheriff's Department. It is well established, however, that as an "administrative arm of a municipality," the Nassau County Sheriff's Department is not a suable entity. *Campbell v. Sposato*, No. 15-1958, 2015 WL 9267222, at *4 (E.D.N.Y. Nov. 17, 2015) (citing Nassau County Charter, DE [14–2], art. XX, §§ 2001, 2003), *report and recommendation adopted*, No. 15-1958, 2015 WL 9273951 (E.D.N.Y. Dec. 16, 2015). Unlike the Nassau County Sheriff's Department, Nassau County itself is a suable entity. However, for the same reasons that Plaintiff has failed to set forth a claim against Armor, which is discussed in greater detail below, Plaintiff's Complaint fails to establish a claim for municipal liability.

### 3. *Section 1983* Claims against Armor

"Armor is a private company that provides medical services for inmates at the [NCCC] pursuant to a contract with the Nassau County Sheriff's Department." Declaration of John J. Doody in Support of Defendant Armor's Motion to Dismiss ("Doody Decl.") [19-1] ¶ 3. Generally, to state a claim under Section 1983, the challenged conduct must be attributable at least in part to a person who was acting under color of state law. *Zamani v. Nassau Cty.*, No. 14-5606L, 2015 WL 9943257, at *4 (E.D.N.Y. Dec. 16, 2015) (quoting *Hawkins v. Nassau Cty. Corr. Facility*, 781 F.Supp.2d 107, 111 (E.D.N.Y. 2011)), *report and recommendation adopted*, No. 14-5606, 2016 WL 393934 (E.D.N.Y. Jan. 28, 2016). However,

"a private employer such as Armor may be held liable under Section 1983 for the acts of its employees where the unconstitutional act was authorized or undertaken pursuant to the official policy of the private entity employer and the employer was jointly engaged with state officials or its conduct is chargeable to the state." *Gaines,* 2013 WL 6410311, at *3; *see Hollander v. Copacabana Nightclub,* 624 F.3d 30, 33 (2d Cir. 2010); *see generally Filarsky v. Delia,* 566 U.S. 377, 389-90, 132 S.Ct. 1657, 1661-65, 182 L.Ed.2d 662 (2012); *see also Zamani,* 2015 WL 9943257, at *5 (citing *Rojas v. Alexander's Dep't Store, Inc.,* 924 F.2d 406, 408 (2d Cir. 1990)); *Cephas,* 2014 WL 537576, at *4 (quoting *Gaines,* 2012 WL 5438931, at *3) (" 'Thus, a private employer acting under color of state law may be held liable under Section 1983 for the acts of its employees where the unconstitutional act was authorized or undertaken pursuant to the official policy of the private entity employer and the employer was jointly engaged with state officials or its conduct is chargeable to the state.' "); *Briel v. Sposato,* No. 12-2868, 2012 WL 3697806, at *5 (E.D.N.Y. Aug. 21, 2012).

In the instant case, Armor is the "medical arm" of the NCCC where Plaintiff was detained. *See Cephas,* 2014 WL 537576, at *5. The Court will therefore assume for purposes of deciding the instant motion that Armor was acting under color of state law in rendering medical services to Plaintiff at the NCCC. *Cherry v. Spoato [sic],* No. 15-1832, 2015 WL 2089588, at *3 (E.D.N.Y. May 5, 2015); *Feder v. Sposato,* No. 11-193, 2014 WL 1801137, at * 6 (E.D.N.Y. May 7, 2014) (quoting *West v. Atkins,* 487 U.S. 42, 54, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988)) ("Because Armor was hired to fulfill the state's constitutional obligation to provide necessary medical care for its inmates, [it][was] 'acting under the color of state law' for purposes of Section 1983").

**\*17** As referenced above, there is no *respondeat superior* liability for § 1983 claims. *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691–94, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Southerland v. City of N.Y.,* 681 F.3d 122, 137 (2d Cir. 2012) (quoting *Monell,* 436 U.S. at 691-94, 98 S.Ct. 2018). Since Plaintiff does not assert claims against any individual employee or official of Armor, Armor may be liable under § 1983 only if Plaintiff "proves that action pursuant to official ... *policy* of some nature caused a constitutional tort." *Grafton v. Cty. of Nassau,* No. 15 CV 4564, 2016 WL 8711072, at *9 (E.D.N.Y. July 15, 2016) (emphasis in original) (citing *Rojas v. Alexander's Dep't*

*Store, Inc.,* 924 F.2d 406, 408-09 (2d Cir. 1990); *Green v. City of New York,* 465 F.3d 65, 82 (2d Cir. 2006)); *Cofield v. Armor Correctional Health Inc.,* No. 12-1394, 2013 WL 2416318, at *4 (E.D.N.Y. May 31, 2013) (citing *Rojas,* 924 F.3d 408). "Although *Monell* dealt with municipal employers, its rationale has been extended to private businesses [acting under color of state law]." *Rojas,* 924 F.2d at 409; *see also Bektic–Marrero v. Goldberg,* 850 F.Supp.2d 418, 432 (S.D.N.Y. 2012) (collecting cases) (holding that *Monell* has been extended to private Section 1983 defendants acting under color of state law).

Here, Plaintiff has not plausibly alleged facts showing that the constitutional deprivations he alleges resulted from an official policy or custom of Armor. In particular,

> Plaintiff has not alleged facts from which to reasonably infer: (1) the existence of a formal policy to deny inmates at the NCCC, including himself, their 'basic medical needs' which is officially endorsed by Armor; (2) actions taken or decisions made by Armor policymaking officials which caused the alleged violation of his civil rights ...; (3) an Armor practice so persistent and widespread as to practically have the force of law; or (4) a failure by Armor policymakers to properly train or supervise their subordinates, amounting to 'deliberate indifference' to the rights of those who come in contact with their employees.

*Whitenack,* 2014 WL 5502300, at *9; *see, e.g., Barrett,* 2014 WL 1220756, at *5 (dismissing claims against Armor where the plaintiff "neither alleged that an Armor employee violated his constitutional rights, nor ... alleged a single fact to support an inference that any action resulted from an official policy or custom").

The Court turns to prevailing Second Circuit case law involving civil rights complaints to demonstrate the factual averments and evidentiary support needed to satisfy the pleading requirements set forth in *Iqbal.* In *Kucharczyk v. Westchester County,* the *pro se* plaintiff alleged in his complaint "a *Monell* claim for [a] pattern due to the fact that there [are] several claims pending in

this court based on the same facts [he] allege[s] in [the instant] [C]omplaint." 95 F.Supp.3d 529, 543 (S.D.N.Y. 2015) (alterations in original). In support of his claim, the plaintiff attached to his complaint a copy of a report issued by the Civil Rights Division of the United States Department of Justice which memorialized the department's findings resulting from an investigation of the correctional facility where the plaintiff was detained.

The court in *Kucharczyk* explained that "[t]he Second Circuit and the district courts within the Second Circuit have held that a plaintiff's citation to a few lawsuits involving claims of alleged [constitutional violations] is not probative of the existence of an underlying policy by a municipality ... or department of corrections." *Id.* (quoting *Ameduri v. Village of Frankfort*, 10 F.Supp.3d 320, 341 (N.D.N.Y. 2014)) (collecting cases). "Some courts, however, have found that other lawsuits identified by a plaintiff that concern the same practice and policy at issue in the complaint permit a plausible inference of deliberate indifference." *Id.* (collecting cases). In *Kucharczyk*, the court concluded that regardless of which approach it adopted, the plaintiff's failure to name the cases and indicate how many were pending rendered his statement conclusory and the court would have to disregard it on that grounds. *Id.* Notwithstanding this deficiency, the court determined that the plaintiff had sufficiently alleged a custom or practice by virtue of the DOJ Report appended to his complaint. *Id.* According to the report, the facility " 'ha[d] a pattern of failing to ... provide inmates with adequate medical ... care," which 'violate[d] WCJ inmates' constitutional rights.' " *Id.* The report further stated that " '[a]lthough WCJ has instituted a policy for submitting grievances, it is not consistently implemented or effectively publicized,' which posed a risk to inmates that perceived that their serious health needs were being unmet." *Id.* Moreover, the court noted, the report was released several years prior to the commencement of the suit, so the facility's policymakers were well aware of the deficiencies. *Id.* at 544-545. The court held that based on this information, the plaintiff adequately alleged "a widespread practice or policy of which Defendants were aware to survive Defendants' Motion to Dismiss his *Monell* claim." *Id.* at 544.

**\*18** Although the DOJ report persuaded the court in *Kucharczyk* that the plaintiff had successfully pleaded a *Monell* claim, this Court notes that submission of such a report is not necessarily required to satisfy the *Iqbal*

pleading standard. For example, in *Donohue v. Manetti*, No. 15-636, 2016 WL 740439, at \*1 (E.D.N.Y. 2016), the *pro se* plaintiff filed a Section 1983 action against Armor, two individual medical professionals and Sheriff Sposato for failing to provide the plaintiff with adequate medical care in violation of the Eighth and Fourteenth Amendments. More specifically, the plaintiff there alleged that he was denied previously prescribed psychotropic medication, and instead of giving him his prescribed pain medication, the defendant nurse deliberately gave him medication to which he was allergic. *Id.* at \*1-2. The defendants in *Donohue* argued that "two isolated incidents are insufficient to be deemed a policy or custom for the purpose of § 1983 liability." *Id.* at \*5. The court rejected the defendants' argument, finding that these incidents, in combination with the comments alleged to have been made to the plaintiff by Armor staff (*i.e.* "things are different now and we don't hand out pills anymore—deal with it," it is "Armor's 'policy' not to 'write' (prescribe) pain medication other than N.S.A.I.D.S." and "I wish you would have died") "support[ed] an inference of a policy or custom to deny inmates adequate medical care." *Id.* at \*6.

Here, Plaintiff's complaint "concerns only allegedly unconstitutional conduct to which he was subjected." *Joseph v. Nassau County Correctional Facility*, No. 15-7010, 2016 WL 3033725 (E.D.N.Y. May 26, 2016). Moreover, Plaintiff does not set forth any facts which could give rise to an inference that the constitutional deprivations suffered by Plaintiff arose from an official policy or custom. On this basis, and for the foregoing reasons, this Court respectfully recommends to Judge Bianco that Defendants' motion to dismiss be GRANTED to the extent it seeks dismissal of Plaintiff's § 1983 claim against Defendant Sposato and Defendant Armor.

### C. Plaintiff's Claim for Deliberate Indifference to Medical Needs

Because the Court is recommending to Judge Bianco that the Amended Complaint be dismissed based on Plaintiff's failure to state a valid § 1983 claim against the Defendants, the Court would not normally address whether Plaintiff has adequately stated a claim that Defendants violated his constitutional rights by acting with deliberate indifference to his serious medical needs. However, this Court is also recommending to Judge Bianco that Plaintiff be granted leave to amend his pleadings. Therefore, the Court will now assess Plaintiff's deliberate indifference claim.

Case 9:15-cv-01222-MAD-TWD    Document 59    Filed 02/12/18    Page 110 of 231

### 1. Legal Standard for Deliberate Indifference

Plaintiff asserts that at the time of his arrest and arrival at NCCC he had a broken left forearm. Compl. § III.C. Despite repeatedly notifying Defendants of his painful condition, Plaintiff contends that Defendants failed to produce him for the necessary surgery and failed to provide him with prescribed pain medication. *Id.* Plaintiff does not specify in his Complaint whether he was a pre-trial detainee or convicted inmate during the time at issue. Given the temporal proximity between Plaintiff's arrest and the purported unconstitutional conduct, the Court finds it is not unreasonable to assume that Plaintiff was a pre-trial detainee for at least some portion of the time at issue. *See generally* Compl. The Eighth Amendment, which prohibits cruel and unusual punishment, governs a convicted prisoner's claims of inadequate medical care. *See Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (citing *Benjamin v. Fraser*, 343 F.3d 35, 49 (2d Cir. 2003), *overruled on other grounds by Caiozzo v. Koreman*, 581 F.3d 63, 70 (2d Cir. 2009); *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983)); *U.S. Const. amend. XIV* (No "State [shall] deprive any person of life, liberty, or property, without due process of law[.]"). However, a pretrial detainee's claim for inadequate medical care is governed by the Fourteenth Amendment's Due Process Clause. *Id.* Since a pre-trial detainee has not been convicted of any crime, the standard applied is different. *Swanson v. City of New York*, No. 16-3231, 2017 WL 3130322, at *6 (E.D.N.Y. July 21, 2017) (quoting *Darnell*, 849 F.3d at 29); *see City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983) ( "The Due Process Clause ... require[s] the responsible government or governmental agency to provide medical care to [pretrial arrestees] ... who have been injured while being apprehended by the police."). "[W]hile the Supreme Court has not precisely limned the duties of a custodial official under the Due Process Clause to provide needed medical treatment to a pretrial detainee, it is plain that an unconvicted detainee's rights are at least as great as those of a convicted prisoner." *Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996) (citing *City of Revere*, 463 U.S. at 244, 103 S.Ct. 2979; *Bryant v. Maffucci*, 923 F.2d 979, 983 (2d Cir. 1991)) ("[T]he due process rights of a ... [pretrial detainee] are at least as great as the Eighth Amendment protections available to a convicted prisoner[.]"). Accordingly, irrespective of which Amendment is utilized to analyze a plaintiff's claim for inadequate medical care, the plaintiff must show that the defendants were deliberately indifferent to his or her serious medical needs, which involves a two-pronged analysis. *Grinmett v. Corizon Med. Assocs. of New York*, No. 15-7351, 2017 WL 2274485, at *3 (S.D.N.Y. May 24, 2017). First, "the alleged deprivation of adequate medical care must be 'sufficiently serious.' " *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832, 844, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)); *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (quoting *Salahuddin*, 467 F.3d at 279). Second, the plaintiff must show that the defendant acted with a "sufficiently culpable state of mind." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994)); *see Salahuddin*, 467 F.3d at 279-81.

**\*19** Prior to the Second Circuit's decision in *Darnell v. Pineiro*, 849 F.3d 17, 21 n.3, 29 (2d Cir. 2017), the analysis under the second prong was deemed to be identical to that regardless of whether the plaintiff's claim was brought under the Eighth Amendment or the Fourteenth Amendment: the plaintiff had to prove that the defendant official was subjectively aware of the harms associated with the constitutional deprivation. *Darnell*, 849 F.3d at 32 (citing *Farmer v. Brennan*, 511 U.S. 825, 836-37, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). However, in *Darnell*, the Second Circuit altered the analysis in light of the Supreme Court's decision in *Kingsley v. Hendrickson*, —— U.S. ——, 135 S.Ct. 2466, 192 L.Ed.2d 416 (2015). In *Kingsley*, the Supreme Court held that "for excessive force claims brought under the Due Process Clause of the Fourteenth Amendment, 'a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable,' " *Darnell*, 849 F.3d at 21 (citing *Kingsley*, 135 S.Ct. at 2473), "reject[ing] the requirement that ... a pretrial detainee establish a state of mind component to the effect that the official applied the force against the pretrial detainee 'maliciously and sadistically to cause harm.' " *Id.* at 21 (citing *Kingsley*, —— U.S. ——, 135 S.Ct. 2466, 2475, 192 L.Ed.2d 416). In other words, after *Kingsley*, "rather than ask whether the charged official 'kn[ew] of and disregard[ed] an excessive risk to inmate health or safety,' courts are to instead determine whether the official 'knew, or should have known' that his or her conduct 'posed an excessive risk to health or safety.' " *Lloyd v. City of New York*, 246 F.Supp.3d 704, 718 (S.D.N.Y. 2017).

The court in *Darnell* explained that the second prong, which had been referred to as the "subjective prong," is more appropriately described as the "mens rea prong" or "mental element prong." *Darnell*, 849 F.3d at 32 (internal quotation marks omitted).

The Second Circuit has held that *Kingsley* is applicable beyond the context of excessive force claims. *Id.* at 35-36 (citing *Castro v. County of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016) (en banc)). District Courts in this circuit have applied *Kingsley* to claims for deliberate indifference to medical needs. *See e.g.*, *Grimmett v. Corizon Med. Assocs. of New York*, No. 15-7351, 2017 WL 2274485, at *4 (S.D.N.Y. May 24, 2017); *Narvaez v. City of New York*, No. 16-1980, 2017 WL 1535386, at *2 (S.D.N.Y. Apr. 17, 2017); *Lloyd v. City of New York*, 246 F.Supp.3d 704, 718 (S.D.N.Y. 2017) ("The reasoning of *Darnell* applies equally to claims of deliberate indifference to serious medical needs under the Fourteenth Amendment."); *Feliciano v. Anderson*, No. 15-4106, 2017 WL 1189747, at *8 (S.D.N.Y. Mar. 30, 2017); *Gonzalez-Torres v. Newson*, No. 17-00455, 2017 WL 2369369, at *3 (D. Conn. May 31, 2017).

The Court notes that "not every lapse in medical care is a constitutional wrong." *Salahuddin*, 467 F.3d at 279. Thus, if the plaintiff fails to satisfy either prong as set forth in *Darnell*, his or her deliberate indifference claim must be dismissed. *See Grimmett*, 2017 WL 2274485, at *3; *Narvaez*, 2017 WL 1535386, at *5. "Moreover [ ] not every lapse in prison medical care will rise to the level of a constitutional violation.' " *Ruiz v. Homerighouse*, No. 01-0266, 2003 WL 21382896, at *2 (W.D.N.Y. Feb. 13, 2003) (alterations in original) (quoting *Smith v. Carpenter*, 316 F.3d 178, 2003 WL 115223, at *4 (2d Cir. 2003)). "[N]egligence alone is insufficient to make out a deliberate indifference claim" under either the Eighth Amendment or the Fourteenth Amendment. *Grimmett*, 2017 WL 2274485, at *5 (S.D.N.Y. May 24, 2017) (citing *Darnell*, 849 F.3d at 36).

**b. Objective Prong**

Generally, to satisfy the objective prong of the deliberate indifference standard, a plaintiff must show "that the alleged deprivation of medical treatment is, in objective terms, 'sufficiently serious'—that is, the prisoner must prove that his medical need was 'a condition of urgency, one that may produce death, degeneration, or extreme pain.' " *Johnson v. Wright*, 412 F.3d 398, 403 (2d Cir.

2005) (quoting *Hemmings v. Gorczyk*, 134 F.3d 104, 108 (2d Cir. 1998)); *see Salahuddin*, 467 F.3d at 279. However, where, as here, "a prisoner receives some care, but allegedly inadequate care, the analysis of whether there was a sufficiently serious medical condition is more complex." *Hardy v. City of New York*, 732 F.Supp.2d 112, 128 (E.D.N.Y. 2010) (*Salahuddin*, 467 F.3d at 280). In such cases, "the court must focus on whether '*the alleged deprivation* of adequate medical care was sufficiently serious.' " *Id.* (quoting *Salahuddin*, 467 F.3d at 280) (emphasis in original and alteration omitted); *see, e.g., Ferguson v. Cai*, No. 11-6181, 2012 WL 2865474, at *4 (S.D.N.Y. July 12, 2012) (quoting *Edmonds v. Central N.Y. Psychiatric Ctr.*, No. 10-5810, 2011 WL 3809913, at *4 (S.D.N.Y. Aug. 25, 2011)) (collecting cases); *DiChiara v. Wright*, No. 06-6123, 2011 WL 1303867, at *6 (E.D.N.Y. Mar. 31, 2011). "[I]f the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry focuses on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." *Salahuddin*, 467 F.3d at 280 (quoting *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003)) (internal quotation marks and alterations omitted). In other words, "it's the particular risk of harm faced by the prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant" for purposes of establishing a deliberate indifference claim. *Smith*, 316 F.3d at 186 (citing *Chance*, 143 F.3d at 702–03); *see Hardy*, 732 F.Supp.2d at 128 (quoting *Salahuddin*, 467 F.3d at 280) ("In effect, a court must determine 'whether the inadequacy in medical care [was] sufficiently serious' by examining the harm plaintiff was exposed to as a result of defendant's conduct."). "A defendant's delay in treating an ordinarily insignificant medical condition can become a constitutional violation if the condition worsens and creates a substantial risk of injury. Conversely, delay in treating a life-threatening condition may not violate the Eighth [or Fourteenth] Amendment if the lapse does not cause any further harm beyond that which would occur even with complete medical attention." *DiChiara*, 2011 WL 1303867, at *7 (citing *Graham v. Wright*, No. 01–9613, 2004 WL 1794503, at *4, 2004 U.S. Dist. LEXIS 15738, at *13 (S.D.N.Y. Aug. 9, 2004)) (internal quotation marks omitted).

**\*20** To determine whether a delay in treatment is objectively serious, the court must "look to 'all relevant facts and circumstances.' " *Id.* (quoting *Smith*, 316 F.3d at 187). In general, "[w]here temporary delays or interruptions in the provision of medical treatment have been found to satisfy the objective seriousness requirement in this Circuit, they have involved either a needlessly prolonged period of delay, or a delay which caused extreme pain or exacerbated a serious illness." *Ferguson v. Cai*, No. 11-6181, 2012 WL 2865474, at \*4 (S.D.N.Y. July 12, 2012) (citing *Salahuddin*, 467 F.3d at 281; *Chance*, 143 F.3d at 702; *Hathaway*, 37 F.3d at 65, 67). Although "the actual medical consequences that flow from the alleged denial of care" will often "be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm," a deliberate indifference claim "may be based on a defendant's conduct in exposing an inmate to an unreasonable risk of future harm." *Smith*, 316 F.3d at 187-88 (citing *Helling v. McKinney*, 509 U.S. 25, 35, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)) (internal citations omitted). However, "the absence of present physical injury will often be probative in assessing the risk of future injury." *Id.* at 188; *see DiChiara*, 2011 WL 1303867, at \*7 (citing *Smith*, 316 F.3d at 187).

Here, as discussed earlier in this Report and Recommendation, Plaintiff alleges that despite the directives of outside medical professionals that he be immediately produced for surgery to repair his broken left forearm, it appears that Defendants were delayed in getting Plaintiff the requisite medical care. Because of this delay, doctors were forced to rebreak Plaintiff's arm and install metal plates and screws. Plaintiff alleges that he is in constant pain and does not have full use of his left wrist. Considering Plaintiff's broken left forearm in the abstract, the Court finds that it constitutes a sufficiently serious medical condition. *See Mendez v. Acting Sheriff, Nassau Cty. Corr. Ctr.*, No. 10-1960, 2010 WL 2629781, at \*2 (E.D.N.Y. June 28, 2010) (citing *Henderson v. Doe*, No. 98-5011, 1999 WL 378333 (S.D.N.Y. June 10, 1999) (broken finger does not rise constitute a serious injury); *Neitzke v. Williams*, 4910 U.S. 319, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989) (broken hip constitutes a serious injury); *Bryan v. Endell*, 141 F.3d 1290, 1293 (8th Cir. 1998) (broken hand constitutes a serious injury); *Durham v. Nu' Man*, 97 F.3d 862, 869 (6th Cir. 1996) (broken arm constitutes an "undeniably serious" injury); *Benning v. Ehrits*, No. 08-CV-0815, 2009 WL 2982973, at

\*1 (N.D.N.Y. Sept. 14, 2009) (broken arm constitutes a serious injury); *Hernandez v. Harrison*, No. 07-7489(JVS) (JC), 2008 WL 4836046, at \*13 (C.D. Cal. Oct. 29, 2008) (broken leg constitutes a serious injury)) (broken knee rises to the level of "sufficiently serious"); *see Vining v. Dep't of Correction*, No. 12-3267, 2013 WL 2036325, at \*4 (S.D.N.Y. Apr. 5, 2013) ("Indeed, numerous courts have found objectively serious injury in cases involving injury to the hand, including broken bones.") (collecting cases).

Moreover, a serious medical condition has been deemed to include " 'condition [s] of urgency, [ ] that may produce death, degeneration, or extreme pain [.]' " *Hathaway*, 99 F.3d at 553 (quoting *Schermerhorn v. Local 100, Transp. Workers Union of Am., AFL-CIO*, 91 F.3d 316, 320 (2d Cir. 1996)) (quotation marks and citation omitted). "[I]t has also been interpreted to include 'less serious denials [of medical attention] which cause or perpetuate pain.' " *Vining v. Dep't of Correction*, No. 12-3267, 2013 WL 2036325, at \*3 (S.D.N.Y. Apr. 5, 2013) (quoting *Brock v. Wright*, 315 F.3d 158, 163 (2d Cir. 2003) (citation omitted)). However, the fact that Plaintiff suffers from a serious medical condition is not sufficient, by itself, to sustain his deliberate indifference claim based on the delay of his surgery; instead, Plaintiff must allege facts which plausibly show that the delay was objectively serious.

**\*21** Viewing the facts in the light most favorable to Plaintiff and drawing every reasonable inference in his favor, the Court cannot, at this stage in the litigation and on this record, determine as a matter of law whether the delay in Plaintiff's surgical procedure was objectively serious. Although Plaintiff does not set forth the exact date upon which he ultimately had the surgery, the Court makes the assumption based on the information contained in the pleading that the surgery was delayed for approximately two months.

### c. *Mens Rea* **Prong**

The Court finds that Plaintiff's allegations state enough information to satisfy the second prong of the deliberate indifference pleading standard, which requires that Defendants acted with a sufficiently culpable state of mind. *See Darnell*, 849 F.3d at 35; *see also Grimmett*, 2017 WL 2274485 (quoting *Chance*, 143 F.3d at 702) ("Second, the defendant must have acted with deliberate indifference, or a 'sufficiently culpable state of mind.' "); *Hathaway*, 37 F.3d at 66. "Deliberate indifference requires more than negligence." *Hathaway*, 99 F.3d at 66 (quoting

*Farmer*, 114 S.Ct. at 1978). As noted, the Second Circuit in *Darnell* explained that in order for a pre-trial detainee to establish a claim for deliberate indifference under the Fourteenth Amendment's Due Process Clause,

> the pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety.

It follows that the defendant official need not "have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm." *Narvaez*, 2017 WL 1535386, at *6 (citing *Darnell*, 849 F.3d at 35). The Court must ask "whether the official 'knew, or should have known' that his or her conduct 'posed an excessive risk to health or safety.' " *Lloyd*, 246 F.Supp.3d at 718; *Darnell*, 849 F.3d at 35. A pre-trial detainee may establish a violation of the Fourteenth Amendment where "officials deliberately delayed care as a form of punishment, ignored a life threatening and fast-degenerating condition for three days, or delayed major surgery for over two years.' " *Ford v. Rodriguez*, No. 15-4909, 2016 WL 6776345, at *4-5 (S.D.N.Y. Nov. 16, 2016) (quoting *Frith v. City of New York*, 203 F.Supp.3d 386, 390 (S.D.N.Y. 2016)), *report and recommendation adopted*, No. 15-4909, 2017 WL 58843 (S.D.N.Y. Jan. 5, 2017). Finally, it is well-established that "negligence, even if it amounts to medical malpractice, does not constitute a constitutional violation." *Thomas v. Nassau County Correctional Center*, 288 F.Supp.2d 333, 338 (E.D.N.Y. 2003) (citing *Estelle v. Gamble*, 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed. 2d 251 (1976)).

Here, Plaintiff alleges that on September 14, 2013, the examining physician at Nassau University Medical Center advised that Plaintiff would need to be returned three days later—on September 17, 2013—for surgery. *See* Compl. § III.C. According to Plaintiff, defendants failed to do so and also failed to give Plaintiff the prescribed pain medication. *Id.* Plaintiff further contends that on September 24, 2013, a visiting orthopedist expressed shock that Plaintiff had not received any surgery and noted on

Plaintiff's chart that it was extremely urgent that he receive surgery. *Id.* On October 9, 2013, plaintiff was transported to the Nassau University Medical Center where he was advised that his arm was in fact broken and that because he had not received the necessary care his arm would have to be rebroken. *Id.* Plaintiff further alleges that on November 5, 2013, he was transferred to the Metropolitan Detention Center. *Id.* Officials transferred Plaintiff to Brooklyn Medical Center and Kingsbrook Hospital "from 2014 through 2015." *Id.* It was the Brooklyn Medical Center where Plaintiff ultimately received the surgery he needed. *Id.* Doctors rebroke Plaintiff's arm and installed two metal plates along with metal screws in his arm. Plaintiff represented that he is in constant pain and does not have 100% use of his left wrist. *Id.*

**\*22** Taking all of Plaintiff's allegations as true, as the Court is required to do, and drawing all reasonable inferences in Plaintiff's favor, the Court finds Plaintiff has sufficiently pleaded that Defendants were fully aware Plaintiff's left forearm was broken and that he required surgery right away. Moreover, Defendants were notified that because they delayed Plaintiff's treatment, Plaintiff's arm would have to be rebroken. Yet Defendants still did not produce Plaintiff for surgery. Further, throughout this period of time, Plaintiff repeatedly complained of pain but defendants refused to provide him with the prescribed pain medication. The Court finds that Armor knew, or should have known that its conduct "posed an excessive risk to health or safety." *Lloyd*, 246 F.Supp.3d at 718; *Darnell*, 849 F.3d at 35

### D. Plaintiff's Fifth Amendment Claim

Because the Court recommends to Judge Bianco that the Amended Complaint be dismissed based on Plaintiff's failure to state a valid § 1983 claim against the Defendants, the Court generally would not need to address whether Plaintiff adequately alleged a violation of Plaintiff's Fifth Amendment rights. However, in light of the fact that the Court also recommends that Plaintiff be granted leave to amend his pleadings, the Court will undertake a brief analysis of Plaintiff's Fifth Amendment claim.

The Fifth Amendment states as follows:

> No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except

in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

U.S. Const. amend. V. "The Due Process Clause of the Fifth Amendment prohibits the United States, as the Due Process Clause of the Fourteenth Amendment prohibits the States, from depriving any person of property without 'due process of law.' " *Dusenbery v. United States*, 534 U.S. 161, 167, 122 S.Ct. 694, 699, 151 L.Ed. 2d 597 (2002). Here, Plaintiff's Complaint has been filed against a state official and a private contractor acting under color of state law, not the federal government. As a court in the Second Circuit has observed, in such circumstances, "[Plaintiff's] appeal to rights secured under the Fifth Amendment is misplaced and dismissed." *Molina v. New York*, 697 F.Supp.2d 276, 284 (N.D.N.Y. 2010). Here, Plaintiff's Fifth Amendment claim must be dismissed, and no amount of re-pleading will cure this problem.

**E. Plaintiff's PLRA Claim and Equal Protection Claim**
Plaintiff further alleges that Defendants' conduct constitutes a violation of the PLRA. Compl. § II.B. Plaintiff does not specify which provision of the PLRA his claim arises under. Since Plaintiff also asserts a violation of the Equal Protection Clause, which prohibits discriminatory treatment, the Court will interpret the instant claim as one under 42 U.S.C. § 1997(d), which sets forth the following prohibition: "No person reporting conditions which may constitute a violation under this subchapter shall be subjected to retaliation in any manner for so reporting." *See Mumin v. Johnson*, No. 07-4973, 2008 WL 976268, at *3 (E.D.N.Y. Apr. 9, 2008). However, Section 1997(d) does not provide a plaintiff with a private cause of action. *Id.* Therefore, the Court will construe this claim as one arising under the Equal Protection Clause.

As stated in the context of Plaintiff's Fifth Amendment claim above, the Fourteenth Amendment to the United States Constitution sets forth prohibitions applicable to the States. The Equal Protection Clause of the Fourteenth Amendment states:

> **\*23** All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. amend. XIV (emphasis added). "[T]he Fourteenth Amendment prohibits the selective adverse treatment of individuals by government actors 'compared with others similarly situated' if such selective treatment is based on 'impermissible considerations such as race ... or malicious or bad faith intent to injure a person.' " *Castro-Sanchez v. N.Y.S. Dep't of Corr. Servs.*, No. 10-8314, 2012 WL 4474154, at *3 (S.D.N.Y. Sept. 28, 2012) (quoting *LeClair v. Saunders*, 627 F.2d 606, 609-10 (2d Cir. 1980)). Here, Plaintiff has not alleged that he was treated differently from other similarly situated individuals, whether by virtue of his race, or the fact that he filed a grievance or sick call request, or on any other grounds. *See generally*, Compl. Plaintiff's PLRA/Equal Protection Clause claim must therefore be dismissed and this Court respectfully makes that recommendation to Judge Bianco. *See id.* (quoting *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005)) ("If a prisoner claims that he received different treatment by prison officials because of a protected characteristic, he must plead 'that he was treated differently than others similarly situated' and that the differential treatment was 'a result of intentional or purposeful discrimination.' ")

**V. <u>LEAVE TO RE-PLEAD</u>**
"When addressing a *pro se* complaint, a district court should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Aquino v. Prudential Life & Cas. Ins. Co.*, 419 F.Supp.2d 259, 278 (E.D.N.Y. 2005) (citing *Thompson v. Carter*,

284 F.3d 411, 419 (2d Cir. 2002) ("The liberal pleading standards applicable to *pro se* civil rights complaints in this circuit require that the district court give [plaintiff] an opportunity to flesh out his somewhat skeletal complaints before dismissing them")). The Second Circuit has stated that "[w]hen a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint." *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999) (citing *Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir. 1990)), *overruled on other grounds by Gonzaga v. Doe*, 536 U.S. 273, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002); *see* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires."). The Court should generally not dismiss a *pro se* complaint without granting the plaintiff leave to amend if a valid claim could be stated. *Clifton v. Hra Nyc Govt*, No. 16-1753, 2016 WL 4203486, at *1 (E.D.N.Y. Aug. 9, 2016) (citing *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000)).

Even under this liberal standard, however, the court may decline to provide the plaintiff with an opportunity to re-plead if the court finds that the plaintiff "cannot correct the defects in his federal claims" and therefore "any attempt to amend the pleading ... would be futile." *Shorter v. Rice*, No. 12-0111, 2012 WL 1340088, at *5 (E.D.N.Y. Apr. 10, 2012); *see Cuoco*, 222 F.3d at 112 (citing *Hunt v. Alliance N. Am. Gov't Income Trust*, 159 F.3d 723, 728 (2d Cir. 1998)) ("The problem with [the plaintiff's] causes of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied.").

**\*24** Based on the foregoing case law, the arguments contained in all the motion papers, and the Court's analysis of Plaintiff's claims set forth *supra* in this Report and Recommendation, the Court recommends to Judge Bianco that although the current allegations are deficient, there is some "indication that a valid claim might be stated" against Defendants Sposato and Armor. *Cuoco*, 222 F.3d at 112 (quoting *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999)) (internal quotation marks omitted). The Court further notes that Plaintiff did not have access to his medical records at the time he filed the Complaint, and those records have since been provided to Plaintiff pursuant to this Court's May 1, 2017 Order. *See* DE 36. Accordingly, the Court respectfully recommends to Judge Bianco that Plaintiff be granted leave to re-plead his claim for individual liability against Defendant Sposato and his *Monell* claim against Armor,

as well as his claim for deliberate indifference to serious medical needs against those defendants.

Since Plaintiff is now in possession of his medical records and legible copies of Defendants' uncited opinions, Plaintiff can utilize the information contained in these documents in redrafting his Complaint. [2]

[2]    In light of Plaintiff Villafane's continued assertion of his need to obtain the transcript of his September 2013 arraignment before Magistrate Judge Brown, this Court secured the transcript and is attaching a copy to this Report and Recommendation to be served upon Plaintiff.

## VI. CONCLUSION

Based on the foregoing findings, the Court respectfully recommends to Judge Bianco that Defendants' motion to dismiss be GRANTED, in part, and DENIED, in part. In particular, the Court recommends that the motion be DENIED insofar as it seeks dismissal based on Plaintiff's failure to exhaust his administrative remedies, and that the motion otherwise be GRANTED. The Court further recommends that Plaintiff's Complaint be DISMISSED, without prejudice, and with leave to amend.

## VII. OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections. *See also* Fed. R. Civ. P. 6(a), (e). Such objections by an attorney of record shall be filed with the Clerk of the Court via ECF. **A courtesy copy of any objections filed is to be sent to the Chambers of the Honorable Joseph F. Bianco, and to the Chambers of the undersigned. Any requests for an extension of time for filing objections must be directed to Judge Bianco prior to the expiration of the fourteen (14) day period for filing objections**. Failure to file objections will result in a waiver of those objections for purposes of appeal. *See Thomas v. Arn*, 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *see also Johnson v. Woods*, 426 Fed.Appx. 10, 11 (2d Cir. 2011) (citing *Cephas*, 328 F.3d at 107) ("A litigant's failure to file objections to a magistrate judge's report and recommendation, even when that litigant is proceeding pro se, waives any challenge to the report on appeal."); *Savoie v. Merchants Bank*, 84 F.3d

52, 60 (2d Cir. 1996) (citing *McCarthy v. Manson*, 714 F.2d 234, 237 n.2 (2d Cir. 1983)).

**Defendants' counsel is directed to serve a copy of this Report and Recommendation upon the *pro se* Plaintiff forthwith by overnight mail and first class mail and to file proof of such service on ECF.**

**SO ORDERED**.

Attachment

UNITED STATES OF AMERICA,

v.

CARLOS VILLAFANE, Defendant.

13-MJ-00445 (DRH)

September 13, 2013

Central Islip, New York

TRANSCRIPT OF CRIMINAL CAUSE
FOR INITIAL APPEARANCE BEFORE
THE HONORABLE GARY R. BROWN
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Government: UNITED STATES ATTORNEY BY: LARA TREINIS GATZ, ESQ. ASSISTANT U.S. ATTORNEY

For the Defendant: GLENN OBEDIN, ESQ. 320 Carleton Avenue #2500 Central Islip, New York 11722

 **\*25** Court Transcriber: SHARI RIEMER, CET-805 TypeWrite Word Processing Service 211 N. Milton Road Saratoga Springs, New York 12866

Proceedings recorded by electronic sound recording, transcript produced by transcription service

(Proceedings began at 3:56 p.m.)
THE CLERK: Calling Case 13-MJ-445, U.S. v. Carlos Villafane.

Counsel, please state your appearances.

MS. GATZ: Good afternoon, Your Honor. Lara Treinis Gatz for the United States.

THE COURT: Good to see you, Ms. Gatz.

MS. GATZ: You too, Your Honor.

MR. OBEDIN: Good afternoon, Your Honor. Glenn Obedin for Mr. Villafane.

THE COURT: Mr. Obedin, how are you, sir?

MR. OBEDIN: I'm fine. Thank you.

THE COURT: Ms. Gatz, we're here on initial appearance; is that right?

MS. GATZ: Yes, Your Honor.

THE COURT: All right. Good. So, Mr. Villafane, I understand we're here to go through some of your rights, talk about the complaint, talk about the propriety of bail if any. But the first question I have for you is have you spoken to your attorney, have you had enough time to talk to Mr. Obedin about what's going on here?

THE DEFENDANT: Yes, sir.

THE COURT: Do you understand what's going on?

THE DEFENDANT: Yes, sir.

THE COURT: Good. So you've been charged in a complaint with conspiring to distribute oxycodone. Without telling me whether or not you did it, just tell me whether or not that you understand that that's what the charge is.

THE DEFENDANT: Yes, sir, I understand, Judge.

THE COURT: So let's talk about statements. First of all, you have the right to be represented by counsel. I find that you do not have sufficient assets to afford counsel. So we appointed Mr. Obedin, a fine member of the bar to defend you in this action and the court will pay for his services. Do you understand that?

THE DEFENDANT: Yes, sir, I do.

THE COURT: He remains your attorney even though the court is paying. Do you understand?

THE DEFENDANT: Yes, sir.

THE COURT: If at any time you happen to come into some money and you want to hire your own attorney, you have that right too. Do you understand that?

THE DEFENDANT: Yes, sir, I do.

THE COURT: Very good. So let's go back to statements. So you're not required to make any statements about the matters charged in the complaint to anyone. If you've made a statement in the past you have the right—you don't have to continue that. If you start one in the future you don't have to—you can stop at any time. You simply put up your hand and say I don't want to talk about this. Do you understand that?

THE DEFENDANT: Yes, sir, I do.

THE COURT: The reason we make a big deal about statements is because the statements that you make can be used against you in the trial of this matter. Do you understand?

THE DEFENDANT: Yes, sir, I do.

THE COURT: And of course the fact that I say don't talk to anybody doesn't mean don't talk to Mr. Obedin. You should talk to your attorney. You understand that, right?

THE DEFENDANT: Yes, sir.

THE COURT: All right. Good. Very good. Ms. Gatz, what is the Government's position on bail?

MS. GATZ: Your Honor, the Government is asking for a permanent order of detention in this matter. The defendant has what I can only describe as a very lengthy criminal history. He also is a chronic substance abuser. He currently is attending a methadone maintenance program. His heroin problem extends back it looks like over a ten-year period.

**\*26** Given a combination of the instant offense, his prior arrests and convictions, his substance abuse history and his history of failing to comply with court directives,

specifically violations of probation and parole and release, the Government is asking for a permanent order of detention.

I just note this is a presumption case.

THE COURT: That was my next question, Ms. Gatz. You predicted that very well.

Mr. Obedin, what do you have to say?

MR. OBEDIN: Yes. Thank you, Your Honor. I had an opportunity to speak to Mr. Villafane. We do not have any type of bail package to present at this time. So I will just ask that we retain our right to present a package if one becomes available.

THE COURT: All right. Very good. I find that the defendant has not rebutted the presumption in this case. I also find that I agree with Pretrial Services that no condition or combination of conditions that have been presented to the court would assure the defendant's return and the safety of the community.

However, I note that this is without prejudice to presenting a bail package should one become available.

MS. GATZ: Your Honor, I ask that you note to the jail that he continued to receive methadone as necessary or at least be screened to see if that's necessary given that he's regularly taking methadone.

THE COURT: That's an excellent idea and while we're on that subject and I'm doing a medical order anyway, Mr. Obedin, is there any other medical conditions that I should alert the jail to?

MR. OBEDIN: Yes. Thank you, Judge. Ms. Gatz jumped in before I had an opportunity and I thank her. Mr. Villafane also has a series of medical issues. He has various metal plates and screws within his body that still give him trouble. He indicates that his left wrist is broken.

THE COURT: Currently broken?

MR. OBEDIN: Currently broken he indicates. I'd certainly like that checked when he gets to the facility.

2017 WL 4179855

THE COURT: I'm going to note there's a wrist injury because I—

MR. OBEDIN: Yes, thank you. And whatever medication along with the methadone would be appropriate for Mr. Villafane given his various physical conditions.

THE COURT: Any other medications?

MS. GATZ: It appears he's still taking oxycodone.

MR. OBEDIN: Well, Mr. Villafane does have diabetes. He does take medicine for that.

THE COURT: All right. So I'll note diabetes. I'm not going to suggest that they give him oxycodone. I don't think that may be the recommended course but that's just my guess.

So I'll send over a medical evaluation order which will alert the jail authorities to those various issues.

What is your preference concerning a preliminary hearing?

MR. OBEDIN: We will waive that, Your Honor.

THE COURT: All right. Mr. Villafane, just to make sure you understand. The Government is required to go to what's called a preliminary hearing to present certain evidence. Your attorney is suggesting that you're willing to waive that. Is that right, sir?

THE DEFENDANT: Yes, sir.

THE COURT: Very good. So that will be waived.

Was there any property seized at the time of arrest?

MS. GATZ: My understanding, Your Honor, is that the officers arrested him in his apartment. So I don't believe there was any property on his person and I'll confirm that.

Just his belt, Your Honor.

THE COURT: Okay. Mr. Villafane, did they take anything from you when they arrested you?

**\*27** THE DEFENDANT: No, sir.

THE COURT: Very good. Anything else we need to do today, Ms. Gatz?

MS. GATZ: Nothing from the Government, Your Honor. Thank you.

MR. OBEDIN: Nothing further, Your Honor. Thank you.

THE COURT: Good luck to you, sir. We're adjourned. (Proceedings concluded at 4:02 p.m.)

\* \* \* \* \*

I certify that the foregoing is a court transcript from an electronic sound recording of the proceedings in the above-entitled matter.

_____

Shari Riemer, CET-805

Dated: August 1, 2017

**All Citations**

Slip Copy, 2017 WL 4179855

---

**End of Document**        © 2018 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Blue Flag – Appeal Notification

Appeal Filed by WHITE v. NEW YORK CITY DEPARTMENT OF CO, 2nd Cir., September 11, 2017

2017 WL 3575700
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Erik WHITE, Plaintiff,
v.
CITY OF NEW YORK, et al., Defendants.

16 Civ. 6183 (LGS)
|
Signed 08/17/2017

**Attorneys and Law Firms**

Erik White, Malone, NY, pro se.

Anthony Matthew Disenso, Omar Javed Siddiqi, New York City Law Department, Bridgette Marie Nunez, New York City Law Depart. Office of the Corporation Counsel, New York, NY, for Defendants.

Santos, Elmhurst, NY, pro se.

## OPINION AND ORDER

LORNA G. SCHOFIELD, UNITED SATES DISTRICT JUDGE

**\*1** Pro se Plaintiff Erik White commenced this action under 42 U.S.C. § 1983 against the City of New York, Assistant Deputy Chief of Corrections Karen Collins, Captain Korporan, Captain Antoine and former Correction Officer Carlos Santos, who is appearing pro se. Defendants move to dismiss the First Amended Complaint under Federal Rule of Civil Procedure 12(c). For the reasons that follow, Defendants' motions are granted.

## I. BACKGROUND

The facts below are drawn from the Complaint, the First Amended Complaint and Plaintiff's statements at the Rule 16 conference that was held on May 2, 2017. Given the "special solicitude" afforded pro se litigants, Plaintiff's factual allegations from all of these sources

are considered to be a part of the Complaint, and these sources individually or together are referred to in this Opinion as the "Complaint." *See Williams v. Corr. Officer Priatno*, 829 F.3d 118, 122 (2d Cir. 2016); *see also White v. Schriro*, No. 16 Civ. 6769, 2017 WL 3268202, at \*2 (S.D.N.Y. July 31, 2017) ("The court may also consider materials outside the complaint to the extent that they are consistent with the allegations in the complaint.") (internal quotation marks omitted). All factual allegations are assumed to be true, and all reasonable inferences are drawn in Plaintiff's favor as the non-moving party. *Christiansen v. Omnicom Grp., Inc.*, 852 F.3d 195, 199 (2d Cir. 2017).

This action arose from an incident that occurred in December 2015, while Plaintiff was a pretrial detainee at Riker's Island. Plaintiff was in protective custody in a special housing area, where he was segregated from other inmates. Defendant Officer Santos escorted Plaintiff's housing area to the barbershop. While Plaintiff was in the barbershop, Officer Santos allowed a group of adolescent inmates to enter and asked the adult inmates to allow the adolescents to get their haircuts first. Because Plaintiff was in protective custody, Officer Santos should not have exposed Plaintiff to other inmates in the barbershop, but he "wanted to save time and cut corners."

An altercation involving some of the adolescent inmates occurred in the barbershop. To restore order, unnamed officers wearing gas masks sprayed a chemical agent on the adolescents who were directly involved in the incident. Officers then ordered Plaintiff and the other inmates to lay face down on the floor, where Plaintiff came into contact with the chemical agent. Defendant Captain Korporan, the area captain, and Defendant Deputy Chief Collins, were among the senior prison officials who were present in the barbershop.

Plaintiff was brought to a holding cell in a decontamination intake area where Defendant Captain Antoine was the intake captain on duty. Deputy Chief Collins "had been present and fully aware of the situation" but she "soon became scarce without assuming control...." While Plaintiff was in the holding cell, he "continued to hack uncontrollably as [he] breathed in the chemicals from [his] skin and [his] clothing." Plaintiff also "regurgitated phle[g]m and saliva, as well as endured breathing complications and dizziness." Plaintiff's distress was obvious, and officers who are not defendants repeatedly

inquired about Plaintiff's well-being and brought him water.

**\*2** In the hours after the incident, Plaintiff continually asked prison officials, including Captain Antoine, for permission to take a shower and for medical attention. At some point that day, Defendant Korporan and an unnamed captain came to Plaintiff's holding cell and asked him to give a written statement regarding the incident. Plaintiff declined and again requested medical attention and a shower. Defendant Korporan told Plaintiff that the clinic was crowded with individuals who had been directly involved in the incident, "but she would see what she could do."

Approximately six hours after the incident, Plaintiff was taken to the clinic for medical treatment. He was taken back to the clinic some time that night "because of [his] condition" and prescribed Maalox and Ibuprofen. Plaintiff was returned to his housing area where he was locked in his cell for over 24 hours while the facility was on lockdown. He was permitted to shower only after the lockdown was lifted. Plaintiff suffers from eczema, which was exacerbated by the chemical agent. At the Rule 16 conference, Plaintiff stated that he was given a skin cream to alleviate his symptoms and "was okay after ... about a week."

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 12(c) permits a party to move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial." The same standard that applies to motions to dismiss under Rule 12(b)(6) applies to motions under Rule 12(c). *See Mantena v. Johnson*, 809 F.3d 721, 727–28 (2d Cir. 2015). "[T]he only facts to be considered are those alleged in the complaint, and the court must accept them, drawing all reasonable inferences in the plaintiff's favor, in deciding whether the complaint alleges sufficient facts to survive." *Doe v. Columbia Univ.*, 831 F.3d 46, 48 (2d Cir. 2016). To withstand dismissal, a pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted).

Courts must "liberally construe pleadings and briefs submitted by pro se litigants, reading such submissions to raise the strongest arguments they suggest." *McLeod v. Jewish Guild for the Blind*, —— F.3d ——, No. 15 Civ. 2898, 2017 WL 3044626, at \*2 (2d Cir. July 19, 2017) (citation omitted). "The policy of liberally construing pro se submissions is driven by the understanding that implicit in the right to self-representation is an obligation ... of the court to make reasonable allowances to protect pro se litigants from inadvertent forfeiture of important rights because of their lack of legal training." *Id.* (citation omitted).

## III. DISCUSSION

Construing the Complaint liberally, it seeks to allege a number of constitutional violations under 42 U.S.C. § 1983 for deliberate indifference to serious medical needs and safety, a violation of the Equal Protection Clause of the Fourteenth Amendment and municipal liability against the City for failure to train, as well as negligence under New York law. As explained below, the § 1983 claims are dismissed for failure to state a claim, and the Court declines to exercise supplemental jurisdiction over the state law claim.

### A. Federal Claims Under § 1983

"Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (internal quotation marks omitted). To establish a claim under § 1983, a plaintiff must show "(1) that some person has deprived him of a federal right, and (2) that the person who has deprived him of that right acted under color" of state law. *Velez v. Levy*, 401 F.3d 75, 84 (2d Cir. 2005) (internal quotation marks omitted). "The first step in any such claim is to identify the specific constitutional right allegedly infringed." *Albright*, 510 U.S. at 271. Here, the factual allegations in the Complaint can be construed to allege § 1983 claims of deliberate indifference to serious medical needs and safety, a violation of the Equal Protection Clause and municipal liability against the City of New York.

#### a. Deliberate Indifference to Serious Medical Needs

**\*3** The deliberate indifference claim is dismissed because the Complaint does not plead sufficient facts. To state

2017 WL 3575700

a claim for deliberate indifference to serious medical needs under § 1983, a plaintiff must satisfy a two-prong test. The first prong is objective: "the alleged deprivation of adequate medical care must be sufficiently serious." *Spavone v. N. Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 139 (2d Cir. 2013) (internal quotation marks omitted). A court must consider "how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006); *accord Candelario v. Quality Choice Corr. Healthcare*, No. 16 Civ. 2083, 2017 WL 3049553, at *4 (S.D.N.Y. July 18, 2017). To satisfy the first prong, "the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013). The objective prong is the same regardless of whether the plaintiff is a pretrial detainee or a prisoner. *Feliciano v. Anderson*, No. 15 Civ. 4106, 2017 WL 1189747, at *10 (S.D.N.Y. Mar. 30, 2017) (citing *Darnell v. Pineiro*, 849 F.3d 17, 30 (2d Cir. 2017)).

The second prong is subjective and requires a court to consider the defendant's mental state. Under the second prong, "a defendant possesses the requisite *mens rea* when he acts or fails to act under circumstances in which he knew, or should have known, that a substantial risk of serious harm to the pretrial detainee would result." *Feliciano*, 2017 WL 1189747, at *13 (applying *Darnell* to a deliberate indifference to serious medical needs claim under § 1983). A defendant's "actions [must be] more than merely negligent." *Id.* (quoting *Salahuddin*, 467 F.3d at 280).

Plaintiff alleges that he came into contact with a chemical agent that caused him to cough uncontrollably, continually cough up phlegm and saliva, and suffer breathing complications, dizziness and eczema. The Complaint also describes the care that Plaintiff received—medical attention within six hours of the incident; a second visit to the infirmary on the night of the incident (when he was prescribed Maalox and Ibuprofen); permission to shower to decontaminate himself approximately 24 hours later; and cream for his eczema. The Complaint does not allege that any of Plaintiff's symptoms were long-lasting or permanent.

Construing the alleged facts in Plaintiff's favor, the Complaint fails to satisfy the objective prong of the deliberate indifference test. Where, as here, "a prisoner alleges a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone in analyzing whether the alleged deprivation is, in objective terms, sufficiently serious...." *Cuffee v. City of New York*, No. 15 Civ. 8916, 2017 WL 1134768, at *6 (S.D.N.Y. Mar. 27, 2017) (internal quotation marks omitted). "[A] short interruption of care, even if the underlying medical condition is serious, does not constitute a serious medical need where the 'alleged lapses in treatment are minor.' " *Id.* (alterations in original) (quoting *Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003)). "However, allegations that the defendant's delay in treating a minor or ordinary medical condition can nevertheless become a constitutional violation if the condition worsens [as a result of the delay] and creates a substantial risk of injury." *Id.* (internal quotation marks omitted and alterations in original).

Here, the basis for the deliberate indifference claim is that Plaintiff's medical treatment was delayed, not that it was inadequate. As pleaded, the delay that Plaintiff experienced does not rise to the level of a constitutional violation. *Feliciano*, 2017 WL 1189747, at *11 (quoting *Demata v. N.Y. State Corr. Dep't of Health Servs.*, 198 F.3d 233 (2d Cir. 1999) (unpublished)) ("Although a delay in providing necessary medical care may ... constitute deliberate indifference, [the Second Circuit] has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment; ignored a 'life-threatening and fast-degenerating' condition for three days; or delayed major surgery for over two years."); *Valdiviezo v. City of New York*, No. 15 Civ. 3902, 2017 WL 1191528, at *4 (S.D.N.Y. Mar. 29, 2017) (same and collecting cases).

**\*4** The Complaint does not allege that the delay in treatment caused or worsened Plaintiff's injury. *See, e.g., Valdiviezo*, 2017 WL 1191528, at *5 (dismissing a deliberate indifference claim where plaintiff did not allege any injury as a result of the delay); *Smith v. City of New York*, No. 15 Civ. 7910, 2016 WL 7471334, at *4–5 (S.D.N.Y. Dec. 28, 2016) (dismissing a deliberate indifference claim where plaintiff failed to allege that an approximately four and a half hour delay "[ ]either caused [ ]or exacerbated his medical condition" and collecting cases). Even assuming the chemical agent aggravated Plaintiff's eczema, the Complaint suggests that, at worst,

2017 WL 3575700

the delay temporarily exacerbated Plaintiff's pre-existing skin condition, which itself does not constitute a serious medical need under Second Circuit law. *See, e.g., Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009) (affirming grant of summary judgment, in part, because plaintiff's eczema, back pain, stomach disorders, allergies, and asthma did not constitute a serious medical need sufficient to support a claim of deliberate indifference to serious medical needs under § 1983). Because Plaintiff's claim fails under the objective prong, this Opinion does not reach the second prong of the deliberate indifference test. This claim is dismissed.

**b. Deliberate Indifference to Safety**

The claim for deliberate indifference to safety is insufficient as well. To state a claim for deliberate indifference to safety, a plaintiff must allege: "(1) objectively, the deprivation the inmate suffered was sufficiently serious that he was denied the minimal civilized measure of life's necessities, and (2) subjectively, the defendant acted with a sufficiently culpable state of mind...." *Burgess v. Gerbing*, No. 15 Civ. 9256, 2017 WL 2992208, at *3 (S.D.N.Y. July 13, 2017) (quoting *Walker*, 717 F.3d at 125). Under the first prong, "the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Burgess*, 2017 WL 2992208, at *4 (quoting *Walker*, 717 F.3d at 125). Under the second prong, a plaintiff must show that "the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35.

The Complaint fails to state a claim for deliberate indifference to Plaintiff's safety based on his exposure to harmful chemicals in the barbershop. The Complaint alleges that Plaintiff was ordered to lay face down on the floor, which caused him to come into contact with a dangerous chemical agent. The Complaint also alleges that defendants knew that there were innocent people in the barbershop when they sprayed the chemical agent and recklessly failed to protect them. These bare allegations are insufficient to meet the objective prong of the deliberate indifference test. Defendants' efforts to

restore order, which included ordering the inmates to lay on the floor were reasonable and based on a legitimate penological concern for the safety of the inmates, including Plaintiff. The assertion that Defendants should have been more careful to protect the inmates from the chemical agent residue on the ground sounds in negligence (rather than recklessness) and is not a constitutional violation. *See Perez v. City of New York*, No. 17 Civ. 0366, 2017 WL 684186, at *3 (E.D.N.Y. Feb. 17, 2017) (dismissing deliberate indifference to safety claim where a chemical agent got into plaintiff's eyes during a prison disturbance and he was denied medical treatment for two months because the use of the chemical agent was "reasonable to restore order," and noting that negligent failure to protect plaintiff from exposure to the chemical agent does not constitute a constitutional violation). Moreover, for the reasons discussed above, Defendants' conduct did not expose Plaintiff to an objectively unreasonable risk of serious damage to his health. Because the Complaint does not satisfy the objective prong of the deliberate indifference test, this Opinion does not reach the subjective prong with respect to the use of chemicals to restore order.

**\*5** To the extent Plaintiff argues that Officer Santos acted with reckless disregard for Plaintiff's safety because Officer Santos brought Plaintiff to the barbershop despite Plaintiff's protective custody status, this argument is unpersuasive. The Complaint fails to allege any facts to support an inference that Officer Santos acted intentionally or recklessly, rather than negligently, by having Plaintiff and the other adult inmates wait in the barbershop while the adolescent inmates got their hair cut. *See Brown v. City of New York*, No. 13 Civ. 6912, 2017 WL 1390678, at *11 (S.D.N.Y. Apr. 17, 2017) (dismissing a deliberate indifference claim where, at worst, defendants negligently put plaintiff in the general prison population because "any § 1983 claim for a violation of due process requires proof of a *mens rea* greater than mere negligence"). In addition, Officer Santos' actions were not the proximate cause of Plaintiff's alleged injuries. That is, if unnamed officers had not sprayed the chemical agent or ordered Plaintiff to lay face down on the ground—a superseding cause—Plaintiff would not have suffered any harm as a result of Officer Santos' conduct. *See Poventud v. City of New York*, 750 F.3d 121, 159 (2d Cir. 2016) ("In all § 1983 cases, the plaintiff must prove that the defendant's action was a proximate cause of the plaintiff[']s injury."); *Bogart v. City of New York*, No. 13 Civ. 1017,

2015 WL 5036963, at *5–*6 (S.D.N.Y. Aug. 26, 2015) ("[E]ven if a Section 1983 defendant's initial act is the 'but for' cause of some ultimate harm ..., he is not legally liable for the harm if an intervening act is a 'superseding cause' that breaks the legal chain of proximate cause.") (relying on *Higazy v. Templeton*, 505 F.3d 161, 181 (2d Cir. 2007)).

Similarly, insofar as the Complaint can be construed to allege a claim of excessive force, that claim also fails because the Complaint does not allege the use of any force that was excessive. *See, e.g., Candelario v. City of New York*, No. 12 Civ. 1206, 2013 WL 1339102, at *9 (S.D.N.Y. Apr. 3, 2013) (finding plaintiff's § 1983 claim of excessive force meritless because he did "not allege[ ] any facts that cou[ld] support an excessive force claim"); *Jenkins v. Elder*, No. 12 Civ. 4165, 2015 WL 5579699, at *4, *6 (S.D.N.Y. Sept. 22, 2015) (granting summary judgment as to excessive force claim under § 1983 where plaintiff failed to allege that defendant officers used more than *de minimis* force, or that one of the individual defendants had used any force against plaintiff).

### c. Equal Protection

Construed broadly, the Complaint alleges that Defendants violated Plaintiff's right to equal protection under the Fourteenth Amendment and § 1983, because those who were directly involved in the altercation— i.e., the adolescent inmates who were sprayed with the chemical agent—were immediately decontaminated and afforded medical attention, but Plaintiff and others who experienced secondary exposure were forced to wait.

"The equal protection clause directs state actors to treat similarly situated people alike." *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995). To state a claim, plaintiff must allege "purposeful discrimination, directed at an identifiable or suspect class," *Giano*, 54 F.3d at 1057, or that, as "a class of one," he was "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment," *see Vill. Of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curium). *See, e.g., Phillips v. Girdich*, 408 F.3d 124, 130 (2d Cir. 2005) (vacating dismissal of Equal Protection claim under § 1983, in part, because the Complaint could be read to allege a class of one Equal Protection violation); *Davis v. McCready*, No. 14 Civ. 6405, 2017 WL 627454, at *5 (S.D.N.Y. Feb. 15, 2017) (dismissing Equal Protection claim for failure to allege membership in any particular class, or differential treatment compared with others similarly situated).

Viewing the alleged facts in the light most favorable to Plaintiff, the Complaint fails to allege facts to support a claim under § 1983 based on an equal protection violation. First, the Complaint does not allege that Plaintiff was a member of a suspect class (or any class), or that Plaintiff was treated differently than similarly situated individuals without a rational basis for the difference in treatment. To the extent that the Complaint alleges that Plaintiff was treated differently than the adolescent inmates in the barbershop, this is insufficient because the Complaint makes clear that Plaintiff and those adolescent inmates, who were directly involved in the altercation and were sprayed with the chemical agent were not similarly situated. Further, the Complaint does not assert that any difference in treatment was without a rational basis. To the contrary, the Complaint suggests that there *was* a rational basis because the adolescent inmates came into direct contact with the dangerous chemical agent, whereas Plaintiff came into contact with it only after being told to lay on the ground. Second, the Complaint does not allege that Defendants purposefully delayed his medical treatment and permission to shower due to intentional or purposeful discrimination based on his membership in a protected class, or for some other purpose lacking a rational basis. Therefore, this claim is dismissed.

### d. Municipal Liability

**\*6** The Complaint alleges that the City is liable because "it is not in their [Correction Officers'] training to protect the innocent in such incidents of chaos." This claim fails as a matter of law.

To hold a municipality liable for a constitutional violation under § 1983, a plaintiff must demonstrate that "the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality." *Jones v. Town of E. Haven*, 691 F.3d 72, 80 (2d Cir. 2012) (citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690–91 (1978)); *accord Mitchell v. City of New York*, 841 F.3d 72, 80 (2d Cir. 2016). A "policy or custom" exists "where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes

a 'deliberate choice' ...." *Cash v. Cty. of Erie*, 654 F.3d 324, 334 (2d Cir. 2011); *Maldonado v. Schriro*, No. 15 Civ. 3409, 2016 WL 7243548, at *2 (S.D.N.Y. Dec. 14, 2016).

A city's failure to train or supervise constitutes "deliberate indifference" where three requirements are met: (1) "a policymaker knows to a moral certainty that her employees will confront a given situation"; (2) "the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation"; and (3) "the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 440 (2d Cir. 2009) (quoting *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992)). "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (internal quotation marks omitted); *Tchatat v. Police Officer Liam O'Hara*, No. 14 Civ. 2385, 2017 WL 3172715, at *8 (S.D.N.Y. July 25, 2017) (citing *Connick* to rule on a motion to dismiss failure to train claim).

"Although there is no heightened pleading requirement for complaints alleging municipal liability under § 1983, a complaint does not suffice if it tenders naked assertions devoid of further factual enhancement." *Valdiviezo*, 2017 WL 1191528, at *3. "The mere assertion ... that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference." *Id.* (quoting *Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir. 1993)).

The Complaint fails to plead sufficient facts to state a claim for municipal liability under *Monell*. First, as discussed above, the Complaint does not allege an underlying violation of federal law. *See Cohen v. Walcott*, No. 13 Civ. 9181, 2017 WL 2729091, at *5 (S.D.N.Y. June 23, 2017) ("Where, as here, a plaintiff fails to establish an underlying constitutional violation there can be no liability under *Monell*."). Second, the Complaint does not include any factual allegations that could support any of the three *Walker* factors. The Complaint alleges, in a conclusory manner, that the alleged constitutional violations resulted from the City's failure to train its correction officers "to protect the

innocent in such incidents of chaos." *See Brown*, 2017 WL 1390678, at *13 (dismissing *Monell* claim under § 1983 where plaintiff did not offer specific factual allegations regarding the City's training for Department of Corrections personnel). Because the Complaint fails to plead adequately municipal liability under § 1983, all claims against the City are dismissed.

**B. State Claims**

**a. Negligence**

**\*7** To the extent that the Complaint can be read to plead negligence—or any other claim—under New York law, the Court declines to exercise supplemental jurisdiction. A district court may decline to exercise supplemental jurisdiction over claims arising under state law if the court "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). In considering whether to exercise its discretion, courts must weigh considerations of "[judicial] economy, convenience, fairness, and comity." *Jones v. Ford Motor Credit Co.*, 358 F.3d 205, 214 (2d Cir. 2004). These factors will usually lead to dismissal of the non-federal claims when the federal claims have been dismissed at a relatively early stage. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). Here, all of the federal claims against Defendants are dismissed on a Rule 12(c) motion before significant discovery has taken place. Therefore, the Court declines to exercise supplemental jurisdiction.

**C. Exhaustion**

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983] ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *Williams*, 829 F.3d at 122. Failure to exhaust under the PLRA is an affirmative defense rather than a pleading requirement, but "a district court may still dismiss a complaint for failure to exhaust administrative remedies if it is clear on the face of the complaint that the plaintiff did not satisfy the PLRA exhaustion requirement." *Id.* (quoting *Jones v. Block*, 549 U.S. 199, 215 (2007)). Here, although it is clear on the face of the Complaint that Plaintiff did not file a grievance at the facility where he was incarcerated (in the initial Complaint, he checked the boxes indicating that he

2017 WL 3575700

did not file a grievance), Defendants did not assert this affirmative defense in their Answer, and therefore, it is waived. *See Ruggiero v. Cty. of Orange*, 467 F.3d 170, 175 (2d Cir. 2006) (noting that a defendant may waive the defense of failure to exhaust); *accord Banks v. Cty. of Westchester*, 168 F. Supp. 3d 682, 693 n.3 (S.D.N.Y. 2016) ("failure to exhaust ... may be waived by a defendant, or forfeited by failure to raise the defense") (internal quotation marks omitted). Accordingly, the Complaint is dismissed. To the extent that Plaintiff believes he can cure the pleading deficiencies identified above, he must exhaust his administrative remedies before refiling a new action in federal court.

**IV. CONCLUSION**

For the foregoing reasons, Defendants' motions are granted, and the Complaint is dismissed in its entirety. The Clerk of Court is directed to close the motions at Docket Nos. 52 and 59, to leave this case open for resolution of the pro se Defendant's crossclaim and to mail a copy of this Order to pro se Plaintiff and pro se Defendant.

**All Citations**

Slip Copy, 2017 WL 3575700

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 1134768
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Hiawatha CUFFEE, Jr., Plaintiff,

v.

The CITY OF NEW YORK, Officer
Squillaro (Shield No. 18063), and Officer
Gonzalez (Shield No. 17148), Defendants.

15 Civ. 8916 (PGG) (DF)
|
Signed 03/27/2017

**Attorneys and Law Firms**

Hiawatha Cuffee, Jr., Marcy, NY, pro se.

Eviana Linnea Frances Englert, NYC Law Department,
New York, NY, for Defendants.

### ORDER

Paul G. Gardephe, United States District Judge

**\*1** Pro se Plaintiff Hiawatha Cuffee, Jr., brings this
action, pursuant to 42 U.S.C. § 1983, against the City of
New York (the "City") and New York City Department
of Corrections ("DOC") Officers Gonzalez and Squillaro.
Plaintiff—who is incarcerated—alleges that the individual
defendants violated his constitutional rights in connection
with a motor vehicle accident involving a DOC bus
that was transporting Plaintiff to Rikers Island. (Cmplt.
(Dkt. No. 2)) Plaintiff also brings a Monell claim against
the City. (Id.) Defendants have moved to dismiss the
Complaint pursuant to Fed. R. Civ. P. 12(b)(6). (Dkt. No.
16)

On October 20, 2016, this Court referred Defendants'
motion to Magistrate Judge Debra Freeman for a Report
and Recommendation ("R & R"). (Dkt. No. 27) On
March 3, 2017, Judge Freeman issued a 28-page R &
R recommending that Defendants' motion to dismiss be
granted in part and denied in part. (Dkt. No. 29) For the
reasons stated below, this Court will adopt the R & R in
its entirety.

### BACKGROUND

### I. FACTS [1]

[1] "[I]n deciding a motion to dismiss a pro se complaint,
it is appropriate to consider 'materials outside the
complaint to the extent that they are consistent
with the allegations in the complaint,' including
'documents that a pro se litigant attaches to [his]
opposition papers.' " Pearson v. Walden Univ., 144 F.
Supp. 3d 503, 508 (S.D.N.Y. 2015) (internal citations
omitted); see also Walker v. Schult, 717 F.3d 119,
122 n. 1 (2d Cir. 2013) (noting that a court may
consider "factual allegations made by a pro se party in
[his] papers opposing [a] motion [to dismiss]"). In its
factual summary, the Court relies on the Complaint
and documents Plaintiff filed in opposing Defendants'
motion to dismiss. (See Dkt. Nos. 2, 14, 15, 23, 26)

On July 31, 2015, the DOC transported Plaintiff by
bus from Rikers Island—where Plaintiff was being
detained [2]—to Bellevue Hospital Center. (Cmplt. (Dkt.
No. 2) at 9) [3] At Bellevue Hospital, Plaintiff underwent
a prostate examination and biopsy. (Id.) After the
procedure, Plaintiff got on a DOC bus for transport
back to Rikers Island. (Id.) Plaintiff alleges that he "was
handcuffed and shackled at the waist[,] and confined in
a steel, locked cage approximately 3½ feet wide." (Id.)
The cage "was positioned directly behind the driver" of
the bus. (Id.) Plaintiff did not have a seatbelt. (Id. at 12)
Defendant Gonzalez was driving the bus (id. at 9), and
Defendant Squillaro was present as a passenger. (See id.
at 9-10; May 21, 2016 Pltf. Ltr. (Dkt. No. 14) at 3)

[2] The Complaint does not disclose whether Plaintiff
was held at Rikers Island as a pre-trial detainee or as
a convicted inmate.

[3] All references to page numbers in this Order are
as reflected in this District's Electronic Case Filing
system.

At about 12:40 p.m., as the bus was returning to Rikers
Island, Defendant Gonzalez "pull[ed] out into traffic ... at
an unusually high rate of speed." (Cmplt. (Dkt. No. 2) at
9) Plaintiff then "heard the screeching of tires," and the
DOC bus collided with another motor vehicle. (Id. at 9-11;
May 21, 2016 Pltf. Ltr. (Dkt. No. 14) at 2) Plaintiff "was
thrown forward" in the steel cage and, "upon impact,"
he "injured [his] knee, lower back, ... neck, and ... was
also bleeding from [his] rectal area [due] to [his] recent

biopsy." (Cmplt. (Dkt. No. 2) at 9) Plaintiff alleges that he "began screaming to [Defendant] Gonzalez ... to ... get [him] back to the hospital because [he] desperately needed medical assistance." (Id.) Plaintiff also alleges that he told Defendants Gonzalez and Squillaro "over and over" that he was bleeding. (May 21, 2016 Pltf. Ltr. (Dkt. No. 14) at 3) Other inmates on the bus also "scream [ed] for help" and "pleaded for medical assistance." (Cmplt. (Dkt. No. 2) at 9)

**\*2** Defendants Gonzalez and Squillaro told Plaintiff to "hold on" and hurriedly exited the bus to investigate the accident. (See id.) Although the bus was only "[five] minutes [away] from Bellevue Hospital" at the time of the accident (May 21, 2016 Pltf. Ltr. (Dkt. No. 14) at 1), Plaintiff and the other inmates "sat on the bus for 1½ hours waiting for [DOC supervisors] to complete their investigation [of the accident]." (Id. at 9) Plaintiff and the other inmates—still in shackles and chains—were eventually loaded onto another DOC bus for transport back to Rikers Island. (See May 21, 2016 Pltf. Ltr. (Dkt. No. 14) at 1) Plaintiff "did not receive medical attention until he was returned back to Rikers [Island]." (Cmplt. (Dkt. No. 2) at 10) Plaintiff contends that the defendant officers' failure to return to Bellevue or to call medical personnel to the scene "caused further harm to Plaintiff." (May 21, 2016 Pltf. Ltr. (Dkt. No. 14) at 3)

At Rikers Island, Plaintiff received an X-ray and was given an ice pack, pain medication, and a cane. (May 21, 2016 Pltf. Ltr. (Dkt. No. 14) at 1; Cmplt. (Dkt. No. 2) at 4) Plaintiff alleges that, as a result of the accident, he sustained injuries to his neck, lower back, knees and pelvis, and that he suffers "extreme[ ]" and "continued pain ... every day." (Cmplt. (Dkt. No. 2) at 10-11) Plaintiff continues to walk with a cane and a "stomach belt," and expresses concern that his loss of mobility will prevent him from performing his duties as a "certified plant maintenance electrician." (Id. at 10-12)

## II. PROCEDURAL HISTORY

Plaintiff commenced this action on November 12, 2015. (Dkt. No. 2) The Complaint—considered liberally and together with Plaintiffs' other filings—asserts three causes of action: (1) a Fourth Amendment claim against Defendants Gonzalez and Squillaro, based on their "[ ]reckless" conduct that placed Plaintiff in a "dangerous position" and caused his injuries; (2) an

Eighth Amendment or Fourteenth Amendment claim for deliberate indifference against Defendants Gonzalez and Squillaro, based on "their cruel and unusual punishment and lack ... of ... medical response" to his injuries following the accident [4]; and (3) a Monell claim against the City, based on its failure to equip DOC buses with seat belts or air bags, which creates a danger that "shackled and handcuffed" detainees may "fly out of their seats." (Id. at 11-12)

[4]   As Judge Freeman noted, "it is unclear from Plaintiff's submissions whether, at the time of the alleged events, he was in custody at Rikers [Island] as a pretrial detainee, or had been convicted of a crime and was serving a sentence of incarceration." (R & R (Dkt. No. 29) at 14) Accordingly, Judge Freeman considered Plaintiff's deliberate indifference claims under both the Eighth Amendment and Fourteenth Amendment. See Little v. Mun. Corp., 51 F. Supp. 3d 473, 488 n.7 (S.D.N.Y. 2014) ("A convicted prisoner's claim based on the conditions of his confinement is analyzed under the Eighth Amendment. In the case of a state pretrial detainee, however, the same claim is analyzed under the Fourteenth Amendment's Due Process Clause.") (internal citation omitted).

On June 30, 2016, Defendants moved to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6). (Dkt. No. 16) On October 20, 2016, this Court referred Defendants' motion to Magistrate Judge Debra Freeman for a Report and Recommendation ("R & R"). (Dkt. No. 27) On March 3, 2017, Judge Freeman issued a 28-page R & R recommending that Defendants' motion to dismiss be granted except as to Plaintiff's deliberate indifference claim against Defendant Gonzalez. (R & R (Dkt. No. 29) at 26) Judge Freeman further recommends that Plaintiff be granted leave to amend the remaining claims in the Complaint, with the exception of the Fourth Amendment claim, which Judge Freeman recommends be dismissed with prejudice. (Id.)

Judge Freeman's R & R gives notice that any objections are to be filed within fourteen days from service of the R & R, and that "FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW." (Id. at 27) No objections to the R & R have been filed. [5]

2017 WL 1134768

5    In a March 16, 2017 letter, Plaintiff states that he has received the R & R and that he will "submit the requested amended [complaint] once an order from [this Court] is received." (Mar. 16, 2017 Pltf. Ltr. (Dkt. No. 30)) Plaintiff's letter does not raise any objections to the R & R.

## DISCUSSION

### I. LEGAL STANDARD

#### A. Review of Magistrate Judge's Report and Recommendation

**\*3**  In reviewing a magistrate judge's report and recommendation, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). Under 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), a party may submit objections to the magistrate judge's R & R. Any objections must be "specific" and "written," and must be made "[w]ithin 14 days after being served with a copy of the recommended disposition." Fed. R. Civ. P. 72(b)(2); see also 28 U.S.C. § 636(b)(1).

" 'The district judge evaluating a magistrate judge's recommendation may adopt those portions of the recommendation, without further review, where no specific objection is made, as long as they are not clearly erroneous.' " Gilmore v. Comm'r of Soc. Sec., No. 09 Civ. 6241 (RMB) (FM), 2011 WL 611826, at *1 (S.D.N.Y. Feb. 18, 2011) (quoting Chimarev v. TD Waterhouse Investor Servs., Inc., 280 F. Supp. 2d 208, 212 (S.D.N.Y. 2003)). A decision is "clearly erroneous" when, "upon review of the entire record, [the court is] left with the definite and firm conviction that a mistake has been committed." United States v. Snow, 462 F.3d 55, 72 (2d Cir. 2006) (quotation marks and citation omitted).

#### B. Motion to Dismiss Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "In considering a motion to dismiss ... the court is to accept as true all facts alleged in the complaint," Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007) (citing

Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)), and must "draw all reasonable inferences in favor of the plaintiff." Id. (citing Fernandez v. Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)).

A complaint is inadequately pled "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement,' " Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557), and does not provide factual allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests." Port Dock & Stone Corp. v. Oldcastle Northeast, Inc., 507 F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550 U.S. at 545).

"Although a court in deciding a Rule 12(b)(6) motion is generally limited to considering the facts alleged in the complaint, a district court may also consider documents appended to the complaint, documents incorporated by reference, and matters of which judicial notice may be taken." Johnson v. Cty. of Nassau, 411 F. Supp. 2d 171, 178 (E.D.N.Y. 2006) (citing Allen v. WestPoint-Pepperell, Inc., 945 F.2d 40, 44 (2d Cir. 1991)). "In addition, a court may also consider documents outside the pleadings if they are 'integral' to the complaint and upon which the complaint relies." Id. at 178 (citing Int'l Audiotext Network, Inc. v. American Tel. and Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995)).

A "pro se complaint ... [is] interpret[ed] ... to raise the 'strongest [claims] that [it] suggest[s].' " Hill v. Curcione, 657 F.3d 116, 122 (2d Cir. 2011) (quoting Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam)); see Weixel v. Bd. of Educ. of City of New York, 287 F.3d 138, 145-46 (2d Cir. 2002) ("When considering motions to dismiss a pro se complaint such as this, 'courts must construe [the complaint] broadly....' " (quoting Cruz v. Gomez, 202 F.3d 593, 597 (2d Cir. 2000))). "However, although pro se filings are read liberally and must be interpreted 'to raise the strongest arguments that they suggest,' a pro se complaint must still 'plead sufficient facts to state a claim to relief that is plausible on its face.' " Wilder v. United States Dep't of Veterans Affairs, 175 F. Supp. 3d 82, 87 (S.D.N.Y. 2016) (internal citations omitted). Moreover, "the court need not accept as true 'conclusions of law or unwarranted deductions of fact.' " Whitfield v. O'Connell, No. 09 Civ. 1925 (WHP), 2010 WL 1010060, at *4 (S.D.N.Y. Mar. 18, 2010) (quoting First Nationwide Bank v. Gelt Funding

Corp., 27 F.3d 763, 771 (2d Cir. 1994)); see also Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009) ("[T]hreadbare recitals of a cause of action, supported by mere conclusory statements, do not suffice [to establish entitlement to relief].").

## II. ANALYSIS

**\*4** Liberally construed, the Complaint asserts (1) a Fourth Amendment claim against Defendants Gonzalez and Squillaro; (2) an Eighth or Fourteenth Amendment claim against Defendants Gonzalez and Squillaro, due to their alleged deliberate indifference to Plaintiff's safety and serious medical needs; and (3) a Monell claim against the City. (See Cmplt. (Dkt. No. 2)) Judge Freeman's thorough and well-reasoned R & R concludes that Defendants' motion to dismiss should be granted on all claims, with the exception of the deliberate indifference claim against Defendant Gonzalez. (See R & R (Dkt. No. 29) at 26) The Court finds no clear error in Judge Freeman's recommendation.

### A. Fourth Amendment Claim

The Complaint alleges that Defendants Gonzalez and Squillaro violated Plaintiff's right "under the 4th Amendment to be secure in his person and not be denied life and liberty." (Cmplt. (Dkt. No. 2) at 11) In support of this claim, Plaintiff alleges that the individual defendants' "[ ]reckless" conduct—which resulted in the July 31, 2015 motor vehicle accident—"placed [Plaintiff] in a dangerous situation" and caused him physical injury. (Id.)

Judge Freeman recommends dismissal of this claim, because "the Fourth Amendment is simply 'inapplicable' to this case." (R & R (Dkt. No. 29) at 11) (citing Smith v. City of New York, No. 15 Civ. 7910 (GHW), 2016 WL 7471334, at \*1 (S.D.N.Y. Dec. 28, 2016)) This Court agrees with that assessment. The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Here, however, "Plaintiff makes no allegations that he was either arrested or subjected to any unlawful search as a result of the motor-vehicle collision that is the subject of [the] Complaint." (R & R (Dkt. No. 29) at 11) Accordingly, Plaintiff's Fourth Amendment claim will be dismissed.

### B. Deliberate Indifference Claim

The Complaint asserts a claim against Defendants Gonzalez and Squillaro based on "their cruel and unusual punishment and lack ... of care ... [or] medical response" after the July 31, 2015 motor vehicle accident. (Cmplt. (Dkt. No. 2) at 11) Interpreting the pro se plaintiff's pleading "to raise the 'strongest [claims] that [it] suggest[s],' " Hill, 657 F.3d at 122, Judge Freeman construed this cause of action as asserting a claim for deliberate indifference to Plaintiff's safety and to his serious medical needs under the Eighth Amendment—if he was a convicted inmate at the time of the accident—or the Fourteenth Amendment—if he was a pretrial detainee at the time of the accident. (R & R (Dkt. No. 29) at 11)

### 1. Applicable Law

"A convicted prisoner's claim of deliberate indifference ... is analyzed under the Eighth Amendment." Caiozzo v. Koreman, 581 F.3d 63, 69 (2d Cir. 2009) (citing Weyant v. Okst, 101 F.3d 845, 856 (2d Cir. 1996)). However, "[a] pretrial detainee's claims ... are governed by the Due Process Clause of the Fourteenth Amendment." Darnell v. Pineiro, 849 F.3d 17, 29 (2d Cir. 2017). Because it is not clear from the Complaint whether Plaintiff was a pre-trial detainee or a convicted prisoner at the time of the July 31, 2015 accident, the Court considers the applicable standards under both the Eighth and Fourteenth Amendments.

"To adequately allege [a constitutional] violation [under the Eighth or Fourteenth Amendment], an inmate must satisfy objective and subjective elements of a two-pronged test." Lynch v. Jane Doe Corr. Officer Blue, No. 14 Civ. 6919 (VB), 2016 WL 831969, at \*3 (S.D.N.Y. Feb. 29, 2016). Plaintiff "must show (1) that the [constitutional] deprivation alleged is 'objectively sufficiently serious' such that the plaintiff was denied 'the minimal civilized measure of life's necessities,' and (2) that the defendant official possessed a 'sufficiently culpable state of mind' associated with 'the unnecessary and wanton infliction of pain.' " Trammell v. Keane, 338 F.3d 155, 161 (2d Cir. 2003) (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)).

**\*5** With respect to the objective component, the legal standard is the same under both the Eighth and the Fourteenth Amendments. See Darnell, 849 F.3d at 30. The plaintiff "must allege facts showing [he] was denied 'the minimal civilized measure of life's necessities.' " Lynch,

2016 WL 831969, at *3 (quoting Farmer, 511 U.S. at 834). " 'When ... the claim is based on an alleged failure to prevent harm or provide safety, the inmate must show [he] 'is incarcerated under conditions posing a substantial risk of harm.' " Id. (quoting Farmer, 511 U.S. at 834). When the claim asserted is deliberate indifference to serious medical needs, the alleged deprivation of medical care must be "sufficiently serious." See Snyder v. Alam, No. 15 Civ. 4033 (VB), 2016 WL 2642226, at *3 (S.D.N.Y. May 6, 2016).

With respect to the subjective component, the legal standards are different under the Eighth and the Fourteenth Amendments. See Darnell, 849 F.3d at 32-36. Under the Eighth Amendment, an inmate "must allege facts showing officials acted with 'deliberate indifference' to the inmate's 'health or safety.' " Lynch, 2016 WL 831969, at *3 (citing Farmer, 511 U.S. at 834). A prison official acts with deliberate indifference when he "has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm." Hayes v. New York City Dep't of Corrs., 84 F.3d 614, 620 (2d Cir. 1996). The official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Cuoco v. Moritsugu, 222 F.3d 99, 107 (2d Cir. 2000).

Under the Fourteenth Amendment, however, "the 'subjective prong' ... of a deliberate indifference claim is defined objectively." Darnell, 849 F.3d at 35. A "pretrial detainee must prove that

> the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety.

Id. Thus, unlike the Eighth Amendment, "the Due Process Clause can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm." Id.

## 2. Deliberate Indifference to Safety

As to Plaintiff's claim of deliberate indifference to safety, Judge Freeman recommends that Defendants motion to dismiss be granted as to Defendant Squillaro, but denied as to Defendant Gonzalez. (R & R (Dkt. No. 29) at 16-17)

With respect to the objective prong of the analysis, which is the same under both the Eighth Amendment and Fourteenth Amendment, Judge Freeman found that Plaintiff pleaded facts raising a plausible inference of a "sufficiently serious" constitutional deprivation. (See R & R (Dkt. No. 29) at 14-16) In the context of prison transportation accidents, the Second Circuit has held that "the failure of prison officials to provide inmates with seatbelts [is] not, without more, ... 'sufficiently serious' to constitute a[ ] [constitutional] violation.' " Jabbar v. Fischer, 683 F.3d 54, 58 (2d Cir. 2012) (quoting Gaston v. Coughlin, 249 F.3d 156, 164 (2d Cir. 2001)). Courts have similarly recognized that "[a]llegations of a public official driving too fast ... are grounded in negligence" and are not actionable under Section 1983. See Carrasquillo v. City of New York, 324 F. Supp. 2d 428, 436 (S.D.N.Y. 2004).

Here, however, Plaintiff alleges more than the absence of a seat belt and driving too fast. As Judge Freeman observes, the Complaint alleges not only that Defendant Gonzalez " 'pull[ed] out into traffic ... at an unusually high rate of speed[,]' " but also that "Plaintiff ... was [at that time] 'handcuffed and shackled at the waist[,] and confined in a steel, locked cage approximately [three-and-a-half] feet wide.' " (R & R (Dkt. No. 29) at 15 (quoting Cmplt. (Dkt. No. 2) at 9)) Judge Freeman found that this combination of factors—"driving recklessly[ ] while Plaintiff was confined in a cage without any reasonable means to protect himself from impact"—was adequate to satisfy the objective prong on the analysis. (See id. at 15-16) This Court finds no clear error in her assessment. See Torres v. Amato, 22 F. Supp. 3d 166, 176 (N.D.N.Y. 2014) (denying defendant summary judgment on deliberate indifference claim where inmate being transported to a correctional facility fell out of the back of a van and sustained fatal injuries; inmate did not have a seatbelt, the door to the van was "improperly latched," and defendant operated the van "in a reckless manner"); see also Darnell, 849 F.3d at 30 ("[C]onditions of confinement may be aggregated to rise to the level of a constitutional violation, but 'only

Cuffee v. City of New York, Slip Copy (2017)
Case 9:15-cv-01222-MAD-TWD    Document 59    Filed 02/12/18    Page 131 of 231
2017 WL 1134768

**\*6** With respect to the subjective prong of Plaintiff's deliberate indifference claim, Judge Freeman determined that—as against Defendant Gonzalez—Plaintiff had stated a claim under either the Eighth Amendment or Fourteenth Amendment. (R & R (Dkt. No. 29) at 16) Given that Defendant Gonzalez was the driver of the bus and that Plaintiff "was positioned directly behind him" (Cmplt. (Dkt. No. 2) at 9), Judge Freeman found it "reasonable to infer that [Defendant] Gonzalez was either actually aware of the excessive risk to Plaintiff's safety or that the risk was obvious [to him]." (R & R (Dkt. No. 29) at 16) Judge Freeman found

> it plausible that the act of [Defendant Gonzalez] in driving recklessly, at excessive speed, with knowledge that a detainee is being transported in the vehicle—not just without a seatbelt, but within a small steel cage, with hands in handcuffs that are linked at the waist and thus cannot be used to brace or otherwise protect himself—could rise to the level of deliberate indifference to an excessive risk to that detainee's safety.

(Id. at 16) This Court finds no clear error in that determination.

With respect to Defendant Squillaro, however, Judge Freeman recommends that the claim for deliberate indifference to safety be dismissed. (Id. at 16-17) The Complaint is silent as to the nature of Defendant Squillaro's involvement in the incident and where he was sitting in relation to Plaintiff. Indeed, as Judge Freeman notes, "Plaintiff makes no allegation that [Defendant Squillaro] personally acted in any way that contributed to the unsafe conditions." (Id. at 17) This Court agrees that the deliberate indifference to safety claim should be dismissed as to Defendant Squillaro.

Accordingly, Defendants' motion to dismiss the deliberate indifference to safety claim will be granted as to Defendant Squillaro, but denied as to Defendant Gonzalez.

### 3. Deliberate Indifference to Serious Medical Needs

Judge Freeman recommends that Plaintiff's claim of deliberate indifference to serious medical needs be dismissed, because Plaintiff's allegations "do[ ] not satisfy the objective prong of either an Eighth or [Fourteenth] Amendment deliberate indifference claim against either [individual defendant]." (R & R (Dkt. No. 29) at 21)

"When a prisoner alleges 'a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone in analyzing whether the alleged deprivation is, in objective terms, sufficiently serious....' " Snyder, 2016 WL 2642226, at *3 (quoting Smith v. Carpenter, 316 F.3d 178, 186 (2d Cir. 2003)) (emphasis omitted). " '[A] short interruption of care, even if the underlying medical condition is serious, does not constitute a serious medical need where the 'alleged lapses in treatment are minor.' " Smith, 2016 WL 7471334, at *4 (quoting Bell v. Jendell, 980 F. Supp. 2d 555, 559-60 (S.D.N.Y. 2013)). "However, allegations that the defendant's delay in treating a minor or ordinary medical condition can nevertheless 'become a constitutional violation if the condition worsens [as a result of the delay] and creates a "substantial risk of injury." ' " Id. (quoting Graham v. Wright, No. 01 Civ. 9613 (NRB), 2004 WL 1794503, at *4 (S.D.N.Y. Aug. 10, 2004)).

Here, the "gravamen of the complaint is a delay, rather than a denial, of medical care" (R & R (Dkt. No. 29) at 19), because it is undisputed that Plaintiff received medical treatment upon his return to Rikers Island. (See Cmplt. (Dkt. No. 2) at 10) Moreover, Plaintiff has not offered factual allegations from which it can plausibly be inferred "that [this] delay caused or exacerbated his injuries." (R & R (Dkt. No. 29) at 20-22) As Judge Freeman notes, although Plaintiff alleges—in his opposition papers—that Defendants Gonzalez and Squillaro "caused further harm to the Plaintiff by not returning to Bellevue or calling E.M.S. to respond to the scene" (May 21, 2016 Pltf. Ltr. (Dkt. No. 14) at 3) (emphasis added), Plaintiff offers no allegations "as to how, or the extent to which, the alleged 'further harm' occurred." (R & R (Dkt. No. 29) at 21) Because Plaintiff's allegations concerning the alleged deprivation resulting from the delay in medical treatment

2017 WL 1134768

are "entirely conclusory," Judge Freeman recommends dismissal of Plaintiff's claim for deliberate indifference to serious medical need. (Id. at 20-22) The Court finds no clear error in that recommendation.

**C. _Monell_ Claim**

**\*7** The Complaint asserts a Monell claim against the City. (Cmplt. (Dkt. No. 2) at 12) Plaintiff alleges that the City violated his constitutional right "to be absent or free from cruel and unusual punishment[,]" because "the DOC buses are not equipped with standard ... seat belts or ... air bags" or other "means to protect [one's] person from bod[i]ly injury." (Id.) Plaintiff contends that "[b]eing shackled and handcuffed [under such conditions] is dangerous [,] because detainees fly out of their seats." (Id.) As part of the relief sought in this action, Plaintiff asks this Court to order the City to implement a "program ... to re-train the transportation [officers] in emergency procedures so they are better trained to handle th[e] type of situation [that occurred on July 31, 2015]." (Id. at 5)

**1. Applicable Law**

"[A] municipality cannot be held liable [under Section 1983] solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978) (emphasis in Monell). "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." Id. at 694.

The Second Circuit applies a two-prong test to Monell claims. A plaintiff "must first prove the existence of a municipal policy or custom in order to show that the municipality took some action that caused his injuries beyond merely employing the misbehaving officer[s]." Vippolis v. Vill. of Haverstraw, 768 F.2d 40, 44 (2d Cir. 1985). A plaintiff may satisfy this requirement by "alleg[ing] the existence of

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused

the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

Brandon v. City of New York, 705 F. Supp. 2d 261, 276-77 (S.D.N.Y. 2010) (internal citations omitted). Second, "the plaintiff must establish a causal connection—an 'affirmative link'—between the policy and the deprivation of his constitutional rights." Vippolis, 768 F.2d at 44.

"[M]ere allegations of a municipal [policy,] custom[,] or practice ... are insufficient to demonstrate [its] existence ... unless supported by factual details," however. Triano v. Town of Harrison, 895 F. Supp. 2d 526, 535 (S.D.N.Y. 2012) (citing Moore v. City of New York, No. 08 Civ. 8879 (PGG), 2010 WL 742981, at *6 (S.D.N.Y. Mar. 2, 2010)). "[A] plaintiff must allege facts tending to support, at least circumstantially, an inference that such a municipal policy or custom exists." Santos v. New York City, 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012). " '[A] conclusory, boilerplate assertion of a municipal policy or custom [is] insufficient to survive a motion to dismiss.' " Plair v. City of New York, 789 F. Supp. 2d 459, 469 (S.D.N.Y. 2011) (quoting Santiago v. City of New York, No. 09 Civ. 0856 (BMC), 2009 WL 2734667, at *7 (E.D.N.Y. Aug. 18, 2009)).

**2. Analysis**

Judge Freeman recommends dismissal of Plaintiff's Monell claim. To the extent that the Monell claim is premised on the theory that DOC buses are not equipped with adequate safety measures, Judge Freeman concludes that Plaintiff has failed to "allege facts plausibly suggesting ... [that an] official policy, custom, or practice" exists. (R & R (Dkt. No. 29) at 24) As Judge Freeman explains, the mere absence of seatbelts or airbags on DOC buses does not—in isolation—give rise to a constitutional violation supporting a Monell claim. (R & R (Dkt. No. 29) at 23-24) See Jabbar, 683 F.3d at 58 ("[T]he failure

2017 WL 1134768

of prison officials to provide inmates with seatbelts does not, without more, violate the Eighth or Fourteenth Amendments."); Carrasquillo, 324 F. Supp. 2d at 436 ("There is ... no Monell liability for the City's failure to provide seatbelts [on prison buses]...."); see also Claudio v. Sawyer, 675 F. Supp. 2d 403, 408 (S.D.N.Y. 2009) ("[A] prerequisite to municipal liability under Monell is an underlying constitutional violation by a state actor.").

 *8 As discussed above, however, Plaintiff has plausibly alleged an underlying constitutional violation for deliberate indifference to safety arising from the combination of circumstances at the time of the July 31, 2015 accident. Judge Freeman acknowledges that "a municipal policy or practice of transporting detainees (or inmates) in buses by placing them in small steel cages within the buses, with handcuffs shackled to waist chains, and without seatbelts or other protective devices[ ] could give rise to Monell liability." (R & R (Dkt. No. 29) at 24) (emphasis in original) Nonetheless, "a plaintiff must allege facts tending to support, at least circumstantially, an inference that such a municipal policy or custom exists." Santos, 847 F. Supp. 2d at 576. Here, the Complaint does not contain sufficient allegations as to the existence of any such policy or custom, or whether "it was the City's ... practice to combine these measures in a way that unduly compromised the safety of those being transported." (R & R (Dkt. No. 29) at 24) Plaintiff's allegations—even when construed liberally—address only the measures that were used by the individual defendants in this particular instance. See Triano, 895 F. Supp. 2d at 538 ("[I]t is well settled that 'a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the [government].'"). Accordingly, this Court finds no clear error in Judge Freeman's recommendation to dismiss Plaintiff's Monell claim to the extent it is based on a theory of an official policy, custom, or practice.

To the extent that Plaintiff's Monell claim is premised on a theory of failure to train or supervise, Judge Freeman similarly recommends that the claim be dismissed for failure to "identify any specific training deficiencies that caused his injuries." (R & R (Dkt. No. 29) at 24-26) To survive a motion to dismiss, " 'a plaintiff must plausibly allege a specific deficiency in the municipality's training.' " Calderon v. City of New York, 138 F. Supp. 3d 593, 613 (S.D.N.Y. 2015) (quoting Tieman v. City of Newburgh, No. 13 Civ. 4178 (KMK), 2015 WL 1379652, at *22

(S.D.N.Y. Mar. 26, 2015)). "Because Plaintiff has done no more than make conclusory assertions [of inadequate training], he has not adequately alleged that the [City's] training policies caused Plaintiff's injuries." Triano, 895 F. Supp. 2d at 541. Accordingly, the Court finds no clear error in Judge Freeman's recommendation to dismiss Plaintiff's Monell claim to the extent it is based on a failure to train theory.

Plaintiff's Monell claim against the City will be dismissed.

### III. LEAVE TO AMEND

Judge Freeman recommends that Plaintiff be granted leave to amend, except as to his Fourth Amendment claim. (R & R (Dkt. No. 29) at 26; see also id. at 11, 16-17, 21-22, 24-26) The Second Circuit has cautioned that district courts "should not dismiss [a pro se complaint] without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." Cuoco, 222 F.3d at 112. " 'Where it appears that granting leave to amend is unlikely to be productive, however, it is not an abuse of discretion to deny leave to amend.' " Lucente v. Int'l Bus. Machines Corp., 310 F.3d 243, 258 (2d Cir. 2002) (quoting Ruffolo v. Oppenheimer & Co., 987 F.2d 129, 131 (2d Cir. 1993)). "One appropriate basis for denying leave to amend is that the proposed amendment is futile. An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." Id. (internal citations omitted).

With respect to Plaintiff's Fourth Amendment claim, this Court agrees that leave to amend should be denied. The Complaint—which concerns a motor vehicle accident involving a DOC bus—alleges no facts that implicate an unlawful search or seizure under the Fourth Amendment. Accordingly, there is no reason to believe that giving Plaintiff an opportunity to amend this claim would be anything other than futile.

For the reasons set forth in Judge Freeman's R & R (see R & R (Dkt. No. 29) at 11, 16-17, 21-22, 24-26), however, the Court cannot conclude that amendment would be futile with respect to Plaintiff's remaining claims. Accordingly, Plaintiff will be granted leave to file an Amended Complaint. [6]

2017 WL 1134768

6    Any Amended Complaint will specify whether—at the time of the accident—Plaintiff was a pretrial detainee or serving a sentence after conviction.

## CONCLUSION

**\*9** For the reasons stated above, this Court adopts Judge Freeman's Report & Recommendation in its entirety, and Defendant's motion to dismiss is granted in part and denied in part. The Clerk of the Court is directed to terminate the motion (Dkt. No. 16). Any Amended Complaint will be filed by April 30, 2017. The Clerk is further directed to mail a copy of this Order to pro se Plaintiff.

SO ORDERED.

**All Citations**

Slip Copy, 2017 WL 1134768

---

**End of Document**    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 550610
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Emilio PADILLA, Plaintiff,
v.
CORRECTION CARE
SOLUTIONS, et al., Defendants.

9:17-CV-1150 (MAD/TWD)
|
Signed 01/22/2018

**Attorneys and Law Firms**

EMILIO PADILLA, 16000236, Onondaga County Justice Center, 555 South State Street, Syracuse, NY 13020, pro se.

**DECISION AND ORDER**

Mae A. D'Agostino, U.S. District Judge

## I. INTRODUCTION

**\*1** Pro se plaintiff Emilio Padilla ("Plaintiff") commenced this civil rights action asserting claims arising out of his detention at the Onondaga County Justice Center ("Onondaga County J.C."). Dkt. No. 1 ("Compl."). By Decision and Order filed on November 29, 2017 (Dkt. No. 4) (the "November Order"), this Court granted Plaintiff's IFP application and reviewed the sufficiency of the Complaint in accordance with 28 U.S.C. § 1915(e) and 28 U.S.C. § 1915A. On the basis of that review, the Court dismissed the Complaint for failure to state a claim upon which relief could be granted. See Dkt. No. 8, generally. In light of his pro se status, Plaintiff was afforded an opportunity to submit an Amended Complaint. See id. at 11. Presently before the Court is Plaintiff's Amended Complaint. Dkt. No. 9 ("Am. Compl.").

## II. LEGAL STANDARD

The legal standard governing the dismissal of a pleading for failure to state a claim pursuant to 28 U.S.C. § 1915A(b) was discussed at length in the November Order and it will not be restated in this Decision and Order. See Dkt. No. 8 at 2-4. The Court will construe the allegations

in the Amended Complaint with the utmost leniency. See, e.g., Haines v. Kerner, 404 U.S. 519, 520 (1972) (holding that a pro se litigant's complaint is to be held "to a less stringent standards than formal pleadings drafted by lawyers.").

## III. NOVEMBER ORDER and SUMMARY OF AMENDED COMPLAINT [1]

[1]    Plaintiff's original complaint included exhibits. Dkt. No. 1-1. Plaintiff incorporated, by reference, the same exhibits attached to the original complaint, but failed to actually attach the exhibits to the Amended Complaint. "Although it is well settled that an amended complaint supersedes a prior complaint in its entirety, it is clear to the court that plaintiff intended to attach the exhibits to his amended complaint." Wellington v. Langendorf, No. 12-CV-1019 (FJS/DEP), 2013 WL 3753978, at *3 (N.D.N.Y. July 15, 2013). To require Plaintiff to file an amended complaint that includes the original exhibits is, "an unnecessary procedural hoop that would waste resources and delay resolution of this action." Alexander v. U.S., No. 13-CV-678, 2013 WL 4014539, at *4 (N.D. Cal. Aug. 5, 2013). Because Plaintiff is a pro se plaintiff, the Court will consider the exhibits and documentation attached to the original Complaint as incorporated by reference in the Amended Complaint.

In the original Complaint, Plaintiff asserted Fourteenth Amendment claims related to deliberate indifference to his serious medical needs against the County of Onondaga, Onondaga County J.C., "Medical Staff," and CCS Correction Care Solution, and "Pharmaceutical Company." See Compl., generally. In the November Order, the Court dismissed Plaintiff's claims holding as follows: (1) Plaintiff failed to sufficiently allege a widespread policy or custom related to Onondaga County; (2) all claims against Onondaga C.J. were barred pursuant to the Eleventh Amendment; (3) the "Medical Staff" is not a "person" as required by Section 1983; and (4) claims against CCS and the Pharmaceutical Company were dismissed for failure to plead that the private parties are state actors. See Dkt. No. 8, generally.

**\*2** In the Amended Complaint, Plaintiff adds the following new defendants: Dr. Monika Zirath ("Zirath") and Nurse Practitioner Jasminique Bobb-Diallo ("Bobb-Diallo"). [2] See Am. Compl. at 1. The Amended Complaint does not contain any claims against Onondaga

County, Onondaga C.J., the Medical Staff, or the "Pharmaceutical Company."[3]

[2]    The Clerk of the Court is directed to add these defendants to the docket report for this action.

[3]    The Clerk of the Court is directed to dismiss County of Onondaga, Onondaga County J.C., the Medical Staff, and the Pharmaceutical Company as defendants herein.

Plaintiff alleges that CCS entered into a contract with Onondaga County to provide medical care for pretrial detainees. Am. Compl. at 2. In April 2017, Plaintiff was treated by Zirath, an employee of Correction Care Solution ("CCS") for complaints related to a shoulder injury. *Id.* at 3, 9. Zirath told Plaintiff that an x-ray would be taken "within the next few days," but suspected that Plaintiff suffered from arthritis and prescribed Naproxen/Naprosyn. *Id.* at 3-4. Zirath did not explain the possible side effects of the medication. *Id.* at 4.

In July 2017, Plaintiff noticed that he was rapidly gaining weight. Am. Compl. at 4. On July 23, 2017, Plaintiff requested sick call because his thighs were swollen and his urine was "very dark." *Id.*; Dkt. No. 1-1 at 15. Plaintiff did not receive a response. Am. Compl. at 4. On July 25, 2017, Plaintiff submitted two additional sick call requests for medical attention because his entire body began to swell. *Id.* at 4-5.; Dkt. No. 1-1 at 16-17. Plaintiff did not receive a response. Am. Compl. at 5. On July 26, 2017, Plaintiff submitted another sick call slip. *Id.* at 5; Dkt. No. 18.

On July 31, 2017, Plaintiff requested sick call because he could not urinate, had chest pain, and could not walk. Am. Compl. at 7; Dkt. No. 1-1 at 19. Later that day, Nurse Harrish examined Plaintiff and took his vitals.[4] Am. Compl. at 5. Plaintiff's blood pressure was 150/100. *Id.* Harrish denied Plaintiff's request to go to the hospital and told him to lay down and elevate his feet. *Id.* Later that evening, Plaintiff submitted another sick call slip. *Id.*

[4]    Harrish is not named as a defendant.

Plaintiff was examined by defendant Bobb-Diallo, a CSC employee.[5] Am. Compl. at 5, 9. Plaintiff told Bobb-Diallo that he could not urinate and that he was experiencing chest pains. *Id.* at 8. Bobb-Diallo diagnosed Plaintiff with high blood pressure and provided blood pressure medication and a water pill. *Id.* at 5-6. Bobb-

Diallo directed Plaintiff to drink a lot of fluids. *Id.* at 6. As a result, in a few days, Plaintiff gained sixty pounds. Am. Compl. at 6.

[5]    The Amended Complaint does not contain facts related to when this examination occurred.

A few days later, Plaintiff told Bobb-Diallo that he needed to go to a hospital and she replied, "let the medication work." Am. Compl. at 6. At the time, the nurse was aware that there was protein in Plaintiff's urine and she observed the swelling in his ankles, legs, and feet. *Id.* at 5, 8. Plaintiff was directed to return to his cell. *Id.* at 6, 7.

On August 1, 2017, at 3:00 a.m. Plaintiff was examined by a nurse and, at 8:00 a.m., he was rushed to St. Joseph's Hospital. Am. Compl. at 8. At the hospital, Plaintiff was diagnosed with protein in his urine, heart failure, and acute kidney failure. *Id.*; Dkt. No. 1-1 at 1. On August 8, 2017, Plaintiff was discharged from the hospital and advised to stop taking Naprosyn. Dkt. No. 1-1 at 2.

**\*3** Construed liberally, the Amended Complaint contains Fourteenth Amendment claims against Zirath and Bobb-Diallo and supervisory claims against CCS. *See* Am. Compl., *generally.* Plaintiff seeks monetary damages. *See id.* at 10.

## IV. ANALYSIS

### A. Private Actors
Plaintiff claims that CCS, Zirath, and Bobb-Diallo, employees of CCS, "acted under color of law to deprive plaintiff of his constitutional rights." *See* Am. Compl. at 3. The law related to private entities and § 1983 actions was discussed in the November Order and will not be restated herein. *See* Dkt. No. 8 at 9-10.

"[T]he provision of medical care to incarcerated prisoners is a public function, even if private physicians contract with the government to provide those services." *Young v. Halle Hous. Assocs., L.P.*, 152 F. Supp. 2d 355, 365 (S.D.N.Y. 2001) (citing *West v. Atkins*, 487 U.S 42, 56 (1988)) ("It is only those physicians authorized by the State to whom the inmate may turn."). "With regard to doctors who treat prison inmates, the Supreme Court has held that it is 'the physician's function within the state system, not the precise terms of his employment, that determines whether his actions can fairly be attributed

to the State' in a suit under 42 U.S.C. § 1983." *Doe v. Torres*, No. 05 CIV. 3388, 2006 WL 290480, at *9 (S.D.N.Y. Feb. 8, 2006) (citing *West*, 487 U.S. at 55-56) ("[A] physician employed by [a state] to provide medical services to state prison inmates ... act[s] under color of state law for purposes of § 1983 when undertaking his duties in treating [a prisoner's] injury.").

Here, defendants treated Plaintiff at the jail. At this juncture, Plaintiff has sufficiently alleged that defendants' were acting under the color of state law for the purposes of Section 1983. *See Young v. Smith*, No. 07-CV-6312, 2008 WL 4561605, at *4 (W.D.N.Y. Oct. 10, 2008) (denying the defendants' motion to dismiss as that the exact nature of the relationship between the physician and the State would be clarified during discovery); *see also Burgess v. County of Rensselaer*, No. 03-CV-0652 (NPM/ RFT), 2006 WL 3729702, at *4 (N.D.N.Y. Dec. 18, 2006) (denying summary judgment filed by nurse holding that her employer may be a state actor for purposes of § 1983). Thus, the Court will proceed to analyze the section 1983 claims against CCS, Zirath, and Bobb-Diallo.

**B. Fourteenth Amendment Claims**
As discussed in the November Order, *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) altered the subjective standard for claims of deliberate indifference under the Fourteenth Amendment. *See* Dkt. No. 8 at 6. Specifically, to state a claim of deliberate indifference to medical needs under the Fourteenth Amendment, a pretrial detainee can satisfy the subjective element by showing that the defendants "knew, or should have known, that the condition posed an excessive risk to health or safety." *See id.* The objective prong of the deliberate indifference claim is the same as a convicted prisoner under the Eighth Amendment. *See Darnell*, 849 F.3d at 30. The objective component of a deliberate indifference medical claim "requires that the alleged deprivation must be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)) (internal quotation marks omitted).

**1. Claims Against Bobb-Diallo**
**\*4** With respect to Bobb-Diallo, Plaintiff claims that she violated his Fourteenth Amendment rights related to medical care for heart failure and acute kidney failure. *See*

Am. Compl. at 8. At this juncture, plaintiff has adequately plead a serious medical condition to satisfy the objective component of the deliberate indifference analysis. *See Rivera v. Fed. Bureau of Prisons*, No. 08 CIV. 5590, 2009 WL 585828, at *5 (S.D.N.Y. Mar. 5, 2009) (holding that kidney failure is sufficiently serious medical condition for the purposes of a deliberate indifference claim). Regarding the subjective analysis, Plaintiff contends that Bobb-Diallo was aware that there was protein in his urine, that his legs were swollen, and that he was having chest pains and deliberately ignored a serious risk to his health and safety resulting in his condition worsening. *See* Am Compl. at 5, 7, 8, 9. Mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, *see e.g. Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008), the Court finds that Plaintiff's Fourteenth Amendment claims against Bobb-Diallo survive sua sponte review and require a response. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed motion to dismiss or for summary judgment.

**2. Claims Against Zirath**
A different conclusion is reached however, with respect to Zirath. Plaintiff alleges that he treated with Zirath on one occasion in April 2017 for complaints of shoulder pain. *See* Am. Compl. at 3-4, 9. "A medical need is considered serious if it presents 'a condition of urgency that may result in degeneration or extreme pain.' " *Linares v. Kudlack*, No. 03-CV-1408 (LEK), 2007 WL 4287700, at *5 (N.D.N.Y. Dec. 4, 2007) (quoting *Chance*, 143 F.3d at 702). Plaintiff claims that he suffered from a shoulder injury but the Amended Complaint lacks facts related to what his physical or medical condition was or further, that it produced pain.

Even assuming Plaintiff sufficiently pleaded that he suffered from a serious medical need, he has failed to allege that Zirath "knew, or should have known, that the condition posed an excessive risk to health or safety." The Fourteenth Amendment claims against Zirath are based upon the assertion that she failed to adequately apprise Plaintiff of the potential side effects of Naproxen/Naprosyn. The fact that a medication has "side effects, [...], is certainly insufficient to state a deliberate indifference claim inasmuch as most prescription medications have side effects[.]" *Bryant v. Wright*, No. 09 CIV 2456, 2010 WL 3629443, at *8 (S.D.N.Y. Aug. 31, 2010) *aff'd*, 451 Fed.Appx.

12 (2d Cir. 2011). "Inadvertent failures to impart medical information, simple lack of due care, and simple negligence do not make out a violation of either the substantive or procedural aspects of the Due Process Clause of the Fourteenth Amendment." *Lara v. Bloomberg*, No. 04 CV 8690, 2008 WL 123840, at *4 (S.D.N.Y. Jan. 8, 2008) (internal quotation marks and citation omitted) (holding that pretrial detainee failed to satisfy deliberate indifference element of claim of failure to receive medical information because the plaintiff did not allege that the doctors' purported failure to inform Plaintiff of the side effects of his medication were driven by the doctors' desire to require Plaintiff to accept the treatment offered). Plaintiff's dispute is nothing more than a quarrel with the nature of his treatment. *See Wright v. Conway*, 584 F.Supp.2d 604, 607 (W.D.N.Y. 2008) ("[the plaintiff's] complaints demonstrate no more than his personal dissatisfaction with the level of care that he received, and these claims must therefore be dismissed."). At most, Zirath's actions constitute negligence, which is not actionable in a § 1983 claim. *See Hendricks v. Coughlin*, 942 F.2d 109, 113 (2d Cir. 1991). Thus, Plaintiff's claims against Zirath are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure state a claim upon which relief may be granted.

### C. Claims Against CCS

In *Rojas v. Alexander's Department Store, Inc.*, the Second Circuit held, "[p]rivate employers are not liable under § 1983 for the constitutional torts of their employees, unless the plaintiff proves that 'action pursuant to official ... policy of some nature caused a constitutional tort.'" *Garcia v. Armor Health Care Inc.*, No. 16-CV-1996, 2016 WL 3647870, at *3 (E.D.N.Y. July 1, 2016) (quoting *Monell v. Dep't of Social Serv. of the City of New York*, 436 U.S. 658, 691 (1978)) (internal quotation marks omitted). "[A] plaintiff can prevail against a municipality [or private company acting under color of state law] by showing that the policymaking official was aware of the employee's unconstitutional actions and consciously chose to ignore them." *Grafton v. Cty. of Nassau*, No. 15-CV-4564, 2016 WL 8711072, at *9 (E.D.N.Y. July 15, 2016) (citing *Jones v. Town of East Haven*, 691 F.3d 72, 81 (2d Cir. 2012)) ("[A] plaintiff must show that a policymaking official was aware of constitutional injury, or the risk of constitutional injury, but failed to take appropriate action to prevent or sanction violations of constitutional rights.").

*5 Here, the Amended Complaint lacks any facts suggesting that Bobb-Diallo's conduct was part of a CCS policy or custom. Thus, Plaintiff's claims against CCS are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure state a claim upon which relief may be granted. *See Garcia*, 2016 WL 3647870, at *3.

### V. CONCLUSION
**WHEREFORE**, it is hereby

**ORDERED** that the Amended Complaint (Dkt. No. 9) is accepted for filing and is deemed the operative pleading; and it is further

**ORDERED** that the Clerk of the Court shall amend the docket to include the following defendants: Zirath and Bobb-Diallo; and it is further

**ORDERED** that the following claims are **DISMISSED** pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted: (1) Fourteenth Amendment claims against Zirath; and (2) claims against CCS; and it is further

**ORDERED** that the Fourteenth Amendment claims against Bobb-Diallo survive the Court's sua sponte review under 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) and require a response; and it is further

**ORDERED** that Zirath and CCS; are **DISMISSED** as defendants herein; and it is further

**ORDERED**, the Clerk shall issue a summons and forward it, along with copies of the Amended Complaint, to the United States Marshal for service upon the remaining defendant. The Clerk shall forward a copy of the summons and Amended Complaint to the Office of the County Attorney of Onondaga County, together with a copy of this Decision and Order; and it is further

**ORDERED**, that a response to the Amended Complaint be filed by the remaining defendant, or his/her counsel, as provided for in the Federal Rules of Civil Procedure;

**ORDERED**, that all pleadings, motions and other documents relating to this action must bear the case number assigned to this action and be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton

2018 WL 550610

St., Syracuse, New York 13261-7367. **Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of same was served on all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a proper certificate of service will be stricken from the docket.** Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. **Plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel, in writing, of** **any change in his address; their failure to do so will result in the dismissal of his action**; and it is further

**ORDERED** that the Clerk of the Court shall amend the docket report in accordance with this Order; and it is further

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2018 WL 550610

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 4417699
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Eric A. SMITH, Plaintiff,

v.

Lauren Grey OUTLAW, Corizon Health
Services, Inc., New York City, and

P.A. Renen Beauchard, Defendants. [1]

No. 15-CV-9961 (RA)
|
Signed 09/30/2017

[1]     The Clerk of Court is respectfully directed to
make two amendments to the caption: (1) remove
Defendant John Doe Psychiatrist and (2) replace the
name of Defendant Corizon with the corporation's
full name, Corizon Health Services, Inc.

**Attorneys and Law Firms**

Eric A. Smith, East Elmhurst, NY, pro se.

Brendan James Alt, Heidell, Pittoni, Murphy & Bach,
LLP, White Plains, NY, for Defendants.

### OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

**\*1**  Plaintiff Eric A. Smith, proceeding *pro se*, brings this
42 U.S.C. § 1983 action alleging that he was deprived
medical care while a pretrial detainee at the Robert
N. Davoren Center at the Rikers Island Correctional
Facility. Defendants Lauren Grey Outlaw, a licensed
social worker, Renen Beauchard, a physician assistant,
the City of New York, and Corizon Health Services, Inc.
move to dismiss the Amended Complaint, pursuant to
Rule 12(b)(6) of the Federal Rules of Civil Procedure, for
failure to state a claim upon which relief can be granted.
For the reasons that follow, Defendants' motion is granted
in part and denied in part.

### FACTUAL BACKGROUND

For purposes of deciding this motion, the Court accepts
as true all facts alleged by Plaintiff. *See, e.g.*, *LaFaro v.
N. Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d
Cir. 2009).

The events giving rise to Plaintiff's allegations occurred
on November 24, 2015, Am. Compl. § 5, while he was a
pretrial detainee at Rikers, in the custody of the City, *id.*
§ 3. That day, Plaintiff returned to Rikers from Bellevue
Psychiatric Hospital and informed Outlaw that he was
feeling suicidal and "wanted to drown [himself]." *Id.*
§ 5. Plaintiff asked to return to Bellevue. *Id.* He also
reported that he had not received his prescribed doses
of heart or psychiatric medication and that that he was
experiencing chest pains, as well as stiffness and numbness
in his left arm. *Id.* Outlaw allegedly asked Plaintiff about
his medications and attempted to "convince [him] that
[he] didn't want to go to Bellevue," *Id.* Plaintiff "took
exception" to Outlaw "questioning [him] as if she was a
psychiatrist or a psychologist" and became frustrated by
her "lack of action." *Id.*

At this point, Outlaw escorted Plaintiff to meet "the
psych," later identified by the City as Physician Assistant
Renen Beauchard. [3]  Plaintiff alleged that Outlaw told
Beauchard that he should be sent to his cell because
he would not answer her questions. Plaintiff refused,
claiming that he had not yet received treatment for
either his chest pains or his suicidal ideations. *Id.* After
Beauchard informed Plaintiff that he would not be sent
to Bellevue, Plaintiff again refused to go to his cell. *Id.*
Outlaw and Beauchard then called the "probe" team and
Plaintiff was strip searched and forced to return to his
cell. *Id.* Plaintiff was not provided any medical treatment.
*Id.* Plaintiff claims to have suffered the following injuries:
a heart attack, "heart pains," emotional distress, PTSD,
mental anguish, major depressive disorder, and "coerced
anxiety disorder." *Id.*

[3]     Although Plaintiff refers to Beauchard as "the
psych," it is unclear whether he was a physician's
assistant who specialized in issues relating to
psychiatry.

### PROCEDURAL HISTORY

On December 18, 2015, Plaintiff commenced this action,
alleging a violation of 42 U.S.C. § 1983. Dkt. 2. By order

dated January 4, 2016, the Court dismissed Plaintiff's claim against the Department of Corrections, requested that the City waive service of summons, and directed, pursuant to *Valentin v. Dinkins*, 121 F.3d 72, 75 (2d Cir. 1997) (per curiam), that the New York City Law Department provide Plaintiff with the identity of the John Doe defendant. Dkt. 6. Plaintiff was given thirty days after receiving said information from the City to file an Amended Complaint. *Id.* On June 3, 2016, having obtained the identities of the individual Defendants, Plaintiff filed the Amended Complaint, Dkt. 28, which Defendants now move to dismiss, Dkt. 50. By letter dated June 1, 2017, Plaintiff notified the Court that, although he will not file a response, he does oppose the Motion to Dismiss. Dkt. 65.

## LEGAL STANDARD

**\*2**  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In considering a motion to dismiss, however, "the court is to accept as true all facts alleged in the complaint ... [and] draw all reasonable inferences in favor of the plaintiff." *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). "This rule applies with particular force where plaintiff alleges civil rights violations or where the complaint is submitted *pro se.*" *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998). Indeed, "[w]here, as here, the complaint was filed *pro se*, it must be construed liberally to raise the strongest arguments it suggests. Nonetheless, a *pro se* complaint must state a plausible claim for relief." *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013) (alterations, citations, and internal quotation marks omitted).

## DISCUSSION

The Court construes the Amended Complaint as alleging that the individual Defendants—Outlaw and Beauchard—deprived Plaintiff of necessary medical care, constituting deliberate indifference to his serious medical needs in violation of the Fourteenth Amendment. With respect to the City and Corizon, the company responsible for providing medical care at Rikers, the Court construes the Complaint as seeking recovery under a theory of municipal liability pursuant to *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978). *See Bess v. City of New York*, No. 11-CV-7604 (TPG), 2013 WL 1164919, at \*2 (S.D.N.Y. Mar. 19, 2013) ("In providing medical care in prisons, Corizon performs a role traditionally within the exclusive prerogative of the state and therefore, in this context, is the functional equivalent of the municipality."); *see also Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008) (per curiam). Because the Court finds that Plaintiff has failed to adequately plead that Outlaw was deliberately indifferent to his medical needs or that a municipal policy or custom caused the alleged denial of medical treatment, Defendants' Motion to Dismiss is granted as to Outlaw, the City, and Corizon. Plaintiff's claim against Beauchard, however, survives.

### I. Denial of Medical Care

Plaintiff was a pretrial detainee of the City during the events giving rise to his claims and his allegations are thus assessed under the Due Process Clause of the Fourteenth Amendment. *See Darnell v. Pineiro*, 849 F.3d 17, 21 n.3, 29 (2d Cir. 2017). Deliberate indifference claims of pretrial detainees are not assessed under the Eighth Amendment because such detainees "have not been convicted of a crime and thus may not be punished in any manner—neither cruelly nor otherwise." *Id.* at 29 (citation and internal quotation marks omitted). To make out a valid deliberate indifference claim under the Due Process Clause, a plaintiff must satisfy a two-prong test. *See id.* First, the deprivation of medical care must have been "sufficiently serious." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006) (citation and internal quotation marks omitted). Second, the defendant must have acted or failed to act with "a sufficiently culpable state of mind," which, "in prison conditions cases" is "deliberate indifference to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Under the Fourteenth Amendment, deliberate indifference is measured from an objective perspective. *Darnell*, 849 F.3d at 35.

To determine whether an alleged deprivation of medical care is "sufficiently serious," a court is required to first determine whether the medical care was inadequate and, if so, "to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or

2017 WL 4417699

will likely cause the prisoner." *Salahuddin*, 467 F.3d at 279-80 (citing *Helling v. McKinney*, 509 U.S. 25, 32–33 (1993)). "There is no settled, precise metric to guide a court in its estimation of the seriousness of a prisoner's medical condition." *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003). A court's inquiry, therefore, "must be tailored to the specific circumstances of each case." *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003). Ultimately, "the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Walker*, 717 F.3d at 125. Indeed, the deliberate indifference standard "contemplates a condition of urgency that may result in degeneration or extreme pain." *Chance*, 143 F.3d at 702 (citation and internal quotation marks omitted).

**\*3** The objective inquiry differs depending on whether the plaintiff alleges a complete denial of medical care or a mere delay in or disruption of treatment. *See Smith*, 316 F.3d at 185-86. "[I]f the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious." *Salahuddin*, 467 F.3d at 280. Indeed, "[t]here is no need to distinguish between a prisoner's underlying 'serious medical condition' and the circumstances of his 'serious medical need' when the prisoner alleges that prison officials have failed to provide general treatment for his medical condition." *Smith*, 316 F.3d at 185-86. If, however, the inmate alleges "a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay or interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation" is sufficiently serious. *Id.* (emphasis in original).

Although the deprivation of care inquiry is context-specific, the Second Circuit has set forth a non-exhaustive list of relevant considerations. *See Brock*, 315 F.3d at 162. Beginning with the question of whether a plaintiff suffers from a "serious medical condition," the following factors are also germane to the analysis: "(1) whether a reasonable doctor or patient would perceive the medical need in question as important and worthy of comment or treatment, (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Id.* (citation and internal quotation marks omitted).

For a plaintiff to satisfy the second prong—concerning *mens rea*—the defendant must have behaved in an objectively reckless manner, or "knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35. Although *mens rea* is assessed from an objective perspective, as opposed to the more demanding subjective recklessness standard employed in the Eighth Amendment context, *see id.*, negligence is still insufficient to give rise to a valid claim under the Fourteenth Amendment, *see id.* at 36. Indeed, "any § 1983 claim for a violation of due process requires proof of a *mens rea* greater than mere negligence." *Id.*; *see also Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2472 (2015) ("[L]iability for *negligently* inflicted harm is categorically beneath the threshold of constitutional due process." (citation and internal quotation marks omitted)). Because such allegations are sufficient to satisfy the more onerous subjective recklessness standard, it follows that objective recklessness is similarly "properly pleaded by allegations of 'intentional efforts on the part of prison officials to delay plaintiff's access to medical care at a time when he was in extreme pain' and has made his medical problems known 'to the attendant prison personnel,' or 'complete denial' of medical treatment, or of a 'reckless or callous indifference to the safety of prisoners.' " *See Veloz v. New York*, 35 F. Supp. 2d 305, 311 (S.D.N.Y. 1999) (citation and internal quotation marks omitted).

### A. Serious Deprivation of Medical Care

Plaintiff claims that he suffered the following injuries: a heart attack, "heart pains," emotional distress, PTSD, mental anguish, major depressive disorder, and "coerced anxiety disorder," Am. Compl. § 5. Accepting his Complaint as true, Plaintiff appears to assert two distinct, cognizable injuries for which he was allegedly deprived adequate medical care: (1) a heart attack and associated chest pains and (2) a psychiatric injury comprised of a host of related disorders. Plaintiff has alleged facts demonstrating the seriousness of the deprivation of medical care relating to the heart attack, but he has failed to do so with respect to his psychiatric condition.

### 1. Heart Attack and Chest Pains

**\*4** Having asserted a complete failure to provide any treatment for his heart condition, Plaintiff has plausibly

alleged deliberate indifference to serious medical needs. Plaintiff claims that he was forced to retreat to his cell without treatment of any kind. This is not an instance in which a prisoner merely disagrees with the form of reasonable treatment that was provided by jail personnel. *See Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001) ("[D]isagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a Section 1983 claim. These issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment."). The Court finds, therefore, that Plaintiff has alleged facts constituting inadequate medical care.

Because Plaintiff has alleged that he was denied any and all treatment for symptoms relating to the onset of a heart attack—rather than a mere delay in treatment or disruption in an ongoing treatment regimen—the Court conducts the second part of the objective inquiry by considering the severity of the underlying medical condition. Although Plaintiff has not specified the precise timing or severity of the symptoms he experienced on the day in question, he does allege to have suffered a heart attack. When he presented to Rikers personnel, he informed them that he had not received his prescribed dose of medication for a pre-existing heart condition and complained of chest pains, as well as numbness and stiffness in his left arm. Am. Compl. § 5. The Court draws the reasonable inference that Plaintiff was either suffering a heart attack at the time he presented to Rikers personnel or that his symptoms were at least suggestive of a heart attack or other serious cardiac condition. Particularly in light of the obligation to construe Plaintiff's pleadings liberally, *see Chance*, 143 F.3d at 701, the Court finds that a prisoner who presents with such symptoms, suffers a heart attack, and is completely denied treatment has satisfied the second aspect of the objective inquiry by demonstrating circumstances that "pose[d] an unreasonable risk of serious damage to his health," *Walker*, 717 F.3d at 125; *see also Melvin v. Cty. of Westchester*, No. 14-CV-2995 (KMK), 2016 WL 1254394, at *5 (S.D.N.Y. Mar. 29, 2016) (plaintiff alleged a sufficiently serious injury due to his factual allegations that he had elevated blood pressure and a low pulse rate and complained of chest pains); *Mandala v. Coughlin*, 920 F. Supp. 342, 353 (E.D.N.Y. 1996) (noting that "ignoring a prisoner's complaints of chest pains where the prisoner later died of a heart attack" has been found to constitute a sufficiently serious injury); *cf. Hutchinson v. N.Y. State Corr. Officers*, No. 02-CV-2407, 2003 WL 22056997, at *5 (S.D.N.Y. Sept. 4, 2003) (complaints of chest pains, alone, do not constitute a sufficiently serious condition); *Flemming v. Velardi*, No. 02 Civ. 4113(AKH), 2003 WL 21756108, at *2 (S.D.N.Y. July 30, 2003) (acknowledging that heart conditions can be sufficiently serious to constitute a deliberate indifference claim but that plaintiff's complaints merely of "chest pains" and "discomfort" did not satisfy the objective injury inquiry and plaintiff did not allege "that his heart problems rose to the level of severity that triggers an Eighth Amendment claim"). [5] This conclusion is buttressed by the relevant factors set forth by the Second Circuit: Plaintiff's symptoms and alleged heart attack constitute a condition that a reasonable patient or physician would consider "important and worthy of comment or treatment," impacts the daily activities of the patient, and entails substantial pain, *See Brock*, 315 F.3d at 162.

[5]     There is an arguable basis for interpreting Plaintiff's claim as alleging a disruption in treatment in light of the fact that he had a pre-existing heart condition for which he had been prescribed medication. Given the nature of a heart attack, however, and bearing in mind the duty to interpret a *pro se* plaintiff's pleadings liberally, *see Chance*, 143 F.3d at 701, Plaintiff's assertion that he was experiencing chest pains and stiffness and numbness in his arm constitutes an allegation of complete denial of medical care.

## 2. Psychiatric Injury

**\*5** Plaintiff, however, has not alleged that the deprivation of care related to his psychiatric injury was sufficiently serious. It is well-established that psychiatric injuries may present serious medical needs. *See Cuoco v. Moritsugu*, 222 F.3d 99, 106-07 (2d Cir. 2000). With respect to this injury, the focus is not on the "underlying medical condition" but the degree to which the delay or interruption in treatment worsened his condition, *see Smith*, 316 F.3d at 185-86, because at the time of the events in question Plaintiff was already undergoing psychiatric treatment. Although Plaintiff complained of suicidal ideations to the individual Defendants, he has not alleged how, if at all, the purported one-day disruption of treatment posed an unreasonable danger to his health.

*See id.* at 187 ("Indeed, in most cases, the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm."); *Bellotto v. Cty. of Orange,* 248 Fed.Appx. 232, 237-38 (2d Cir. 2007) (summary judgment in favor of defendants affirmed because, despite missing doses of psychiatric medication and being inadequately monitored for worsening mental health problems, plaintiff "[did] not allege that he suffered any pain or physical harm during his incarceration"). Accordingly, he has failed to adequately plead a serious deprivation of medical care with respect to his psychiatric condition. *See Hamm v. Hatcher,* No. 05 Civ. 503(ER), 2013 WL 71770, at *9 (S.D.N.Y. Jan. 7, 2013) (district court granted defendants summary judgment where plaintiff's access to psychiatric medication was interrupted for ten days and he complained of "exacerbated depression, nightmares, hopelessness, and suicidal thoughts" because, "[e]ven assuming that Plaintiff's averments were substantiated by admissible evidence," his allegations were "insufficient to show that he was subjected to a significant risk of serious harm").

## B. Objective Recklessness

Having adequately alleged a serious deprivation of medical care with respect to a purported heart attack, Plaintiff must also assert facts demonstrating that Beauchard and Outlaw were deliberately indifferent to his needs in denying him treatment, Plaintiff has adequately pled the elements of objective recklessness with respect to Beauchard but not Outlaw.

## 1. Defendant Beauchard

Plaintiff has sufficiently pled objective recklessness as to Physician Assistant Beauchard. According to Plaintiff, Beauchard took no steps to diagnose or treat him or to arrange for treatment by another medical professional even though Plaintiff had a pre-existing heart condition and complained of chest pain, as well as stiffness and numbness in his left arm. These circumstances, taken together, did not necessarily require Beauchard to provide any specific form of treatment. *See Sonds,* 151 F. Supp. 2d at 312. At a minimum, however, Beauchard should have taken *some* action instead of merely returning Plaintiff to his cell. *See Veloz,* 35 F. Supp. 2d at 311

(the more demanding subjective recklessness standard is "properly pleaded by allegations of ... 'complete denial' of medical treatment." (citation and internal quotation marks omitted)). There is thus a sufficient basis for the Court to conclude that, at the very least, Beauchard should have known of the obvious risk to Plaintiff's health, even if he was not subjectively aware of it. *See Darnell,* 849 U.S. at 35. With respect to Beauchard, therefore, Plaintiff has properly alleged objective recklessness.

## 2. Defendant Outlaw

Plaintiff, however, has not adequately pled objective recklessness with respect to Lauren Outlaw. The primary thrust of Plaintiff's argument is that she was dismissive of his complaints. What is missing from Plaintiff's allegations, however, is some basis to suggest that Outlaw knew, or should have known of, an excessive risk to his safety. Unlike Beauchard, Outlaw is not alleged to have been a medical professional but rather a licensed social worker. Indeed, there is no dispute that, upon hearing Plaintiff's complaints and questioning him, Outlaw escorted Plaintiff to a medical professional—Beauchard. Plaintiff has thus failed to plead facts indicating that Outlaw's behavior amounted to anything more than negligence. *See Feliciano v. Anderson,* 15-CV-4106 (LTS) (JLC), 2017 WL 1189747, at *14 (S.D.N.Y. Mar. 30, 2017) (plaintiff failed to state a claim with respect to correctional officer because "[c]orrections officers who defer to the judgment of medical professionals are only liable if the plaintiff pleads facts demonstrating that the 'nonmedical defendants should have challenged the medical professionals' decisions' "); *Smith v. Woods,* No. 05-CV-01439 (LEK/DEP), 2008 WL 788573, at *9 (N.D.N.Y. Mar. 20, 2008) (granting defendant summary judgment because she was a licensed social worker and there was no indication that she had the authority to override the treatment decision made by the treating psychiatrist); *Inesti v. Hogan,* No. 11 Civ. 2596(PAC) (AJP), 2013 WL 791540, at *26 (S.D.N.Y. Mar. 5, 2013) (granting defendants, captains at the jail, summary judgment because "it would be entirely appropriate [for them] to defer to medical staff"); *Brock,* 315 F.3d at 164 (upholding grant of summary judgment to prison superintendent on the basis that he had "no medical training" and deferred to decision of trained medical personnel because such an allegation amounted, at most, to one of negligence rather than recklessness); *Kemp v.*

*Wright*, No. 01 CV 563(JG), 2005 WL 893571, at *9 (E.D.N.Y. Apr. 19, 2005) (granting director of inmate grievance program summary judgment because a person "with no medical training [who] gives automatic and complete deference to a decision by a physician" amounts only to negligence (citation and internal quotation marks omitted)). Accordingly, Plaintiff has failed to adequately state a claim with respect to Outlaw.

## II. Municipal Liability

**\*6** Although municipalities and other local government bodies are "persons" within the meaning of 42 U.S.C. § 1983, it is well-established that they cannot be liable merely because they employ a tortfeasor. *See Board of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403 (1997). Instead, a government body may be liable for a violation of § 1983 only "if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." *Connick v. Thompson*, 563 U.S. 51, 60 (2011); *see also Cash v. Cty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011). A claim for municipal liability under § 1983 thus requires a plaintiff to "plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007) (citation and internal quotation marks omitted); *see also Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012). With respect to the existence of a policy or custom, at the very least "a plaintiff must allege facts tending to support, at least circumstantially, an inference that such a municipal policy or custom exists." *Santos v. New York City*, 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012).

Here, accepting Plaintiff's factual allegations as true and liberally construing his pleadings, his claims against the City and Corizon nonetheless fail because he has not identified the existence of an official policy or custom that led to any constitutional injury. The Complaint contains neither factual allegations that a municipal employee was acting pursuant to any sort of official policy, custom concerning the denial of medical treatment, nor allegations of widespread conduct or any other fact that could give rise to an inference of the existence of such a custom or policy, *see Guzman v. United States,* No. 11 Civ. 5834(JPO), 2013 WL 5018553, at *3 (S.D.N.Y. Sept. 13, 2013). "Although there is no heightened pleading requirement for complaints alleging municipal liability under § 1983," *Kucharczyk v. Westchester County,* No. 14-CV-601 (KMK), 2015 WL 1379893, at *6 (S.D.N.Y. Mar. 26, 2015), Plaintiff must nonetheless provide some facts capable of supporting the existence of such a policy or custom. Because his pleadings fail to do so, they are inadequate to support a § 1983 action against either the City or Corizon.

## CONCLUSION

Although the Court has been mindful to afford Plaintiff's Complaint the liberal interpretation that it is due, Plaintiff has nevertheless failed to state a plausible Fourteenth Amendment claim against Outlaw, the City, and Corizon. Accordingly, the claims against the defendants other than Beauchard are dismissed.

The Clerk of Court is respectfully directed to terminate item number 50 on the docket. A conference is hereby scheduled for November 9, 2017 at 2:00 p.m. to discuss the scope and timing of discovery.

SO ORDERED.

**All Citations**

Slip Copy, 2017 WL 4417699

---

2018 WL 459662
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Robert JONES, Plaintiff,

v.

Detective James MEEHAN, Detective Jose
Criollo, Detective Adam Sager, Detective
Gregory Thornton, Lieutenant Felix Rivera,
and Officer Steven Mikolanda, Defendants.

14 Civ. 6402 (KPF)
|
Signed 01/16/2018

**Attorneys and Law Firms**

Robert Jones, pro se.

Maria Fernanda DeCastro, NYC Law Department, New York, NY, for Defendants.

**OPINION AND ORDER**

KATHERINE POLK FAILLA, United States District Judge [1]

[1]    The Clerk of Court is directed to modify the caption of this case as set forth above.

**\*1** Plaintiff Robert Jones, proceeding *pro se*, claims that his Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendment rights were violated in the course of his January 2012 arrest and prosecution for a string of burglaries. After the Court dismissed *sua sponte* certain parties from the case, those remaining as Defendants are the following present or former employees of the New York City Police Department ("NYPD"): Detective James Meehan, Detective Jose Criollo, Detective Adam Sager, Detective Gregory Thornton, Lieutenant Felix Rivera, and Officer Steven Mikolanda (collectively, "Defendants"). [2] Pending before the Court are the parties' cross-motions for summary judgment. After a thorough review of the record, and after construing Plaintiff's claims liberally because of his *pro se* status, the Court concludes that Defendants are entitled to summary judgment on all claims.

[2]    The Complaint also names the Property Clerk's Office, presumably seeking to hold liable a member of that office as a John Doe Defendant. Because there is insufficient evidence identifying, much less explaining the conduct of, any such defendant, the Court will not address his or her liability further in this Opinion.

**BACKGROUND** [3]

[3]    The Court draws its facts principally from the Complaint ("Compl." (Dkt. #1)), and the parties' submissions in connection with the cross-motions for summary judgment, including Defendants' Local Rule 56.1 Statement ("Def. 56.1" (Dkt. #123)); Plaintiff's memorandum of law in support of his motion for summary judgment ("Pl. Br." (Dkt. #109) and reply memorandum ("Pl. Reply" (Dkt. #129)); the transcript of Plaintiff's deposition ("Pl. Dep." (Dkt. #122-8)); and the exhibits attached to the declaration of Maria Fernanda DeCastro ("DeCastro Decl., Ex. [ ]" (Dkt. #122)). In addition, the Court will refer to Defendants' memorandum of law in support of their cross-motion for summary judgment as "Def. Br." (Dkt. #121)). The Court's citations to Defendants' Rule 56.1 Statement incorporate by reference the documents and testimony cited therein. As needed for clarity, the Court has cited to the page numbers assigned by this Court's electronic case filing system in referring to certain of Plaintiff's submissions. (Dkt. #109). The Court will explain in greater detail, in the Discussion portion of this Opinion, the manner in which it construed the factual assertions in Plaintiff's submissions.

**A. Factual History**

As will soon become relevant to the Court's analysis, Plaintiff suffers from a variety of medical ailments. Plaintiff testified during his deposition that as the result of a car accident in 1986 and an altercation with law enforcement in 1999, he suffered injuries to his neck, back, right knee, and right hip; these injuries have required at least two surgeries. (*See* Pl. Dep. 20:6-21:24, 26:21-27:9). In addition, Plaintiff had been using crutches for around three years as of December 26, 2011. (Def. 56.1 ¶ 13). Separately, Plaintiff suffers from high blood pressure, for which he has been prescribed Simvastatin, Metoprolol, and Enalapril Maleate. (*See* Pl. Dep. 23:23-24:12). And Plaintiff has been diagnosed with several psychological conditions, including post-traumatic stress disorder,

anxiety, and antisocial personality disorder. (*See id.* at 29:17-30:5).

**\*2** During the relevant time period, Plaintiff was on parole and living in a halfway house. (*See* Def. 56.1 ¶¶ 64-68). The arrest underlying his current claims resulted from an investigation into a string of burglaries in a compact area of Manhattan. The NYPD's investigation into those burglaries, as well as Plaintiff's consequent arrest and prosecution, are discussed more fully below.

**1. The Reported Burglaries**

**a. December 26, 2011 Burglary at 616 Ninth Avenue**

On December 27, 2011, Detective James Meehan received a report that on the preceding day, the resident of an apartment located at 616 Ninth Avenue had returned to his apartment to find his front door open and personal items missing from the apartment. (Def. 56.1 ¶¶ 3-4). Those items included a 2005 Apple Macbook, a 2011 Apple Macbook, an Amazon Kindle, an iMac desktop computer, and $600.00 cash. (*See id.* at ¶ 5). The resident also reported that his kitchen window, which was normally closed, was open. (*Id.* at ¶ 6).

On December 29, 2011, Detective Meehan traveled to the scene to investigate the burglary. (Def. 56.1 ¶ 7). There, he found a knife that did not belong to the resident. (*Id.* at ¶ 8). Meehan also viewed a security video showing a black male with a crutch ascending the stairs to the floor of the resident's apartment, before descending the stairs and exiting the building "a short while later." (*Id.* at ¶¶ 11-12).

**b. January 7, 2012 Burglary at 409 West 48th Street**

On January 11, 2012, the resident of an apartment located at 409 West 48th Street informed Detective Jose Criollo that on January 7, 2012, her bedroom window had been opened and her two Apple computers had been stolen. (Def. 56.1 ¶¶ 14-16). [4]

---

[4]    Several of the electronics burglarized in this case could be identified by their serial numbers. For security reasons, the Court does not repeat those numbers in this Opinion.

**c. January 11, 2012 Burglary at 405 West 44th Street**

Police also received reports of a burglary that occurred on January 11, 2012: The resident of an apartment located at 405 West 44th Street informed Detective Criollo that at 6:30 p.m., "he heard a loud bang coming from his son's bedroom"; when he entered the room, he witnessed a black male standing in the middle of the room. (Def. 56.1 ¶¶ 18-19). The resident reported further that upon his entrance, the black male "fled through a window and went up the fire escape to the roof of the building." (*Id.* at ¶ 20). He described the culprit as a black male "with a goatee, approximately 20-30 years old, 5'10" tall, weighing approximately 180 pounds, wearing a black knitted cap." (*Id.* at ¶ 21).

Later that day, at approximately 8:38 p.m., Detective Criollo reported to scene of the burglary and surveilled the area from the rooftop of 405 West 44th Street. (Def. 56.1 ¶¶ 22-23). From this vantage point, Detective Criollo noticed the window of an apartment in the adjacent building, 407 West 44th Street. (*Id.* at ¶ 24). He then knocked on the door of the adjacent apartment and spoke with a witness who recalled that "he observed a black male with crutches go up to the roof of 405 West 44[th] Street" that same day. (*Id.* at ¶¶ 25-27).

**d. January 11, 2012 Burglary at 403 West 44th Street**

Also on January 11, 2012, Police Officer Victor Lopez notified Detective Criollo about a potential burglary at a different adjacent building, 403 West 44th Street. (Def. 56.1 ¶ 28). According to Officer Lopez, while Criollo was responding to the 405 West 44th Street burglary, Lopez "noticed an open door and an open window at apartment 5B at 403 West 44th Street." (*Id.* at ¶ 29). At approximately 8:59 p.m., Detective Criollo contacted and interviewed the resident of the apartment, who reported that upon entering the apartment, she noticed that several cabinets that were previously closed had been opened. (*Id.* at ¶¶ 30-32). She also gave Criollo a black knitted cap that she found on her bedroom floor near a window, which cap was then vouchered as evidence and submitted to the NYPD Lab for DNA analysis. (*Id.* at ¶¶ 33-35). The NYPD recovered DNA from the cap, which on April 3, 2012, returned a positive match with DNA of a prior offender,

Plaintiff Robert Jones. (*Id.* at ¶¶ 36-37; *see* DeCastro Decl., Ex. P). [5]

[5]     Defendants have introduced exhibits, including documents from the New York State Police Forensic Investigation Center, indicating that this state agency determined that the DNA obtained from "scrapings" of the discarded black cap matched a DNA sample of Plaintiff that was maintained in the New York State DNA Index System ("SDIS"). (DeCastro Decl., Ex. N-P). In return, Plaintiff has submitted a report from the Office of the Chief Medical Examiner ("OCME"), comparing the DNA evidence from a cup from which Plaintiff drank at the Midtown North Precinct to other DNA evidence obtained during the investigation, including "hat scrapings," and finding that the source of the DNA on the cup was "most likely [the] major donor" of the DNA from the hat scrapings. (*See* Dkt. #109-1 at 5-8).

**\*3** In the course of his investigation on January 11, Detective Criollo received several corroborating reports of a black male on crutches exiting 403 West 44th Street. Specifically, another officer reported that while Criollo was at 405 West 44th, the officer "observed a black male on crutches" exit 403 West 44th Street. (Def. 56.1 ¶ 38). Mayor's Office Investigator George Tsatsaronis also reported observing "a black male with a goatee, on what appeared to be one crutch, exit 403 West 44th Street." (*Id.* at ¶ 40).

#### e. January 11, 2012 Burglary at 319 West 47th Street

Police also received reports of a third burglary in the area on January 11, 2012: The resident of an apartment at 319 West 47th Street reported that upon returning to his apartment, and in similar fashion to the other burglaries, he found a rear window open. (Def. 56.1 ¶¶ 41-42). He noted further that a Nikon camera, a Nikon camera lens, a JVC camcorder, and a camera bag had been stolen from the apartment. (*Id.* at ¶ 43).

#### f. January 20, 2012 Burglaries at 407 West 50th Street

One week later, on January 20, 2012, the NYPD received three complaints from residents of apartments at 407 West 50th Street, reporting burglaries of their respective apartments on January 19, 2012. (Def. 56.1 ¶¶ 44, 48, 53;

*see* DeCastro Decl., Ex. S, T). The first victim reported that he returned to the apartment to find a window over his fire escape open and that several personal items were missing, including a Mac Laptop. (Def. 56.1 ¶¶ 45-47). The second victim reported that she returned to her apartment to find her door chain-locked from within and the window above her fire escape open. (*Id.* at ¶¶ 49-50). She initially reported that jewelry was missing from her apartment, and later reported that an Apple iPod was also missing. (*Id.* at ¶¶ 51-52). The third victim reported that he returned to his apartment to find a window open and a Mac Laptop missing. (*Id.* at ¶¶ 54-55).

#### g. January 24, 2012 Burglary at 947 Amsterdam Avenue

On January 24, 2012, the resident of an apartment at 947 Amsterdam Avenue reported to police that he returned to the apartment to find a candle on his living room windowsill knocked to the floor. (Def. 56.1 ¶ 56). He also reported that various items were missing from the apartment, including a Mac Laptop and iPad. (*Id.* at ¶ 57). The victim informed Detective Criollo that the "Find My [iP]hone" feature of his laptop had located his computer in the area of 581 Glenmore Avenue, in Brooklyn; this address was approximately 174 feet from 571 Glenmore Avenue, the address of a halfway house at which Plaintiff then resided. (*See id.* at ¶¶ 58-60).

### 2. The Continued Investigation and Plaintiff's Arrest

#### a. The Dissemination of the Police Sketch

On January 24, 2012, the NYPD created a sketch of the individual suspected of committing the January 11, 2012 burglaries, based on witness descriptions of the individual they observed exiting 403 West 44th Street. (Def. 56.1 ¶ 61). The sketch became a wanted poster that was distributed to various NYPD Precincts, and the following day, Lieutenant Seamus McHugh of the 77th Precinct, located in Brooklyn, informed Lieutenant Felix Rivera that a detective in his precinct had stopped an individual resembling the sketch. (*Id.* at ¶¶ 62-63). That individual was Plaintiff, who at the time was on parole and sharing a room with three roommates at the halfway house at 571 Glenmore Avenue. (*Id.* at ¶¶ 64-68).

Armed with this information, on January 25, 2012, at approximately 10:45 p.m., Detective Gregory Thornton and Lieutenant Rivera, along with non-party Detective Robert Hahn, appeared at 571 Glenmore Avenue and received consent from the halfway house manager to enter the residence. (Def. 56.1 ¶¶ 69-71). The manager led Detectives Thornton and Hahn to Plaintiff's second-floor room, where Detective Hahn observed Plaintiff sitting on the bed "using one of the computers that was reported as stolen." (*Id.* at ¶¶ 72-73). Hahn also observed other electronics in the room and Plaintiff's crutches. (*Id.* at ¶ 74).

**b. Plaintiff's Questioning and Arrest**

**\*4** Plaintiff was then transported to the Midtown North Precinct for questioning. (Def. 56.1 ¶ 75).[6] Plaintiff contends that his questioning at the Midtown North Precinct lasted "16 hours and 15 minutes," during which the police deprived Plaintiff of blood pressure and psychiatric medication, water, and the use of a toilet. (Pl. 56.1 ¶ 4; *see* Pl. Br. ¶¶ 25, 67, 86).[7] He further maintains that Defendants sought to deprive Plaintiff of these necessities in order to force him to drink water from a white styrofoam cup, from which the officers then retrieved a sample of his DNA to compare with samples from unsolved burglaries, "which y[i]elded a neg[a]tive result." (Pl. 56.1 ¶ 6; *see* Pl. Br. ¶¶ 82-84). More importantly, Plaintiff contends that this deprivation caused him to develop Renal Insufficiency Syndrome, which was diagnosed during his stay at Rikers Island in July 2012. (*See* Pl. Br. ¶¶ 26, 28, 67).

[6]    The record is unclear as to whether Plaintiff was placed immediately under arrest, or whether Plaintiff voluntarily accompanied the police to Midtown North. (*Compare* DeCastro Decl., Ex. DD, at ¶ 11; Ex. EE, at ¶ 11 ("Plaintiff ... agreed to go to the Midtown North Precinct for questioning."), *with* Pl. Dep. 154:4-11 (stating Detective Thornton "was one of the detectives that escorted [Plaintiff] out of the location ... handcuffed and placed [Plaintiff] in the back of the police car")).

[7]    Plaintiff also asserts that he was arrested and taken to the Midtown North Precinct on January 27, 2012, rather than January 25, 2012. (*See* Pl. 56.1 ¶¶ 1-3). The record belies this timeline. (*See, e.g.*, DeCastro Decl., Ex. DD, at ¶¶ 7-11; Ex. EE, at ¶¶ 2-11; Ex. FF, at ¶ 9).

On January 26, 2012, Plaintiff was placed in a lineup, and the resident of 403 West 44th Street who had encountered a burglar in his apartment identified Plaintiff as the burglar. (Def. 56.1 ¶ 76). On that same date, Detective Hahn acquired a search warrant for Plaintiff's room at 571 Glenmore Avenue; Detectives Thornton, Rivera, and Adam Sager executed the warrant at approximately 6:00 p.m. (*Id.* at ¶¶ 77-78). In Plaintiff's room, the detectives located the following stolen items, identified by serial number: the Mac laptop from the 409 West 48th Street burglary; two Mac laptops from the 407 West 50th Street burglary; the iPod from the 407 West 50th Street burglary; and the Mac laptop from the 947 Amsterdam Avenue burglary. (*Id.* at ¶¶ 79-83). All items but the first were located under Plaintiff's bed. (*See id.*).

While at the Midtown North Precinct from January 26 to January 27, 2012, Plaintiff was arrested and charged with nine burglaries. (*See* Def. 56.1 ¶ 84; *see also* DeCastro Decl., Ex. B). On January 27, 2012, Officer Steven Mikolanda transported Plaintiff to Bellevue Hospital for medical clearance because the police planned to voucher his crutches as evidence. (Def. 56.1 ¶ 86). Medical records from Plaintiff's visit to Bellevue show that he related to medical personnel complaints of pain in his right knee and left hip, as well as Post-Traumatic Stress Disorder and anxiety. (*See* DeCastro Decl., Ex. KK). Plaintiff asserts that, "[a]fter the arrest, [he] didn't have access to high blood pressure medication until four days later when [he] was screened and processed in the Department of Corrections." (Pl. Dep. 111:6-18).

**c. Defendants' Allegedly Violative Conduct**

The parties vigorously dispute the identities and conduct of the police personnel who interacted with Plaintiff during his time at the Midtown North Precinct. For his part, Plaintiff recalled that Detective Thornton transported him to the interrogation room "and refused to provide [Plaintiff] with water or medication or toilet" despite the latter's requests. (Pl. Dep. 154:8-9). He also claims that Detective Sager brought him to the precinct, conducted the lineup, and "was made aware that [Plaintiff] was in need of toileting" and had high blood pressure. (*Id.* at 154:13-21).

**\*5** Plaintiff testified that while he was detained at Midtown North, Detective Meehan told Plaintiff that he would be questioned, at which point Plaintiff "said to [Meehan] that [Plaintiff was] off [his] medication," and that he "suffer[ed] from high blood pressure." (Pl. Dep. 62:7-22). Plaintiff contends that Meehan responded, "I'm going to question you," which prompted Plaintiff to refuse to answer questions and request a lawyer. (*Id.* at 62:16-25). Plaintiff contends further that after he was placed in the lineup, he returned to detention "for some time," during which "Detective Criollo stepped in and asked if [Plaintiff] was alright," and in response to which Plaintiff, unsuccessfully, requested water and the use of a toilet. (*Id.* at 65:12-25). Plaintiff testified that Detective Meehan appeared again a short time later, at which point plaintiff requested the use of a toilet and his medication, to which Meehan responded, "I don't know about the medication." (*Id.* at 65:20-21). Finally, Plaintiff claims that while Officer Mikolanda transported Plaintiff to Bellevue Hospital, he denied Plaintiff medication and water. (*Id.* at 154:22-155:2).

Defendants proffer markedly different recollections of events. Detective Thornton admits to investigating Plaintiff's residence at 571 Glenmore Avenue before Plaintiff traveled to Midtown North for questioning, but claims he "never deprived" Plaintiff of water or the use of a bathroom "at any point in time during which [P]laintiff was at" the Precinct. (DeCastro Decl., Ex. EE, at ¶¶ 16-17). Detective Meehan goes even further, asserting that "[a]t no point during January 25, 2012, through January 27, 2012, did [he] have any interactions with [P]laintiff." (DeCastro Decl., Ex. D, at ¶ 14). Instead, Meehan states that his sole role in Plaintiff's case was gathering evidence related to the burglary reports and processing the arrest for one of the burglaries at the Midtown *South* Precinct. (*See id.* at ¶¶ 2-9, 13). And although Detective Criollo admits that he arrested Plaintiff at the Midtown North Precinct after one of the burglary victims identified Plaintiff in the lineup, Criollo states that he "never deprived [P]laintiff of water" nor the "use of a bathroom," and that "[P]laintiff never asked [him] for any medication at any point in time during" his stay at Midtown North. (DeCastro Decl., Ex. J, at ¶¶ 23-27, 30-33).[8]

8    Plaintiff did not testify specifically that Detective Rivera denied him medical treatment, but claimed instead that in his "supervisory capacity," Rivera

"directed ... Mikolanda to confiscate [Plaintiff's] crutches" and "was involved in all levels of the investigation." (Pl. Dep. 153:21-154:1). Rivera admits to having a supervisory role in the investigation, but similarly denies depriving Plaintiff of water or the use of a bathroom, and states that he "never recovered any medication from [P]laintiff" and "Plaintiff never asked [Rivera] for any medication at any point in time during which [P]laintiff was at the Midtown North Precinct." (DeCastro Decl., Ex. DD, at ¶¶ 19-22).

### 3. Plaintiff's Criminal Prosecution

On or about January 27, 2012, Detective Criollo filed a criminal complaint in the Criminal Court of the City of New York, New York County, charging Plaintiff with nine counts of Second Degree Burglary and eight counts of Fifth Degree Criminal Possession of Stolen Property. (*See* DeCastro Decl., Ex. LL). On or about February 1, 2012, a grand jury in the same court indicted Plaintiff. (Def. 56.1 ¶ 95). Over 21 months later, on November 14, 2013, the charges against Plaintiff were dismissed. (*Id.* at ¶ 96).

### B. Procedural History

Plaintiff, proceeding *pro se*, filed the Complaint in this action on August 4, 2014. (*See* Dkt. #1). On September 17, 2014, the Court dismissed certain defendants from the case because Plaintiff did not sufficiently allege their requisite personal involvement in the underlying events. (Dkt. #6). The Court also dismissed claims against the NYPD and the City of New York, as well as the prosecutors involved in Plaintiff's criminal case. (*Id.*).

On June 2, 2017, after the parties had completed discovery, Plaintiff moved for summary judgment. (Dkt. #109). On July 17, 2017, Defendants opposed Plaintiff's summary judgment motion and cross-moved for summary judgment. (Dkt. #118-123). On October 13, 2017, Plaintiff replied to Defendants' cross-motion (Dkt. #129), and on November 17, 2017, Defendants filed a reply memorandum of law in support of their motion for summary judgment (Dkt. #137).

### DISCUSSION

### A. Applicable Law

### 1. Motions for Summary Judgment

**\*6** Federal Rule of Civil Procedure 56(a) provides that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also* Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y., 822 F.3d 620, 631 n.12 (2d Cir. 2016) (internal quotation marks and citation omitted). A fact is "material" if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003) (citation omitted). And where, as here, "parties file cross-motions for summary judgment, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." Fireman's Fund Ins. Co., 822 F.3d at 631 n.12 (alterations omitted) (quoting Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001)).

**2. Motions for Summary Judgment in *Pro Se* Cases**
In a *pro se* case, the court must take an additional step and liberally construe the *pro se* party's pleadings "to raise the strongest arguments that they suggest." McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999) (quoting Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994)).

This task has been complicated by Plaintiff's imperfect compliance with Local Rule 56.1. Under that rule, a movant is required to identify admissible evidence in support of each factual assertion in his or her Rule 56.1 statement. *See* S.D.N.Y. Local Rule 56.1(d) ("Each statement by the movant ... pursuant to Rule 56.1(a) ... must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).") Conversely, a non-movant seeking to controvert these factual assertions must also cite to admissible evidence, and where properly-supported facts in a Rule 56.1 Statement are denied with only conclusory assertions, the court will find such facts to be true. *See id.*; *id.* at 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to

be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party.").

"*Pro se* litigants are ... not excused from meeting the requirements of Local Rule 56.1." Wali v. One Source Co., 678 F. Supp. 2d 170, 178 (S.D.N.Y. 2009) (citing Vt. Teddy Bear v. 1-800-BEARGRAM Co., 373 F.3d 241, 246 (2d Cir. 2004)). Nevertheless, even where there is incomplete compliance with the Local Rules, a court retains discretion "to consider the substance of the plaintiff's arguments." *Id.* (citing Holtz v. Rockefeller & Co., 258 F.3d 62, 73 (2d Cir. 2001) ("[W]hile a court is not required to consider what the parties fail to point out in their Local Rule 56.1 Statements, it may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement." (internal quotation marks omitted))); *see also* Hayes v. Cty. of Sullivan, 853 F. Supp. 2d 400, 406 n.1 (S.D.N.Y. 2012) ("In light of Plaintiff's *pro se* status, the Court overlooks his failure to file a Local Rule 56.1 Statement and conducts its own independent review of the record.").

Plaintiff's opening submission comprises a collection of assertions, both factual and legal, made under oath; a supporting memorandum of law; and various excerpts from transcripts of court conferences, pleadings, discovery responses of the parties, and documentary evidence. (Dkt. #109). His proffered Rule 56.1 Statement, however, is only two pages long and lacks any citations to admissible evidence in this case. Similarly, Plaintiff's combined reply brief and opposition to Defendants' cross-motion for summary judgment comprises largely conclusory retorts to Defendants' Rule 56.1 Statement, along with a list of additional exhibits, not all of which were produced (and, thus, not all of which are available to the Court). [9] Defendants urge the Court to deny Plaintiff's motion for summary judgment based on his failure to comply with Local Rule 56.1. While the Court understands Defendants' frustration with Plaintiff's mode of arguing his claims, it also understands the difficulties Plaintiff experiences as a *pro se* litigant. It therefore has overlooked his failure to comply with Local Rule 56.1, and has instead conducted a searching review of the record.

[9]    In places, Plaintiff suggests that a particular Defendant's failure to respond to his motion warrants

2018 WL 459662

entry of a default judgment as to that Defendant. (*See, e.g.*, Pl. Reply ¶¶ 13-14). This is incorrect, as Defendants jointly responded to Plaintiff's motion and jointly cross-moved for summary judgment in their favor. (*See* Dkt. #118-123).

**\*7** A word is in order, however, about what the Court has and has not considered among Plaintiff's submissions. In addition to Plaintiff's affirmations, the Court has also construed the allegations of Plaintiff's Complaint to be assertions of fact made under oath, and has taken as true the well-pleaded allegations therein. However, the Court has not taken as true any legal conclusions contained in Plaintiff's sworn statements, such as his assertions that certain conduct amounted to a violation of his constitutional rights, or that Defendants lacked probable cause to engage in certain conduct. Additionally, the Court has rejected certain factual assertions that are wholly belied by the record in this case, including, for example, Plaintiff's statements about his arrest date. Finally, the Court will not consider statements or arguments that were more appropriately made in Plaintiff's now-dismissed criminal case.

### 3. Civil Rights Claims Under 42 U.S.C. § 1983

Plaintiff's mode of argument has also impacted the manner in which the Court and Defendants have construed his claims. (*See* Def. Br. 1 n.2 (detailing confusion concerning what claims Plaintiff was raising)). Plaintiff's Complaint, read liberally, initially suggested claims of warrantless searches and seizures, false arrest, and malicious prosecution, in violation of the Fourth Amendment (and, as to certain claims, the Fifth Amendment), as well as claims relating to his conditions of confinement, properly considered under the Fourteenth Amendment. [10] Plaintiff's opening brief, however, seeks summary judgment only as to his claim that Defendants were deliberately indifferent to his medical needs, in violation of the Fourteenth Amendment. What is unclear from Plaintiff's motion is whether he is moving for summary judgment on one of several claims of constitutional violations, thereby leaving the others for resolution at trial, or whether his Complaint should be construed to pursue only a single claim of deliberate indifference. The confusion was not clarified in Plaintiff's reply submission, which focuses on his deliberate indifference claim while offering brief rebuttals to Defendants' arguments for summary judgment on the other claims. The Court will assume that Plaintiff has

raised claims for false arrest, improper search and seizure, malicious prosecution, and deliberate indifference, and evaluate each of them under 42 U.S.C. § 1983. [11]

[10]    Plaintiff mistakenly argues that his conditions of confinement claims arise under the Eighth Amendment. *See Darnell* v. *Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) ("A pretrial detainee's claims ... are governed by the Due Process Clause of the Fourteenth Amendment[.]").

[11]    In the interest of completeness, Defendants have moved for summary judgment as to certain claims that might theoretically be discerned from Plaintiff's pleading, including claims for deprivation of property or equal protection violations under 42 U.S.C. § 1983, and for conspiracy to violate his civil rights under 42 U.S.C. § 1985. To the extent that such claims were in fact made, the Court rejects them for substantially the reasons set forth in Points VII and VIII, and the second Point IX, of Defendants' memorandum of law in support of their motion. Additionally, the Court does not understand Plaintiff to be raising state-law claims in his Complaint, and will not address any here.

Section 1983 provides a remedy when a state actor deprives a plaintiff of federally protected rights, including rights provided by the Fourth and Fourteenth Amendments. *See* 42 U.S.C. § 1983; *see also City of Okla. City* v. *Tuttle*, 471 U.S. 808, 816 (1985) ("By its terms, of course, [§ 1983] creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere."). "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt* v. *Cole*, 504 U.S. 158, 161 (1992).

**\*8** "A § 1983 claim has two essential elements: [i] the defendant acted under color of state law; and [ii] as a result of the defendant's actions, the plaintiff suffered a denial of h[is] federal statutory rights, or h[is] constitutional rights or privileges." *Annis* v. *Cty. of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998); *see also West* v. *Atkins*, 487 U.S. 42, 48 (1988); *Flagg Bros., Inc.* v. *Brooks*, 436 U.S. 149, 155-56 (1978).

### 4. Qualified Immunity

Even though the Court to find that one or more Defendants violated Plaintiff's constitutional rights, liability under § 1983 might be foreclosed under the doctrine of qualified immunity.

"Qualified immunity is an affirmative defense that shields government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Stephenson* v. *Doe*, 332 F.3d 68, 76 (2d Cir. 2003) (internal quotation marks and citation omitted); *see generally Hassell* v. *Fischer*, —— F.3d ——, No. 16-2835(L), 2018 WL 265084, at *3 n.7 (2d Cir. Jan. 3, 2018); *Almighty Supreme Born Allah* v. *Milling*, 876 F.3d 48, 58-59 (2d Cir. 2017). Qualified immunity thus hinges on: "[i] whether plaintiff has shown facts making out a violation of a constitutional right; [ii] if so, whether that right was 'clearly established'; and [iii] even if the right was 'clearly established,' whether it was 'objectively reasonable' for the officer to believe the conduct at issue was lawful." *Gonzalez* v. *City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013) (citing *Taravella* v. *Town of Wolcott*, 599 F.3d 129, 133-34 (2d Cir. 2010)).

For a constitutional right to be "clearly established," "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson* v. *Creighton*, 483 U.S. 635, 640 (1987); *see also Ashcroft* v. *al-Kidd*, 563 U.S. 731, 741 (2011). "In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle* v. *Howards*, 566 U.S. 658, 664 (2012) (internal citation and quotation marks omitted).

"Even where the plaintiff's federal rights and the scope of the official's permissible conduct are clearly established, the qualified immunity defense protects a government actor if it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act." *Lennon* v. *Miller*, 66 F.3d 416, 420 (2d Cir. 1995) (citing *Creighton*, 483 U.S. at 641). "The objective reasonableness test is met—and the defendant is entitled to immunity—if 'officers of reasonable competence could disagree' on the legality of the defendant's actions." *Id.* (citing *Malley* v. *Briggs*, 475 U.S. 335, 341 (1986)). Thus, "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly

incompetent or those who knowingly violate the law." *Messerschmidt* v. *Millender*, 565 U.S. 535, 546 (2012) (internal quotation marks and citation omitted).

**B. Defendants Are Entitled to Summary Judgment on All Claims**

**1. Plaintiff's Fourth and Fifth Amendment Claims Fail**

The Court discerns several Fourth Amendment claims in Plaintiff's Complaint, including allegations that one or more Defendants (i) improperly entered Plaintiff's residence to arrest him on January 25, 2012; (ii) improperly searched his residence on January 26, 2012; (iii) improperly obtained a sample of Plaintiff's DNA from a drinking cup he used at the Midtown North Precinct; and (iv) participated in the malicious prosecution of the Plaintiff. (*See, e.g.*, Compl. ¶ 51 (alleging Defendants "deprive[d] [P]laintiff of [h]is constitutionally protected interest guaranteed under the Fourth Amendment ... to be free from illegal search and seizure, without probable cause to arrest"); *see also, e.g.*, *id.* (complaint headings throughout beginning with "Malicious Prosecution"), ¶¶ 14-20, 51, 54-56, 93-97, 127-31). For the reasons set forth in the remainder of this section, the claims all fail.

**a. January 25, 2012 Entrance into Plaintiff's Residence**

**\*9** Although "[t]he Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects," it does not prohibit such entry where police officers obtain "voluntary consent ... either from the individual whose property is searched or from a third party who possesses common authority over the premises." *Illinois* v. *Rodriguez*, 497 U.S. 177, 181 (1990) (internal citations omitted). "[T]he exception for consent extends even to entries and searches with the permission of a co-occupant whom the police reasonably, but erroneously, believe to possess shared authority as an occupant." *Georgia* v. *Randolph*, 547 U.S. 103, 109 (2006).

Further, although the authority necessary to consent to a police officer's residential entry might not extend to a landlord or hotel manager, *see Georgia* v. *Randolph*, 547 U.S. at 112, a parolee living in a halfway house, such as Plaintiff here, has a diminished expectation of privacy and thus a lessened Fourth Amendment protection than an average tenant or hotel guest, *see Samson* v.

*California*, 547 U.S. 843, 850 (2006) ("[P]arolees have fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment."); *cf.* *United States* v. *Amerson*, 483 F.3d 73, 84 (2d Cir. 2007) ("Probationers ... have diminished —but far from extinguished—reasonable expectations of privacy.").

Here, the manager of Plaintiff's halfway house consented to Detectives Thornton and Hahn, and Lieutenant Rivera, entering the halfway house and guided them to Plaintiff's shared bedroom on the second floor of the building. Thus, although the officers did not have a warrant to enter the residence, given Plaintiff's lessened expectation of privacy as a parolee, the halfway house manager's consent validated their entrance into the halfway house. *Cf.* *United States* v. *Reyes*, 283 F.3d 446, 457 (2d Cir. 2002) ("It is beyond doubt that [probationer]'s actual expectation of privacy in the environs of his home was necessarily and significantly diminished because [he] was ... serving a court-imposed term of federal supervised release that mandated home visits 'at any time' from his federal probation officer.").

More fundamentally, the record establishes that Detective Hahn gathered the inculpatory evidence against Plaintiff by viewing Plaintiff through an open door sitting on his bed with a reportedly stolen computer alongside other stolen electronics and his crutches. (*See* DeCastro Decl., Ex. EE, at ¶ 9 ("Detective Hahn and [Detective Thornton] encountered [P]laintiff ... at the halfway house" and "observed [him] through an open bedroom door[.]")). *Cf.* *United States* v. *Delva*, 858 F.3d 135, 149 (2d Cir. 2017) ("Under the plain-view exception, 'if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant.' " (quoting *Minnesota* v. *Dickerson*, 508 U.S. 366, 375 (1993))). Hahn was subsequently the affiant for the search warrant of Plaintiff's residence; he was not, however, named as a defendant in this case. The record does not establish that any of the Defendants conducted a warrantless search of Plaintiff's room on the evening of January 25, 2012, and "[i]t is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farid* v. *Ellen*, 593 F.3d 233, 249 (2d Cir. 2010) (quoting *Farrell* v. *Burke*, 449 F.3d 470, 484 (2d Cir. 2006)). Accordingly,

the record does not establish a constitutional violation stemming from Defendants' entrance into the halfway house and their observations of Plaintiff on January 25, 2012.

**b. January 25, 2012 Transport to Midtown North Precinct**

**\*10** As noted, the record is unclear as to whether the officers formally arrested Plaintiff on January 25, 2012, or whether he consented to travel to the Midtown North Precinct for further questioning. *See supra* note 6. Assuming for purposes of analysis that Plaintiff was arrested without a warrant immediately before or after his transportation to the Midtown North Precinct, there was abundant probable cause for the arrest and no Fourth Amendment violation.

A law enforcement officer may effect a warrantless arrest given probable cause to believe, at the moment of the arrest, that the individual subject to arrest has committed a crime. *See* *Devenpeck* v. *Alford*, 543 U.S. 146, 152 (2004); *United States* v. *Llanes*, 398 F.2d 880, 883 (2d Cir. 1968). An officer has probable cause if such belief is founded upon "facts and circumstances within" the officer's "knowledge and of which they had reasonably trustworthy information." *Llanes*, 398 F.2d at 883. In the context of an arrest for burglary, courts have found probable cause based on factors such as a *modus operandi* linking the crimes to the defendant, descriptions of the suspect matching the defendant's characteristics, and the defendant's possession of property stolen during the offense. *See, e.g.*, *Wiltshire* v. *Wanderman*, No. 13 Civ. 9169 (CS), 2015 WL 4164808, at *3 (S.D.N.Y. July 10, 2015); *Williams* v. *Carter*, No. 7:13 Civ. 382 (DNH), 2014 WL 5361494, at *5 (N.D.N.Y. Oct. 21, 2014).

Here, assuming *arguendo* that Plaintiff's transportation to the Midtown North Precinct occurred pursuant to an arrest, Defendants would have had probable cause for same. At that time, they were aware of a string of burglaries committed in a tightly-circumscribed geographic area by a suspect described as a black male who used a crutch. In addition to the videos corroborating this description, Defendants were aware that another officer had identified Plaintiff as resembling a sketch of the suspect, and that one of the stolen computers had indicated that it was located near Plaintiff's address. And any suspicions the officers may have had at the time they

entered the halfway house were confirmed when Detective Hahn observed Plaintiff sitting on his bed, using a laptop, surrounded by electronics far too numerous to be for his personal use and accompanied by his crutches. Detective Thornton and Lieutenant Rivera did not falsely arrest Plaintiff.

### c. Retrieval of the DNA Sample

Plaintiff spends a substantial portion of his motion papers outlining various constitutional violations that are alleged to have occurred when Defendants Criollo and Meehan caused Plaintiff to drink from a cup at the Midtown North Precinct house and, thereby, leave a DNA sample that could be compared to DNA recovered from the cap and the knife. (*See* Pl. Br.; Pl. Reply; *see also* Pl. Dep. 153:1-7 (identifying Criollo and Meehan)). The circumstances under which that DNA was allegedly obtained are discussed later in this Opinion in the Fourteenth Amendment analysis. Here, the Court focuses on whether these Defendants violated the Fourth Amendment in obtaining the DNA sample. It concludes that they did not.

"The Fourth Amendment does not protect abandoned or voluntarily discarded property because any expectation of privacy that may have existed becomes irrelevant the moment it is abandoned." Anip Patel, *The Constitutionality of DNA Sampling of Arrestees*, 13 U. PITT. J. TECH. L. POL'Y 1, 25 (2012). Both the Supreme Court and the Second Circuit are clear on this point. *See, e.g.*, *United States* v. *Lee*, 916 F.2d 814, 818 (2d Cir. 1990) ("When a person voluntarily abandons property, ... he forfeits any reasonable expectation of privacy that he might have had in the property."); *United States* v. *Levasseur*, 816 F.2d 37, 44 (2d Cir. 1987) ("[A] warrantless search or seizure of abandoned property does not violate the fourth amendment.") (citing *Abel* v. *United States*, 362 U.S. 217, 240-41 (1960) ("There can be nothing unlawful in the government's appropriation of ... abandoned property.")). Even if Plaintiff could claim a reasonable expectation of privacy in a drinking cup that was provided to him by law enforcement during his interrogation—a proposition the Court highly doubts—any such expectation dissipated when he discarded the cup after the questioning. [12] There was, therefore, no Fourth Amendment violation in recovering the cup and obtaining the DNA sample. [13]

[12] Relatedly, the Supreme Court has upheld state statutes that permit the warrantless obtaining of DNA samples from individuals arrested for serious offenses. *See* *Maryland* v. *King*, 569 U.S. 435, 465-66 (2013) (upholding provision of Maryland DNA Collection Act; "When officers make an arrest supported by probable cause to hold for a serious offense and they bring the suspect to the station to be detained in custody, taking and analyzing a cheek swab of the arrestee's DNA is, like fingerprinting and photographing, a legitimate police booking procedure that is reasonable under the Fourth Amendment."). And while the New York DNA collection and indexing statute, N.Y. Exec. Law § 995, does not address, and thus does not authorize, law enforcement officers to obtain DNA samples from arrestees, the language of *King* suggests that this practice, as applied to the particular facts of this case, would not violate the Fourth Amendment.

In his submissions, Plaintiff suggests that Defendants have violated 42 U.S.C. § 14135e, a provision of an earlier version of the federal DNA collection statute. (*See* Pl. Br., Dkt. #109 at 11). Those provisions have been transferred to 34 U.S.C. ch. 407, and include provisions for, among other things, the collection and analysis of DNA from certain offenders, training in and improvements to DNA technology and research, and grants to states to implement DNA collection processes for arrestees. The analogue to the provision cited by Plaintiff is 34 U.S.C. § 40706, which criminalizes the use of DNA samples obtained pursuant to this chapter for purposes other than those specified in this chapter. Because this federal statute was not implicated by the events at issue, § 40706 is inapplicable to the DNA sample from the cup.

[13] To the extent that Plaintiff is raising a Fifth Amendment challenge to this conduct, it also fails.

In *Schmerber* v. *California*, 384 U.S. 757, 764, 761 (1966), the Supreme Court clarified that the Fifth Amendment privilege against self-incrimination does not protect a person from being compelled to produce "real or physical evidence," but rather protects against the compulsion of evidence that is "testimonial or communicative [in] nature." Here, because the DNA sample taken from the cup is neither testimonial nor communicative in nature, Plaintiff's Fifth Amendment rights were not violated. *See id.* at 765 (concluding that blood sample was admissible because it "was neither petitioner's testimony nor evidence relating to some communicative act or writing" by petitioner); *accord Toliver* v. *Artus*, No. 11 Civ. 1051 (MAT), 2013 WL 55692, at *9 (W.D.N.Y. Jan. 3, 2013).

### d. January 26, 2012 Search of the Residence

**\*11**  The Court next considers the search that Detectives Thornton, Rivera, and Sager conducted on January 26, 2012, pursuant to the warrant they obtained on the basis of Detective Hahn's affidavit. Fourth Amendment precedent confirms that police may enter a home to execute a valid search warrant, so long as they operate within the scope of the warrant. *See Steagald* v. *United States*, 451 U.S. 204, 211-12 (1981) ("[W]e have consistently held that the entry into a home to conduct a search or make an arrest is unreasonable under the Fourth Amendment unless done pursuant to a warrant."); *Rogers* v. *Cartagena*, No. 10 Civ. 9285 (JPO), 2013 WL 1285169, at *4 (S.D.N.Y. Mar. 28, 2013) ("No search conducted pursuant to a valid search warrant violates [the Fourth Amendment], so long as the officers conducting the search do so within the warrant's scope."). To be valid, a warrant must (i) "be issued by [a] neutral, disinterested magistrate[ ]"; (ii) be supported by "probable cause to believe that the evidence sought will aid in a particular apprehension or conviction for a particular offense"; and (iii) "particularly describe the things to be seized" and "place to be searched." *Dalia* v. *United States*, 441 U.S. 238, 255 (1979) (internal quotation marks and citations omitted).

Here, the record provides no indication that the court issuing the warrant operated as a "rubber stamp for the police." *United States* v. *Ventresca*, 380 U.S. 102, 109 (1965). Moreover, Detective Hahn's affidavit, submitted in support of the warrant application, provided ample probable cause for the warrant's issuance. That affidavit

stated that during his investigation, Hahn discovered that the suspect of several burglaries between November 30, 2011, and January 19, 2012, was often "described as a black male who was using crutches" and that "some of the above incidents, specifically the entry or exit from [the] buildings, were captured on surveillance video." (DeCastro Decl., Ex. FF, at ¶ 7). The affidavit also stated that an Apple laptop taken from one of the residences contained a tracking device that indicated that the laptop was located "on Glenmore Avenue near Schenck Avenue[,] which is less than one block from the target premises." (*Id.* at ¶ 8). Hahn stated that upon visiting the target premises, he observed Plaintiff on the "lower left bunk" in a bedroom, "using an Apple laptop which had previously been taken from one of the ... residential locations," that Plaintiff "was using crutches," and that Hahn "observed other laptops and electronics involved in the commission of said crimes." (*Id.* at ¶ 9). Finally, the warrant particularly described the things to be seized—"evidence of proceeds from a string of burglaries" including electronics, currency, and evidence of ownership—and the place to be searched, including "the common area" of 571 Glenmore Avenue, "and the upstairs front bedroom, specifically the lower left bunk bed ..., the area under said bed, the area next to ... said bed, the dresser located on the left of the room, the closet in said room, and the area directly adjacent to the closet[.]" (DeCastro Decl., Ex. GG).

Plaintiff has failed to identify any deficiencies in the warrant used to search his room, and the Court has found none. Accordingly, Detectives Thornton, Rivera, and Sager did not violate the Fourth Amendment in executing the warrant the day after Plaintiff's arrest.

### e. Malicious Prosecution

Throughout his Complaint, Plaintiff uses the term "malicious prosecution" to connote conduct by Defendants that Plaintiff believes violated his constitutional rights. The Court has considered, however, whether Plaintiff has in fact demonstrated a claim for malicious prosecution, and finds that he has not.

"In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his [constitutional] rights ..., and must establish the elements of a malicious prosecution claim

2018 WL 459662

under state law." *Manganiello* v. *City of N.Y.*, 612 F.3d 149, 160-61 (2d Cir. 2010) (internal citations omitted); *See also Rohman* v. *N.Y.C. Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000). A malicious prosecution claim under New York law, in turn, requires a plaintiff to prove "[i] the initiation or continuation of a criminal proceeding against plaintiff; [ii] termination of the proceeding in plaintiff's favor; [iii] lack of probable cause for commencing the proceeding; and [iv] actual malice as a motivation for defendant's actions." *Manganiello*, 612 F.3d at 161.

**\*12** For all of the reasons discussed in this Opinion, Plaintiff has not raised a genuine dispute of material fact concerning any of his alleged constitutional violations. Likewise, however, Plaintiff has failed to raise a triable dispute concerning the elements of malicious prosecution under state law. *First*, the record does not establish that Defendants initiated a criminal proceeding against Plaintiff. Police officers, such as the named Defendants here, "do not generally 'commence or continue' criminal proceedings," but a malicious prosecution claim "can still be maintained against a police officer if the officer is found to 'play an active role in the prosecution' " such as by "generat[ing] witness statements or ... regularly [remaining] in touch with the prosecutor regarding the case." *Bermudez* v. *City of N.Y.*, 790 F.3d 368, 377 (2d Cir. 2015) (alterations and citations omitted).

Put somewhat differently, "[b]ecause there is a presumption that prosecutors exercise independent judgment in deciding whether to pursue a prosecution, plaintiff must demonstrate that defendant 'distorted the process by which plaintiff was brought to trial.' " *Bazemore* v. *City of N.Y.*, No. 12 Civ. 5088 (KBF), 2016 WL 1449746, at \*5 (S.D.N.Y. Apr. 12, 2016) (quoting *Bailey* v. *City of N.Y.*, 79 F. Supp. 3d 424, 449 (E.D.N.Y. 2015)) (citing *Townes* v. *City of N.Y.*, 176 F.3d 138, 147 (2d Cir. 1999)). No such evidence has been presented in this case. Although Detective Criollo signed the criminal complaint against Plaintiff charging him with burglary (*see* DeCastro Decl., Ex. LL), the record is bereft of facts concerning any Defendant's further involvement in Plaintiff's prosecution, much less any improper conduct that could sustain a claim of malicious prosecution.

*Second*, Plaintiff's malicious prosecution claim fails for much the same reasons that Plaintiff's Fourth Amendment claim fails: As in the Fourth Amendment context, probable cause is a complete defense to malicious prosecution. *Harper* v. *City of N.Y.*, No. 11 Civ. 4333 (CM), 2013 WL 432599, at \*3 (S.D.N.Y. Jan. 31, 2013); *see generally Stansbury* v. *Wertman*, 721 F.3d 84, 95 (2d Cir. 2013) (observing that "[t]he probable cause standard in the malicious prosecution context is slightly higher than the standard for false arrest cases") (citing *Boyd* v. *City of N.Y.*, 336 F.3d 72, 76 (2d Cir. 2003)). "One need not be certain of the outcome of a criminal proceeding to have probable cause for instituting such action. Rather, '[p]robable cause consists of such facts and circumstances as would lead a reasonably prudent person in like circumstances to believe plaintiff guilty.' " *Cox* v. *Cty. of Suffolk*, 827 F. Supp. 935, 938 (E.D.N.Y. 1993) (quoting *Colon* v. *City of N.Y.*, 60 N.Y.2d 78, 82 (1983)).

"[U]nder New York law, indictment by a grand jury creates a presumption of probable cause that may *only* be rebutted by evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.' " *Dufort* v. *City of N.Y.*, 874 F.3d 338, 352 (2d Cir. 2017) (internal citations omitted). That burden lies squarely on Plaintiff, and he has not discharged it. Plaintiff presents no new facts that would have invalidated his prosecution, and as discussed above, the probable cause supporting his arrest was plentiful. Indeed, the positive identification by a victim during a lineup alone would have sufficed to establish probable cause. *See Keith* v. *City of N.Y.*, 641 Fed.Appx. 63, 67 (2d Cir. 2016) (summary order) (finding probable cause where victim positively identified suspect after seeing him in neighborhood and again during lineup, and noting, "information from an identified citizen accusing another individual of the commission of a specific crime is [generally still] sufficient to provide the police with probable cause" (quoting *Okunubi* v. *City of N.Y.*, 971 N.Y.S.2d 338, 340 (2d Dep't 2013))); *Smith* v. *City of N.Y.*, 388 F. Supp. 2d 179, 187 (S.D.N.Y. 2005) (finding probable cause where investigator relied on victim's description of defendant and other officer's descriptions of alleged crime).

**\*13** *Third*, the record contains simply no evidence that Defendants acted with actual malice. In the malicious prosecution context, the element of actual malice requires proof "that the defendant must have commenced the prior criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served." *Cox*, 827 F. Supp. at 940 (quoting *Nardelli* v. *Stamberg*, 44 N.Y.2d 500, 503 (1978)); *accord Smith*, 388

*F. Supp. 2d at 187.* Given the surfeit of evidence against Plaintiff that, even now, he fails to refute—including witness identification, discovery of stolen goods in his room, and electronic indications from at least one stolen item that it was in the vicinity of his residence—Plaintiff cannot plausibly argue that Defendants acted with the requisite malice in pursuing his prosecution.

There is no viable malicious prosecution claim on these facts. More to the point, Plaintiff has failed to identify a genuine dispute of material fact as to any of his Fourth or Fifth Amendment claims. Summary judgment is therefore warranted in favor of Defendants on these claims.

### 2. Plaintiff's Fourteenth Amendment Claim Fails

Plaintiff's allegations concerning his interview at Midtown North can also fairly be read to allege a claim under the Fourteenth Amendment: Plaintiff contends that during his detention there, Defendants were deliberately indifferent to Plaintiff's medical conditions, which indifference resulted in his later diagnosis of Renal Insufficiency Syndrome. (*See, e.g.*, Pl. Br. ¶¶ 25, 41-45). Although the Court is keenly aware of the importance of medical treatment for those in police custody, it finds that Plaintiff has not identified a genuine dispute of material fact in this regard, and that Defendants are entitled to summary judgment.

Before analyzing Plaintiff's claim, the Court pauses to define and contextualize it. Plaintiff argues that Defendants deliberately deprived him of water, medication, or toileting opportunities at the precinct house, in order to trick him into providing a DNA sample when he drank from the cup that was eventually provided to him. Such trickery, even if true, does not a due process violation make. *See Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 431 (2d Cir. 2009) ("To establish a violation of substantive due process rights, a plaintiff must demonstrate that the state action was so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." (internal quotation marks and citation omitted)); *cf. Illinois v. Perkins*, 496 U.S. 292, 297 (1990) ("*Miranda* forbids coercion, not mere strategic deception by taking advantage of a suspect's misplaced trust" in law enforcement). What is more, Plaintiff's argument collapses of its own illogic: If Defendants were so singularly focused on obtaining a DNA sample from Plaintiff, they would have been only too eager to offer him a beverage (for obvious reasons)

or his medication (which would have required Plaintiff to drink something), and there would have been no reason for Defendants to be antagonistic to Plaintiff's bathroom breaks. However, the Court will put these obvious logical fallacies to the side, and will construe Plaintiff's arguments with all the strength that the record permits.

#### a. Applicable Law

Courts in the Second Circuit analyze a pretrial detainee's claims of unconstitutional conditions of confinement, such as inadequate medical care, under the Fourteenth Amendment's Due Process Clause rather than the Eighth Amendment's Cruel and Unusual Punishment Clause. *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017). Nevertheless, "[a] detainee's rights are 'at least as great as the Eighth Amendment protections available to a convicted prisoner.' " *Id.* (quoting *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)). A claim for inadequate medical care requires a showing of "deliberate indifference to ... serious medical needs," which in turn requires proof of two elements: "medical need" and "deliberate indifference." *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003).

**\*14** The first element, "medical need," is objective, measuring "the severity of the alleged deprivation." *Smith*, 316 F.3d at 183-84. Courts assessing this prong "examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause" the plaintiff. *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006). Factors informing this analysis include "[i] whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' [ii] whether the medical condition significantly affects daily activities, and [iii] 'the existence of chronic and substantial pain.' " *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003) (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)). In addition, "the actual medical consequences that flow from the alleged denial of care will be highly relevant[.]" *Smith*, 316 F.3d at 187.

The Second Circuit has recently clarified that the second element, "deliberate indifference," though often characterized as "subjective," is better understood as an element simply analyzing *mens rea* because it is "defined objectively." *Darnell*, 849 F.3d at 29, 35. Indeed, this element requires proof that the defendant "acted

intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant[ ] knew, or should have known, that the condition posed an excessive risk to health or safety." *Id.* at 35. This standard therefore does not encompass "an inadvertent failure to provide adequate medical care." *Estelle* v. *Gamble*, 429 U.S. 97, 105-06 (1976).

### b. Discussion

Even viewing the facts in Plaintiff's favor, the Court cannot say that Defendants were deliberately indifferent to Plaintiff's medical needs. Neither Plaintiff's blood pressure nor his psychological conditions were sufficiently serious to mandate immediate medical attention by Defendants on pain of constitutional violation. And even if they were so serious, Defendants neither intentionally nor recklessly failed to tend to Plaintiff's medical conditions.

*First*, considering the severity of the alleged deprivation in the context of the surrounding circumstances, neither Plaintiff's blood pressure nor his psychological conditions were sufficiently serious to require the officers at Midtown North to render immediate medical care to Plaintiff. Courts have come to differing conclusions as to whether high blood pressure is a serious medical condition, *see Lozada* v. *City of N.Y.*, No. 12 Civ. 38 (ILG) (JMA), 2013 WL 3934998, at *6 (E.D.N.Y. July 29, 2013) (comparing cases); but the record here does not suggest that Plaintiff's condition posed any potential for immediate harm if he went without blood pressure medication while at Midtown North.

Tellingly, Plaintiff's own actions make plain that *he* was not terribly concerned—and thus that Defendants were justified in not being concerned—about his blood pressure during that period. Plaintiff had elected not to take his blood pressure medication since the morning of the day before his arrest. (*See* Pl. Dep. 62:7-15). And, despite Plaintiff's recollection that he informed medical professionals at Bellevue of his blood pressure condition (*see* Pl. Dep. 79:20-22), the medical records make clear that the only medical issues Plaintiff reported were injuries to his right knee, left hip, and lower lumbar spine, and diagnoses of post-traumatic stress disorder and anxiety. (*See* DeCastro Decl., Ex. KK). Similarly, when

discussing prescriptions with Bellevue personnel, Plaintiff only reported taking Vicodin and Prozac; a member of the psychiatric department who noted his Post-Traumatic Stress Disorder thus prescribed him a dose of Klonopin before his discharge. (*See id.*). In short, there can be no dispute that Plaintiff informed anyone at Bellevue of a serious blood pressure condition or an urgent need for medication. *Cf. Davis* v. *Klein*, No. 11 Civ. 4868 (ENV), 2013 WL 5780475, at *4 (E.D.N.Y. Oct. 25, 2013) ("[N]o reasonable jury could credit plaintiff's account" of his injuries from an arrest "where undisputed medical records *directly and irrefutably* contradict[ed] plaintiff's description[.]") (citing *Bove* v. *City of N.Y.*, 98 Civ. 8800 (HB), 1999 WL 595620 at *6 (S.D.N.Y. 1999)).

**\*15** And with respect to Plaintiff's mental health issues, the Court does not doubt that Plaintiff suffers from such conditions. But the record does not show that Plaintiff presented symptoms or complaints of such conditions to a degree that presented the potential for further harm or debility. *See Bellotto* v. *Cty. of Orange*, 248 Fed.Appx. 232, 237 (2d Cir. 2007) (summary order) (finding that county jail was not deliberately indifferent to inmate's medical needs where "the only medical consequence he alleges was an anxiety attack, which ... resulted in no physical injuries and 'no acute distress' "); *cf. Covington* v. *Westchester Cty. Dep't of Corr.*, No. 06 Civ. 5369 (WHP), 2010 WL 572125, at *6 (S.D.N.Y. Jan. 25, 2010) ("[C]ourts [have found] that depression *with suicidal ideation or severe anxiety attacks* are sufficiently severe conditions to meet the objective element of the deliberate indifference standard." (emphasis added)); *Zimmerman* v. *Burge*, No. 9:06 Civ. 0176 (GLS) (GHL), 2009 WL 3111429, at *8 (N.D.N.Y. Sept. 24, 2009) (collecting cases for the proposition that psychological conditions may be sufficiently serious if numerous or coupled with suicidal ideation or severe anxiety). In short, the record does not establish that Plaintiff's blood pressure or psychological conditions were sufficiently acute to raise a genuine dispute of fact on the "medical need" prong of the deliberate indifference analysis.

And even if Plaintiff's conditions were sufficiently serious, the record is clear that Defendants did not intentionally or recklessly place Plaintiff in a position of "excessive risk to health or safety." *Darnell*, 849 F.3d at 35. Plaintiff testified that he did not receive his blood pressure medication until four days after his arrest "when [he] was screened and processed in the Department

of Corrections." (Pl. Dep. 111:15-18). Because, even crediting Plaintiff's recitation of events, Defendants interacted with Plaintiff only for a matter of hours, no jury could find that Defendants caused or contributed to the worsening of Plaintiff's condition or his developing Renal Insufficiency Syndrome. *Cf. Bilal* v. *White*, 494 Fed.Appx. 143, 145-46 (2d Cir. 2012) (summary order) ("Although epilepsy and arthritis arguably are serious underlying conditions, the record ... demonstrates a temporary delay or interruption in the provision of otherwise adequate medical treatment for those ailments lasting only a few hours. Even assuming that [Plaintiff's] conditions could produce serious complications if neglected over sufficient time, there is no evidence that [Plaintiff's] conditions worsened over the hours of delay here." (internal citations omitted)). Indeed, given Plaintiff's decision to not take his blood pressure medication for more than a day prior to his arrest, the delay in receiving blood pressure medication can be laid largely at his feet. *See Buffaloe* v. *Fein*, No. 12 Civ. 9469 (GBD) (AJP), 2014 WL 1224446, at *3 (S.D.N.Y. Mar. 20, 2014) (holding plaintiff did not prove deliberate indifference as to heart and back conditions where he "contributed to his own condition by refusing meals"); *Ross* v. *Kelly*, 784 F. Supp. 35, 46-47 (W.D.N.Y.) (holding that plaintiff did not prove deliberate indifference where plaintiff was "largely to blame for many of the delays in treatment"), *aff'd*, 970 F.2d 896 (2d Cir. 1992).

Plaintiff claims that the delay in receiving his blood pressure medication and water caused the Renal Insufficiency Syndrome with which he was diagnosed in Rikers Island six months later. However, he has proffered no medical evidence from which a trier of fact could discern a causal connection; to the contrary, the medical records from Rikers disclose that Plaintiff suffered from both chronic kidney disease and chronic Hepatitis C, both of which were more likely causes of his Renal Insufficiency Syndrome and neither of which could have been caused by a half-day deprivation of medication. (*See, e.g.*, Pl. Br., Dkt. #109-3 at 31). And with respect to Plaintiff's psychological conditions, the record is clear that Plaintiff received medication at Bellevue after reporting his diagnoses, thanks in large measure to Defendants' efforts in transferring him to the hospital for medical clearance. (*See* DeCastro Decl., Ex. KK).

**\*16** In short, while the Court is mindful—and law enforcement should be equally mindful—of the need for officers to ensure that arrestees and detainees remain in compliance with their medical and mental health treatment regimens, no reasonable jury could find on these facts that any of the Defendants was deliberately indifferent to any of Plaintiff's medical or psychological needs. Summary judgement is warranted, therefore, as to Plaintiff's Fourteenth Amendment claims.

### 3. Defendants Are Entitled to Qualified Immunity

The Court has scrutinized the record and has found insufficient evidence to raise a triable question of fact concerning constitutional violations visited upon Plaintiff in connection with his arrest and prosecution for the burglary charges. However, even had the Court found any such violation, it would have found Defendants subject to qualified immunity. As detailed earlier in this Opinion, the Court's inquiries in this regard focus on whether Plaintiff has proffered evidence of the violation of a right that was "clearly established," and, if so, whether it was "objectively reasonable" for the Defendant in question to believe the conduct at issue was lawful. *Gonzalez*, 728 F.3d at 154.

The Court acknowledges that the Fourth, Fifth, and Fourteenth Amendments are well-known to law enforcement officers such as Defendants. But whether the precise contours of these rights, as identified by Plaintiff in his submissions, were clearly established may be a different issue. Assuming that point, the Court nonetheless finds that it was objectively reasonable for Defendants to believe that the following actions were lawful:

(i) Requesting consent to enter a halfway house from the manager of that halfway house, in order to question a then-current parolee living there;

(ii) Observing, from an open door to a shared bedroom, Plaintiff using and possessing an inordinate number of electronics similar to electronics that had been reported to have been burglarized by an individual who had an appearance and crutches similar to those of Plaintiff;

(iii) Arresting Plaintiff after observing the electronics, the crutches, and the proximity of Plaintiff's residence to the signal received from the "Find my [iP]hone" functionality, and after compiling witness statements and reports from other law enforcement

officers that suggested Plaintiff's involvement in the offenses;

(iv) Obtaining a DNA sample from a white styrofoam cup discarded by Plaintiff; and

(v) Obtaining a search warrant from a neutral magistrate based on the abundant evidence suggesting Plaintiff's involvement in the burglaries.

On this record, there can be no serious quarrel with Defendants' entitlement to qualified immunity. For this independent reason, summary judgment in favor of Defendants on all claims is warranted.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is DENIED, Defendants' cross-motion for summary judgment is GRANTED, and Plaintiff's causes of actions are DISMISSED WITH PREJUDICE.

The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

**All Citations**

Slip Copy, 2018 WL 459662

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 3309726
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Kashawn DOBBINS, Plaintiff,

v.

Commissioner Joseph PONTE et al., Defendants.

15-CV-3091 (JMF)
|
Signed 08/02/2017

**Attorneys and Law Firms**

Kashawn Dobbins, Jamaica, NY, pro se.

John L. Garcia, Tobias Eli Zimmerman, City of New York Law Department, New York, NY, for Defendants.

<u>OPINON AND ORDER</u>

JESSE M. FURMAN, United States District Judge

**\*1** Plaintiff Kashawn Dobbins, a New York State prisoner proceeding *pro se*, brings claims against the City of New York (the "City"), several New York City Department of Correction ("DOC") officers, and a DOC Hearing Officer. (Docket No. 22 ("Second Am. Compl.")). Specifically, Dobbins alleges that he was subjected to the use of excessive force, that his Fourteenth Amendment due process rights were violated, and that he was denied necessary medical treatment. (*Id.* at 2-4). The parties now cross-move, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment. (Docket No. 53; Docket No. 55 ("Defs.' Mem."); Docket No. 58 ("Pl.'s Mem.")). Additionally, Dobbins moves for leave to amend his complaint to add claims against another DOC Officer. For the reasons discussed below, Defendants' motion for summary judgment is granted in part and denied in part, Dobbins's motion for summary judgment is denied, and his motion for leave to amend is denied.

**BACKGROUND**

The relevant facts, taken from the Second Amended Complaint and admissible materials submitted by the parties, are either undisputed or described in the light most favorable to the non-moving party. *See Costello v. City of Burlington*, 632 F.3d 41, 45 (2d Cir. 2011). [1]

[1]  As required by Local Rule 56.1, Defendants filed a Statement of Undisputed Facts with citations to the record. (Docket No. 57 ("Defs.' Rule 56.1 SUF")). Pursuant to Local Rule 56.2, they also served Dobbins with notice that, in opposing their motion, he could not rely only on his Complaint, but had to submit evidence to support his claims. (Docket No. 56). Dobbins, however, did not file his own statement of undisputed facts; instead, he submitted a ten-page "Opposition" (Docket No. 61 ("Pl.'s Opp'n")), and a seven-page letter requesting summary judgment and leave to amend his complaint. (Pl.'s Mem.). Nevertheless, in light of the "special solicitude" owed to *pro se* litigants, *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010), the Court has considered the evidence submitted by Dobbins—as well as the transcript of his deposition, which was submitted by Defendants. *See Wali v. One Source Co.*, 678 F. Supp. 2d 170, 178 (S.D.N.Y. 2009) ("[W]here a *pro se* plaintiff fails to submit a proper Rule 56.1 statement in opposition to a summary judgment motion, the Court retains some discretion to consider the substance of the plaintiff's arguments, where actually supported by evidentiary submissions."). Additionally, the Court has independently reviewed Defendants' Local Rule 56.1 statement to ensure that it is supported by admissible evidence in the record. *See Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003) ("[E]ven [if] plaintiff's Rule 56.1 counter-statement failed to specifically controvert [defendant's Rule 56.1] assertions, the unsupported assertions must nonetheless be disregarded and the record independently reviewed."); *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (noting that a court "may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file" a Local Rule 56.1 statement (internal quotation marks omitted)).

**\*2**  In early 2014, Dobbins was in pretrial custody at the Otis Bantum Correction Center ("OBCC"), a DOC facility on Rikers Island. (Second Am. Compl. 2; Docket No. 54-1 ("First Am. Compl."), at 2). On the evening of February 1, 2014, DOC Officers from the Emergency Services Unit ("ESU") conducted a search of Dobbins's

housing area and cell. (Second Am. Compl. 2; Defs.' Mem. 2). During the search, Officer Rivera—a Defendant here—escorted Dobbins to his cell and began to search his person. (Defs.' Mem. 2). Officer Rivera came to believe that Dobbins was hiding something in his mouth and ordered him to spit it out. (*Id.* at 2-3). Defendants allege that Dobbins refused and that Officer Rivera, soon assisted by Officer Ortiz, began struggling with Dobbins to place him in handcuffs. (*Id.* at 3). Dobbins contends that after he turned around to be handcuffed, one of the Officers "slammed" him "on the bed," choked him, and hit him "about three times" in the ribs. (Docket No. 54-2 ("Dobbins Depo."), at 32-38). He alleges that he suffered injuries to his wrist, back, and ribs as a result. (*Id.* at 32).

Officers Boyd and Richardson—Defendants here as well —then removed Dobbins from his cell and escorted him out of the housing area, events that were captured on videotape by DOC personnel. (Docket No. 54-3 ("Video")). The videotape shows Officers Boyd and Richardson forcefully holding Dobbins's handcuffed arms behind him in what Defendants describe as "control holds ... to gain his compliance" and "to ensure that [he] did not escape them and run." (*Id.* at 21:10-22:35; Docket No. 57 ("Defs' Rule 56.1 SUF") ¶¶ 7-8). On the videotape, Dobbins is heard screaming "I'm not resisting nothing!" and, at one point, looks directly at the camera and says: "For the camera, they're breaking my wrists, seriously!" (Video 21:51-53). The officers then took him to a hallway right outside the housing area, where they secured him facing a wall for a few minutes, during which he continued to yell "My wrist!" and the like. (*Id.* at 22:05-25:34). The videotape then shows a group of officers escorting Dobbins away from the housing area, apparently to the intake unit. (*Id.* at 26:28-27:10). Notably, in his deposition, Dobbins testified that he was not "touch[ed]" by any officer on his way to intake, that it was "just walking and probably like holding me and making sure I don't run or something like that, and holding me while I am being handcuffed." (Dobbins Depo. 68-69).

In the intake unit, Dobbins was strip-searched by Officer Richardson. (Docket No. 54-8 ("Richardson Report")). Dobbins alleges that during the course of the strip-search —which was not captured by the camera, even though the videotape continued to run—Officer Richardson punched him until he was knocked unconscious and that he awoke bleeding from the head. (Second Am. Compl.

3). Defendants do not dispute that Officer Richardson punched Dobbins, or that the latter was knocked unconscious, but insist that Officer Richardson defended himself after Dobbins "threw the first punch." (Defs.' Mem. 4; Richardson Report). Later the same day, Dobbins received medical treatment for a three-centimeter laceration to the right side of his scalp and a contusion to his left eye. (Docket No. 54-11 ("Feb. 1, 2014 Medical Records")). The records from that visit specifically note the absence of any "neck pain." (*Id.*). One week later, Dobbins returned to the OBCC medical clinic complaining of "chest discomfort" and "hand pain," citing the February 1, 2014 incident. (Docket No. 54-12 ("Feb. 8, 2014 and Feb. 12, 2014 Medical Records")). He received treatment for an abrasion on his right wrist. (*Id.*).

Defendants allege that during the search, a small plastic bag was found outside of Dobbins's cell, the contents of which later tested positive for crack cocaine. (Docket No. 54-13). On February 4, 2017, Dobbins received a notice charging him with three disciplinary infractions: assaulting staff, possession of a controlled substance, and refusing to obey a direct order. (Docket No. 54-15 ("Notice of Infraction")). Three days later, Hearing Officer Wiley—also a Defendant here—conducted a hearing. (Docket No. 54-18 ("Hearing Tr."), at 1). Despite repeated requests, Dobbins was not permitted to review any of the Officers' statements or other paperwork that was read into the hearing record. (Hearing Tr. 8-11). He was, however, allowed to call two witnesses. (*Id.* at 12-21). Following the hearing, Hearing Officer Wiley found Dobbins guilty of all three infractions and sentenced him to seventy days in the Central Punitive Segregation Unit ("CPSU"). (Docket No. 54-19 ("Disciplinary Disposition Notice")). Thereafter, the Bronx County District Attorney's Office prosecuted Dobbins for the substance recovered during the February 1, 2014 search. (Docket No. 54-21). On September 30, 2014, Dobbins pleaded guilty to one count of Promoting Prison Contraband in violation of New York Penal Law Section 205.20, and was sentenced to one year of imprisonment, to be served concurrently with his underlying sentence. (*Id.*).

**\*3** After exhausting the prison grievance procedures, Dobbins filed this action, naming as Defendants the DOC, the Commissioner of DOC, the Warden of OBCC, several named and unnamed DOC officers, and medical staff ("to[sic] many to name.") (First Am. Compl. 1).

By Order dated May 4, 2015, this Court dismissed the claims against the DOC, the OBCC Warden, the DOC Commissioner, and medical staff for pleading deficiencies. (Docket No. 6 ("Order of Service")). The Court also construed the Complaint to assert state law claims against the City under a theory of *respondeat superior*, but dismissed any claim against the City pursuant to *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978). (Order of Service 2-3). Thereafter, Dobbins filed the operative complaint, the Second Amended Complaint, naming as Defendants the City; DOC Officers Ortiz, Rivera, Boyd, and Richardson; and Hearing Officer Wiley. (Docket No. 22). [2] Liberally construed, the Second Amended Complaint asserts against the DOC Officers or Hearing Officer Wiley claims under state and federal law for excessive force, violations of due process, and the deprivation of medical treatment; and asserts against the City a *respondeat superior* claim under state law. (*Id.*). [3]

[2]   In a letter dated October 18, 2016, Dobbins requested that the Court "accept" his Second Amended Complaint, and referenced the document filed on August 5, 2015. (Docket No. 65). Attached to the letter, however, was another complaint—also labelled "Second Amended Complaint"—that is identical in substance, if not form, to that filed on August 5, 2015. For the purposes of this Opinion, the Court will treat the Second Amended Complaint filed on August 5, 2015, rather than the attachment to the October 18, 2016 letter, to be the operative complaint.

[3]   It is not entirely clear whether Dobbins repleads a municipal liability claim against the City in the Second Amended Complaint. To the extent he does, however, it fails for the same reason that his earlier claim failed: He does not sufficiently plead the existence of an unconstitutional policy or practice. *See, e.g.*, *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 404 (1997) ("It is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." (internal quotation marks omitted)).

## LEGAL STANDARDS

Summary judgment is appropriate where the admissible evidence and the pleadings demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (per curiam). A dispute over an issue of material fact qualifies as genuine "if the evidence is such that a reasonable jury could return a judgment for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (citing *Celotex*, 477 U.S. at 322-23); *accord PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam).

In ruling on a motion for summary judgment, all evidence must be viewed "in the light most favorable to the non-moving party," *Overton v. N.Y. State Div. of Military & Naval Affairs*, 373 F.3d 83, 89 (2d Cir. 2004), and the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004). When, as in this case, both sides move for summary judgment, the district court is "required to assess each motion on its own merits and to view the evidence in the light most favorable to the party opposing the motion, drawing all reasonable inferences in favor of that party." *Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 171 (2d Cir. 2011). Thus, "neither side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it." *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993).

**\*4** To defeat a motion for summary judgment, a non-moving party must advance more than a "scintilla of evidence," *Anderson*, 477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading or on conclusory statements, or on mere

assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (citation omitted). Affidavits submitted in support of, or opposition to, summary judgment must be based on personal knowledge, must "set forth such facts as would be admissible in evidence," and must show "that the affiant is competent to testify to the matters stated therein." *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004) (quoting Fed. R. Civ. P. 56(e)).

It is well established that courts must give "special solicitude" to *pro se* litigants in connection with motions for summary judgment. *Tracy*, 623 F.3d at 101. Thus, a *pro se* party's papers opposing summary judgment are to be read liberally and interpreted to raise the strongest arguments that they suggest. *See, e.g., Clinton v. Oppenheimer & Co. Inc.*, 824 F. Supp. 2d 476, 481 (S.D.N.Y. 2011). This special solicitude is not unlimited, however, and does not "relieve" a plaintiff of his or her "duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003) (internal quotation marks omitted). Nor is the "duty to liberally construe a plaintiff's opposition the equivalent of a duty to re-write it." *Johnson v. N.Y.C. Dep't of Correction*, No. 14-CV-8450 (JMF), 2016 WL 4030854, at *2 (S.D.N.Y. July 25, 2016) (internal quotation marks and alterations omitted).

## THE CROSS-MOTIONS FOR SUMMARY JUDGMENT

Defendants move for summary judgment on each of Dobbins's claims. Liberally construed, Dobbins's motion appears to seek summary judgment on his excessive force and due process claims. (Pl.'s Mem. 1-5). The Court will address each claim in turn.

### A. Excessive Use of Force

Dobbins's excessive force claim is analyzed under the Due Process Clause of the Fourteenth Amendment, as he was a pretrial detainee at the time of the alleged incident. *See, e.g., Holland v. City of New York*, 197 F. Supp. 3d 529, 545 (S.D.N.Y. 2016). For a pretrial detainee to establish an excessive force claim, he "must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*,

135 S. Ct. 2466, 2473 (2015). To be unreasonable, the conduct at issue—judged "from the perspective and with the knowledge of the defendant officer[s]," *id.* at 2474, and evaluated "in light of contemporary standards of decency," *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (internal quotation marks omitted)—must be "sufficiently serious ... to reach constitutional dimensions," *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993) (internal quotation marks omitted). A court may consider, among other factors, "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley*, 135 S. Ct. at 2473 (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)); *see also Musaid v. Manka*, No. 13-CV-7880 (PKC) (MHD), 2016 WL 540806, at *4 (S.D.N.Y. Feb. 9, 2016) (applying this analysis). [4]

[4]  To the extent Dobbins also alleges claims for battery and assault under state law, those claims are subject to the same standard as his excessive force claim. *See Green v. City of Mount Vernon*, 96 F. Supp. 3d 263, 295 (S.D.N.Y. 2015) ("Assault and battery claims, when alleged against a police officer, are evaluated like excessive force claims.").

**\*5** Applying those standards here, the parties' cross-motions for summary judgment are borderline frivolous to the extent they relate to the incident in Dobbins's cell and in the intake unit. As to the former, there is a clear factual dispute: Defendants maintain that Officers Rivera and Ortiz used only the force necessary to restrain Dobbins, who resisted an order to reveal what was in his mouth, while Dobbins contends that the Officers body slammed, choked, and punched him—conduct that would be objectively unreasonable even if Dobbins had resisted a lawful order. (Defs.' Mem. 9-10; Dobbins Depo. 33-34, 37). Defendants contend that "no reasonable juror could credit Plaintiff's version" of the event because his allegations are "contradicted by Plaintiff's medical records." (Defs.' Mem. 11). But putting aside the question of whether the Court could grant summary judgment on that basis, it is not the case. Dobbins sought additional medical treatment only one week after the incident, complaining of "chest discomfort" and "hand pain," and he was treated for an abrasion on his right wrist. (Feb. 8, 2014 and Feb. 12, 2014 Medical Records). The fact that

WESTLAW    © 2018 Thomson Reuters. No claim to original U.S. Government Works.    4

2017 WL 3309726

Dobbins sought additional treatment "only ... once, more than one week after the Incident" (Defs.' Mem. 11), and the fact that he was not diagnosed with serious injuries at any time, may well cast doubt on the veracity of Dobbins's claims. But those are factual issues of credibility for a jury to decide at trial, not for the Court on summary judgment.

As for the incident in the intake unit, the factual disputes are even more transparent. According to Defendants, Dobbins initiated the physical alteration when he "threw a punch at Officer Richardson," "[struck] him in the shoulder," and "simultaneously rais[ed] his hands in a fighting stance." (Docket No. 54-4; *see also* Richardson Report). Defendants maintain that Richardson's punches were thus necessary to defend himself "from imminent physical assault." (Richardson Report). By contrast, Dobbins claims that Richardson threatened him during the walk to the intake unit and then punched him in the face at the end of the strip search, without reason or provocation. (Dobbins Depo. 75-76). Defendants assert that "the majority of evidence supports" their version of the incident. (Defs.' Mem. 14). But whether or not that is true, it is "axiomatic" that courts may not assess credibility or weigh the evidence on summary judgment, except in limited circumstances where the "evidence is so contradictory and fanciful that it cannot be believed by a reasonable person" and thus "may be disregarded." *Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 476-77 (S.D.N.Y. 2003). Drawing all inferences in the non-moving party's or parties' favor, the Court cannot say that either side's account of the incidents in Dobbins's cell and in the intake unit cannot be believed by a reasonable person. Accordingly, summary judgment must be and is denied as to those incidents. [5]

[5]     Defendants' argument that they are entitled to qualified immunity fares no better as to the incidents in Dobbins's cell and in the intake unit. (Defs.' Mem. 15-18). As a general matter, qualified immunity protects government officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). On February 1, 2014, it was well established that the Constitution prohibited corrections officers from using objectively unreasonable force against pretrial detainees. *See, e.g., Toliver v. City of New York*, 530 Fed.Appx. 90, 92 n.1 (2d Cir. 2013); *Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009), *overruled on other grounds by*

*Darnell v. Pineiro*, 849 F.3d 17, 33-35 (2d Cir. 2017). Thus, if Dobbins's accounts of the two incidents are true, Defendants would not be entitled to immunity.

By contrast, to the extent Dobbins asserts an excessive force claim with respect to the conduct of the officers who escorted him from his cell to the intake unit, it fails as a matter of law. As an initial matter, it is not clear whether Dobbins even asserts a claim as to that conduct. Although the Second Amended Complaint refers to "the walk out of the cell," it is not clear whether the conduct it describes took place in the cell or after. (Second Am. Compl. 2-3). And in his deposition, Dobbins testified that he was not "touch[ed]" by any officer on his way to intake, but that it was "just walking and probably like holding me and making sure I don't run or something like that, and holding me while I am being handcuffed." (Dobbins Depo. 68-69). In any event, the period during which Dobbins was transferred from his cell to the intake unit was the one and only part of the February 1, 2014 events that was captured entirely on video, and the video makes clear that the force used to restrain Dobbins was not "objectively unreasonable." *Kingsley*, 135 S. Ct. at 2473. Dobbins was indisputably acting in a belligerent and defiant manner, and—"account[ing] for the 'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' " and "appropriately deferring to 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security,' " *id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 540 (1979))—no reasonable jury could conclude that the force used was "sufficiently serious ... to reach constitutional dimensions." *Romano*, 998 F.2d at 105 (internal quotation marks omitted).

**B. Due Process**

**\*6**   Dobbins's due process claim can be addressed more swiftly. As a pretrial detainee, Dobbins was entitled under the Due Process Clause of the Fourteenth Amendment to (1) written notice of the charges against him at least twenty-four hours before the hearing, (2) a written statement of the factual allegations against him, and (3) at least a limited ability to present witnesses and evidence. *See Best v. N.Y.C. Dep't of Correction*, 14 F. Supp. 3d 341, 347-48 (S.D.N.Y. 2014) (citing *Wolff v. McDonnell*, 418 U.S. 539 (1974)). Here, all three of those requirements were indisputably met. He was provided with written notice of the charges against him

—assaulting staff, possession of controlled substances, and refusing to obey a direct order—on February 4, 2014, three days before his disciplinary hearing was held. (Defs.' Mem. 7; Notice of Infraction; Dobbins Depo. 91). The document included a statement (titled "Details of Incident"), derived from Officer Richardson's account of what had occurred, that sufficed to put Dobbins on notice of the factual allegations against him—even without the more complete reports and "paperwork" that he later requested. *See Dawkins v. Gonyea*, 646 F. Supp. 2d 594, 607-08 (S.D.N.Y. 2009) (discussing adequate notice). And finally, Dobbins was allowed to call two witnesses to testify at the hearing (Hearing Tr. 10, 12-21), although he himself was not permitted to question them. *See e.g.*, *Bullock v. Reckenwald*, No. 15-CV-5255 (LTS) (DF), 2016 WL 5793974, at *11-14 (S.D.N.Y. Aug. 24, 2016), *report and recommendation adopted*, No. 15-CV-5255 (LTS) (DF), 2016 WL 5719786 (S.D.N.Y. Sept. 30, 2016); *Sowell v. Bullis*, No. 13-CV-1482 (GLS) (DJS), 2016 WL 1696454, at *9 (N.D.N.Y. Mar. 25, 2016), *report and recommendation adopted*, No. 13-CV-1482 (GLS) (DJS), 2016 WL 1700410 (N.D.N.Y. Apr. 27, 2016).

Liberally construed, the Second Amended Complaint also includes allegations that Hearing Officer Wiley was biased and "conducted an unfair hearing by [siding] with coworkers to cover up wrong doings." (First Am. Compl. 9; *see also* Second Am. Compl. 11; Pl.'s Opp'n 39). An inmate facing a disciplinary hearing is entitled to an impartial hearing officer who does not "prejudge the evidence" or an inmate's guilt. *Patterson v. Coughlin*, 905 F.2d 564, 569-70 (2d Cir. 1990) (citing *Wolff*, 418 U.S. at 570-71). But a claim of hearing officer bias requires more than an inmate's own subjective beliefs and conclusory allegations. *See Brooks v. Prack*, 77 F. Supp. 3d 301, 316 (W.D.N.Y. 2014) (citing *Francis v. Coughlin*, 891 F.2d 43, 47 (2d Cir. 1989)). In this case, Hearing Officer Wiley was not involved in the underlying incidents, and the undisputed facts show that she allowed Dobbins to state his version of facts on the record, considered the available documentary evidence, and questioned Dobbins's witnesses. (Hearing Tr. 1-21; Disciplinary Disposition Notice). That is, Dobbins's conclusory assertions of Hearing Officer Wiley's bias aside, there is no evidence in the record from which a reasonable jury could conclude that Dobbins was denied his right to an impartial hearing officer. Accordingly, the Court grants Defendants' motion for summary judgment

with respect to Dobbins's due process claims, and denies Dobbins's cross-motion as to those claims.

**C. Deprivation of Medical Care**
Dobbins's final claim—for deprivation of mental health treatment—requires even less ink. To determine whether allegations of inadequate medical care are sufficient, a court must decide, among other things, "whether the prisoner was actually deprived of adequate medical care" and, if so, "whether the inadequacy in medical care is sufficiently serious." *Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006); *see also Darnell v. Pineiro*, 849 F.3d 17, 27 (2d Cir. 2017) (discussing the applicable standards for pretrial detainees). Here, the Court dismissed Dobbins's initial claim for deprivation of mental health treatment on the ground that he failed to identify anyone who was personally involved in the alleged deprivation of mental health care. (Order of Service 4-5). Dobbins repleaded the claim in the Second Amended Complaint, but he failed to remedy that fundamental defect. (*See* Second Am. Compl. 3 (stating only that Dobbins "was sent to the S.H.U. and was den[i]ed mental health for over 70 days")). In any event, the undisputed facts show that Dobbins did receive both medical treatment and mental health treatment during this period. (Docket No. 54-20; Feb. 1, 2014 Medical Records; Feb. 8, 2014 and Feb. 12, 2014 Medical Records; Pl.'s Opp'n 8). Thus, Defendants' motion for summary judgment with respect to Dobbins's deliberate indifference claim must be and is granted.

## MOTION FOR LEAVE TO AMEND

*7 In his motion for summary judgment, Dobbins also requests leave to add Captain O'Hara, the supervisor during the events described above, as a defendant. (Pl.'s Mem. 1-2). Although leave to amend a complaint should be freely given "when justice so requires," Fed. R. Civ. P. 15(a)(2), Dobbins's request is denied, for two independent reasons. First, this case is now all but trial ready, and adding claims against Captain O'Hara would cause undue delay. Furthermore, Dobbins provides no good reason for not seeking to add claims against Captain O'Hara earlier in the case. Defendants identified Captain O'Hara as a witness to the incidents in question, and provided Dobbins with a copy of his witness report, as far back as March 2016. Yet, Dobbins inexplicably waited more than seven

2017 WL 3309726

months, until discovery had closed and Defendants had filed their summary judgment motion, before proposing to add Captain O'Hara as a defendant. *See, e.g., Rodriguez v. Kittles*, No. 92-CV-1154 (SHS), 1996 WL 14442, at *2 (S.D.N.Y. Jan. 16, 1996) ("Permitting plaintiff to amend his complaint while the summary judgment motion is pending and on the eve of trial would be unduly prejudicial to the defendant."); *see also, e.g., Antrobus v. N.Y.C. Dep't of Sanitation*, No. 11-CV-5434 (CBA) (LB), 2016 WL 5394697, at *11 (E.D.N.Y. Feb. 25, 2016) ("Prejudice is generally found where the motion to amend comes on the eve of trial after many months or years of pre-trial activity; the amendment would cause undue delay in the final disposition of the case; the amendment brings entirely new and separate claims, adds new parties or at least entails more than an alternate claim or a change in the allegations of a complaint." (internal quotation marks omitted)).

Second, and in any event, Dobbins provides no indication that he possesses facts with which he could allege valid claims against Captain O'Hara. *See, e.g., Rodriguez*, 1996 WL 14442, at *2 (denying a motion for leave to add claims against two new defendants on the eve of trial where the plaintiff failed to "attach a copy of his proposed amended complaint to his declaration" and failed to "provide any grounds to suggest that plaintiff would even have a viable claim against" the two new defendants); *Hays v. City of New York*, No. 14-CV-10126 (JMF), 2017 WL 782496, at *8 (S.D.N.Y. Feb. 28, 2017) (denying leave to amend where the *pro se* plaintiff had not "given any indication" that she was "in possession of facts" that would state a valid claim (internal quotation marks omitted)). The video of the February 1, 2014 incident shows that Captain O'Hara was walking upstairs during the time that Officers Rivera and Ortiz were allegedly assaulting Dobbins in his cell. (Video 19:26-20:08). And Dobbins does not suggest that Captain O'Hara participated in the alleged assault in the intake unit or had a "realistic opportunity to intervene" in what is alleged to have been only a brief and unprovoked attack by Officer Richardson. *Holland*, 197 F. Supp. 3d at 549-50 (describing the elements of a failure-to-intervene claim). [6]

---

Liberally construed, Dobbins's motion could also be read to propose adding a claim or claims relating to the drugs found near his cell, which he disputes. (Pl.'s Mem. 3-4). Any such claim, however, would be barred by *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994),

as Dobbins pleaded guilty to charges stemming from those drugs.

## CONCLUSION

For the foregoing reasons, Dobbins's motions for summary judgment and leave to amend the Second Amended Complaint are DENIED in their entirety, and Defendants' motion for summary judgment is GRANTED in part and DENIED in part. In particular, Defendants' motion is granted with respect to Dobbins's deliberate indifference claim, his due process claims, and his excessive force (and assault and battery) claim to the extent it is based on Defendants' alleged conduct when Dobbins was escorted from his cell to the intake unit. By contrast, Defendants' motion and Dobbins's cross-motion are denied with respect to the excessive force claims relating to the conduct in Dobbins's cell and in the intake unit.

In light of the substance of Dobbins's surviving claims and the need for trial to resolve them, this Court exercises its discretion under Title 28, United States Code, Section 1915(e)(1), and will seek to obtain *pro bono* counsel for Dobbins. *See Cooper v. A. Sargenti Co.*, 877 F.2d 170, 174 (2d Cir. 1989). Further, the Court believes— in light of this ruling; the possibility that Dobbins will obtain counsel in short order; and the fact that, all things considered, Dobbins's injuries were relatively minor— that the parties should attempt to settle the case without the need for trial. To that end, by separate Order to be entered today, the Court is referring the case to the assigned Magistrate Judge (the Honorable James L. Cott) for settlement purposes only. **No later than one week after *pro bono* counsel enters a notice of appearance or September 15, 2016, whichever is earlier**, the parties shall contact the Chambers of Magistrate Judge Cott to schedule a settlement conference as soon as possible. In the event that the case does not settle, the Court will issue a further Order with respect to the timing and procedures leading up to trial (the details of which will depend on whether Dobbins is represented or not).

**\*8** The Clerk of Court is directed to terminate Docket No. 53; to terminate Officer Boyd and Hearing Officer Wiley (each of whom is named only in claims that have been dismissed) as Defendants; and to mail Dobbins a copy of this Opinion and Order.

**Dobbins v. Ponte, Slip Copy (2017)**

2017 WL 3309726

This Court certifies, pursuant to Title 28, United States Code, Section 1915(a)(3), that any appeal from this Order would not be taken in good faith, and *in forma pauperis* status is thus denied. *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

SO ORDERED.

**All Citations**

Slip Copy, 2017 WL 3309726

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 1724573
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Dwaine GRAY, Plaintiff,
v.
Doctor KANG LEE, Defendant.

No. 9:13–cv–258 (GLS/DEP).
|
Signed April 15, 2015.

**Attorneys and Law Firms**

Dwaine Gray, Malone, NY, pro se.

Hon. Eric T. Schneiderman, New York State Attorney General, The Capitol, Christopher W. Hall, Assistant Attorney General, of Counsel, Albany, NY, for the Defendant.

### *MEMORANDUM–DECISION AND ORDER*

GARY L. SHARPE, Chief Judge.

### I. *Introduction*

**\*1** Plaintiff *pro se* Dwaine Gray commenced this action against defendant Doctor Kang Lee,[1] pursuant to 42 U.S.C. § 1983, alleging that Lee was deliberately indifferent to Gray's serious medical needs in violation of the Eighth Amendment.[2] (*See generally* Compl., Dkt. No. 1.)

[1] Gray also named Ms. Vonda L. Johnson as a defendant, (Compl.), but she has since been dismissed from this action, (Dkt. No. 10 at 6–7, 9).

[2] In his complaint, Gray also asserted claims under the Americans with Disabilities Act, 42 U.S.C. §§ 12101–12213, and the Rehabilitation Act, 29 U.S.C. §§ 701–796I, (Compl.), but those claims have been dismissed, (Dkt. No. 10 at 5–6, 9).

On August 12, 2014, Lee filed a motion for summary judgment, (Dkt. No. 32), which Gray opposed, (Dkt. No. 40). In a Report and Recommendation (R & R) issued on March 9, 2015, Magistrate Judge David E. Peebles

recommended that Lee's motion for summary judgment be granted and Gray's remaining Eighth Amendment claim be dismissed. (Dkt. No. 43.) Pending are Gray's objections to the R & R. (Dkt. No. 44.) For the reasons that follow, the R & R is adopted in its entirety.

### II. *Background*[3]

[3] Gray specifically objects to Judge Peebles' recommendation that the court deem admitted all properly supported facts contained in Lee's statement of material facts. (Dkt. No. 43 at 3 n. 1; Dkt. No. 44 at 2.) The court reviews this portion of the R & R *de novo. See Almonte v. N.Y. State Div. of Parole,* No. Civ. 904CV484GLS, 2006 WL 149049, at \*3, \*5 (N.D.N.Y. Jan.18, 2006). Under this District's Local Rules, the moving party must submit a statement of material facts, which "set[s] forth, in numbered paragraphs, each material fact about which the moving party contends there is no genuine issue." N.D.N.Y. L.R. 7.1(a)(3). The opposing party must file a response to the statement of material facts, which must "mirror the movant's [s]tatement of [m]aterial [f]acts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs." *Id.* If the opposing party fails to comply, "[t]he [c]ourt shall deem admitted any properly supported facts set forth in the [s]tatement of [m]aterial [f]acts that the opposing party does not specifically controvert," and, where the opposing party is *pro se,* the moving party must advise the pro se litigant about the consequences of his failure to respond. *Id.* Here, while Gray filed a response opposing Lee's summary judgment motion, (Dkt. No. 40), he did not file anything that even remotely resembles a response to Lee's statement of material facts, despite receiving notice of the consequences of his failure to do so, (Dkt. No. 32 at 3). In his defense, Gray argues that he "submitted various pieces of evidence annexed to his opposition to summary judgment, showing that [Lee]' s narrative was self-serving," and that he "introduced to the [c]ourt documentary evidence that [Lee] obviously did not have a planned course of medical treatment, as [Lee] routinely came to contradictory conclusions, and would often ignore [Gray's] needs." (Dkt. No. 44 at 2.) However, "a district court has no duty to perform an independent review of the record to find proof of a factual dispute-even if that nonmoving party is proceeding pro se," and an individual's pro se status does not relieve him of the ramifications

associated with the failure to comply with the court's local rules. *Davis v. City of Syracuse,* No. 5:12–CV–0276, 2015 WL 1413362, at \*12 (N.D.N.Y. Mar.27, 2015). Therefore, the court adopts Judge Peebles' recommendation to deem admitted all properly supported facts set forth in Lee's statement of material facts. Accordingly, unless otherwise noted, the facts are not in dispute.

Gray is an inmate in the custody of the Department of Corrections and Community Supervision (DOCCS) and, during the time relevant to his claims, was incarcerated at Clinton Correctional Facility. (Def .'s Statement of Material Facts (SMF) ¶¶ 1, 9, Dkt. No. 32, Attach. 1.) Prior to entering Clinton, Gray suffered a shoulder injury, for which he was prescribed Naproxen. (*Id.* ¶ 8.) After arriving at Clinton in or around April 2012, Gray met with Lee, a clinical physician, who asked Gray if he wished to continue taking Naproxen. (*Id.* ¶¶ 3, 10.) Gray declined the medication, claiming that it did not work. (*Id.* ¶ 10.) One month later, Lee again met with Gray, at which time Gray complained of continued shoulder pain and requested stronger pain medication. (*Id.* ¶ 11.) Lee obliged Gray's request and prescribed Flexeril, a muscle relaxer used to relieve acute pain, but not suitable for long-term use. (*Id.* ¶¶ 11, 12.)

Over the Summer of 2012, Gray frequently met with medical staff, including Lee and various nurses at Clinton. (*Id.* ¶¶ 13–17.) During those meetings, Gray continued to complain of pain in his right shoulder, reiterated his refusal of Naproxen, and requested stronger pain medications-including a continuation of Flexeril and/or a narcotic analgesic. (*Id.* ¶¶ 13–17.) Also during those examinations, Lee consistently found that Gray had a good range of motion in his shoulder, despite Gray's complaints that he was unable to move it. (*Id.* ¶¶ 15, 16.)

At the end of September 2012, Lee ordered an x-ray of Gray's right shoulder, which was completed in early October. (*Id.* ¶¶ 18, 19.) Lee discussed the results with Gray, which indicated that there was "early osteoporosis ... present" and "a large spur arising from the inferior aspect of the acromion," ordered a magnetic resonance imaging (MRI) for further testing, and prescribed Motrin for Gray's pain. (*Id.* ¶¶ 19, 20; Dkt. No. 32, Attach. 2 at 4.) The MRI was completed in January 2013, and, once the radiologist's report was received, Lee referred Gray to an orthopedic specialist, as the MRI suggested that Gray may have a tendon tear. (Def.'s SMF ¶¶ 21, 23, 24.) During the time that Gray was waiting for his consultation with

the specialist, Gray continued to meet with medical staff at Clinton, and Lee continued to prescribe Motrin for Gray's pain. (*Id.* ¶ 25.) Ultimately, in April 2013, Gray was transferred to Franklin Correctional Facility, where he now resides, and whose medical staff is now charged with his care. (*Id.* ¶ 26.)

## III. *Standard of Review*

**\*2** Before entering final judgment, this court reviews report and recommendation orders in cases it has referred to a magistrate judge. If a party properly objects to a specific element of the magistrate judge's findings and recommendations, this court reviews those findings and recommendations *de novo. See Almonte v. N.Y. State Div. of Parole,* No. Civ. 904CV484GLS, 2006 WL 149049, at \*3, \*5 (N.D.N.Y. Jan.18, 2006). In those cases where no party has filed an objection, only vague or general objections are made, or a party resubmits the same papers and arguments already considered by the magistrate judge, this court reviews the findings and recommendations of the magistrate judge for clear error. *See id.* at \*45.

## IV. *Discussion*

In his R & R, Judge Peebles recommended dismissal of Gray's Eighth Amendment deliberate indifference claim. (Dkt. No. 43 at 12–21.) Specifically, Judge Peebles first noted that Gray failed to satisfy the objective requirement of this cause of action because Gray's medical records reflect that he was provided with frequent treatment, and, therefore, "no reasonable factfinder could conclude that ... Lee's treatment of [Gray]'s shoulder condition was inadequate or, to the extent it could be construed as inadequate, that it was sufficiently serious." (*Id.* at 16–19.) Judge Peebles further reasoned that, given the extensive treatment that Gray received, including frequent examinations, prescriptions for pain medications, x-rays, MRI testing, and referrals to orthopedic specialists, Gray also failed to prove the subjective component of a deliberate indifference claim. (*Id.* at 19–20.)

Here, Gray raises several objections to the R & R. First, Gray specifically objects to Judge Peebles' findings that Gray received consistent and adequate medical care and that Lee did not act with deliberate indifference.

(Dkt. No. 44 at 3–6.) Gray argues that Lee "often times came to different conclusions based on the same medical information" and failed to comply with both "accepted medical practice" and DOCCS policy by prescribing Motrin for long periods of time, which caused Gray stomach pains.[4] (*Id.*) The court reviews these objections *de novo. See Almonte,* 2006 WL 149049, at *3, *5.

[4]    The court notes that this is the first time that Gray has incorporated Lee's long-term prescription of Motrin as part of his Eighth Amendment claim. Indeed, both his complaint and response to Lee's motion for summary judgment are devoid of these allegations. (*See generally* Compl.; Dkt. No. 40.)

A prisoner's claim that he was provided insufficient medical care is analyzed under the Eighth Amendment's prohibition of cruel and unusual punishment. *See Estelle v. Gamble,* 429 U.S. 97, 101–03, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Id.* at 104 (internal quotation marks and citation omitted). "To show that he has been subjected to cruel and unusual punishment, a prisoner must satisfy a standard that includes both objective and subjective components." *Taylor v. Goorde,* 548 F. App'x 696, 697–98 (2d Cir.2013). The objective component asks whether the prisoner was actually deprived of adequate medical care and whether the denial in care was "sufficiently serious." *Id.* at 698 (internal quotation marks and citation omitted). The subjective component concerns the defendant's mental state, and requires a showing that the defendant acted "with deliberate indifference to inmate health"-"a mental state equivalent to subjective recklessness," which "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir.2006).

*3 Here, Gray has failed to satisfy both the objective and subjective components. In short, because Gray was frequently treated, prescribed pain medication, tested with an x-ray and MRI, and referred to an orthopedic specialist, he was not actually deprived of adequate treatment-the objective component-and, further, this extensive treatment and care is evidence that Lee did not act with deliberate indifference-the subjective component. The fact that Gray was not prescribed the precise pain medication of his choosing is of no moment; " 'a prisoner

does not have the right to choose his medical treatment as long as he receives adequate treatment.' " *Hanrahan v. Mennon,* 470 F. App'x 32, 33 (2d Cir.2012) (quoting *Hill v. Curcione,* 657 F.3d 116, 123 (2d Cir.2011)). Similarly, Gray's contentions that Lee violated DOCCS policy and "accepted medical practice" by prescribing Motrin for long-term use are equally without merit. First, a failure to comply with DOCCS policy directives or regulations is not a constitutional violation. *See Sanders v. Gifford,* No. 9:11–CV–0326, 2014 WL 5662775, at *4 (N.D.N.Y. Nov.4, 2014). Second, Gray alleges, at best, a negligence or medical malpractice claim, which also does not give rise to an Eighth Amendment violation. *See Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003). Accordingly, the court adopts Judge Peebles' findings that Gray was provided with adequate medical care, and that Lee did not act with deliberate indifference.

Second, Gray objects to Judge Peebles' findings of fact that Gray "could not be in severe pain because he worked at the Clinton ... mess hall" and that Gray ultimately "secured a less strenuous work detail at the facility mess hall for reasons other than [his] severe pain." (Dkt. No. 44 at 3 (referring to Dkt. No. 43 at 16–17, 16 n. 4.) Because these proposed findings of fact are not central, or even particularly relevant, to Judge Peebles' ultimate recommendation to dismiss Gray's complaint, the court construes these as general objections, which warrant review only for clear error. *See Almonte,* 2006 WL 149049, at *4–5.

At the outset of his analysis, Judge Peebles noted that the undisputed facts did not support a finding that Gray's pain was severe. (Dkt. No. 43 at 16–17.) Judge Peebles observed that Gray's continued work as a server in the mess hall, and his testimony that he was relieved of certain work duties not because of his injury, but because he was friendly with the corrections officer who assigned job responsibilities, undermined his claims of severe pain. (*Id.* at 16 n. 4.) These facts, however, were but a few of the facts that Judge Peebles considered in determining that Gray's pain was not severe. (*Id.* at 16–17 (noting that Gray's medical records also did not support a finding of severe pain, as medical personnel often discerned no acute distress, and further noting that Gray's voluntary discontinuation of Naproxen also belied his claims of severe pain).) In any event, notwithstanding the severity, or lack thereof, of Gray's pain, Judge Peebles concluded that Gray's claim should be dismissed because he was

provided with adequate medical care. (*Id.* at 16–19.) Accordingly, the court finds no clear error in either this portion of the R & R or the remainder of the R & R, and it is adopted in its entirety.

**\*4** Finally, the court notes that, in his objections to the R & R, Gray takes issue with Judge Peebles' denial of his motion to appoint counsel, arguing that, had he been appointed counsel, "summary judgment would not have been granted," and the failure to appoint counsel "may even rise to a violation of [Gray]'s right to Equal Protection." (Dkt. No. 44 at 6–7.) However, Gray's motion to appoint counsel was denied before the R & R was even issued, (Dkt.Nos.35, 37), and, therefore, Gray's dissatisfaction with the disposition of his motion to appoint counsel cannot appropriately be construed as an objection to the R & R at all. To the extent that Gray seeks to renew his motion to appoint counsel in his objections, that request is denied.

### V. *Conclusion*

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge David E. Peebles' March 9, 2015 Report and Recommendation (Dkt. No. 43) is **ADOPTED** in its entirety; and it is further

**ORDERED** that Lee's motion for summary judgment (Dkt. No. 32) is **GRANTED;** and it is further

**ORDERED** that Gray's complaint (Dkt. No. 1) is **DISMISSED;** and it is further

**ORDERED** that Gray's renewed motion to appoint counsel (Dkt. No. 44 at 6–7) is **DENIED;** and it is further

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum–Decision and Order to the parties.

**IT IS SO ORDERED.**

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

In this civil rights action, commenced pursuant to 42 U.S.C. § 1983, *pro se* plaintiff Dwaine Gray, a New York State prisoner, alleges that defendant Dr. Kang Lee, a prison physician, was deliberately indifferent to his serious medical needs by failing to provide him with proper pain medication and treatment for a shoulder injury suffered prior to his arrival at the correctional facility where defendant Lee was employed during the relevant time period. As relief, Gray seeks recovery of compensatory damages in the amount of $300,000, as well as injunctive relief directing the defendant to refer him for outside orthopedic consultation and prescribe for him appropriate pain medication.

Now that discovery in the action is closed, defendant has moved for summary judgment dismissing plaintiff's claim against him. In his motion, defendant Lee argues that plaintiff's claim represents little more than his disagreement with the course of treatment prescribed. For the reasons set forth below, I recommend that defendant's motion be granted.

I. *BACKGROUND* [1]

[1]    Although plaintiff has opposed defendant's motion for summary judgment, he did not file a response to defendant Lee's statement of undisputed material facts, submitted pursuant to rule 7.1(a)(3) of the local rules of practice for this court. By its terms, local rule 7.1 provides, in part, that *"[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."* N.D.N.Y. L.R. 7.1(a)(3) (emphasis in original). Courts in this district have routinely enforced a non-movant's failure to properly respond. *See, e.g., Elgamil v. Syracuse Univ.,* No. 99–CV–0611, 2000 WL 1264122, at \*1 (N.D.N.Y. Aug.22, 2010) (McCurn, J.) (listing cases). Undeniably, *pro se* litigants are entitled to some measure of forbearance when defending against summary judgment motions. *Jemzura v. Public Svc. Comm'n,* 961 F.Supp. 406, 415 (N.D.N.Y.1997) (McAvoy, J.). The deference owed to *pro se* litigants, however does not extend to relieving them of the ramifications associated with the failure to comply with the court's local rules. *Robinson v. Delgado,* No. 96–CV–0169, 1998 WL 278264, at \*2 (N.D.N.Y. May 22, 1998) (Pooler, J.,

adopting report and recommendation by Hurd, M.J.). Stated differently, "a pro se litigant is not relieved of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Latouche v. Tompkins,* No. 09–CV–0308, 2011 WL 1103045, at *1 (N.D.N.Y. Mar. 23, 2011) (Mordue, J.). Here, because plaintiff was warned of the consequences of failing to properly respond to defendant's statement of undisputed material facts, *Dkt. No. 32 at 3,* and he has failed to do so, I recommend that the court deem the facts contained in defendant Lee's statement as having been admitted to the extent they are supported by accurate record citations. *See, e.g., Latouche,* 2011 WL 1103045, at *1; *see also Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). As to any facts not contained in defendant's statement of undisputed material facts, in light of the procedural posture of this case, the court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of plaintiff. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003).

Plaintiff is a prison inmate being held in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). *See generally Dkt. No. 1.* While he is currently confined elsewhere, at the times relevant to his claims in this action, Gray was incarcerated at the Clinton Correctional Facility ("Clinton") located in Dannemora, New York. *Id.*

**\*5** In January 2012, while detained at the Westchester County Jail, Gray slipped and fell in the shower, injuring his right shoulder. *Dkt. No. 1 at 4; Dkt. No. 32–2 at 1.* Plaintiff entered into DOCCS's custody two months later, on or about March 2, 2012, and was initially designated to the Downstate Correctional Facility ("Downstate"). *Dkt. No. 32–3 at 16,* 20. On March 16, 2012, while Gray was at Downstate, an x-ray taken of his right shoulder revealed "no fracture, dislocation, soft tissue calcification or significant arthritic change. Large enthesophyte extending from anteroinferior port of acromium measuring about 1.5 cm." *Id.* at 20; *Dkt. No. 32–2 at 57.* The impression stated on the x-ray report by the attending roentgenologist was "NO ACUTE BONE INJURY IDENTIFIED RIGHT SHOULDER STUDY. NO DJD. LARGE ENTHESOPHYTE EXTENDING FROM INFERIOR PORTION OF ACROMIUM. THIS CAN CONTRIBUTE TO SHOULDER IMPINGEMENT SYNDROME IN PROPER CLINICAL SETTING. NO PRIOR STUDY." *Dkt. No. 32–2 at 57.* According to the plaintiff's

health records, a physician at Downstate met with Gray on March 20, 2012, at which time he discussed the x-ray results with plaintiff and prescribed 500 milligrams of Naproxen twice daily for thirty days. [2] *Dkt. No. 32–2 at 55; Dkt. No. 32–3 at 20–21*

[2]     Naproxen is a non-steroidal anti-inflammatory drug used to treat pain and inflammation associated with various medical conditions. *Dorland's Illustrated Medical Dictionary,* 1251 (31st ed.2007).

Plaintiff was transferred into Clinton on April 10, 2012. *Dkt. No. 32–3 at 19.* While at Clinton, his medical care was overseen by defendant Kang Lee, M.D., a prison physician employed at that facility. *Dkt. No. 32–2 at 1.*

Defendant Lee first met with Gray on April 13, 2012. *Dkt. No. 32–2 at 3,* 5–52. Plaintiff refused defendant Lee's offer to continue Naproxen at that time because, according to plaintiff, it did not help his pain. *Dkt. No. 32–2 at 3; Dkt. No. 32–2 at 51.*

Defendant Lee met with plaintiff again on May 31, 2012. *Dkt. No. 322 at 3,* 50. During that visit, plaintiff continued to complain of right shoulder pain. *Id.* Defendant Lee observed that Gray had a good range of motion and responded to his request for stronger pain medication with a short term prescription of Flexeril (cyclobenzaprine), a muscle relaxer commonly used to relieve skeletal muscle spasms and pain associated with acute musculoskeletal conditions. *Id.; see also Dorland's Illustrated Medical Dictionary,* 463, 725. During subsequent meetings with facility nurses on June 3, 2012 and June 26, 2012, Gray persisted in his refusal of Naproxen and indicated a desired to continue receiving Flexeril instead. *Dkt. No. 321 at 3; Dkt. No. 32–2 at 3,* 49.

On June 29, 2012, defendant Lee examined plaintiff's shoulder, again finding good range of motion. *Dkt. No. 32–2 at 3,* 48. According to defendant Lee, during this appointment, plaintiff requested a prescription for a narcotic analgesic. *Id.* Discerning no need for it, defendant Lee denied plaintiff's request. *Id.*

Plaintiff was next seen by defendant Lee on August 13, 2012. *Dkt. No. 32–2 at 4,* 47. At that time, despite plaintiff's claim that he could not move his right shoulder, defendant Lee continued to find that he had a good range of motion. *Id.*

**\*6** During plaintiff's visit with medical staff at Clinton on September 4, 2012, he was not in acute distress, did not ask for pain medicine, and was observed having full range of motion in his right shoulder. *Dkt. No. 32–2 at 4*, 46. On September 8, 2012, medical personnel attended to plaintiff for complaints about a twisted ankle, and notes from that visit do not include any indication that plaintiff complained of shoulder pain or requested pain medication. *Id.*

On September 29, 2012, defendant Lee ordered a second x-ray of Gray's right shoulder. *Dkt. No. 32–2 at 4*, 45. The x-ray, which was taken on October 4, 2012, was interpreted by the attending radiologist as follows:

> EARLY OSTEOPOROSIS IS PRESENT AT THE GLENOHUMERAL JOINT. THERE IS A LARGE SPUR ARISING FROM THE INFERIOR ASPECT OF THE ACROMION. THIS MAY CONTRIBUTE TO IMPINGEMENT. CONSIDER CORRELATION WITH MRI EXAM.

*Id.* at 70. During his appointment with plaintiff on October 15, 2012, defendant Lee discussed the results of the x-ray and prescribed Motrin for plaintiff's pain. *Id.* at 4, 44.

Defendant Lee met with plaintiff again on November 8, 2012, at which time he referred Gray for magnetic resonance imaging ("MRI") testing. *Dkt. No. 32–2 at 4*, 42. The MRI testing, conducted on January 11, 2013, resulted in the following findings, rendered by the attending radiologist:

> FINDINGS: Abnormal signal is present in the anterior aspect of the supraspinatus portion of the rotator cuff tendon consistent with a tear. There is also a suggestion of extension to the center portion of the supraspinatus tendon. Abnormal signal in the subscapularis portion of the rotator cuff tendon suggests a tear. Glenoid labrum is intact. There is abnormal signal in the superolateral aspect of the head of the right humerus consistent with bone edema. The acromioclavicular joint is intact.

> IMPRESSION: FINDINGS SUGGESTING A TEAR TO THE ANTERIOR ASPECT OF THE SUPRASPINATUS PORTION OF THE ROTATOR CUFF TENDON. THESE ABNORMALITIES ARE LOCATED ADJACENT TO PROMINENT CORTICAL SPUR ON THE UNDERSURFACE OF THE RIGHT ACROMION. POSSIBLE SUBSCAPULARIS TENDON TEAR.

*Dkt. No. 32–2 at 72*.

After receiving the MRI report, defendant Lee commenced the process for referring the plaintiff to an outside orthopedic specialist on January 31, 2013. *Dkt. No. 32–2 at 5*, 38, 73–74. While Gray awaited his orthopedic consultation, he met with medical staff at Clinton on several occasions, and defendant Lee continued to prescribe Motrin for plaintiff's pain. *Dkt. No. 32–2 at 5*, 33–37.

Plaintiff was transferred out of Clinton and into the Franklin Correctional Facility on April 25, 2013. *Dkt. No. 32–2 at 5; Dkt. No. 32–3 at 31*. At that point, defendant Lee's responsibility for plaintiff's medical treatment was transferred to the medical staff at the new facility. *Dkt. No. 32–2 at 5*.

In general, plaintiff does not dispute the above-described facts. Instead, plaintiff complains that defendant Lee swiftly terminated each appointment without undertaking any examination of him and failed to refer him to an outside specialist. *See, e.g., Dkt. No. 1 at 5–6* ("Upon seeing [defendant Lee in April 2012,] I explained that I try to move my arm, my statement to him was it hurts whenever I try to move it, he then summoned for the officer that for [sic] me to leave.... Upon seeing him, never once did he look in my medical records, all he did was ask me my name, then he said that I'm done.... [Defendant] Lee acted deliberately to deny treatment, and or [sic] to make specialty care[ ] referrals[.]"); *Dkt. No. 32–3 at 50* ("[E]very time I went to [defendant Lee's] office, it was like maybe 30 seconds, I'd been there for 30 seconds."); *Dkt. No. 40 at 3* ("[Defendant Lee] routinely ignored [plaintiff]'s complaints and medical needs and provided only cursory examinations without reviewing his medical file.").

## II. *PROCEDURAL HISTORY*

**\*7** Plaintiff commenced this action on or about March 8, 2013. *Dkt. No.* 1. Although plaintiff's complaint names two defendants, Dr. Kang Lee and Ms. Vonda L. Johnson, the medical supervisor at Clinton, the claims asserted against defendant Johnson were dismissed by Chief Judge Gary L. Sharpe in a decision and order dated September 13, 2013. *Id.* at 1–2; *Dkt. No. 10.* Judge Sharpe's order, issued pursuant to 28 U.S.C. §§ 1915(e) and 1915A, also granted plaintiff's application to proceed in the action *in forma pauperis* and dismissed plaintiff's claims asserted under the Americans With Disabilities Act, 42 U.S.C. § 12101 *et seq.,* and section 504 of the Rehabilitation Act, 29 U.S.C. § 794, without prejudice. *Dkt. No. 10 at 8–9.*

Plaintiff's Eighth Amendment deliberate medical indifference claim asserted against defendant Lee survived Judge Sharpe's initial order, and is the subject of defendant Lee's pending motion for summary judgment, filed on August 12, 2014. *Dkt. No. 10 at 9; Dkt. No. 32.* In his motion, defendant Lee argues that no reasonable factfinder could conclude he was deliberately indifferent to plaintiff's serious medical needs. *See generally Dkt. No. 32–4.* Plaintiff responded in opposition to defendant's motion on September 26, 2014. *Dkt. No. 40.*

Defendant's motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Summary Judgment Standard*
Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005). A material fact is genuinely in dispute "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4; *Sec. Ins. Co.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S. at 250.

**\*8** When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Anderson,* 477 U.S. at 255; *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B. *Plaintiff's Deliberate Medical Indifference Claim*
In his complaint, plaintiff alleges that defendant Lee was deliberately indifferent to his serious medical needs, in violation of the Eighth Amendment, by failing to conduct a full examination, refer him to outside specialist, and prescribe pain medication. *See generally Dkt. No. 1.* Defendant Lee, however, contends that his care and treatment of plaintiff was appropriate, and no reasonable factfinder could conclude otherwise based on the record evidence. *See generally Dkt. No. 32–4.*

### 1. *Legal Standard Governing Deliberate Medical Indifference Claims*
The Eighth Amendment prohibits punishment that is "incompatible with 'the evolving standards of decency that mark the progress of a maturing society [,]' or which 'involve the unnecessary and wanton infliction of pain [.]' " *Estelle v. Gamble,* 429 U.S. 97, 102–03, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (quoting *Trop v. Dulles,* 356 U.S. 86, 100–01, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) and

Case 9:15-cv-01222-MAD-TWD   Document 59   Filed 02/12/18   Page 177 of 231
Gray v. Rang Lee, Not Reported in F.Supp.3d (2015)
2015 WL 1724573

*Gregg v. Georgia,* 428 U.S. 153, 169–73, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (citations omitted)). While the Eighth Amendment " 'does not mandate comfortable prisons,' neither does it permit inhumane ones." *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). "These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Estelle,* 429 U.S. at 103. Failure to provide inmates with medical care, "[i]n the worst cases, ... may actually produce physical torture or lingering death, [and] ... [i]n less serious cases, ... may result in pain and suffering no one suggests would serve any penological purpose." *Id.*

A claim alleging that prison officials have violated an inmate's Eighth Amendment rights by neglecting to provide adequate medical care must satisfy both objective and subjective requirements. *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009); *Price v. Reilly,* 697 F.Supp.2d 344, 356 (E.D.N.Y.2010). To satisfy the objective requirement, the Second Circuit has said that

> [d]etermining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable medical care.... Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner.

**\*9** *Salahuddin v. Goord,* 467 F.3d 263, 279–80 (2d Cir.2006) (citations omitted).

The second inquiry of the objective test requires a court to look at the seriousness of the inmate's medical condition if the plaintiff alleges a complete failure to provide treatment. *Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003). "Factors relevant to the seriousness of a medical condition include whether a reasonable doctor or patient would find it important and worthy

of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain ." *Salahuddin,* 467 F.3d at 280 (quotation marks and alterations omitted).

If, on the other hand, a plaintiff's complaint alleges that treatment was provided but was inadequate, the second inquiry of the objective test is narrowly confined to that specific alleged inadequacy, rather than focusing upon the seriousness of the prisoner's medical condition. *Salahuddin,* 467 F.3d at 280. "For example, if the prisoner is receiving ongoing treatment and the offending conduct is an unreasonable delay or interruption in that treatment, [the focus of the] inquiry [is] on the challenged delay or interruption in treatment, rather than the prisoner's underlying medical condition alone." *Id.* (quotations marks omitted).

To satisfy the subjective requirement, a plaintiff must demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.' " *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999). "In medical-treatment cases ..., the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin,* 467 F.3d at 280. "Deliberate indifference," in a constitutional sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.* (citing *Farmer,* 511 U.S. at 837); *see also Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J .); *Waldo v. Goord,* No. 97–CV–1385, 1998 WL 713809, at \*2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J., *adopting report and recommendation* by Homer, M.J.). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin,* 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 839–40).[3]

3    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

### 2. *Analysis*
Addressing first the objective element of the governing test, I note that the record evidence demonstrates defendant Lee and other DOCCS medical personnel at

2015 WL 1724573

Clinton provided plaintiff with frequent treatment for his shoulder condition. *Dkt. No. 32–2 at 33–57*. Plaintiff's medical records, while indicating complaints of pain, do not support his claims that he suffered severe pain, and indeed, in some instances, medical personnel treating plaintiff discerned no acute distress. *See, e.g., id.* at 46. Moreover, despite plaintiff's allegations that he suffered severe pain, the evidence before the court reflects that he was able to work as a server in the facility mess hall for three hours per day, seven days a week, from approximately June 2012 until August of that year, when he began ASAT programing. *Dkt. No. 32–3 at 33–37*. In his job at the mess hall, plaintiff would fill pitchers with water, clean the tables, or disburse bread to inmates. [4] *Id.* at 34. The record also reflects that plaintiff voluntarily discontinued taking the pain medication Naproxen in or about the beginning of June 2012. *Dkt. No. 32–2 at 51; Dkt. No. 32–3 at 21*. At that time, rather than ignoring plaintiff's complaints of pain altogether, defendant Lee provided a prescription for Flexeril, a muscle relaxer, for two weeks. *Dkt. No. 32–3 at 23*. Thereafter, plaintiff was prescribed Percocet, an analgesic comprised of oxycodone hydrochloride and acetaminophen, and over-the-counter medications for his pain. *Dkt. No. 32–2 at 33–47; Dorland's Illustrated Medical Dictionary,* 1377, 1429. Defendant Lee also thereafter ordered repeat x-rays of plaintiff's shoulder in September 2012, and ordered an MRI in January 2013, based on the x-ray results. *Id.* at 42, 45, 77–78. Based upon these circumstances, it is doubtful that a reasonable factfinder could conclude that defendant Lee did not provide plaintiff with consistent and appropriate care.

[4]    At his deposition in connection with this matter, plaintiff first stated that he was removed from "table top" duty, involving filling water pitchers and cleaning table tops, due to the pain in his shoulder. *Dkt. No. 32–3 at 34*. Later, however, plaintiff testified that he began disbursing the bread not "because [his] shoulder was hurting him," but because he knew the corrections officer assigning jobs. *Id.* at 42.

**\*10** Even if the court assumes, for purposes of this motion, that plaintiff's allegations are true, including that defendant Lee's examinations of plaintiff were superficial and short in duration, and that defendant Lee failed to prescribe the pain medication plaintiff requested, I find that no reasonable factfinder could conclude that defendant Lee's treatment of plaintiff's shoulder condition was inadequate or, to the extent it could be

construed as inadequate, that it was sufficiently serious. The Eighth Amendment does not afford prisoners a right to medical treatment of their choosing. The question of what diagnostic techniques—including x-rays and MRIs—and treatments should be administered to an inmate are "classic example[s] of a matter for medical judgment," and, accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle,* 429 U.S. at 107; *Chance,* 143 F.3d at 703; *Rosales v. Coughlin,* 10 F.Supp.2d 261, 264 (W.D.N.Y.1998). In this case, plaintiff's claim is based on his desire to be examined in a specific manner and provided specific pain medications. This constitutes a disagreement regarding the course of treatment, which does not give rise to a constitutional right or sustain a claim under section 1983. *United States ex rel. Hyde v. McGinnis,* 429 F.2d 864, 867 (2d Cir.1970) (citation omitted).

As described above, plaintiff's medical records reflect that he was seen by defendant Lee on four occasions between April 2012 and August 2012, before defendant Lee ordered x-rays of plaintiff's shoulder in September 2012. *Dkt. No. 32–2 at 45,* 47, 48, 50, 52. In between his visits with defendant Lee, other medical personnel at Clinton monitored plaintiff's shoulder condition. *Id.* at 33–57. When a provider callout was requested, defendant Lee timely responded with an examination of plaintiff. *Id.* at 4749. Within six months of plaintiff's arrival at Clinton, and because plaintiff's pain persisted, defendant Lee ordered x-rays, thereafter ordered MRI testing, and then initiated a process for referral of the plaintiff to a specialist. *Id.* at 38, 45, 73–74, 77–78. Under these circumstances, even taking into consideration plaintiff's allegations, I find that no reasonable factfinder could conclude that defendant Lee's treatment of plaintiff's shoulder condition was sufficiently serious to satisfy a deliberate medical indifference claim under the Eighth Amendment.

Similarly, based on defendant Lee's declaration submitted in support of the pending motion and the treatment afforded plaintiff by defendant Lee as documented in plaintiff's medical records, I find that no reasonable factfinder could conclude that defendant Lee acted with deliberate indifference to a serious medical condition. The record reflects that on each occasion he was seen by defendant Lee, plaintiff's range of motion was observed and medication consistent with defendant Lee's

professional judgment was prescribed. *Dkt. No. 32–2 at 47,* 48, 50, 52. When plaintiff's shoulder pain persisted, a new x-ray was ordered and, based upon the findings of that x-ray, MRI testing was arranged. *Id.* at 45, 77–78. Upon receipt and review of the MRI report, defendant Lee referred Gray to an outside orthopedic specialist. *Id.* at 38, 73–74. Simply stated, based upon a careful review of the record, I find nothing to suggest that defendant Lee turned a blind eye to plaintiff's condition or failed to act while aware of a substantial risk of harm to plaintiff's health or safety.

 **\*11**  Accordingly, because I find that the record evidence does not reflect a genuine dispute of material fact with respect to either the objective or subjective element of plaintiff's medical indifference claim, I recommend defendant Lee's motion for summary judgment be granted. [5]

[5] Plaintiff's response in opposition to defendant Lee's summary judgment motion reflects his belief defendant Lee was negligent in providing him with treatment and liable for medical malpractice. *See generally Dkt. No. 40.* For example, in his memorandum of law, plaintiff states the following:

It is clear from Plaintiff's original claim, his response above and comprehensive exhibits that he presents a viable claim that Dr. Lee did not use reasonable care or best judgment in applying the knowledge and skill ordinarily possessed by practitioners in the field and that he deviated from accepted standards of medical practice, and that deviation was the proximate or aggravating cause of the injuries or damage to Petitioner.

*Dkt. No. 40 at 8–9.* Claims of negligence and medical malpractice, however, are not cognizable under 42 U.S.C. § 1983. *See, e.g., Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ( "[D]eliberate indifference describes a state of mind more blameworthy than negligence."); *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) ("A showing of medical malpractice is ... insufficient to support an Eighth Amendment claim unless the malpractice involves culpable recklessness."); *Morris v. Hoke,* No. 87–CV–7812, 1992 WL 310792, at \*2 (S.D.N.Y.

Oct.21, 1992) ("[T]he [plaintiff's allegations] would underlie, at best, a state claim of negligence or medical malpractice, not cognizable under 42 U.S.C.1983."). Accordingly, I recommend that, to the extent plaintiff's complaint could be construed as asserting state law negligence and medical malpractice claims, the court declines to exercise supplemental jurisdiction over those claims in the event my recommendation is accepted and plaintiff's federal claim against defendant Lee is dismissed.

IV. *SUMMARY AND RECOMMENDATION*

Based upon a careful review of the evidence now before the court, including excerpts of plaintiff's medical records and the transcript of plaintiff's deposition, I conclude that no reasonable factfinder could find plaintiff can satisfy either the objective or subjective element of the governing test for establishing a deliberate medical indifference claim under the Eighth Amendment. Accordingly, it is therefore respectfully

RECOMMENDED that defendant Lee's motion for summary judgment (*Dkt. No. 32* ) be GRANTED, and that plaintiff's remaining deliberate indifference claim be DISMISSED in all respects.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Filed March 9, 2015.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 1724573

---

**End of Document**     © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 865844
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Ronald GANTT, Plaintiff,

v.

Martin HORN et al., Defendants.

No. 09 Civ. 7310(PAE).
|
March 8, 2013.

*OPINION & ORDER*

PAUL A. ENGELMAYER, District Judge.

**\*1** Plaintiff Ronald Gantt, proceeding *pro se,* brings this action pursuant to 42 U.S.C. § 1983 claiming that defendants—corrections officers employed by the New York City Department of Corrections ("DOC") —violated his Eighth Amendment rights during his incarceration. He claims the defendants (1) acted with deliberate indifference in depriving him of adequate medical treatment, and (2) denied him outdoor recreation.[1] Defendants now move for summary judgment under Federal Rule of Civil Procedure 56. For the reasons set forth, that motion is granted.

[1]    In his opposition to defendants' summary judgment motion, Gantt expressed the intention to abandon an additional claim, based on the confiscation of his footwear. Pl. Br. 4.

## I. Background and Procedural History[2]

[2]    Although Gantt submitted a short opposition to the motion for summary judgment (Dkt.93), it is essentially devoid of factual assertions, and Gantt failed to file a responsive statement of undisputed facts, as required by Rule 56.1 of the District's Local Civil Rules. Where a party fails to do so, a district court "may in its discretion opt to 'conduct an assiduous review of the record,' " to assure that the non-movant's rights are protected, and the Court does so here. *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001) (quoting *Monahan v. N.Y.C. Dep't of Corr.,* 214 F.3d 275, 292 (2d Cir.2000)). The background facts set forth herein are derived from the

materials cited in defendants' Local Civil Rule 56.1 Statement of Undisputed Facts, with all ambiguities drawn in favor of the plaintiff. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). These materials include the Declaration of Jeffrey S. Dantowitz ("Dantowitz Decl.") (Dkt.83) and attached exhibit; the Declaration of Dr. Ross MacDonald ("MacDonald Decl.") (Dkt.84) and attached exhibits; and Defendants' Local Rule 56.1 Statement of Material Fact ("Def.56.1") (Dkt.82). Citations to defendants' 56.1 statement incorporate by reference the documents contained therein.

### A. Overview of Gantt's Incarceration During 2008 and 2009

Between September 17 and 25, 2008, Gantt was incarcerated by the DOC at the Anna M. Kross Center ("AMKC") on Riker's Island. He was then released on bail. Dantowitz Decl. ¶ 2. Between October 14, 2008, and May 6, 2009, Gantt was again incarcerated and housed at AMKC. *Id.* On May 6, 2009, Gantt was found to be in possession of narcotics and tobacco and was transferred to the Central Punitive Segregation Unit ("CPSU") of the Otis Bantum Correctional Center ("OBCC"). *See* Second Amended Complaint ("SAC") (Dkt.24), at 4; Dantowitz Decl. ¶ 3. On June 16, 2009, Gantt was transferred to a New York State correctional facility. Dantowitz Decl. ¶ 3. On June 26, 2009, Gantt was rearrested and returned to DOC, where he was housed at the Robert N. Davoren Center ("Davoren Center"). On June 28, 2009, Gantt was transferred from the Davoren Center back to the CPSU at OBCC, where he was housed until July 17, 2009. *Id.* Gantt was then again transferred to a New York State correctional facility. *Id.*

Gantt's claims of Eighth Amendment violations arise from his detention at both at AMKC and OBCC. He claims that the defendants failed to adequately treat his rheumatoid arthritis and glaucoma, and unjustifiably delayed treating those conditions.

### B. Gantt's Medical Treatment

On September 17, 2008, when Gantt arrived at AMKC, AMKC medical staff performed an intake medical examination. Def. 56.1 ¶ 24. They asked Gantt about any health conditions and whether he was taking medication for ongoing illnesses. *Id.* DOC's records of Gantt's intake

do not indicate that he disclosed either that he was suffering from rheumatoid arthritis or glaucoma, or that he reported taking any medication for these, or any other, conditions. *Id.;* MacDonald Decl. Ex. A ("Sept. 17 Exam.").

On October 15, 2008, following his return to DOC custody, a new intake medical screening was performed. MacDonald Decl. ¶ 24. DOC's records of Gantt's intake reflect that Gantt told attending medical staff that he suffered from rheumatoid arthritis. DOC's records do not, however, reflect that Gantt identified any medications he was currently taking, or that Gantt disclosed that he was suffering from glaucoma. *Id.;* *id.* Ex. B ("Oct. 15 Exam."). The attending medical staff developed a plan to treat the pain associated with Gantt's rheumatoid arthritis, which included his taking 500 milligrams of Naprosyn twice daily. Oct. 15 Exam. at 4. That plan was approved by a supervising physician. *Id.* The same day, a pharmacy order was issued authorizing the administration to Gantt of 500 milligrams of Naprosyn twice daily for four days. MacDonald Decl. ¶¶ 25–26; *id.* Ex. C. [3]

[3]   It is unclear whether Gantt received this Naprosyn as prescribed. Gantt claims in his Second Amended Complaint that he did not receive it for two weeks and that, in response, he placed his name on a sick call list requesting medical attention. SAC 3. An inmate who makes such a request can request a visit to the AMKC clinic for evaluation Monday through Friday, MacDonald Decl. ¶ 6, and may also seek medical treatment by making an emergency sick call, at any time. *Id.* Gantt's medical records, which include records of other sick-call consultations, do not reflect any sick-call requests or consultations before December 14, 2008. *Id.* ¶ 27. On the other hand, the medical records do not reflect the distribution of a four-day order of Naprosyn to Gantt in accordance with the October 15 pharmacy order. MacDonald Decl. Ex. C. Even assuming that Gantt did not receive the Naprosyn prescribed in October, however, for the reasons that follow, this lapse is insufficient to support a claim under the Eighth Amendment.

**\*2**  On December 14, 2008, during an emergency sick call, Gantt reported to the attending physician that he had glaucoma and required medication. MacDonald Decl. ¶ 27. The physician referred Gantt to the optometry clinic and issued a consultation request that Gantt be evaluated by the appropriate specialist. *Id.;* *id.* Ex. D ("Dec. 14 Consultation Request"). The same day, the

site medical director approved that request; Gantt was given an appointment at the prison's optometry specialty clinic scheduled for December 19, 2008. MacDonald Decl. ¶¶ 27–28. According to the DOC's records of Gantt's medical history, Gantt refused this appointment. *See* Dec. 14 Consultation Request. [4]

[4]   In his Second Amended Complaint, Gantt alleges that he "never refused any medical direction." SAC 3. Under Correctional Health Service ("CHS") policy, an inmate who refuses an appointment with a specialist must complete a Refusal of Treatment form indicating that he has met with medical staff and understands the risks of refusing such treatment. MacDonald Decl. ¶ 13. Defendants have not produced such a form related to Gantt's optometry appointment. Gantt's refusal is instead documented only in a handwritten notation on the Consultation Request. *See* Dec. 14 Consultation Request.

On January 26, 2009, during a sick call visit, an attending physician examined Gantt, who had complained of pain associated with rheumatoid arthritis. MacDonald Decl. ¶ 29; SAC 3. The attending physician prescribed 500 milligrams of Naprosyn twice a day for five days. MacDonald Decl. ¶ 29; *id.* Ex. E. That evening, Gantt received a four-day supply of Naprosyn. MacDonald Decl. Ex. F; *id.* ¶ 30.

The attending physician also referred Gantt to a rheumatologist. *Id.* ¶ 31; *id.* Ex. G. On February 11, 2009, Gantt was examined by a rheumatology specialist at Bellevue Hospital. MacDonald Decl. ¶ 31; SAC 4. The specialist recommended that Gantt receive 500 milligrams of Naprosyn twice a day or 600 milligrams of Ibuprofen three times a day. MacDonald Decl. ¶ 31.

On February 24, 2009, Gantt was seen for mental health care by an AMKC social worker, who referred Gantt to the medical clinic for an evaluation related to his arthritis and glaucoma. *Id.* ¶ 32. Two days later, on February 26, 2009, attending medical staff prescribed Gantt 500 milligrams of Naprosyn twice a day for three days. *Id.* ¶ 33. That evening, Gantt received a three-day supply of Naproxen (another name for Naprosyn). *Id.;* *id.* Ex. H.

On May 7, 2009, in response to complaints of wrist pain, Gantt was prescribed 500 milligrams of Naproxen twice a day for four days. *Id.* ¶ 34. The following evening, Gantt received a four-day supply of Naproxen. *Id.* Ex. I.

On June 27, 2009, Gantt was prescribed 400 milligrams of Motrin three times a day for four days; the following evening he received the Motrin. *Id.* ¶ 35; *id.* Ex. J. During the June 27, 2009 evaluation, Gantt reported for the first time that he had not taken glaucoma medication during the preceding eight months. *Id.* ¶ 36. He told the attending medical staff that he had missed his December 2008 ophthalmology appointment and, for the first time, told medical staff that he had previously been prescribed Travatan and Timolol. *See id.* Ex. K ("June 27 Consultation Request"). Gantt was referred to the optometry clinic for evaluation. *Id.* However, Gantt failed to appear for his July 6, 2009 appointment at that clinic. *See id.* Ex. L ("Specialty Clinic Form") (indicating that Gantt was a "No show" and needed a new appointment).

**\*3** On July 12, 2009, Gantt was prescribed 400 milligrams of Motrin to be taken once a day for five days, and received a seven-day supply of Motrin the following evening. *Id.* Ex. M. On July 14, 2009, Gantt was examined by an attending physician who again referred him to the optometry specialty clinic for evaluation of his glaucoma. *Id.* Ex. N ("July 14 Consultation Request"). On July 17, 2009, however, before he could be seen by the optometry clinic, Gantt was discharged from DOC and transferred to a New York State correctional facility. *Id.* ¶ 39; Dantowitz Decl. ¶ 3.

Although Gantt alleges that his eyesight "will suffer in the long run because of the action of the defendants," he acknowledges that his eyesight is "not yet damaged." SAC 7. When deposed on April 13, 2012, Gantt attested that he is "in regular shape except for the pain in the neck [and] back area." Dantowitz Decl. Ex. A ("Gantt Dep.").

### C. Gantt's Administrative Grievances

DOC's grievance procedure, the Inmate Grievance Resolution Program (the "IGRP"), sets out the steps an inmate must follow to exhaust his or her administrative remedies. Dantowitz Decl. ¶ 4. It states that "[i]f the inmate has not received any response [within the five-day period for informal resolution of grievances], the inmate should go to the Grievance Office to sign Form # 710R and indicate on that form that a hearing is requested." *Id.* ¶ 5 (citation omitted). The IGRP also specifies the process that inmates confined to their cells must use to make a hearing request. *Id.* It further provides that inmates must appeal adverse determinations of their grievances to the

warden, then to the Central Office Review Committee, and finally to the Board of Correction. *Id.* ¶ 6. *See, e.g., Mamon v. N.Y.C. Dep't of Corr.,* No. 10 Civ. 8055(NRB), 2012 WL 260287, at * 3 (S.D.N.Y. Jan. 27, 2012) (summarizing the IGRP).

Gantt alleges that, beginning in October 2008, he filed four formal grievances relating to his medical care while in prison. *See* SAC 3, 4, 6. In support of his allegations, Gantt attached three of these grievances filed in May 2009, two on May 26, 2009. SAC 12–19. These grievances allege, *inter alia,* (1) denial of medical services, (2) denial of recreation time, and (3) deficient cleanliness of visitation areas. [5] Gantt further alleges that his grievances went unanswered by prison officials. *Id.* DOC records indicate that, although Gantt's grievances were apparently not acted upon, Gantt neither requested a hearing in connection with any of his formal grievances, nor filed an appeal with the warden of any DOC facility, the Central Office Review Committee, or the Board of Correction. Dantowitz Decl. ¶ 7. Gantt acknowledges that he did not request a hearing related to his grievances and that he did not file any appeal. Pl. Br. 1–2.

[5]     Gantt does not bring any claim here relating to the cleanliness of visitation areas.

### D. Procedural History

On August 19, 2009, Gantt filed his original Complaint against the DOC and individual corrections officers pursuant to 42 U.S.C. § 1983, alleging violations of his Eighth Amendment rights. Dkt. 2. On March 24, 2010, defendants filed their answer to Gantt's original Complaint. Dkt. 13. On September 23, 2010, Gantt filed his First Amended Complaint. Dkt. 21. On January 24, 2011, with permission of the Court, Gantt filed his Second Amended Complaint. Dkt. 24. On May 3, 2011, defendants filed their answer to Gantt's Second Amended Complaint. Dkt. 48. On May 10, 2011, the Court set a discovery schedule. Dkt. 52. On August 21, 2012, after several extensions of the discovery period and briefing schedule, defendants moved for summary judgment. Dkt. 81–85. On December 28, 2012, Gantt submitted his opposition to the motion for summary judgment. Dkt. 93. On January 10, 2013, defendants filed a reply. Dkt. 94.

### II. Applicable Legal Standard

**\*4** Under Rule 56, to prevail on a motion for summary judgment, the movant must "show [ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The movant bears the burden of demonstrating the absence of a question of material fact. In determining whether this standard has been met, the Court must view all facts "in the light most favorable" to the non-moving party. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *see also Holcomb v. Iona Coll.,* 521 F.3d 130, 132 (2d Cir.2008). To survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed.R.Civ.P. 56(c)(1); *see also Wright v. Goord,* 554 F.3d 255, 266 (2d Cir.2009). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines,* 593 F.3d 159, 166 (2d Cir.2010) (citation omitted). Only disputes over "facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian,* 680 F.3d 234, 236 (2d Cir.2012) (citing *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003)).

The Court is mindful that Gantt is a *pro se* litigant whose submissions must be construed to "raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons,* 470 F .3d 471, 474 (2d Cir.2006) (per curiam) (citation and emphasis omitted). However, this forgiving standard "does not relieve plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 50 (2d Cir.2003) (citation omitted). Bald assertions by a *pro se* litigant, " 'completely unsupported by evidence, [are] not sufficient to overcome a motion for summary judgment.' " *Geldzahler v. N. Y. Med. Coll.,* 746 F.Supp.2d 618, 620 n. 1 (S .D.N.Y.2010) (quoting *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995)).

Under Local Civil Rule 56.1, which governs factual statements on motions for summary judgment, "[e]ach numbered paragraph in the statement of material facts ... will be deemed to be admitted ... unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." Local Civ. R. 56.1(c). In addition, "[e]ach statement by the movant or opponent ... including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed.R.Civ.P. 56(c)." Local Civ. R. 56.1(d). When moving for summary judgment against a *pro se* litigant, the movant must provide the *pro se* litigant with "the papers in support of the motion ... [and the] 'Notice To Pro Se Litigant Who Opposes a Motion For Summary Judgment' with the full texts of Fed.R.Civ.P. 56 and Local Civil Rule 56.1 attached." Local Civ. R. 56.2. *Pro se* litigants provided with notice are not excused from satisfying their obligations under Local Civil Rule 56.1. *Allen v. City of N. Y.,* 480 F.Supp.2d 689, 703 (S.D.N.Y.2007) (citing *Vt. Teddy Bear Co. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004)).

**\*5** Here, Gantt received such notice: Defendants furnished him with their papers, the required notice, and copies of Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule 56.1. *See* Dkt. 81. Gantt, however, failed to submit a responsive statement of material facts. Although defendants argue that Gantt's failure necessitates admission of all factual statements provided in defendants' 56.1 Statement, *see* Def. Reply. Br. 2–4, that is not so: The Court may not rely solely on the statement of undisputed facts contained in the movant's Local Rule 56.1 statement. Rather, the Court "must be satisfied that the citation to evidence in the record supports the [movant's] assertion," *i.e.,* that the materials underlying defendant's 56.1 statement themselves establish these facts. *Vt. Teddy Bear Co.,* 373 F.3d at 244 (citing *Giannullo v. City of N. Y.,* 322 F.3d 139, 143 n. 5 (2d Cir.2003)).

### III. Discussion

Defendants argue that: (1) Gantt failed to exhaust his administrative remedies, which, under 42 U.S.C. § 1997e(a), bars his claims here; (2) the facts do not permit the inference that the defendants acted with deliberate indifference to his medical needs; (3) DOC is not a suable entity and there is no basis for finding municipal liability; and (4) Gantt failed to serve certain named defendants, thus depriving this Court of jurisdiction over those individuals.

Defendants are correct that DOC is not a suable entity. *See, e .g.,* N.Y.C. Charter Ch. 17 § 396 ("All actions

and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the City of New York and not in that of any agency, except where otherwise provided by law."); *Jenkins v. N.Y.C. Dep't of Homeless Servs.,* 643 F.Supp.2d 507, 510 (S.D.N.Y.2009) ("The Defendant is 'clearly correct' and 'the overwhelming body of authority holds that [a city agency] is not a suable entity.' " (quoting *Renelique v. Doe,* No. 99 Civ. 10425(LTS) (HBP), 2003 WL 23023771, at *6 (S.D.N.Y. Dec. 29, 2003))). Accordingly, for the purposes of resolving this motion, the Court will substitute the City of New York for DOC. *See, e.g., Renelique,* 2003 WL 23023771, at *7 (treating City, not agency, as defendant for purposes of resolving summary judgment motion).

For the reasons that follow, the Court holds that Gantt has failed (1) to exhaust his administrative remedies, and (2) to establish that defendants acted with deliberate indifference to serious medical needs. The Court accordingly grants summary judgment to defendants, and has no need to reach defendants' arguments as to defective service or municipal liability.

**A. Exhaustion**

The Prison Litigation Reform Act ("PLRA") requires an inmate to exhaust all available administrative remedies before bringing a federal civil rights action. 42 U.S.C. § 1997e(a). Under the PLRA, " '[n]o action shall be brought with respect to prison conditions under section 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.' " *Dennis v. Westchester Cnty. Jail Corr. Dep't,* 485 F. App'x 478, 480 (2d Cir.2012) (summary order) (quoting 42 U.S.C. § 1997e(a)). "This requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim." *Simmons v. Bezio,* No. 9:11–CV–753 (DNH/ATB), 2012 WL 3054127, at *2 (N.D.N.Y. June 21, 2012) (citing *Giano v. Goord,* 380 F.3d 670, 675–676 (2d Cir.2004)) (additional citations omitted). Inmates must exhaust their administrative remedies even if they are seeking only money damages otherwise unavailable in prison administrative proceedings. *Giano,* 380 F.3d at 675.

**\*6** Failure to exhaust all available administrative remedies is an affirmative defense. *Jones v. Bock,* 549 U.S. 199, 216 (2007); *Johnson v. Testman,* 380 F.3d 691, 695 (2d Cir.2004), *overruled on other grounds by Woodford v. Ago,*

548 U.S. 81 (2006). It must be raised by a defendant, and it is the defendant's burden to prove that the plaintiff failed to meet the exhaustion requirements. *See Key v. Toussaint,* 660 F.Supp.2d 518, 523 (S.D.N.Y.2009). The prison's requirements, and not the PLRA, "define the boundaries of proper exhaustion." *Espinal v. Goord,* 558 F.3d 119, 124 (2d Cir.2009) (quoting *Jones,* 549 U.S. at 218).

"Courts must construe the exhaustion requirement strictly because '[a] prisoner who does not want to participate in the prison grievance system will have little incentive to comply with the system's procedural rules unless noncompliance carries a sanction' and '[t]he benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance.' " *Petrucelli v. Hasty,* 605 F.Supp.2d 410, 419 (E.D.N.Y.2009) (quoting *Woodford,* 548 U.S. at 95). Thus, partial exhaustion of administrative remedies is not sufficient, even if prison officials have actual notice of a claim. *See Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007).

The Second Circuit has identified limited circumstances under which administrative exhaustion is not mandatory. Exhaustion is not mandatory when:

> (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as reasonable misunderstanding of the grievance procedure, justify the prisoner's failure to comply with the exhaustion remedy.

*Ruggiero v. Cnty. of Orange,* 467 F.3d 170, 175 (2d Cir.2006). Here, Gantt does not deny knowledge of the appeals procedure. Rather, he claims, in his opposition to summary judgment, that he did not follow the grievance appeals process because "his efforts were thwarted by defendant Geurrant." Pl. Br. 1. In his Second Amended Complaint, Gantt does not make such a claim. It does allege that he filed at least 15 grievances against medical staff and corrections officials, but that at least 11 were confiscated and he was able to produce only three. SAC 6. As to the response to those grievances, Gantt's Second Amended Complaint alleges only that Guerrant did not

respond to his grievances, *id.*, not that he took affirmative steps to block Gantt from appealing.

Under the IGRP, Gantt was required to file an appeal if he did not receive a response to his grievance after five days —that is, "[t]he IGRP places the burden on the prisoner to request a formal hearing when there is no timely response to a grievance." *Malik v. City of N.Y.*, No. 11 Civ. 6062(PAC)(FM), 2012 WL 3345317, at *7 (S.D.N.Y. Aug. 15, 2012), *report and recommendation adopted*, 2012 WL 4475156 (S.D.N.Y. Sep. 28, 2012). Gantt does not allege that he was misinformed or denied information about these procedures. Thus, his failure to exhaust cannot be excused unless he can allege facts sufficient to demonstrate an "affirmative act by prison officials that would have prevented him from pursuing administrative remedies." *Ruggiero*, 467 F.3d at 178.

**\*7** Here, Gantt—including in the opposition to summary judgment, in which he stated generally that his efforts to appeal had been thwarted—has failed to allege any "affirmative act" by prison officials that prevented him from either requesting a hearing or filing an appeal in accordance with the IGRP. Gantt offers only the conclusory statement that he was "thwarted" from doing so. This case is thus a far cry from those that have found prison official defendants estopped from raising non-exhaustion as an affirmative defense. In each, the prisoner alleged concrete affirmative steps that officials had taken to prevent him from availing himself of administrative remedies. *See, e.g., Ziemba v. Wezner*, 366 F.3d 161, 162–63 (2d Cir.2004) (recognizing estoppel as defense to PLRA exhaustion requirement where plaintiff alleged that he was beaten and threatened by prison officials and denied food and medical care in retaliation for his grievances); *Hemphill v. New York*, 380 F.3d 680, 687 (2d Cir.2004) (plaintiff threatened with retaliation for pursuing administrative remedies). Gantt alleges no such thing. The most that his Second Amended Complaint can be said to allege by way of retaliation is that defendants told him that he would not get recreation. SAC 7. However, as Gantt acknowledges, even that statement was not in response to his grievances, but in response to his "yelling out of [his] cell." *Id.* And even if such a threat could be found and, contrary to Gantt's allegations, even if it had been made in response to his grievances, a threat to deny recreation would not suffice to prevent Gantt from pursuing administrative remedies.[6]

[6]

For this and other reasons, summary judgment is merited for the defense on the merits of Gantt's claim based on an alleged denial of recreation. Although Gantt's Second Amended Complaint and grievances allege generally that he was denied recreation, he has not mustered any factual support for this claim. Nor has he clearly alleged, let alone supported, specifically what recreation was denied to him. Gantt's allegations leave unclear whether Gantt alleges he was denied all recreation during his incarceration; Gantt states only that "[e]ach morning, for the duration of [his] stay at OBCC, [he] was never given recreation." SAC 5. In any event, even assuming that Gantt was denied not just morning recreation but recreation at all hours during his incarceration at OBCC, that denial would not give rise to an Eighth Amendment claim. "Denial of a prisoner's recreation privileges for an extended period of time violates the Eighth Amendment if the denial results in a deprivation 'of the minimal civilized measure of life's necessities' and the defendants act with a sufficiently culpable state of mind amounting to deliberate indifference to a serious need." *Beckford v. Portundo*, 151 F.Supp.2d 204, 213 (N.D.N.Y 2001) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)); *see also Anderson v. Coughlin*, 757 F.2d 33, 36 (2d Cir.1985). Gantt does not allege that he was denied all opportunity to exercise, but only that he was denied outdoor recreation. *See Anderson*, 757 F.2d at 36 (noting "[c]ourts have recognized that some opportunity for exercise must be afforded to prisoners," but the Constitution does not mandate it take a particular form). The Court further notes that Gantt was incarcerated at OBCC for a total of 64 non-consecutive days in 2009. That period is shorter than those in which a wholesale denial of recreation has been held to rise to the level of an Eighth Amendment violation. *See, e.g., Jolly v. Coughlin*, 76 F.3d 468, 480–81 (2d Cir.1996) (three-and-a-half year denial of recreation held to violate the Eighth Amendment).

Therefore, defendants are not estopped from raising this defense, and Gantt's failure to exhaust his administrative remedies is not excused. *See Ruggiero*, 467 F.3d at 178. Because Gantt failed to exhaust his administrative remedies or to supply an excuse for his failure to do so, defendants' motion for summary judgment must be granted as to all his claims.

### B. Medical Care Claims

An independent basis for granting summary judgment is that Gantt has failed to adduce evidence sufficient

to support an Eighth Amendment claim based on the medical care during his incarceration. To state a claim under § 1983, Gantt must show that "(1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." *Sinder v. Dylag,* 188 F.3d 51, 53 (2d Cir.1999).

Here, Gantt claims that, during his incarceration, the defendants, by acting with deliberate indifference to his medical needs, violated his Eighth Amendment rights. The Eighth Amendment protects prisoners from "cruel and unusual punishment" caused by prison officials. U.S. Const. amend. VIII. "To determine whether a punishment is cruel and unusual, courts must look beyond historical conceptions to 'the evolving standards of decency that mark the progress of a maturing society.' " *Graham v. Florida,* 130 S.Ct. 2011, 2021 (2010) (quoting *Estelle v. Gamble,* 429 U.S. 97, 102, (1976)).

**\*8** Where an Eighth Amendment claim involves alleged denials of medical care, "a prisoner must prove 'deliberate indifference to [his] serious medical needs.' " *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Estelle,* 429 U.S. at 104) (alteration in original). This standard incorporates both objective and subjective elements: "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2002); *see also Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

With respect to the objective element, there is no "static test" to determine whether a deprivation is sufficiently serious. *Jabbar,* 683 F.3d at 57. A serious medical need is generally characterized by "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Johnson v. Wright,* 412 F .3d 398, 403 (2d Cir.2005) (citation omitted). The Second Circuit has endorsed considering various factors in determining the existence of a serious medical condition, including: (1) the "existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment"; (2) "the presence of a medical condition that significantly affects an individual's daily activities"; (3) "the existence of chronic and substantial pain"; and (4) "adverse medical

effects or demonstrable physical injury." *See Chance,* 143 F.3d at 702; *Smith,* 316 F.3d at 187.

Where a claim concerns the temporary delay or interruption in the provision of medical treatment—as is the case here—then "the focus shifts to the particular risk of harm faced by a prisoner due to the challenged *deprivation of care,* rather than the prisoner's underlying medical condition in the abstract." *Edmonds v. Cent. N.Y. Psych. Ctr.,* No. 10 Civ. 5810(DAB), 2011 WL 3809913, at \*4 (S.D.N.Y. Aug. 25, 2011) (emphasis added); *see also Chance,* 143 F.3d at 702; *Smith,* 316 F.3d at 186–87; *accord Hill v. Dekalb Reg'l Youth Det. Ctr.,* 40 F.3d 1176, 1188–89 (11th Cir.1994) ("[D]elay in medical treatment must be interpreted in the context of ... whether the delay worsened the medical condition."). A short interruption of care, even if the underlying medical condition is serious, does not constitute a serious medical need where "the alleged lapses in treatment are minor and inconsequential." *Smith,* 316 F.3d at 186. On the other hand, "the failure to provide treatment for an otherwise insignificant wound may violate the Eighth Amendment if the wound develops signs of infection, creating a substantial risk of injury in the absence of appropriate medical treatment." *Id.; see also Chance,* 143 F.3d at 702.

Here, Gantt alleges that the defendants acted with deliberate indifference by refusing to provide him with "proper" treatment of his rheumatoid arthritis and glaucoma. On the summary judgment record, Gantt received treatment for his arthritis and was given the opportunity to seek consultation as to his glaucoma as soon as he notified prison officials. Accordingly, his claim is properly characterized as challenging the adequacy and timeliness of treatment, not as asserting a failure to provide any treatment.

**\*9** Measured against cases involving temporary delays or interruptions in the provision of treatment, these facts, taken in the light most favorable to Gantt, fall far short of satisfying the objective component of an Eighth Amendment claim. In cases where temporary delays or interruptions in the provision of medical treatment have been held to satisfy the objective seriousness requirement, they have involved either a needlessly prolonged period of delay or a delay that caused extreme pain or exacerbated a serious illness. *See, e.g., Salahuddin v. Goord,* 467 F.3d 263, 281 (2d Cir.2006) (assuming, *arguendo,* that a five-month delay in treatment for

2013 WL 865844

Hepatitis C caused sufficiently serious harm); *Chance,* 143 F.3d at 702 (finding a six-month delay in treatment for a dental condition that led to infection and extreme pain sufficiently serious); *Hathaway,* 37 F.3d at 65, 67 (finding a two-year delay in treatment of broken pin in an inmate's hip that caused persistent pain sufficiently serious).

Gantt's claim is based on the delay in his receipt of medication to treat his arthritis and glaucoma. However, the summary judgment record reflects that he first informed defendants of his rheumatoid arthritis on October 15, 2008, a full month after his initial arrival at AMKC. *Compare* Sept. 17 Exam., *with* Oct. 15 Exam. It further reflects that Gantt, on October 15, 2008, and five more times during the ensuing months, was given six prescriptions for medications intended to treat pain associated with his rheumatoid arthritis. *See* MacDonald Decl. Ex. C (Oct. 15, 2008); *id.* Ex. E (Jan. 26, 2009); *id.* Ex. H (Feb. 26, 2009); *id.* Ex. I (May 7, 2009); *id.* Ex.J (June 27, 2009); *id.* Ex. M (July 12, 2009). In addition, Gantt was seen by a rheumatology specialist at Bellevue Hospital. *See* MacDonald Decl. ¶ 31.

As to Gantt's glaucoma, on the record before the Court, he did not disclose that condition to defendants until December 14, 2008, at which time the attending physician referred Gantt to the optometry clinic. There is a dispute whether Gantt, as defendants claim, refused to attend his scheduled appointment at the optometry clinic, or whether, as Gantt claims, he never refused treatment. Either way, however, there is no factual basis for a claim that Gantt at that time was denied treatment. Gantt was subsequently evaluated on June 27, 2009, at which time he disclosed that he had previously been prescribed Travatan and Timolol for his glaucoma. *See* June 27 Consultation Request. Gantt was again referred to the optometry clinic and, on the undisputed medical record, he failed to appear for his scheduled appointment. *See* Specialty Clinic Form. Finally, on July 14, 2009, Gantt was again referred to the optometry clinic, but he was discharged from DOC custody before he could attend his scheduled appointment. *See* July 14 Consultation Request; Dantowicz Decl. ¶ 3.

Even reading these facts in the light most favorable to Gantt, including treating the unsworn allegations in his Complaint as creditable allegations, Gantt has failed to demonstrate how the modest delays suggested above in the provision of medical treatment, or for that matter

the actual medical treatment provided by the defendants, placed him at risk of serious harm. Gantt claims generally that he suffered pain caused by his arthritis, but Gantt does not allege that his pain or discomfort from either his arthritis or glaucoma was prolonged. Quite the contrary, in his deposition, Gantt stated that he was "in regular shape" and, in the Second Amended Complaint, acknowledged that his eyesight is as-yet undamaged by his glaucoma. Gantt Dep. 47; SAC 7. Thus, Gantt has not alleged that any delays in his treatment caused any symptoms of his underlying illnesses to worsen, or that any delays materially altered the way his diseases have since affected him. Furthermore, Gantt has not alleged, beyond making conclusory claims, that any delay in treatment, or any inadequacy of such treatment, has put him at an "unreasonable risk of future harm." *Smith,* 316 F.3d at 188. The facts at hand fall far short of those in cases in which courts have found an objectively serious injury.

**\*10** Because Gantt has failed to satisfy the objective prong of the Eighth Amendment inquiry, the Court need not address the subjective prong. However, the Court does so here in the interest of completeness. Gantt's claim fails to meet the subjective standards because the facts failed to permit a factfinder to find that "the charged official[s acted] with a sufficiently culpable state of mind ." *Hathaway,* 99 F.3d at 553.

The deliberate indifference standard requires "more than mere negligence." *Farmer v. Brennan,* 511 U.S. 825, 835 (1994). It is "equivalent to criminal recklessness, [where] the official 'knows of and disregards an excessive risk to inmate health or safety.' " *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) (quoting *Farmer,* 511 U.S. at 837). "[A] prisoner must demonstrate more than 'an inadvertent failure to provide adequate medical care' by prison officials to successfully establish Eighth Amendment liability." *Smith,* 316 F.3d at 184 (quoting *Estelle,* 429 U.S. at 105).

Here, Gantt does not allege, and if he had, the record would not support, that defendants acted with deliberate indifference to his medical needs. On the contrary, Gantt's medical records demonstrate that the defendants were, at a minimum, fairly attendant to Gantt's medical issues. They show that when Gantt requested treatment, prison medical staff responded. When Gantt informed medical staff of his rheumatoid arthritis and each subsequent time

he complained of pain to medical staff, a prescription was issued for Naprosyn or another analgesic, and he was ultimately issued seven prescriptions for analgesics to address pain caused by his rheumatoid arthritis and seen by a rheumatoid specialist at Bellevue Hospital. When Gantt finally disclosed his glaucoma, he was referred to the optometry specialty clinic for evaluation. The facts, without more, are inconsistent with the thesis that defendants acted with deliberate indifference to his medical needs.

As the Second Circuit has emphasized, the Eighth Amendment "is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law." *Smith,* 316 F.3d at 184. "[N]ot every lapse in prison medical care will rise to the level of a constitutional violation." *Id.* Further, "mere disagreement over the proper treatment does not create a constitutional claim." *Chance,* 143 F.3d at 703. The facts before the Court permit a factfinder to find neither that Gantt suffered a sufficiently serious deprivation of medical care, nor that any lapse or delay was caused by a prison official's deliberate indifference. Accordingly, summary judgment must be granted for defendants on Gantt's Eighth Amendment medical care claims.

## CONCLUSION

For the foregoing reasons, Defendants motion for summary judgment is granted and the plaintiff's Second Amended Complaint is dismissed in its entirety, with prejudice, as to all defendants. The Clerk of Court is directed to terminate the motion pending at docket number 81 and to close the case.

 **\*11**  The Court certifies, pursuant to 28 U.S.C. § 1915(a) (3), that any appeal from this order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal. *See Coppedge v. United States,* 369 U.S. 438, 444–45 (1962).

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 865844

---

**End of Document**          © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 618451
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Johnny MORGAN, Plaintiff,

v.

Kimberly SHIVERS (Operations Lieutenant),
Rashee Graham (Senior Officer), Christopher
Merrick (Senior Officer), Keith Hardy (Activities
Lieutenant), Jabraddrick Durrant (Corrections
Officer), Gregory Adams (Corrections Officer),
Mr. William Feliciano (Shu Officer), and
the United States of America, Defendants.

1:14-cv-7921-GHW
|
Signed 01/29/2018

**Attorneys and Law Firms**

Johnny Morgan, White Deer, PA, pro se.

Natasha Waglow Teleanu, United States Attorney's
Office, New York, NY, for Defendants.

MEMORANDUM OPINION AND ORDER

GREGORY H. WOODS, United States District Judge

### I. INTRODUCTION

**\*1** In February 2014, *pro se* Plaintiff Johnny Morgan
was a pre-trial detainee at the Federal Metropolitan
Correctional Center ("MCC") in New York. Following
social contact visits in the prison, inmates were required to
submit to a visual search. During one such search, prison
officials located contraband in one of Mr. Morgan's
body cavities. According to Mr. Morgan, the prison
officials conducted an unreasonable search and forcibly
removed the contraband from his body, causing him
pain. Mr. Morgan brings a number of constitutional
claims pursuant to *Bivens v. Six Unknown Named Agents*,
as well as claims under the Federal Tort Claims Act
("FTCA"). Mr. Morgan's FTCA claims related to the
search at issue here will be decided at trial; Defendants
move for summary judgment only as to Mr. Morgan's
*Bivens* claims, as well as his FTCA claim to the extent
it is premised on a violation of Bureau of Prisons
("BOP") policy. Because it is not appropriate to imply a

damages remedy for the constitutional claims raised by
Mr. Morgan, Defendants' motion for partial summary
judgment is GRANTED.

### II. FACTUAL BACKGROUND [1]

[1]    The following facts are drawn from the Defendants'
Local Civil Rule 56.1 Statement and Plaintiff's
response in opposition. The Court cites to
Defendants' 56.1 statement, but only does so to
the extent the fact is undisputed. The citation to
the Defendants' statement therefore incorporates Mr.
Morgan's response. *See* Dkt. Nos. 229 & 242.

Plaintiff Johnny Morgan was incarcerated at the BOP's
MCC in New York, New York from March 5, 2012 until
April 15, 2013, and again from October 1, 2013 until
March 26, 2015. Dkt. No. 212, Defendants' Statement
of Material Undisputed Facts Pursuant to Local Rule
56.1 ("Defs.' 56.1") ¶ 1. While at the MCC, Mr. Morgan
had visits with friends and family. *Id.* ¶ 2. Pursuant to
BOP policy, upon the conclusion of social contact visits,
inmates are required to submit to a visual search by a
correctional officer. *Id.* ¶¶ 3-4. Such searches generally
involved the inmate removing his clothes, and complying
with various verbal orders that would facilitate the
correctional officer's search for contraband. *Id.* ¶¶ 5-6.

On February 10, 2014, Mr. Morgan participated in a
social visit. *Id.* ¶ 7. During the visit, he was given a "big,"
"fat" piece of contraband that consisted of tobacco and
K2, wrapped in plastic, which he attempted to secret
in his anal cavity. *Id.* ¶¶ 8-9; Declaration of Natasha
Teleanu ("Teleanu Decl."), Ex. A ("Morgan Dep. Tr.")
at 52:4-15, 53:17-54:16, 64:20-21. Mr. Morgan admits
that the contraband was only pushed half-way into his
anal cavity. Defs.' 56.1 ¶ 9. Following this social visit,
at around 6:30 p.m., MCC correctional officer Rashee
Graham started to conduct the required visual search of
Mr. Morgan. *Id.* ¶ 11; Morgan Dep. Tr. at 72:4-74:10,
78:10-78:21. During the search, following two orders to
squat and cough and an order directing Mr. Morgan
to spread his butt cheeks, Officer Graham saw the
contraband. Defs.' 56.1 ¶¶ 12-14. Officer Graham ordered
Mr. Morgan to turn the contraband over, but Mr. Morgan
refused to do so. *Id.* ¶ 15. Officer Graham then radioed
for assistance from other prison officers, and while he did
so, Mr. Morgan attempted to push the contraband further
inside him. *Id.* ¶ 17; Morgan Dep. Tr. at 94:2-16. *Id.*
Eventually Lieutenant Keith Hardy responded to Officer

Graham's request for assistance and came to the search room. *Id.* ¶ 18. What happened next is in dispute. Mr. Morgan contends that that the contraband was forcibly removed from his anal cavity by Officer Graham, causing Mr. Morgan pain. *Id.* ¶ 19; Morgan Dep. Tr. at 135:6-7 ("Once he pulled [the contraband] from out of me I observed it from his hand."). According to a BOP report concerning the incident, the officers involved aver that no force was used in removing the bag from Mr. Morgan's rectum. Dkt. No. 221, Declaration of Anthony Pedone, Ex. A (Special Investigative Agent Investigative Report at 2-3).

**\*2** Pursuant to BOP procedure, when officers suspect an inmate is secreting contraband, that inmate is escorted to a "dry cell" in order for officers to observe the inmate's bowel movements to ensure that the inmate is not hiding additional contraband. Defs.' 56.1 ¶ 21. After the contraband was retrieved, Mr. Morgan was therefore handcuffed and escorted to a dry cell in the special housing unit. *Id.* ¶ 20. On his way to the dry cell, and again after some time in the dry cell, Mr. Morgan asked Lieutenant Hardy and one other officer to be taken to the medical department because he was in pain, and had observed blood on the contraband and on his underwear. Defs.' 56.1 ¶¶ 43-44. Mr. Morgan asked "nobody else" besides these two officers about receiving medical treatment. Morgan Dep. Tr. at 148:1-5. While in the dry cell, Mr. Morgan used tissues to wipe around his anal cavity, saw blood on the tissues after doing so, and showed officers the tissues. *Id.* at 150:6-17. Mr. Morgan testified that he eventually fell asleep in the dry cell, and that when he woke up, "by then the bleeding I think kind of slowed down, so I just left it like that. And then they took me [to get medical treatment] the next day." *Id.* at 151:4-10.

Less than twenty-four hours after the search, at around 1:00 p.m. on February 11, 2014, the MCC Chief Psychologist, Dr. Elissa Miller evaluated Mr. Morgan's condition. *See* Dkt. No. 217, Declaration of Elissa R. Miller, Psy.D ("Miller Decl."), Ex. A (February 11, 2014 Sexual Abuse Intervention Contact Note) ("The Chief Psychologist was contacted by the [Prison Rape Elimination Act ("PREA") ] Coordinator.... According to the [PREA Coordinator], Inmate Morgan reported he was 'violated' during a visual search.... Inmate Morgan was immediately interviewed at 1:00 p.m."). The psychologist reported that Mr. Morgan told her that the search caused him pain, and that he continued to wipe blood from his

anus as a result of the search. Defs.' 56.1 ¶ 49. Dr. Miller responded to Mr. Morgan's complaints by directing a "complete medical evaluation" by the Health Services Department, and further referring him to the special investigation unit for further investigation of the incident. Miller Decl., Ex. A at 1.

Later that day, at around 3:45 p.m., Mr. Morgan received the directed medical evaluation when BOP mid-level medical practitioner Erwin Ramos performed an injury assessment. Defs.' 56.1 ¶¶ 51, 53. Mr. Ramos noted "no rectal/anal tears" and "no bleeding[,] redness, or swelling" during this exam. *Id.* ¶¶ 54-55, *see also* Dkt. No. 218, Declaration of Erwin Ramos ("Ramos Decl."), Ex. A (February 11, 2014 Health Services Clinic Encounter Report). In the two months following the February 10, 2014 incident, including twice within one week of the search, Mr. Morgan was seen by other BOP and independent medical practitioners on a number of occasions. Defs.' 56.1 ¶ 56. Specifically, Mr. Morgan was seen by Dr. Miller on February 12, February 20, and March 13; by a BOP mid-level practitioner on February 15; by an outside clinic on February 28; by a BOP psychiatrist on March 24; and by a BOP physician on March 25. *See* Miller Decl. ¶¶ 5-7, 9 & Exs. B, C, and D; Dkt. No. 219, Declaration of Robert Beaudoin, M.D. ("Beaudouin Decl.") ¶¶ 9-14 & Exs. B, C, D, and E.

Although Mr. Morgan testified that he is not aware of any internal damage to his anal cavity, Morgan Dep. Tr. at 164:3-5, in opposing summary judgment, he maintains that he "continues to bleed from his rectum" and "continues to believe that he sustained damage at the time of the incident," Dkt. No. 242, Plaintiff's Corrected Response In Opposition To Defendants['] Statement of Material Undisputed Facts, ¶¶ 54-55.

### III. PROCEDURAL HISTORY

Mr. Morgan filed his initial complaint on September 29, 2014, and amended his complaint multiple times. Defendants filed their motion for partial summary judgment on May 17, 2017, arguing that Plaintiff failed to timely exhaust his administrative remedies under the Prison Litigation Reform Act ("PLRA"), that certain Individual Defendants had no personal involvement with the alleged constitutional violations at issue, that any delay in medical treatment was not sufficiently serious to support liability, and that a violation of BOP policy is not actionable under the FTCA. Dkt. No. 222 ("Defs.'

Mot."). Plaintiff opposed Defendants' motion on July 6, 2017. Dkt. No. 230 ("Pl.'s Oppn").

**\*3** Following the filing of Plaintiff's opposition, Defendants requested leave to file an extended reply in support of their motion for summary judgment in order to address the applicability of the recent Supreme Court decision in *Ziglar v. Abbasi*, 137 S.Ct. 1843 (2017). The Court granted Defendants' request, and Defendants filed their reply brief on July 21, 2017. Dkt. No. 234 ("Defs.' Reply"). Mr. Morgan filed a sur-reply on August 10, 2017 to address the Defendants' additional arguments. Dkt. No. 244 ("Pls.' Sur-Reply").

### IV. LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " (quoting former *Fed. R. Civ. P. 56(c)*)).

The party moving for summary judgment must first demonstrate the absence of any genuine dispute of material fact. *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 114 (2d Cir. 2017) (citing *Celotex*, 477 U.S. at 323). If the burden of proof at trial would fall on the movant, that party's "own submissions in support of the motion must entitle it to judgment as a matter of law." *Albee Tomato, Inc. v. A.B. Shalom Produce Corp.*, 155 F.3d 612, 618 (2d Cir. 1998). If, on the other hand, "the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *Simsbury-Avon Preservation Soc'y v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009) (citing *Celotex Corp.*, 477 U.S. at 322-23).

If the moving party meets its burden, the nonmoving party "must come forward with 'specific facts showing that there is a genuine issue for trial' " in order to avoid summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting former

*Fed. R. Civ. P. 56(e)*). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, and he "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks and citation omitted).

A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (internal quotation marks and citation omitted). The Court's job is not to "weigh the evidence or resolve issues of fact." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 254 (2d Cir. 2002). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553-54 (2d Cir. 2005) (citation omitted).

**\*4** When the plaintiff is proceeding *pro se,* as Mr. Morgan is here, the Court is obliged to construe the plaintiff's submissions with "special solicitude" and interpret them "to raise the strongest arguments that they *suggest.*" *Roman v. Donelli,* 347 Fed.Appx. 662, 663 (2d Cir. 2009) (summary order) (emphasis in original) (quoting *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474-75 (2d Cir. 2006)).

### V. DISCUSSION

#### A. The Legal Framework for *Bivens* Claims

In 1971, in *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, the Supreme Court held that a plaintiff had an

implied private right of action for damages against federal officers who violated the plaintiff's Fourth Amendment rights against unreasonable search and seizure when they handcuffed him inside his home without a warrant. In the more than forty years since that decision, the Supreme Court has created a new implied right of action in only two other cases: (1) under the Fifth Amendment's due process clause for gender discrimination arising out of a Congressman's firing of his female secretary, *Davis v. Passman*, 442 U.S. 228 (1979), and (2) under the Eighth Amendment's cruel and unusual punishment clause arising out of prison officials' failure to treat an prisoner's asthma, which resulted in the prisoner's death, *Carlson v. Green*, 446 U.S. 14 (1980).

In a recent decision, the Supreme Court underscored that "expanding the *Bivens* remedy is now a 'disfavored' judicial activity." *Ziglar v. Abbasi*, 137 S.Ct. 1843, 1857 (2017) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). That is because "[w]hen an issue involves a host of considerations that must be weighed and appraised, it should be committed to those who write the laws rather than those who interpret them." *Id.* at 1857 (citing *Bush v. Lucas*, 462 U.S. 367, 380 (1983)) (internal quotation marks omitted). In *Ziglar*, the Court re-emphasized that the creation of a new private right of action under *Bivens* must be carefully scrutinized.

As the Supreme Court has instructed, this careful scrutiny requires courts to engage in a process to determine whether it is appropriate for the Judiciary to extend a *Bivens* remedy to the claims of a particular case. A court must first determine whether the claim "presents a new *Bivens* context." *Id.* at 1859. A new *Bivens* context will exist "[i]f the case is different in a meaningful way from previous *Bivens* cases decided by this Court." *Id.* The Court presented a non-exhaustive list of considerations to examine if a case is meaningfully different, including:

> "[T]he rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk or disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider."

*Id.* at 1860.

If the court determines that the claim at issue differs meaningfully from previous *Bivens* cases, the court must then determine if it is appropriate to imply a new private right of action to that claim. In *Ziglar*, the Supreme Court affirmed the long-held precedent that a *Bivens* remedy "will not be available if there are 'special factors counselling hesitation in the absence of affirmative action by Congress.' " *Id.* at 1857 (citing *Carlson*, 446 U.S. at 18). The Court explained that the "special factors" inquiry "must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed. Thus, to be a 'special factor counselling hesitation,' a factor must cause a court to hesitate before answering that question in the affirmative." *Id.* at 1857-58. That is, a court begins with the premise that the Judiciary should not readily extend a *Bivens* remedy to new claims, and before a court does so, it should consider a number of factors to determine whether "Congress would want the Judiciary to entertain a damages suit in a given case." *Id.* Among those factors is whether alternative remedies exist for addressing the constitutional violations raised by the claims of a particular case. The Supreme Court held that "if there is an alternative remedial structure present in a certain case, that alone may limit the power of the Judiciary to infer a new *Bivens* cause of action." *Id.*

**\*5** Defendants have moved to dismiss several of the *Bivens* claims that Mr. Morgan's submissions can be construed to raise, contending that these claims differ meaningfully from previous *Bivens* cases, and that there are special factors counselling hesitation in extending a *Bivens* remedy to those claims. In particular, Defendants move to dismiss Plaintiff's (1) Fourth Amendment search and seizure claim; (2) Fifth Amendment excessive force claim; and (3) Fifth Amendment sexual assault claim. [2], [3]

[2]    As Defendants correctly note, and as Plaintiff concedes, because Plaintiff was a pre-trial detainee at the time of the search at issue in this case, his claims arise under the Fifth Amendment, not the Eighth. *See* Defs.' Reply at 14 n.4; Pl.'s Sur-Reply at 8-9; *see also Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d. Cir. 2000).

[3]    Defendants do not move to dismiss Plaintiff's Fifth Amendment deliberate indifference claim using the special factors analysis reiterated by the Supreme

Court in *Ziglar*. That claim is addressed separately below.

### B. Mr. Morgan's Claims Are Meaningfully Different from Prior *Bivens* Cases, and Special Factors Counsel Hesitation In Extending A *Bivens* Remedy Here

Each of Mr. Morgan's claims present new *Bivens* contexts. Mr. Morgan's Fourth Amendment claim differs meaningfully from the Fourth Amendment claim in *Bivens* because his claim arises out of allegations concerning a routine search for contraband, not a warrantless seizure of a person. In addition, the body cavity search was conducted by correctional officers, not narcotics agents. Importantly, the search took place in a prison. This difference is meaningful because the Supreme Court has long distinguished its analysis of the Fourth Amendment when raised in the context of a prison facility. In doing so, it has emphasized that "[a] detention facility is a unique place fraught with serious security dangers," and therefore that an inmate's privacy interests must be balanced against the "significant and legitimate security interests of the institution." *Bell v. Wolfish*, 441 U.S. 520, 559-60 (1979). Mr. Morgan's Fourth Amendment search and seizure claim is therefore meaningfully different from the Fourth Amendment claim in *Bivens*, and thus presents a new *Bivens* context. *Ziglar*, 137 S.Ct. at 1860.

Similarly, although *Davis* concerned the Fifth Amendment, Mr. Morgan's Fifth Amendment excessive force and sexual assault claims are meaningfully different from gender discrimination claim raised in *Davis*. That claim concerned an employment action, not a physical search in the prison context. Mr. Morgan's Fifth Amendment claims also present a different context than the claims in *Carlson*, as that case concerned the cruel and unusual punishment clause of the Eighth Amendment as it related to a failure to provide medical treatment, while Mr. Morgan's claims relate to a search for contraband and arise under the Fifth Amendment. *See Ziglar*, 137 S.Ct. at 1864 ("The constitutional right is different here, since *Carlson* was predicated on the Eight Amendment and this claim is predicated on the Fifth."). Furthermore, the allegation that BOP officials forcibly removed contraband from Mr. Morgan's anal cavity is significantly different from the claims in *Carlson* concerning prison officials' indifference to a prisoner's medical need. Plaintiff's Fifth Amendment claims for excessive force and sexual assault

therefore implicate a new context for the application of a *Bivens* remedy.

As the Supreme Court reiterated in *Ziglar*, once a court determines that a plaintiff's claim presents a new *Bivens* context, the court must then analyze whether "special factors counsel[ ] hesitation" in expanding *Bivens* "in the absence of affirmative action by Congress." *Id.* at 1857 (citing *Carlson*, 446 U.S. at 18). Here, the Court concludes that there are a number of special factors that caution against extending a *Bivens* remedy to Mr. Morgan's Fourth and Fifth Amendment claims relating to his body cavity search. First, "when alternative methods of relief are available, a *Bivens* remedy usually is not." *Id.* at 1863. Contrary to Mr. Morgan's assertion, this is not a case in which the only remedy would be the court-created implied right of action—that is, it is not "damages or nothing." *Bivens*, 403 U.S. at 410. Importantly, Plaintiff had an alternative remedy for his claim that the body cavity search violated his constitutional rights—the FTCA. The FTCA provides for money damages for claims "arising ... out of assault, battery," and other torts with regard to acts or omissions of officers of the U.S. Government. 28 U.S.C. § 2680(h). Mr. Morgan is pursuing this remedy; his FTCA claim is not challenged in Defendants' motion for summary judgment, and will proceed to trial.

**\*6** Although the Supreme Court considered the existence of the FTCA remedy in *Carlson*, and nevertheless created an implied private right of action in that case, the Supreme Court's recent decision in *Ziglar* indicates that hesitation is nevertheless appropriate today. In emphasizing that "expanding the *Bivens* remedy is now considered a 'disfavored' judicial activity," the Supreme Court observed that its conclusion in *Carlson* "might have been different if [it] were decided today." *Ziglar*, 137 S. Ct. at 1856-57 (noting that "the Court has refused to [extend *Bivens* to any new context] for the past 30 years"). Therefore, despite the fact that previously, the FTCA and *Bivens* were considered "parallel, complementary causes of action," *Carlson*, 446 U.S. at 20, the Court believes that, in light of the Supreme Court's recent decision in *Ziglar*, the existence of the alternative remedial structure is nevertheless a factor counselling hesitation in extending an implied damages remedy to Mr. Morgan's claims.

While the existence of an alternative remedial structure alone may be sufficient to counsel against the creation of a judicial remedy in this case, the fact that Mr. Morgan's

claims arise in the prison context also counsels hesitation. The Supreme Court has opined on factual circumstances very similar to those raised in Mr. Morgan's lawsuit, and has instructed courts to give deference to prison officials in preventing the smuggling of contraband into prison facilities. In *Bell v. Wolfish*, the Court recognized that the "[s]muggling of money, drugs, weapons, and other contraband is all too common an occurrence" in detention facilities, "[a]nd inmate attempts to secrete these items into the facility by concealing them in body cavities are documented in this record, and in other cases. 441 U.S. at 559. In holding that visual body cavity searches were not per se Fourth Amendment violations, the Court explained that "the problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* at 547.

This is particularly true for the policies and practices concerning prison officials' searches for contraband; the Supreme Court has "recognized that deterring the possession of contraband depends in part on the ability to conduct searches without predictable exceptions." *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 327-28 (2012). The creation of a damages remedy here could have the negative consequence of deterring prison officials from engaging in such searches. Fundamentally, Mr. Morgan's claims present a plethora of policy-related considerations that would require the Court to balance the challenges prison administrators and officers face in maintaining prison security against the expansion of private right of action for damages. This task is more appropriately suited for Congress, not the Judiciary. *See Bell*, 441 U.S. at 548 ("But judicial deference is accorded not merely because the [prison] administrator ordinarily will, as a matter of fact in a particular case, have a better grasp of his domain than the reviewing judge, but also because the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial."). The Supreme Court's acknowledgment that searches for contraband in prisons present issues that warrant judicial deference to prison officials is another factor counseling hesitation in extending *Bivens* to Mr. Morgan's claims concerning the body cavity search.

Furthermore, Congress has legislated in the arena of prisoner rights, suggesting that the courts should not extend a damages remedy in this sphere. As the Supreme Court explained in *Ziglar*, "legislative action suggesting that Congress does not want a damages remedy is itself a factor counseling hesitation." 137 S.Ct. at 1865. One such example of legislative action relevant to the claims raised in this case is the Prison Litigation Reform Act ("PLRA"). As the Court in *Ziglar* explained,

> **\*7** Some 15 years after *Carlson* was decided, Congress passed the Prison Litigation Reform Act of 1995, which made comprehensive changes to the way prisoner abuse claims must be brought in federal court. So it seems clear that Congress had specific occasion to consider the matter of prisoner abuse and to consider the proper way to remedy those wrongs ... [T]he Act itself does not provide for a standalone damages remedy against federal jailers. It could be argued that this suggests Congress chose not to extend the *Carlson* damages remedy to cases involving other types of prisoner mistreatment.

*Id.* at 1865. The PLRA covers Plaintiff's claims here: "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). This statutory scheme further causes the Court to hesitate in extending an implied damages remedy here.

In addition to the PLRA, in 2003, Congress enacted the Prison Rape Elimination Act ("PREA"). 34 U.S.C.A § 30301. The PREA was enacted to, among other things, "protect the Eighth Amendment rights of Federal, State, and local prisoners," 34 U.S.C. § 30302(7), in light of the Congressional finding that "[t]he high incidence of sexual assault within prisons involves actual and potential violations of the United States Constitution," 34 U.S.C. § 30301(13). This statutory scheme has not, however, been interpreted to establish a private cause of action for allegations of prison rape. *See Amaker v. Fischer*, No. 10-CV-0977A, 2014 WL 4772202, at \*14 (W.D.N.Y.

Sept. 24, 2014) (collecting cases), *order superseded,* No. 10-CV-0977, 2015 WL 1822541 (W.D.N.Y. Apr. 22, 2015). This further suggests that, when Congress had the "specific occasion to consider the matter" of prison sexual assault, "and to consider the proper way to remedy those wrongs," it did not find the creation of a remedy for individuals appropriate. *Ziglar,* 137 S.Ct. at 1865. Congressional action in this area suggests that the Judiciary should hesitate before creating a remedy in this case.

Because there are numerous special factors counseling hesitation in extending *Bivens* to the factual circumstances of this case, the Court declines to do so. Defendants are therefore entitled to summary judgment on Mr. Morgan's Fourth Amendment search and seizure claim and his Fifth Amendment claims for excessive force and sexual assault.

### C. Mr. Morgan's Deliberate Indifference Claim Fails

Defendants do not move to dismiss Mr. Morgan's Fifth Amendment deliberate indifference claim based upon the analysis reiterated by the Supreme Court's decision in *Ziglar*.[4] Instead, Defendants contend that Mr. Morgan has not established the elements of a claim for deliberate indifference to medical needs. The Court agrees. Specifically, the record does not support a finding of a sufficiently serious delay or harm.

[4]  The Court notes that, even in light of the proscription against creating new *Bivens* remedies, it would be counterintuitive if a convicted prisoner could remedy a federal officer's failure to provide medical care amounting to punishment, but a pre-trial detainee —who, "unlike convicted prisoners[,] cannot be punished at all," could not. *Kingsley v. Hendrickson,* 135 S.Ct. 2466, 2475 (2015).

A claim of deliberate indifference to serious medical needs has typically been analyzed under a two-pronged standard. "The first requirement is objective: 'the alleged deprivation of adequate medical care must be 'sufficiently serious.' " *Spavone v. New York State Dep't of Correctional Servs.,* 719 F.3d 127, 138 (2d Cir. 2013) (quoting *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir. 2006)). The second requirement is that the charged officials must be "reckless in their denial of medical care." *Id.* As the Second Circuit has explained this two-prong standard as it applies to pre-trial detainees like Plaintiff, the

second requirement—the "*mens rea* prong" of deliberate indifference to serious medical needs claims—must be analyzed objectively: courts must determine whether the official "knew, or should have known" that his or her conduct "posed an excessive risk to health or safety." *Darnell v. Pineiro,* 849 F.3d 17, 32, 35 (2d Cir. 2017). Here, the Court need not reach the second prong of this standard, because there are no facts in the record to support a finding that the alleged deprivation was sufficiently serious.

**\*8**  To meet the first prong of the deliberate indifference standard, "the alleged deprivation must be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir. 1996). As the Second Circuit explained,

> [d]etermining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable care. Thus, prison officials who act reasonably in response to an inmate-health risk cannot be found liable under the Cruel and Unusual Punishments Clause, and, conversely, failing to take reasonable measures in response to a medical condition can lead to liability. Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner. For example, if the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious. Factors relevant to the seriousness of a medical condition

include whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain.

*Salahuddin v. Goord*, 467 F.3d at 279-80 (internal citations and quotation marks omitted).

In cases such as this one, where some treatment was given but the plaintiff alleges that that treatment was inadequate, "the seriousness inquiry focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." *Id.* at 280 (quoting *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003) (internal quotation marks omitted)). "Where temporary delays or interruptions in the provision of medical treatment have been found to satisfy the objective seriousness requirement in this Circuit, they have involved either a needlessly prolonged period of delay, or a delay which caused extreme pain or exacerbated a serious illness." *Ferguson v. Cai*, No. 11-cv-6181, 2012 WL 2865474, at *4 (S.D.N.Y. July 12, 2012); *see also Feliciano v. Anderson*, No. 15-cv-4106, 2017 WL 1189747, at *11 (S.D.N.Y. Mar. 30, 2017) ("Although a delay in providing necessary medical care may in some cases constitute deliberate indifference, [the Second Circuit] has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment; ignored a 'life-threatening and fast-degenerating' condition for three days; or delayed major surgery for over two years.") (citing *Demata v. N.Y. State Corr. Dep't of Health Servs.*, 198 F.3d 233 (2d Cir. 1999) (unpublished)).

Here, there are several reasons why Mr. Morgan's claim for deliberate indifference to serious medical needs fails. First, there is no dispute that Mr. Morgan received medical treatment less than twenty-four hours after he requested to be seen by the medical department. *See* Morgan Dep. Tr. at 151:10. The record indicates that Mr. Morgan asked for medical attention twice in the evening of February 10, 2014—when being escorted to the dry cell, and again after some time had passed while in the dry cell. Morgan Dep. Tr. at 144:5-15, 147:21-149:2. Mr. Morgan asserted that, while in the dry cell, he showed officers tissues he wiped around his anal cavity that had blood on them. There is no evidence that he otherwise informed

officers of any urgent medical need. By the afternoon of the next day, on February 11, 2014, Mr. Morgan was seen by BOP psychologist and a BOP mid-level practitioner. Defs.' 56.1 ¶¶ 46, 51, 53. No reasonable jury could find that this temporary delay in treatment was "needlessly prolonged," or that this short waiting time amounted to a constitutional deprivation of care in light of the symptoms described by Mr. Morgan.

**\*9** Moreover, there is no evidence in the record that the delay caused "extreme pain" or exacerbated Mr. Morgan's existing pain. The pain was not so severe that it kept him awake in the dry cell; he testified that he fell asleep and when he woke up his condition had improved. *See* Morgan Dep. Tr. at 151:4-10 ("[B]y the [time I woke up] the bleeding I think kind of slowed down, so I just left it like that."). Mr. Morgan also testified that prior to seeing the mid-level practitioner the afternoon following the search, he was in pain, but that the pain was "a little better" than the day prior, "[m]eaning it wasn't hurting as bad as it was when the incident first happened." Morgan Dep. Tr. at 155:22-156:9. That is, even before receiving medical attention, his condition improved on its own. There is no evidence that Mr. Morgan's conditioned worsened as a result of the time he waited before being seen by the BOP psychologist and BOP mid-level practitioner, and the record therefore does not support a finding that BOP officials were deliberately indifferent to a serious medical need. *See Rodriguez v. City of New York*, 802 F. Supp. 2d 477, 482 (S.D.N.Y. 2011) (granting defendants summary judgment on a claim for deliberate indifference where plaintiff "present[ed] no evidence that his condition worsened as a result of the three-day delay between his request and receipt of medical attention"); *see also Pabon v. Goord*, 99-cv-5869, 2003 WL 1787268, at *11 (S.D.N.Y. Mar. 28, 2003) ("More importantly, there is no evidence that these lapses had any significant impact on the actual care that Plaintiff received, or on his course of treatment.").

Additionally, the medical records of the BOP medical staff who met with Mr. Morgan after the incident do not support a finding that the medical care Plaintiff received was so deficient that it amounted to a constitutional harm. The Sexual Abuse Intervention notes from BOP Chief Psychologist Dr. Miller indicate that he was sent to the Health Services Department "for a complete medical evaluation," and that he would be seen again by a psychologist "in light of this reported incident."

Miller Decl., Ex. A (February 11, 2014 Sexual Abuse Intervention Contact Note). After meeting with Dr. Miller, Mr. Morgan was indeed examined by MLP Erwin Ramos. Ramos performed an external examination on Mr. Morgan, and noted that there were "no rectal/anal tears; no bleeding noted on visual exam; no redness or swelling." Ramos Decl., Ex. A (February 11, 2014 Health Services Clinic Encounter Report). Neither medical practitioner commented that Mr. Morgan required further medical treatment. See *Toliver v. City of New York,* No. 10 CIV. 5806 SHS JCF, 2013 WL 6476791, at *5 (S.D.N.Y. Dec. 10, 2013) ("The minimal treatment that he ultimately received—treatment he does not complain about—leads to the conclusion that his injuries were not serious.") *report and recommendation adopted,* No. 10 CIV. 5806 SHS, 2014 WL 549402 (S.D.N.Y. Feb. 11, 2014).

Furthermore, in addition to being seen by Dr. Miller and MLP Ramos on February 11, 2014, Mr. Morgan was seen by medical staff on numerous occasions following the February 10, 2014 incident: three times by Dr. Miller (February 12, February 20, and March 13); once by a BOP mid-level practitioner on February 15; by an outside clinic on February 28, by a BOP psychiatrist on March 24; and by a BOP physician on March 25. See Miller Decl. ¶¶ 5-7, 9 & Exs. B, C, and D; Dkt. No. 219, Beaudouin Decl. ¶¶ 9-14 & Exs. B, C, D, and E. Simply put, there is no evidence in the record to support a claim that there were delays or interruptions in his medical care—indeed, Mr. Morgan was seen by medical professionals multiple times within one week of the search. See *Pabon,* 2003 WL 1787268, at *10 ("The [medical] history recited [ ] makes it apparent that Plaintiff's condition was not ignored."). Mr. Morgan did not complain of pain or bleeding during any of these visits; there is no evidence to support a finding that Mr. Morgan suffered the type of "life-threatening and fast-degenerating" condition that courts in this Circuit have held to be an adequate basis for a deliberate indifference claim.

Mr. Morgan asserts that the treatment provided by MLP Ramos was inadequate because Ramos "should have [done] an external examination." Morgan Dep. Tr. at 163:6-11. That contention is not sufficient for a reasonable jury to find that the treatment provided amounted to a constitutional harm. "It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir. 1998). In addition, MLP Ramos' sworn declaration states "[i]nternal examinations were performed only when it was suspected that an inmate possessed contraband; however, the normal practice of the Health Services Department was to not perform internal examinations." Ramos Decl. ¶ 15. [5] This further supports the conclusion that the treatment provided to Mr. Morgan did not rise to the level of a constitutional deprivation. Defendants' motion for summary judgment as to this claim is therefore granted.

[5]    The Court notes the irony in Mr. Morgan's contention that an internal examination would have been appropriate in these circumstances, given that such an examination "would have required [MLP Ramos] to insert a finger or instrument into Mr. Morgan's anal cavity." Ramos Decl. ¶ 15.

### D. Mr. Morgan's FTCA Claim Predicated on Violation of BOP Policy Fails

**\*10** Finally, Defendants move for summary judgment with respect to Mr. Morgan's FTCA claim to the extent it is predicated on an alleged violation of BOP policy. In opposing Defendants' motion for summary judgment, Mr. Morgan rejects the contention that his FTCA claim is based on a violation of BOP policy: "The Plaintiff is not forming the basis of his FTCA claim on the regulations propagated by the BOP. The basis of the Plaintiff's claim is the state law assault perpetrated upon him by defendants ..." Pl's. Opp'n at 21. Nevertheless, in the interest of completeness, the Court addresses Defendants' argument here.

The FTCA waives sovereign immunity of the United States against claims for property damage or person injury "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1); *see also* 28 U.S.C. § 2674. As such, a plaintiff's cause of action under the FTCA must be comparable to a cause of action that is recognized in the jurisdiction where the tort took place. "This 'private analogue' requirement

asks 'whether a private person would be responsible for similar negligence under the laws of the State where the acts occurred.' " *McGowan v. United States*, 825 F.3d 118, 125 (2d Cir. 2016) (quoting *Dorking Genetics v. United States*, 76 F.3d 1261, 1266 (2d Cir. 1996)).

Defendants read Mr. Morgan's SF-95 Form to state that his claim is based on Officer Graham "illegally and in defiance of B.O.P. policy, ... repeatedly forc[ing] his fingers into [Plaintiff's] rectum, while other officers restrained [Plaintiff], in an effort to retrieve the suspected contraband." *See* Defs.' 56.1 ¶¶ 74-75. To the extent the violation of BOP policy, standing alone, is the "private analogue" for Mr. Morgan FTCA claim, that claim fails. The Second Circuit has evaluated FTCA claims that purport to be based on a government official's failure to abide by federal regulations, and has held that a " 'violation of the government's duties under federal procurement regulations is action of the type that private persons could not engage in and hence could not be liable for under local law.' " *McGowan*, 825 F.3d at 127 (quoting *Chen v. United States*, 854 F.2d 622, 626 (2d Cir. 1988)) (internal quotation marks omitted). In *McGowan*, the Second Circuit further held that there is no "freestanding duty to abide by private regulations" under New York law. *Id.* Lacking a private analogue under New York law, Mr. Morgan cannot bring his FTCA claim on the basis of the officers' violation of BOP regulations. To the extent he does so, his claim fails as a matter of law, and Defendants' are therefore entitled to summary judgment on that claim.

## VI. CONCLUSION

Because Mr. Morgan has alternative remedies available to him, and because there are special factors counseling hesitation in extending *Bivens* to the context raised in this case, Defendants are entitled to summary judgment on Mr. Morgan's Fourth and Fifth Amendment claims. In addition, because the record does not show that Mr. Morgan suffered a "sufficiently serious" delay or harm, Defendants are entitled to summary judgment on his Fifth Amendment deliberate indifference claim. Finally, to the extent Mr. Morgan's FTCA claim is predicated on a violation of BOP policy, that claim fails as a matter of law because there is no private analogue for a violation of BOP policy under New York law. Defendants' motion for partial summary judgment is therefore granted.

**\*11** The Clerk of Court is directed to terminate the motion pending at Dkt. No. 211.

Chambers will mail Plaintiff a copy of this order WRJHWKHU with copies of any unpublished cases cited in this opinion.

SO ORDERED.

### All Citations

Slip Copy, 2018 WL 618451

---

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

 © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 2274485
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Paul GRIMMETT, Plaintiff,
v.
CORIZON MEDICAL ASSOCIATES OF NEW
YORK; Allan Matthew, DDS; Dr. Sharma,
MD, Site Medical Director of New York
City Department of Correctional Services,
Manhattan Detention Center, Defendants.

15-CV-7351 (JPO) (SN)
|
Signed 05/24/2017

**Attorneys and Law Firms**

Paul Grimmett, Beacon, NY, pro se.

Austa Starr Devlin, David Rosen, Heidell, Pittoni,
Murphy & Bach, LLP, New York, NY, Daniel Gerard
May, Heidell, Pittoni, Murphy & Bach, LLP, White
Plains, NY, for Defendants.

OPINION AND ORDER

J. PAUL OETKEN, United States District Judge

 **\*1** Plaintiff Paul Grimmett, proceeding *pro se*, brings
this action pursuant to 42 U.S.C. § 1983, alleging that he
was denied dental care while incarcerated at Manhattan
Detention Center ("MDC"). Specifically, he alleges that
Allan Matthew, D.D.S., and Dr. Sharma, M.D., the MDC
Site Medical Director, were deliberately indifferent to
Grimmett's serious dental condition and related ear pain
and hearing loss in violation of the Eighth and Fourteenth
Amendments to the United States Constitution. He
further alleges municipal liability under § 1983 on the part
of Corizon Medical Associates of New York ("Corizon").
Grimmett also raises state medical malpractice and
negligence claims against all Defendants. Defendants
move to dismiss Grimmett's second amended complaint
("SAC") pursuant to Federal Rule of Civil Procedure
12(b)(6). For the reasons that follow, Defendants' motion
is granted in part and denied in part.

**I. Background**

 **A. Procedural History**

Grimmett filed this lawsuit in September 2015. (Dkt.
No. 2.) He filed a first amended complaint ("FAC") in
April 2016 and named as defendants the City of New
York, Corizon, Dr. Matthew, Dr. Sharma, and Acting
MDC Warden Cooper. (Dkt. No. 38.) On August 12,
2016, the Honorable Analisa Torres dismissed the FAC,
but granted Grimmett leave to file a second amended
complaint against Dr. Matthew and Dr. Sharma. (Dkt.
No. 56.)

On November 18, 2016, Grimmett filed his SAC
against Defendants Corizon, Dr. Matthew, and Dr.
Sharma. (Dkt. No. 61.) The SAC asserts claims under
§ 1983 for deliberate indifference to Grimmett's serious
medical needs in violation of the Eighth and Fourteenth
Amendments, along with state medical malpractice and
negligence claims. Defendants have moved to dismiss
the SAC pursuant to Rule 12(b)(6). (Dkt. No. 73.) The
motion is fully submitted. The case was reassigned to the
undersigned on April 5, 2017.

 **B. Plaintiff's Claims** [1]

[1]    The following facts are taken from Grimmett's SAC
       and opposition brief and are accepted as true for
       purposes of this motion. *See, e.g.,* Gill v. Mooney, 824
       F.2d 192, 195 (2d Cir. 1987) (considering facts alleged
       in affidavit submitted by *pro se* plaintiff in opposition
       to motion to dismiss); *Flores v. N.Y.C. Human Res.
       Admin.*, No. 10 Civ. 2407, 2011 WL 3611340, at *1
       n.1 (S.D.N.Y. Aug. 16, 2011) ("Because of [plaintiff's]
       *pro se* status, ... the Court may consider factual
       allegations [plaintiff] makes in her opposition papers,
       in addition to the allegations in the complaint....").
       Grimmett has also attached several exhibits to the
       SAC, which were filed under seal because they contain
       Grimmett's medical and other confidential personal
       information. (Dkt. No. 64.) The Court has considered
       these exhibits to the extent that they are referenced in
       or integral to the SAC. *See Sira v. Morton*, 380 F.3d
       57, 67 (2d Cir. 2004).

Grimmett was first incarcerated at MDC in June 2013.
(SAC ¶¶ 2, 9, 11.) On July 2, 2013, Grimmett had a dental
appointment with Dr. Matthew. (*Id.* ¶ 27.) During this
appointment, Grimmett told Dr. Matthew that, before he
was arrested, his personal dentist had recommended "a

2017 WL 2274485

full mouth extraction" of all his teeth due to preexisting dental problems. (*Id.* ¶¶ 8, 28.) Grimmett alleges that, at the time of this appointment, he had "swollen gums that were already infected," along with "dental caries and badly decayed teeth," and that Dr. Matthew saw these conditions. (Dkt. No. 83 at 36.) Dr. Matthew examined Grimmett's mouth and told him he "would put [him down] for all of the necessary work that needs to be done." (SAC ¶ 29; *see also* Dkt. No. 83 at 35; SAC Ex. G at 56.) Grimmett alleges that Dr. Matthew intentionally omitted the real facts of Grimmett's condition from Grimmett's medical records so that Dr. Matthew could avoid providing further treatment. (Dkt. No. 83 at 36.) The medical records from the initial visit do not mention infection or the need for extraction, though they do indicate "swollen gums" and some "bone loss." (SAC Ex. G at 56.) Grimmett alleges that Dr. Matthew never scheduled the follow-up treatment he promised. (SAC ¶ 147.)

**\*2** After the initial appointment, Grimmett sent "numerous" dental slips to Dr. Matthew and to the dental department but received no response for approximately three months. (*Id.* ¶ 30.)

On October 5, 2013, Grimmett went to the infirmary because he was in "agonizing pain from an abscess in [his] mouth." (*Id.* ¶¶ 31-32.) A nurse directed him to Dr. Sharma. (*Id.* ¶ 34.) When Grimmett asked for amoxicillin and ibuprofen to help control the pain and treat the infection, Dr. Sharma told him that there was no one available to administer any medication. (*Id.* ¶¶ 35-36.) Grimmett then asked Dr. Sharma to examine his mouth, but the doctor refused. (*Id.* ¶ 37.) Grimmett described his condition to Dr. Sharma, who replied that he would have to report to sick call to be seen. (*Id.* ¶ 38.) Grimmett alleges that, despite the doctor's representations to the contrary, Dr. Sharma in fact had "all the keys to the cabinet to provide 'emergency medication.' " (Dkt. No. 83 at 47.)

Two days later, on October 7, 2013, Grimmett went to sick call and explained to a physician assistant ("PA") that his mouth was in "agonizing pain" and that he could not "hear anything out of [his] left ear." (SAC ¶¶ 39-40.) He explained that he had been experiencing that level of pain for the past two days. (*Id.* ¶ 46.) The PA told Grimmett that he had a tooth abscess, prescribed him medication for the pain and infection, and generated dental and ENT referrals. (*Id.* ¶¶ 42-44; *id.* Ex. G at 59.)

Grimmett went back to sick call the next day because he had not received his pain medication (SAC ¶¶ 47-48), and again on October 11 because the ibuprofen and penicillin were not helping his toothache (*id.* ¶¶ 49, 52). He was prescribed a new regimen of medications, which included Augmentin and Tylenol with codeine. (*Id.* ¶¶ 53-55; *id.* Ex. G at 61-62.)

On October 24, 2013, Mariane Molfetas, D.D.S., a non-party to this lawsuit, extracted two of Grimmett's teeth. (SAC ¶ 64; *id.* Ex. G at 70.) On December 13, 2013, a hearing aid for Grimmett was approved (SAC ¶ 68; *id.* Ex. G(2) at 7), and he received the hearing aid on January 21, 2014 (SAC ¶ 73; *id.* Ex. G(2) at 11-13). Grimmett was then transferred to Downstate Reception Center, where a nurse told him that he could have a full extraction once he got to his "primary facility." (SAC ¶¶ 75, 78.) On September 12, 2014, after Grimmett was transferred to Auburn Correctional Facility, where he would stay for at least six months, an oral surgeon extracted his lower teeth. (*Id.* ¶¶ 82, 83, 90-93.) A month later, after Grimmett had completed a course of amoxicillin for an infection in his upper gums, his upper teeth were removed. (*Id.* ¶¶ 94-95.) As of May 2015, Grimmett was being fitted for dentures. (*Id.* ¶¶ 103-04.)

## II. Legal Standard

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter ... to state a claim to relief that is plausible on its face." *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 128 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678).

**\*3** When evaluating whether a complaint meets these requirements, courts "must accept as true all of the factual allegations contained in the complaint," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007) (quoting *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 508 n.1 (2002)), and "draw all inferences in the light most favorable to the non-moving party[ ]," *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007). Additionally, a complaint "filed *pro se* is 'to be liberally construed,' and 'a *pro se* complaint, however inartfully pleaded, must be held to

less stringent standards than formal pleadings drafted by lawyers.' " *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citation omitted) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

### III. Discussion

#### A. Deliberate Indifference to Serious Medical Needs
Grimmett brings claims for deliberate indifference to his serious medical needs under the Eighth Amendment, which applies to convicted prisoners, and the Fourteenth Amendment, which applies to pretrial detainees under state custody. *See Darnell v. Pineiro*, 849 F.3d 17, 21 n.3, 29 (2d Cir. 2017). Under either provision, a plaintiff must satisfy a two-prong test to make out such a claim. First, "the alleged deprivation of adequate medical care must be 'sufficiently serious.' " *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006)). Second, the defendant must have acted with deliberate indifference, or a "sufficiently culpable state of mind." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994)). The Court addresses each prong in turn.

#### 1. Serious Deprivation of Adequate Medical Care

For a medical condition to be sufficiently serious under the first prong, it must be " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain.' " *Chance*, 143 F.3d at 702 (quoting *Hathaway*, 37 F.3d at 66); *see also Harrison v. Barkley*, 219 F.3d 132, 137 (2d Cir. 2000) ("A serious medical condition exists where 'the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.' " (quoting *Chance*, 143 F.3d at 702)). In the specific context of dental care, the Second Circuit has held that "[a] cognizable claim regarding inadequate dental care, like one involving medical care, can be based on various factors, such as the pain suffered by the plaintiff, the deterioration of the teeth due to a lack of treatment, or the inability to engage in normal activities." *Chance*, 143 F.3d at 703 (citations omitted); *see also id.* (finding a serious medical condition where plaintiff "alleged that, as the result of the defendants' actions, he suffered extreme pain, his teeth deteriorated, and he has been unable to eat properly"). When an inmate alleges "a temporary delay or interruption in the provision of

otherwise adequate medical treatment," a court should focus on "the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious,' to support an Eighth Amendment claim." *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003) (quoting *Chance*, 143 F.3d at 702). Thus, even though "[p]risoners are not entitled to a 'perfect plan for dental care,' " *Alster v. Goord*, 745 F. Supp. 2d 317, 333 (S.D.N.Y. 2010) (quoting *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986)), tooth decay and cavities may qualify as serious medical conditions, *see Harrison*, 219 F.3d at 137.

**\*4** Here, Grimmett alleges that he suffered from "swollen gums" that were "infected," along with obvious tooth decay and bone loss (Dkt. No. 83 at 36)—dental conditions "that tend[ ] to cause acute infections, debilitating pain and tooth loss if left untreated." *Harrison*, 219 F.3d at 137; *see id.* ("Because a tooth cavity will degenerate with increasingly serious implications if neglected over sufficient time, it presents a 'serious medical need' within the meaning of our case law."). He further alleges that the delay in appropriate dental care exacerbated his injuries or increased the risk of future harm. *See Smith*, 316 F.3d at 185-86. Specifically, Grimmett alleges that the delay in care "allowed the infection in [his] gums to fester and develop into a full blown painfully agonizing oral abscess" (Dkt. No. 83 at 37), and resulted in hearing loss (*id.* at 34, 40).

Accordingly, Grimmett has satisfied the first prong: "the alleged deprivation of adequate medical care," by both Dr. Matthew and Dr. Sharma, is "sufficiently serious." *Spavone*, 719 F.3d at 138.

#### 2. State of Mind

Under the second prong of the deliberate indifference standard, a plaintiff must show that a defendant acted with a sufficiently culpable state of mind. Until recently, the analysis under this prong was identical whether the claim was brought under the Eighth Amendment or the Fourteenth Amendment. *See Darnell*, 849 F.3d at 33. In February 2017, however, following the Supreme Court's decision in *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), and while the parties were briefing the instant motion, the Second Circuit held that the analysis differs depending on

2017 WL 2274485

whether the inmate is a convicted prisoner or a pretrial detainee. *Darnell*, 849 F.3d at 35. [2] In particular, under the Eighth Amendment, deliberate indifference is equivalent to recklessness "according to a more exacting subjective standard akin to that used in the criminal context, which would require proof of ... subjective awareness" on the part of the defendant. *Id.* at 32 (citing *Farmer v. Brennan*, 511 U.S. 825, 836-37 (1994)). Deliberate indifference under the Eighth Amendment, therefore, means that a prison official "appreciate[d] the risk to which a prisoner was subjected." *Id.* at 35. In contrast, after *Darnell*, a plaintiff suing under the Fourteenth Amendment is required to show only that the prison official acted with objective recklessness, or that the defendant "knew, or should have known" that "an excessive risk to health or safety" would result. *Id.*; *see also Lloyd v. City of New York*, No. 14 Civ. 9968, 2017 WL 1207838, at *9 (S.D.N.Y. Mar. 31, 2017). As before, however, more than negligence is required to hold a defendant liable for violating either constitutional provision. *Darnell*, 849 F.3d at 36.

[2]    "Although *Darnell* involved a challenge to conditions of confinement, the holding of the decision is broad enough to extend to medical deliberate-indifference claims." *Feliciano v. Anderson*, No. 15 Civ. 4106, 2017 WL 1189747, at *13 (S.D.N.Y. Mar. 30, 2017); *see Darnell*, 849 F.3d at 33 n.9 ("[D]eliberate indifference means the same thing for each type of claim under the Fourteenth Amendment.").

It is unclear from the SAC whether Grimmett was a pretrial detainee or a convicted prisoner during the relevant time period. Under either the Eighth or Fourteenth Amendment, however, Grimmett has made out a claim against Dr. Matthew but has failed to state a claim against Dr. Sharma.

**Dr. Matthew.** According to Grimmett, Dr. Matthew deliberately refused to provide treatment for three months, despite the fact that Grimmett sent "numerous dental slips to [Dr. Matthew] and to the dental department." (SAC ¶ 30.) Although the three-month delay on its own may not be enough to allege deliberate indifference, Grimmett has included additional allegations—beyond those recited in the FAC—to sufficiently plead that Dr. Matthew also acted "with a sufficiently culpable state of mind." *Salahuddin*, 467 F.3d at 280. In particular, Grimmett alleges that Dr. Matthew "omit[ted] the real facts of plaintiff's condition

[from his medical records] so that he would not have to address plaintiff's serious dental condition" (Dkt. No. 83 at 36), and that Dr. Matthew "omitted [information] that would have placed plaintiff at a level to receive required treatment" (*id.* at 38; *see also* SAC ¶ 147 ("Plaintiff was never scheduled for a follow up by [Dr. Matthew].... [F]urthermore, when plaintiff wrote to [Dr. Matthew], plaintiff never received a response....")). Grimmett therefore has alleged facts that, even under the subjective recklessness standard of the Eighth Amendment, plausibly plead that Dr. Matthew was deliberately indifferent to Grimmett's serious medical needs. Accordingly, Defendants' motion to dismiss Grimmett's claim against Dr. Matthew is denied.

**\*5 Dr. Sharma.** Grimmett alleges that Dr. Sharma was deliberately indifferent when Grimmett reported to sick call on October 5, 2013, in agonizing pain from an abscess in his mouth (SAC ¶¶ 31-38), and that Dr. Sharma refused to examine Grimmett's mouth or prescribe any medication, despite the fact that Dr. Sharma had "all of the keys to the cabinet" (Dkt. No. 83 at 47). Dr. Sharma instead told Grimmett that there was nothing he could do, and that Grimmett should sign up for sick call. (SAC ¶ 38; Dkt. No. 83 at 43-44.) Indeed, Grimmett went to sick call two days later, where he was seen by a PA who prescribed him medication for the pain and infection and generated dental and ENT referrals. (SAC ¶¶ 39, 42, 44, 48; *id.* Ex. G at 58-59.) This two-day delay in treatment on its own is insufficient to plead recklessness, and Grimmett's allegations that Dr. Sharma "knew, or should have known" that "an excessive risk to health or safety" would result, *Darnell*, 849 F.3d at 35, are conclusory. *See Feliciano*, 2017 WL 1189747, at *13 ("Instead of seeing [plaintiff] immediately, [the defendant doctor] instructed him to rinse out his eye with cold water and to sign up for sick call in the morning. Although [plaintiff] did not receive immediate medical care, this fact is insufficient to establish that [the doctor] knew, or should have known, that the brief delay put [plaintiff's] health in jeopardy." (citation omitted)). Furthermore, although Grimmett may have preferred to be seen by a doctor rather than a PA during sick call (SAC ¶ 143; Dkt. No. 83 at 47-48), "mere disagreement over the proper treatment does not create a constitutional claim," *Chance*, 143 F.3d at 703. At the most, therefore, Grimmett has alleged that Dr. Sharma was negligent. Because negligence alone is insufficient to make out a deliberate indifference claim even under the Fourteenth Amendment, *see Darnell*, 849

2017 WL 2274485

F.3d at 36, Grimmett's § 1983 claim against Dr. Sharma is dismissed.

### B. Municipal Liability Against Corizon Medical Associates [3]

[3] The SAC includes claims against Corizon, despite the fact that Judge Torres granted Grimmett leave to replead his claims only against Dr. Matthew and Dr. Sharma. The Court could dismiss these claims on this ground alone. *See Palm Beach Strategic Income, LP v. Salzman*, 457 Fed.Appx. 40, 43 (2d Cir. 2012) (summary order) ("District courts in this Circuit have routinely dismissed claims in amended complaints where the court granted leave to amend for a limited purpose and the plaintiff filed an amended complaint exceeding the scope of the permission granted."); *see also Pagan v. N.Y. State Div. of Parole*, No. 98 Civ. 5840, 2002 WL 398682, at *3 (S.D.N.Y. Mar. 13, 2002) (dismissing with prejudice new claims in an amended complaint that were outside the scope of the court's order granting the *pro se* plaintiff leave to amend). However, given Grimmett's *pro se* status, the Court declines to dismiss these claims solely because they exceed the scope of the leave granted. *See Ong v. Park Manor (Middletown Park) Rehab. & Healthcare Ctr.*, No. 12 Civ. 974, 2015 WL 5729969, at *22 (S.D.N.Y. Sept. 30, 2015) ("Given Plaintiff's pro se status, and the Court's obligation to liberally construe pro se pleadings, the Court is hesitant to dismiss Plaintiff's [amended complaints] on this ground."); *see also Moriates v. City of New York*, No. 13 Civ. 4845, 2016 WL 3566656, at *2-3 (E.D.N.Y. June 24, 2016) ("For *pro se* litigants, broad leave to replead is generally appropriate, since they lack the legal acumen and experience to differentiate successful claims from unsuccessful ones.").

Corizon, although a private entity, is treated as a municipal actor for purposes of this lawsuit. *See Bess v. City of New York*, No. 11 Civ. 7604, 2013 WL 1164919, at *2 (S.D.N.Y. Mar. 19, 2013) ("In providing medical care in prisons, Corizon performs a role traditionally within the exclusive prerogative of the state and therefore, in this context, is the functional equivalent of the municipality."). "It is axiomatic that municipalities cannot be held liable pursuant to § 1983 on a *respondeat superior* theory." *Betts v. Shearman*, No. 12 Civ. 3195, 2013 WL 311124, at *15 (S.D.N.Y. Jan. 24, 2013) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978)). "[T]o hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove

three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2009) (quotations and citation omitted). There are four ways a plaintiff can allege a policy or custom:

> (1) the existence of a formal policy officially endorsed by the municipality; (2) actions taken or decisions made by municipal officials with final decision making authority, which caused the alleged violation of plaintiff's civil rights; (3) a practice so persistent and widespread that it constitutes a custom of which constructive knowledge can be implied on the part of the policymaking officials; or (4) a failure by policymakers to properly train or supervise their subordinates, amounting to "deliberate indifference" to the rights of those who come in contact with the municipal employees.

**\*6** *Betts v. Rodriquez*, No. 15 Civ. 3836, 2016 WL 7192088, at *5 (S.D.N.Y. Dec. 12, 2016) (quoting *Guzman v. United States*, No. 11 Civ. 5834, 2013 WL 5018553, at *3-4 (S.D.N.Y. Sept. 13, 2013)).

As in the FAC, Grimmett alleges in the SAC that Corizon "had an unwritten policy of avoiding high costs in detainee's medical bills," and that this policy is why Dr. Matthew and Dr. Sharma delayed Grimmett's access to a dentist for approximately three months. (*See* FAC ¶ 56; SAC ¶ 146.) "To state there is a policy," however, "does not make it so," and Grimmett has alleged no facts from which the Court can plausibly infer that Corizon had such an unwritten policy. *Shearman*, 2013 WL 311124, at *16; *see also Zherka v. City of New York*, 459 Fed.Appx. 10, 12 (2d Cir. 2012) (summary order) ("It has long been well-settled that 'the mere assertion that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference.' " (quoting *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995))). In addition, the SAC lacks allegations that would allow the Court to infer that any such policy was the cause of Grimmett's alleged constitutional injuries.

2017 WL 2274485

Although Grimmett alleges that Corizon's contract with the New York City Department of Correctional Services was terminated "due to a pattern of violations of detainee's Civil and Constitutional rights" (SAC ¶ 148; Dkt. No. 83 at 50), there is no indication that the termination was due to a policy of avoiding costs. The two press clippings that are attached to and referenced in the SAC concern the inadequate treatment that one MDC inmate received and problems with Corizon employee background checks, respectively, but do not support Grimmett's contention that the company had an unwritten cost-cutting policy. (Dkt. No. 83 at 49-50; SAC Ex. I.)

Grimmett also alleges that Dr. Matthew and Dr. Sharma were "final decision makers" and were therefore granted municipal policymaking authority. (Dkt. No. 83 at 35, 48.) Even if Dr. Matthew and Dr. Sharma were "final decision makers" with respect to Grimmett's care, which is what Grimmett appears to allege, that allegation is insufficient to plead that they were final *policymakers* with regard to Corizon's billing policies. In particular, allegations that Dr. Matthew and Dr. Sharma chose a treatment plan for Grimmett that would keep costs down is not enough to plausibly plead that they possessed final authority to establish pricing policy. *See Hurdle v. Bd. of Educ. of City of N.Y.*, 113 Fed.Appx. 423, 427 (2d Cir. 2004) (summary order) ("Even if [the defendant] was the *decisionmaker* with regard to [the plaintiff's] transfer, that does not establish that she had the authority to set the policy authorizing involuntary employee transfers."). Accordingly, even accepting Grimmett's factual allegations as true and liberally construing his pleadings, the Court concludes that Grimmett has failed to plausibly allege the existence of a policy or custom. Accordingly, his § 1983 claim against Corizon is dismissed.

**C. State Law Claims**

**\*7** Liberally construed, the SAC also asserts claims against Defendants under New York law for medical malpractice and negligence. (SAC ¶ 145; Dkt. No. 83 at 51.) Defendants do not contest that the Court has supplemental jurisdiction over Grimmett's state law claims under 28 U.S.C. § 1367; instead, they request that the Court decline to exercise supplemental jurisdiction on the ground that Grimmett has failed to state a federal claim under § 1983. (Dkt. No. 77 at 16; Dkt. No. 86 ¶ 23.) However, because the Court has not dismissed all of Grimmett's federal claims, it will retain supplemental jurisdiction over his state law claims. *See, e.g., Rodriguez v. Cnty. of Westchester*, No. 15 Civ. 9626, 2017 WL 118027, at \*11 (S.D.N.Y. Jan. 11, 2017). Defendants have not moved to dismiss Grimmett's medical malpractice or negligence claims on their merits. Accordingly, Defendants' motion to dismiss Grimmett's state law claims on jurisdictional grounds is denied.

**IV. Conclusion**

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part. The Clerk of Court is directed to terminate the motion at Docket No. 73.

SO ORDERED.

**All Citations**

Slip Copy, 2017 WL 2274485

 © 2018 Thomson Reuters. No claim to original U.S. Government Works.

 © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 3604242
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Jerry RAMRATTAN, Plaintiff,

v.

Brian FISCHER, et al., Defendants.

No. 13 Civ. 6890(KPF).
|
Signed June 9, 2015.

*OPINION AND ORDER*

KATHERINE POLK FAILLA, District Judge.

 **\*1**  Plaintiff Jerry Ramrattan, a New York State prisoner proceeding *pro se*, brings this action pursuant to 42 U.S.C. § 1983, the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S .C. § 2000cc ("RLUIPA"), and the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 to 12213 (the "ADA"). Plaintiff alleges that the failure of the New York State Department of Corrections and Community Supervision ("DOCCS") to hire a Hindu chaplain and provide meals compliant with his religious beliefs violates his rights under the Free Exercise Clause of the First Amendment and RLUIPA. Plaintiff also brings an ADA claim in connection with his claimed need for hearing aids. Defendants have moved to dismiss the Complaint for failure to state a claim. For the reasons discussed herein, that motion is granted.

## BACKGROUND [1]

[1]  The facts alleged herein are drawn from Plaintiff's Complaint ("Compl." (Dkt.# 2)), and are assumed true for the purposes of this Opinion. Citations to the Complaint are made using the page-numbering convention imposed by this Court's electronic case filing ("ECF") system. Plaintiff attached a large volume of documents to his Complaint, and it was therefore docketed as 12 separate PDFs. To the extent this Opinion cites documents contained within the first PDF (Dkt.# 2), those will be referenced as "Compl. [page number]." To the extent this Opinion cites documents contained in the other 11 PDFs,

docket entries 2–1 to 2–11, those will be referenced as "Dkt. # 2–1 at [page number]," and so on. Defendants' memorandum of law in support of their motion to dismiss (Dkt.# 71) will be referred to as "Def. Br." As discussed further below, Plaintiff's opposition to Defendants' pre-motion letter (Dkt.# 46) will be referred to as "Pl. Opp."; Plaintiff did not submit any formal opposition to Defendants' motion.

### A. Factual Background

Plaintiff practices the Hindu religion. (Compl.5). Upon arriving in DOCCS custody, Plaintiff identified himself as a member of the Hindu faith, and attempted to seek out a Hindu chaplain who could assist him in the practice of his religion. (*Id.*). Plaintiff was informed that DOCCS did not employ a Hindu chaplain. (*Id.*). Plaintiff then began filing grievances and writing letters to various officials within and outside of DOCCS, complaining about the lack of a Hindu chaplain and advocating for the hiring of one. (*Id.*). In response to his numerous inquiries, Plaintiff was informed that it was not fiscally possible for DOCCS to employ a chaplain for every religious group, especially where the population of inmates practicing a particular religion was very small. (*See, e.g.,* Dkt. # 2–2 at 18). In the case of Hinduism, he was told, far less than one percent of the prison population had identified as Hindu (*viz.,* fewer than 50 inmates out of a population of over 55,000). (*See id.*). Plaintiff was repeatedly advised to follow the procedure set forth in DOCCS Directive # 4202 on Religious Programs and Practices and was encouraged to work with the coordinating chaplain at his facility to locate a religious volunteer to assist him in the practice of his religion. (*See id.; also see* Dkt. # 2–2 at 31, 32, 35, 36, 38; Dkt. # 2–3 at 3, 4; Dkt. # 2–6 at 31).

Plaintiff did write the coordinating chaplain at Auburn Correctional Facility, who informed Plaintiff that he would help provide materials and support. (Compl.37). He further explained that although DOCCS could not accommodate a "group meet" or other group-oriented religious services for "just one person," Plaintiff "MOST CERTAINLY" [*sic* ] would be "allowed to worship in the privacy of [his] cell as needed." (*Id.*). The coordinating chaplain at Great Meadow Correctional Facility [2] later provided Plaintiff with a similar response. (*See* Dkt. # 2–6 at 31). Despite these communications, Plaintiff alleges that DOCCS's failure to hire a Hindu chaplain has interfered with his ability to practice his religion and constitutes unlawful religious discrimination. (Compl.5–6). Plaintiff further complains that he has been forced to eat foods that

do not comport with his religious dietary restrictions, and that he has been unable to observe unspecified "religious holy days and rites." (*Id.* at 5).

2    Plaintiff has moved between facilities several times. Discerning the exact timeline of Plaintiff's facility moves is not necessary to the resolution of the instant motion.

**\*2** In addition to his claims based on religion, Plaintiff also alleges that, in response to his numerous grievances, he has been subjected to retaliation by Defendants. (Compl.8–9). Finally, in a single sentence near the end of his narrative, Plaintiff alleges that Defendants have violated his rights under the ADA. (*Id.* at 9).

**B. Procedural Background**

On September 27, 2013, Plaintiff initiated this lawsuit against Defendants, seeking $25 million in damages, including "punitive rewards for deliberate indifference, pain (spiritual and emotional), religious suffering, religious discrimination, physical suffering, discriminatory hiring practices, violations of my constitutional rights ... and direct harm from foods ingested." (Compl.11). Plaintiff also sought injunctive relief in that DOCCS be required to hire a Hindu chaplain and that DOCCS "provide for [his] religious needs in all aspect[s]." (*Id.*).

On October 31, 2013, this Court issued an order of service. In addition to directing Plaintiff to complete the paperwork that would permit the United States Marshals Service to effect service on his behalf, the Order also dismissed DOCCS from the case as an entity that could not be sued under Section 1983 due to Eleventh Amendment immunity. (Dkt.# 6). 3 Between November 2013 and March 2014, Plaintiff sent the Court numerous letters setting out Plaintiff's allegations concerning retaliation against him for filing the instant lawsuit, and seeking a protective order. (*See* Dkt. # 7, 9–12, 14, 18–21). The Court denied Plaintiff's requests contained within those letters and provided guidance as to how to proceed with new complaints. (Dkt.# 20). Nonetheless, Plaintiff continued to submit numerous letters to the Court concerning matters outside the scope of his claims in this lawsuit. (*See, e.g.,* Dkt. # 22–24, 34, 41).

3    Given that Plaintiff styled his Complaint as based entirely on Section 1983, and only referenced the ADA in a single line, the Court did not at that time construe Plaintiff to have brought valid claims under any statutes under which Congress had abrogated the states' immunity. *See Trotman v. Palisades Interstate Park Comm'n,* 557 F.2d 35, 40 (2d Cir.1977) (finding that Congress has not abrogated the states' Eleventh Amendment immunity under Section 1983); *cf. United States v. Georgia,* 546 U.S. 151, 159 (2006) (establishing three-part process for determining whether Congress had validly abrogated a state's immunity from suit for certain ADA claims).

On June 27, 2014, Defendants submitted a pre-motion letter describing their proposed motion to dismiss and requesting a conference. (Dkt.# 43). On July 24, 2014, Plaintiff submitted a response to Defendants' pre-motion letter that addressed the substance of Defendants' proposed motion. (Dkt.# 46). The Court held a telephonic pre-motion conference with all parties on July 29, 2014. (*See* Dkt. # 52 ("July 29, 2014 Tr.")). Among other things, at that conference, the Court ensured that Plaintiff understood that he would have another opportunity to respond more fully to Defendants' motion once they filed it. (*Id.* at 4–5). As it happened, Plaintiff did not submit an opposition to Defendants' motion to dismiss; accordingly, given Plaintiff's *pro se* status, the Court accepts Plaintiff's opposition to Defendants' pre-motion letter as his opposition to their motion.

In their motion papers, Defendants argue that the Complaint should be dismissed because: (i) Plaintiff cannot maintain an ADA claim against individuals; (ii) damages against Defendants in their official capacities are barred by the Eleventh Amendment; (iii) money damages are not available to Plaintiff under RLUIPA; (iv) Plaintiff fails adequately to allege the individual Defendants' personal involvement in any alleged constitutional violation; (v) Plaintiff fails to state a cognizable constitutional violation to sustain a Section 1983 claim; and (vi) Plaintiff fails to state a cognizable claim for retaliation. (Def.Br.1–2, 4–12). In his opposition, Plaintiff argues that he has stated claims, and provides incremental factual information, as discussed further below. (*See generally* Pl. Opp.).

**DISCUSSION**

## A. Motions to Dismiss Under Fed.R.Civ.P. 12(b)(6)

**\*3** Defendants have moved to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). When considering such a motion, a court should "draw all reasonable inferences in Plaintiff's favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co.,* 648 F.3d 98, 104 (2d Cir.2011) (internal quotation marks omitted) (quoting *Selevan v. N.Y. Thruway Auth.,* 584 F.3d 82, 88 (2d Cir.2009)).

A plaintiff will survive a motion to dismiss if he alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007); *see also In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) ("While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to nudge [a plaintiff's] claims across the line from conceivable to plausible." (internal quotation marks omitted)). The Court is not, however, bound to accept "conclusory allegations or legal conclusions masquerading as factual conclusions." *Rolon v. Henneman,* 517 F .3d 140, 149 (2d Cir.2008) (citation and internal quotation marks omitted).

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable LLC,* 622 F.3d 104, 111 (2d Cir.2010). "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 72 (2d Cir.1995) (per curiam)).

"[C]ourts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (internal quotation marks omitted) (citing *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996)); *accord McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999). "That said, the liberal pleading standard accorded to *pro se* litigants is not without limits, and all normal rules of pleading are not absolutely suspended."

*Hill v. City of New York,* No. 13 Civ. 8901(KPF), 2015 WL 246359, at \*2 (S.D.N.Y. Jan. 20, 2015) (internal quotation marks omitted). Further, even where Defendants have not sought dismissal of a particular claim, the Court has the authority to screen *sua sponte* an *in forma pauperis* complaint at any time and must dismiss a complaint, or portion thereof, that is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B); *see Livingston v. Adirondack Beverage Co.,* 141 F.3d 434, 437 (2d Cir.1998).

## B. Plaintiff's ADA Claims Are Dismissed

### 1. Applicable Law

**\*4** The purpose of the ADA is to "eliminate discrimination on the basis of disability and to ensure evenhanded treatment between the disabled and the able-bodied." *Andino v. Fischer,* 698 F.Supp.2d 362, 378 (S.D.N.Y.2010) (internal quotation marks omitted). Title II of the ADA mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

To state a claim under the statute, then, a plaintiff must plead "[i] that he is a 'qualified individual' with a disability; [ii] that he was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by a public entity; and [iii] that such exclusion or discrimination was due to his disability." *Varney v. Many,* No. 13 Civ. 5285(VB), 2015 WL 1730071, at \*3 (S.D.N.Y. Apr. 14, 2015) (citing *Hargrave v. Vermont,* 340 F.3d 27, 34–35 (2d Cir.2003)). Critically, plaintiff must allege his mistreatment "was motivated by either discriminatory animus or ill will due to disability." *Id.* (internal quotation marks omitted). "Courts routinely dismiss ADA suits by disabled inmates that allege inadequate medical treatment, but do not allege that the inmate was treated differently because of his or her disability." *Id.* (citing *Elbert v. N.Y. State Dep't of Corr. Servs.,* 751 F.Supp.2d 590, 595 (S.D.N.Y.2010) (collecting cases)).

### 2. Analysis

Plaintiff contends that "all the defendants and employees and staff violated the ADA [ ][be]cause I have hearing aids." (Compl.9). Defendants argue that Plaintiff's claims must be dismissed because an ADA claim cannot be brought against individuals; Defendants do not otherwise address the merits of Plaintiff's claim. (Def.Br.4).

### a. Plaintiff's ADA Claims Against Individual Defendants Are Dismissed with Prejudice

Defendants are correct that "individuals cannot be named as defendants in ADA suits in either their official or representative capacities." *Tavares v. N.Y.C. Health & Hosps. Corp.,* No. 13 Civ. 3148(PKC)(MHD), 2015 WL 158863, at *7 n. 8 (S.D.N.Y. Jan. 13, 2015) (citing *Carrasquillo v. City of New York,* 324 F.Supp.2d 428, 441 (S.D.N.Y.2004) (dismissing ADA claims against individuals)); *see also Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn,* 280 F.3d 98, 107 (2d Cir.2001) (holding that Title II of the Americans with Disabilities Act does not provide "for individual capacity suits against state officials"). Plaintiff's ADA claims are therefore dismissed with prejudice against the individual Defendants.

### b. Plaintiff's ADA Claims Against the State Are Dismissed Without Prejudice

Construed liberally, Plaintiff's complaint can be read to assert an ADA claim against New York State (or DOCCS, the State's agency). Such a claim is actionable under *Tennessee v. Lane,* 541 U.S. 509 (2004), which upheld the ADA's abrogation of a State's Eleventh Amendment immunity, and found that liability extends to include state and local governments, as well as their agencies and instrumentalities. Even if the State or DOCCS were currently party to this action, however, Plaintiff's claim must nevertheless be dismissed.

**\*5** Plaintiff's claim fails because it is a bare, conclusory allegation that does not provide "enough facts to state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 569. First, Plaintiff does not adequately allege any disability, nor does he allege that Plaintiff was prevented from participating in or benefiting from prison programs and services because of his disability: his mere recitation of "because I have hearing aids" is not enough. He does not allege that he has hearing loss or any other disability. When an ADA claim fails to allege that plaintiff was a "qualified individual with a disability," it must be dismissed. *See, e.g., Veloz v. New York,* 178 F. App'x 39,

41 (2d Cir.2006) (summary order) (affirming dismissal of ADA claim where inmate did not demonstrate he was a "qualified individual with a disability").

Likewise, when an ADA claim does not state that a plaintiff was *excluded* from a prison service or program, it must be dismissed. *See Carrasquillo,* 324 F.Supp.2d at 443 (dismissing ADA claim where inmate alleged only that he had difficulty walking to law library and infirmary, not that he was prevented altogether from accessing them, and admitted access on several occasions); *Devivo v. Butler,* No. 97 Civ. 7919(HB), 1998 WL 788787, at *4 (S.D.N.Y. Nov. 10, 1998) (dismissing ADA claim where blind inmate failed to allege that he was denied services in prison because he was blind). Finally, Plaintiff does not allege any discriminatory animus, or that he was excluded from any public service because of ill will against his disability. *See Varney,* 2015 WL 1730071, at *3. Accordingly, Plaintiff's ADA claims are dismissed in their entirety.

Plaintiff has not sought leave to amend his Complaint. However, the principle that the "court should freely give leave [to amend a pleading] when justice so requires," Fed. R. Civ. P. 15(a)(2), is particularly applicable to *pro se* plaintiffs, *see Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003). "A *pro se* complaint should not be dismissed without the court granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Chavis v. Chappius,* 618 F.3d 162, 170 (2d Cir.2010) (internal quotation marks omitted). "Where it appears that granting leave to amend is unlikely to be productive, however, it is not an abuse of discretion to deny leave to amend." *Lucente v. Int'l Bus. Mach. Corp.,* 310 F.3d 243, 258 (2d Cir.2002) (internal quotation marks omitted).

Plaintiff's opposition to Defendants' pre-motion letter provides information, albeit sparse, suggesting that an amendment of his ADA claim may not be futile. Specifically, Plaintiff asserts that he has been classified by an audiologist as "HL 30," and argues that he is entitled to certain accommodations under DOCCS Directive # 2612, which addresses accommodations for inmates with hearing impairments. (Pl.Opp.3). [4] He also contends that he has been "denied access" to certain services, including the "Resource Room and the tele-fax machine," although he does not make clear that the denial of access is *because of* ill will towards his disability, or whether he

was entirely excluded from those services. (*Id.*). He also claims that he "can't use the regular telephone" since he has not been provided with hearing aids. (*Id.*). [5] But even if Plaintiff's alleged hearing disability does prevent him from using certain services, this is not enough: not receiving proper treatment for a disability is not enough to sustain an ADA claim. Rather, Plaintiff must allege that he was mistreated *because of* his disability. *See Elbert,* 751 F.Supp.2d at 596 (dismissing ADA claims where "Plaintiff [was] claiming that Decedent was not properly treated *for* his [disability], not that he was mistreated *because of* his [disability]" (emphases in original)); *see also Varney,* 2015 WL 1730071, at *3.

[4]   The Court takes notice that the classification of "HL 30" means the inmate has "non-significant hearing loss" under the Directive, but may nonetheless be entitled to some accommodations. *See, e.g., Rosales v. LaValley,* No. 11 Civ. 106(MAD)(CFH), 2012 WL 7688115, at *1 (N.D.N.Y. Nov. 2, 2012) (discussing and quoting text of Directive # 2612), *report and recommendation adopted in part, rejected in part,* 2013 WL 992547 (N.D.N.Y. Mar. 13, 2013).

[5]   In this regard, the Court cautions Plaintiff that false or frivolous claims will be dismissed. In particular, Plaintiff's allegations that he cannot use a telephone strain credulity where he has participated in a telephone conference with the Court unaided, and heard and responded to everything the Court said. (*See generally* July 29, 2015 Tr.).

**\*6** The Court therefore will permit Plaintiff to amend his ADA claims, if he believes he can allege facts that support the elements of such a claim as set forth herein. If Plaintiff chooses to amend his ADA claims, he may also amend to add the public entity DOCCS, despite its prior dismissal from this action. If Plaintiff fails to re-plead these claims adequately, they may be dismissed with prejudice.

## C. Plaintiff's Claims of Religious Deprivation Are Dismissed

Plaintiff brings his religious-liberty claims pursuant to two separate statutes: 42 U.S.C. § 1983 and Section 3 of RLUIPA, 42 U.S.C. § 2000cc–1.

### 1. Applicable Law

#### a. Claims Under Section 1983

Plaintiff first relies on Section 1983, which establishes liability for deprivation, under the color of state law, "of any rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983. "The purpose of [Section] 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole,* 504 U.S. 158, 161 (1992). As such, a "[Section] 1983 claim has two essential elements: [i] the defendant acted under color of state law; and [ii] as a result of the defendant's actions, the plaintiff suffered a denial of h[is] federal statutory rights, or h[is] constitutional rights or privileges." *Annis v. County of Westchester,* 136 F.3d 239, 245 (2d Cir.1998).

In attempting to ascertain the putative violation of rights underlying Plaintiff's Section 1983 claim, Defendants have construed the Complaint to allege violations of the Free Exercise Clause of the First Amendment, which guarantees the right to the free exercise of religion. Convicted felons do not relinquish this right upon incarceration. *See O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348 (1987) ("Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." (internal citations omitted)); *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) ("Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." (internal citation omitted)). It is well-accepted, however, that a prisoner's right to exercise his religion involves considerations that do not apply to persons outside of the penal system. Namely, "the prisoner's right is not absolute or unbridled, and is subject to valid penological concerns, including those relating to institutional security." *Woodward v. Perez,* No. 12 Civ. 8671(ER), 2014 WL 4276416, at *3 (S.D.N.Y. Aug. 29, 2014) (internal quotation marks omitted); *see also Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993) ("A prisoner's right to practice his religion is ... not absolute."). Accordingly, free exercise claims of prisoners are judged "under a reasonableness test less restrictive than that ordinarily applied: a regulation that burdens a protected right passes constitutional muster if it is reasonably related to legitimate penological interests." *Salahuddin v. Goord,* 467 F.3d 263, 274 (2d Cir.2006) (quoting *O'Lone,* 482 U.S. at 349); *see Vann v. Fischer,* No. 11 Civ.1958(KPF), 2014 WL 4188077, at *8–14 (S.D.N.Y. Aug. 25, 2014) (finding burdens imposed

on inmates wearing religious beads were reasonably related to legitimate penological interest of inmate safety), *reconsideration denied,* No. 11 Civ.1958(KPF), 2015 WL 105792 (S.D.N.Y. Jan. 7, 2015).

**\*7** Under this reasonableness test, a prisoner asserting a free exercise claim "must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Salahuddin v. Goord,* 467 F.3d at 274–75.[6] "The defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct; the burden remains with the prisoner to show that these articulated concerns were irrational." *Id.* at 275 (alterations and internal quotation marks omitted).

[6]  "It has not been decided in this Circuit whether, to state a claim under the First Amendment's Free Exercise Clause, a 'prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs.' " *Holland v. Goord,* 758 F.3d 215, 220 (2d Cir.2014) (quoting *Salahuddin v. Goord,* 467 F.3d at 27475). However, because here the Court finds that Plaintiff has not pleaded sufficient facts to allege the personal involvement of any Defendants or to establish any burden on his religious beliefs, the Court need not grapple with the weight of the burden at this time.

"A substantial burden on religious exercise exists when an individual is required to choose between following the precepts of his religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of his religion on the other hand." *Vann,* 2014 WL 4188077, at \*9 (alterations and internal quotation marks omitted) (citing *Westchester Day Sch. v. Village of Mamaroneck,* 504 F.3d 338, 348 (2d Cir.2007)). Plaintiff need not show that the disputed conduct impedes a religious practice mandated by his religion, but he must show that it burdens a religious practice that is "central or important" to his practice of religion. *Ford,* 352 F.3d at 593–94. "Significantly, the plaintiff's burden in demonstrating substantial burden is not a particularly onerous task." *Woodward,* 2014 WL 4276416, at \*4 (internal quotation marks omitted); *see also McEachin v. McGuinnis,* 357 F.3d 197, 202 (2d Cir.2004).

Although Defendants do not address it, this Court also construes Plaintiff to have alleged violations of the First Amendment's Establishment Clause. Indeed, in his opposition to Defendants' pre-motion letter,

Plaintiff specifically refers to the Establishment Clause. (Pl.Opp.4). The First Amendment's Establishment Clause provides that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. In deciding an Establishment Clause claim, courts in this Circuit continue to apply the three-prong test articulated by the Supreme Court in *Lemon v. Kurtzman,* 403 U.S. 602 (1971). *See Bronx Household of Faith v. Bd. of Educ. of N.Y.C.,* 650 F.3d 30, 40 n. 9 (2d Cir.2011) ("Although the *Lemon* test has been much criticized, the Supreme Court has declined to disavow it and it continues to govern the analysis of Establishment Clause claims in this Circuit."). Under *Lemon,* "government action which interacts with religion [i] must have a secular purpose, [ii] must have a principal or primary effect that neither advances nor inhibits religion, and [iii] must not foster an excessive government entanglement with religion." *Bronx Household of Faith,* 650 F.3d at 40 (alterations and internal quotation marks omitted) (citing *Lemon,* 403 U.S. at 612–13). "[A]t the heart of the Establishment Clause [is] that government should not prefer one religion to another, or religion to irreligion." *Pugh v. Goord,* 571 F.Supp.2d 477, 494 (S.D.N.Y.2008) (quoting *Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet,* 512 U.S. 687, 703 (1994)).

**\*8** Given that plaintiff is a prisoner challenging a DOCCS action or regulation, "the *Lemon* test is tempered by the test laid out by the Supreme Court in [*Turner v. Safley,* 482 U.S. 78 (1987) ], which found that a prison regulation that impinges on an inmate's constitutional rights is nevertheless valid if it is reasonably related to legitimate penological interests." *Pugh,* 571 F.Supp.2d at 494 (internal quotation marks omitted). Additionally, "in the prison context, the [E]stablishment [C]lause has been interpreted in the light of the affirmative demands of the [F]ree [E]xercise [C]lause." *Muhammad v. N.Y.C. Dep't of Corr.,* 904 F.Supp. 161, 198 (S.D.N.Y.1995) (internal quotation marks omitted); *see also id.* ("In order to permit inmates to freely exercise their religion, *some* entanglement is necessary." (emphasis in original)). As discussed further below, regardless of the underlying constitutional violation Plaintiff alleges—whether under the Free Exercise Clause, the Establishment Clause, or something else entirely—he must allege the personal involvement of Defendants to state a claim under Section 1983. *See Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006).

**b. Claims Under RLUIPA**

"RLUIPA offers similar protections to prisoners as the Free Exercise Clause but heightens the standard for both plaintiffs and defendants." *Woodward,* 2014 WL 4276416, at *6 (citation and internal quotation marks omitted). "RLUIPA protects inmates by providing that a government shall not 'impose a substantial burden' on the 'religious exercise'[ ] of inmates in certain institutions unless the government shows that the burden furthers a compelling interest by the least restrictive means." *Salahuddin v. Goord,* 467 F.3d at 273 (footnote omitted) (quoting 42 U.S.C. § 2000cc–1(a)). "Only if a plaintiff shows that his religious exercise has been substantially burdened, do the defendants need to show something more than a rational relationship between the policy at issue and a governmental interest." *Woodward,* 2014 WL 4276416, at *6. If the plaintiff demonstrates that the "state has imposed a substantial burden on the exercise of his religion[,] ... the state may overcome a RLUIPA claim by demonstrating that the challenged policy or action furthered a compelling governmental interest and was the least restrictive means of furthering that interest." *Redd v. Wright,* 597 F.3d 532, 536 (2d Cir.2010) (citing 42 U.S.C. § 2000cc–1(a)).

**2. Analysis**

**a. Official Capacity Damages Claims Brought Under Section 1983 Are Dismissed**

The Eleventh Amendment, as a general matter, makes states immune from suit. *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 54 (1996). Eleventh Amendment immunity applies also to state officials sued in their official capacities. *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 101–02 (1984). "Employees of DOC[C]S and its facilities, when sued in their official capacities, have been held to be subject to the State's Eleventh Amendment immunity." *Lyerly v. Phillips,* No. 04 Civ. 3904(PKC), 2005 WL 1802972, at *3 (S.D.N.Y. July 29, 2005) (collecting cases). "The eleventh amendment bars recovery against an employee who is sued in his official capacity, but does not protect him from personal liability if he is sued in his individual or personal capacity." *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) (internal quotation marks omitted). Thus, to the extent Plaintiff sues Defendants in their official capacities under Section 1983, his claims are dismissed. He may still, however, seek money damages against Defendants in their personal capacities.

**b. Official and Individual Capacity Damages Claims Brought Under RLUIPA Are Dismissed**

**\*9** RLUIPA does not afford a plaintiff a cause of action for money damages against individual defendants in either their official capacities, *Sossamon v. Texas,* 131 S.Ct. 1651, 1663 (2011), or their individual capacities, *Washington v. Gonyea,* 731 F.3d 143, 145 (2d Cir.2013). Accordingly, to the extent Plaintiff seeks monetary damages under RLUIPA, those claims are dismissed.

Plaintiffs may, however, seek injunctive relief against officials in their official capacities. *See Sossamon,* 131 S.Ct. at 1658 (holding that "a waiver of sovereign immunity to other types of relief does not waive immunity to damages"); *id.* at 1666 (Sotomayor, J., dissenting) (observing that "the majority appears to accept that equitable relief is available to RLUIPA plaintiffs"); *see also Goode v. Bruno,* No. 10 Civ. 1734(SRU), 2013 WL 5448442, at *7 (D.Conn. Sept. 30, 2013) (permitting a RLUIPA claim for injunctive relief to continue past summary judgment).[7] All that remains for this Court's consideration, then, are his claims for injunctive relief under RLUIPA and his claims for personal capacity monetary damages under Section 1983.

[7]     Although Defendants do not make this argument, it is also possible that Plaintiff's RLUIPA claims for injunctive relief should be dismissed as moot. In this Circuit, "an inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility." *Salahuddin v. Goord,* 467 F.3d at 272; *see also Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir.1996) (per curiam) ("It is settled in this Circuit that a transfer from a prison facility moots an action for injunctive relief against the transferring facility."). Plaintiff is currently incarcerated at Attica Correctional Facility, and all Defendants are employed elsewhere, potentially rendering his claims moot. Certain decisions in this District have allowed claims for injunctive relief against prison officials to proceed despite an inmate's transfer from the facility in question, under the theory that such claims may be "capable of repetition, yet evading review." *Pugh,* 571 F.Supp.2d at 489. However, the Court's determination that Plaintiff has not adequately pleaded a claim means that it will not consider the mootness issue at this time.

Ramratan v. Fischer, Not Reported in F.Supp.3d (2015)

2015 WL 3604242

### c. Plaintiff Has Failed to Plausibly Allege the Personal Involvement of Defendants

Plaintiff brings claims against 12 individual Defendants, including the Governor of the State of New York, the Commissioner of the New York State Police, the former Commissioner of DOCCS, six facility superintendents, and a DOCCS Director. As a prerequisite to relief under both Section 1983 and RLUIPA, a plaintiff must show the personal involvement of defendants in the alleged constitutional deprivations. *See Farrell,* 449 F.3d at 484 (Section 1983); *Covington v. Mountries,* No. 13 Civ. 343(VEC), 2014 WL 2095159, at *5 (S.D.N.Y. May 20, 2014) (RLUIPA). To show personal involvement, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.' " *Id.* (quoting *Twombly,* 550 U.S. at 555).

A court may consider supervisory personnel "personally involved" if a plaintiff plausibly alleges facts showing that those defendants: (i) participated directly in the alleged constitutional violation; (ii) failed to remedy the wrong after being informed of it; (iii) created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom; (iv) were grossly negligent in supervising subordinates who committed the wrongful acts; or (v) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating there were ongoing unconstitutional acts. *Grullon v. City of New Haven,* 720 F.3d 133, 139 (2d Cir.2013) (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)). [8]

---

[8]     Courts have disagreed as to whether the five *Colon* factors continue to apply after *Iqbal. See generally McNaughton v. de Blasio,* No. 14 Civ. 221(KPF), 2015 WL 468890, at *5 n. 8 (S.D.N.Y. Feb. 4, 2015) (collecting cases). Any such uncertainty, however, does not alter settled law that "[t]he mere fact that a defendant possesses supervisory authority is insufficient to demonstrate liability for failure to supervise under [Section] 1983." *Styles v. Goord,* 431 F. App'x 31, 33 (2d Cir.2011) (summary order) (collecting cases).

**\*10** "The bare fact that [an official] occupies a high position in the New York prison hierarchy is insufficient to sustain [a] claim." *Colon,* 58 F.3d at 874; *see also Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985) (explaining that sustaining a Section 1983 claim "requires a showing of more than the linkage in the prison chain of command; the doctrine of respondeat superior does not apply"). "Even where there has been a constitutional violation, receipt of letters or grievances is insufficient to impute personal involvement." *Dilworth v. Goldberg,* No. 10 Civ. 2224(RJH)(GWG), 2011 WL 3501869, at *19 (S.D.N.Y. July 28, 2011) (citation, alteration, and quotation marks omitted), *report and recommendation adopted,* 2011 WL 4526555 (S.D.N.Y. Sept. 30, 2011). Further, "[t]he fact that an official ignored a letter alleging unconstitutional conduct is not enough to establish personal involvement." *Vann,* 2014 WL 4188077, at *7 (citation omitted). "Nor is a supervisor liable under [Section] 1983 when she receives a letter and forwards it to the appropriate staff personnel to handle, but takes no other action." *Id.; see also Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.2007) (affirming dismissal for failure to allege personal involvement where defendant referred one letter and responded to the next by informing plaintiff that a decision had been rendered). Additionally, after *Iqbal,* under both Section 1983 and RLUIPA, "an official's denial of a grievance alleging a constitutional deprivation, without more, does not amount to personal involvement in the deprivation of that right." *Joseph v. Fischer,* No. 08 Civ. 2824(PKC)(AJP), 2009 WL 3321011, at *18 (S.D.N.Y. Oct. 8, 2009). "Only where a supervisory official receives and acts on a prisoner's grievance (or substantively reviews and responds to some other form of inmate complaint) can the supervisor be held personally involved for [Section] 1983 purposes." *Vann,* 2014 WL 4188077, at *7 (internal quotation marks omitted). As Defendants argue, Plaintiff has not met the burden of pleading personal involvement for any of the 12 individual Defendants.

### i. Dr. Adams, C.O. Hayes, and Sgt. Hutti

With regards to Dr. Adams, C.O. Hayes, and Sgt. Hutti, Plaintiff simply does not allege any involvement in, or even awareness of, his purported religious deprivations. Accordingly, to the extent that Plaintiff's complaint makes religious deprivation claims against Dr. Adams, C.O. Hayes, and Sgt. Hutti, those claims are dismissed.

### ii. Governor Cuomo, Former Commissioner Fischer, and Superintendent D'Amico

Plaintiff alleges that Governor Cuomo, Former Commissioner Fischer, and Superintendent D'Amico violated RLUIPA and the Free Exercise Clause by failing to hire a Hindu chaplain and failing to provide him with a special Hindu diet. (Compl.5–6). As Defendants point out (Def.Br.6–7), Plaintiff does nothing more in his Complaint than name these individuals, reference their job titles, make conclusory allegations that they failed to provide him a Hindu chaplain and diet, and attach letters he sent them complaining about the lack of a Hindu chaplain. (*See* Compl. 5–6, 22; Dkt. # 2–2 at 22–24). Receipt by these officials of letters of complaint, even if true, is simply not enough to establish personal involvement. *See Dilworth,* 2011 WL 3501869, at *19.[9] Plaintiff's claims against these Defendants are apparently predicated entirely upon their positions of authority within New York State. Accordingly, Plaintiff's religious deprivation claims against Governor Cuomo, Former Commissioner Fischer, and Superintendent D'Amico are dismissed.

[9]    At least one letter attached to the Complaint indicates that former Commissioner Fischer referred Plaintiff's letter to the appropriate official for handling. (*See, e.g.,* Dkt. # 2–2 at 18). Referring an inmate's complaint to the appropriate staff is not enough to establish personal involvement. *See Vann,* 2014 WL 4188077, at *7.

### iii. Superintendents Perez, Rock, Racette, Graham, LaValley, and Director Morris

**\*11** Plaintiff also alleges that Superintendents Perez, Rock, Racette, Graham, LaValley, and Director Morris violated RLUIPA and the Free Exercise Clause by failing to hire a Hindu chaplain and failing to provide him with a special Hindu diet. (Compl.5–6). As with the other Defendants, Plaintiff does not include any specific factual allegations against these Defendants; he simply provides their names and titles and alleges they failed to hire a Hindu chaplain or provide him with a special diet. Claiming that these individuals are in the chain-of-command in the prison hierarchy is not enough to allege personal involvement. *See Colon,* 58 F.3d at 874. Plaintiff further attaches letters and grievance determinations to the Complaint; these attachments purport to demonstrate that these Defendants were copied on correspondence complaining about the lack of Hindu chaplain or that they reviewed Plaintiff's grievances. Significantly, however, alleging that these Defendants received and reviewed letters and grievances, or even that they denied the relief sought in grievances, is not enough to plead their personal involvement. Accordingly, Plaintiff's religious deprivation claims against Superintendents Perez, Rock, Racette, Graham, LaValley, and Director Morris are dismissed.

### d. Plaintiff Has Failed to State a Claim for Religious Deprivation

Plaintiff's Complaint is dismissed solely on the ground that he has failed to allege any personal involvement by Defendants. However, because Plaintiff is *pro se,* because his claims are dismissed without prejudice (except where specified), and because Plaintiff's claims as-pleaded are wholly inadequate, the Court will address the substance of Plaintiff's religious deprivation claims as well. Plaintiff does not adequately allege any facts that demonstrate that his ability to practice his religion has been unlawfully burdened by the failure of DOCCS to hire a Hindu chaplain or provide him a special religious diet.

### i. Plaintiff's Claims Regarding the Failure to Hire a Hindu Chaplain Are Deficient

Plaintiff's claims regarding religious discrimination are vague and conclusory. Plaintiff simply repeats in his Complaint that his "freedom of religion" has been "violated," that he has been subject to "religious discrimination," that there have been "important Holy Days and Rituals that [he] could not properly observe" due to religious discrimination, that Defendants have "disregard[ed][his] religious needs [and] religious rites," and that they have failed "to accommodate [him] religiously." (Compl.5–6). Plaintiff's opposition to Defendants' pre-motion letter is no better, incanting repeatedly the legal conclusion that his practice of religion has been substantially burdened. (Pl.Opp.1–2, 4).

The operative Complaint does not allege any facts that "nudge [Plaintiff's] claims across the line from conceivable to plausible." *In re Elevator Antitrust Litig.,* 502 F.3d at 50. Plaintiff makes no showing regarding how contact with Hindu advisors is "central or important" to the practice of his faith, necessary to sustain a Free Exercise claim. *Rossi v. Fishcer,* No. 13 Civ. 3167(PKC)(DF), 2015 WL 769551, at *10 (S.D.N.Y. Feb. 24, 2015) (dismissing free exercise claim based on lack of access

to advisors). Nor does he explain how not having a Hindu advisor impermissibly burdens his practice of his religion. He claims his religious "needs" and "rites" have been disregarded, and that he has not been able to "properly" observe religious holidays. (Compl.6). But Plaintiff does not identify any specific needs, rites, or holidays; nor does he allege the facts of any occasion when any Defendant has actually interfered with the practice of his religion. Plaintiff simply complains that it is "religious discrimination" that DOCCS "provide[s] chaplains for Muslims, Jews, Catholics, Christians, Protestant[s], [and] Nation of Islam," but not for his religion, "which is an equally large religion." (Compl.6). These conclusory allegations are not enough to state a claim under the First Amendment or RLUIPA. [10]

[10] Determining whether a challenged policy is reasonably related to a legitimate penological interest is a fact-laden inquiry that is generally ill-suited for resolution on a motion to dismiss. *See Ford, 352 F.3d at 596* (declining to determine whether defendants' conduct was reasonably related to legitimate penological interests on motion to dismiss because "the record [was] insufficient to resolve this fact—and context—specific dispute"). On this motion to dismiss, the Court declines to assess whether there is a "valid, rational connection" between Defendants' actions and their purported concerns. *See Turner, 482 U.S. at 89.*

The Court notes, however, that Defendants advance strong arguments based on the record in this case, which is more voluminous than is typical on a motion to dismiss due to the number of documents Plaintiff attached to his Complaint. (Def.Br.11). Specifically, as Defendants argue, letters Plaintiff attached to his complaint strongly support that because so few inmates are Hindu—comprising less than one percent of the DOCCS prison population— it was not fiscally justifiable to employ a Hindu chaplain on staff. (*See* Dkt. # 2–2 at 18, # 2–11 at 13). The Court may revisit Defendants' arguments if further motion practice ensues.

**ii. Plaintiff's Claims Regarding the Failure to Provide a Special Religious Diet Are Deficient**

**\*12** Plaintiff also fails to state a claim as it concerns his diet. It is true that it has long been established that "prison authorities must accommodate the right of prisoners to receive diets consistent with their religious scruples." *Kahane v. Carlson, 527 F.2d 492, 495 (2d Cir.1975);*

*see also McEachin, 357 F.3d at 203* ("[C]ourts have generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights."). But Plaintiff again only makes conclusory allegations: he claims that the food that DOCCS provides is "not in accordance with my religious beliefs and religious diet," and that they have failed to accommodate his "dietary needs in accordance with [his] religion." (Compl.5–6). Plaintiff's opposition to Defendants' pre-motion letter does not fill in any detail; it simply claims, "For all food served in messhall, as well as[ ] sold in commissary, doesn't comply nor fall within the criteria for practicing Hinduism. Therefore, Plaintiff is forced to eat food that goes against his religious diet and belief." (Pl.Opp.2). Plaintiff does not allege what a Hindu diet is, or identify how the meals he is provided are not compatible with that diet.

Moreover, during the July 29, 2014 conference, Plaintiff suggested that his discontent with his prison diet stemmed not from the dictates of his religion, but from the fact that in accommodating his religious diet the facility often substituted animal proteins with soy protein, which is something Plaintiff does not personally eat. (July 29, 2014 Tr. 11–12). The Court cautions Plaintiff that DOCCS is under no obligation to accommodate his personal dietary preferences; it only must accommodate diets dictated by his practice of his religion. *See Kahane, 527 F.2d at 496* (holding that a prison was required to provide an orthodox Jewish rabbi with a diet that maintained his good health and did not violate Jewish dietary laws, but refusing to mandate any specific food item or method for fulfilling this order, as "[s]uch details are best left to the prison's management which can provide from the food supplies available within budgetary limitations"); *see also Rossi, 2015 WL 769551, at \*9* (finding plaintiff did not plausibly allege Free Exercise Clause claim where he did not allege that holy day meals were inconsistent with religious beliefs or explain how adding certain items to the meals was "central or important" to his religion).

**D. Plaintiff's Retaliation Claims Are Dismissed**

Finally, Plaintiff alleges that Defendants retaliated against him for filing grievances by denying him needed medical care and otherwise subjecting him to "harassment, threats, [and] retaliation ." (Compl.9). To establish a First Amendment claim of retaliation, a plaintiff must show: "[i] that the speech or conduct at issue was protected,

[ii] that the defendant took adverse action against the plaintiff, and [iii] that there was a causal connection between the protected speech and the adverse action." *Espinal v. Goord,* 558 F.3d 119, 128 (2d Cir.2009) (citation omitted). In the prison context, "only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action." *Wrobel v. County of Erie,* 692 F.3d 22, 31 (2d Cir.2012) (citation omitted). "Otherwise the retaliatory act is simply *de minimis* and therefore outside the ambit of constitutional protection." *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003) (citation omitted); *see also Wrobel,* 692 F.3d at 31.

**\*13** When considering a prisoner's retaliation claims, the court must bear in mind that "prisoners may be required to tolerate more than average citizens, before a retaliatory action taken against them is considered adverse." *Davis,* 320 F.3d at 353 (citation omitted). Since it is "near[ly] inevitabl[e]" that "prisoners will take exception" with the decisions of prison officials, and given "the ease with which claims of retaliation may be fabricated," the Second Circuit has cautioned that prisoners' retaliation claims must be "examin[ed] ... with skepticism and particular care." *Colon,* 58 F.3d at 872; *see also Davis,* 320 F.3d at 352. "To survive a motion to dismiss, such claims must be supported by specific and detailed factual allegations, not stated in wholly conclusory terms." *Friedl v. City of New York,* 210 F.3d 79, 85–86 (2d Cir.2000) (citation omitted).

Although Plaintiff has satisfied the first prong of a retaliation claim—the First Amendment protects prisoners from retaliation for the filing of grievances and lawsuits, *Davis,* 320 F.3d at 352–53—his claims are stated in "wholly conclusory terms," *Friedl,* 210 F.3d at 86, and must be dismissed. With regards to "all defendants," Plaintiff alleges they violated his rights "in many ways as to harassment, threats, retaliation, false misbehavior reports, messing with legal mail and reg[ular] mail, moving around from one floor to other then moving me from facility to facility creating undue hardship as well as to my family and love[d] ones too with all the games by these defendants." (Compl.9). As Defendants argue (Def.Br.13), this claim must be dismissed because even under the most liberal reading of the Complaint, Plaintiff's allegations are wholly conclusory and lacking in facts sufficient to connect each Defendant to a retaliatory action. *See Dove v. Fordham Univ.,* 56 F.Supp.2d 330, 335 (S.D.N.Y.1999) (dismissing complaint where plaintiff

named defendants in caption but body of complaint contained no allegations explaining how defendants violated the law or injured plaintiff), *aff'd sub nom. Dove v. O'Hare,* 210 F.3d 354 (2d Cir.2000); *see also Kasiem v. Rivera,* No. 09 Civ. 9665(DLC), 2011 WL 166929, at *6 (S.D.N.Y. Jan. 18, 2011) (dismissing as too conclusory allegations that defendants made false reports and made death threats "solely on the basis of retaliatory reprisal").

In alleging his retaliation claims, Plaintiff does specifically name Defendants Dr. Adams, C.O. Hayes, Sgt. Hutti, and Superintendent LaValley. (Compl.8). Even so, Plaintiff's allegations against these Defendants are far too conclusory to state a claim. He alleges they retaliated by issuing him two "false tickets" and engaging in the "biggest set up" to have him transferred from the Clinton Correctional Facility. (*Id.*). Plaintiff does not specify who issued these "false tickets" or which grievances these allegedly retaliatory actions were in response to; he does not state what acts each of these Defendants took in retaliation; and he does not establish any time frame that might permit an inference of a causal connection. *See Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001) (finding that failure to set forth a time frame for the alleged events precludes inference of a causal relationship for purposes of retaliation claim), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 508 (2002). Plaintiff has not pleaded enough facts to state a claim for retaliation. His retaliation claims are therefore dismissed without prejudice.

## CONCLUSION

**\*14** For the foregoing reasons, the Complaint is dismissed in its entirety. The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

Should Plaintiff wish to attempt to re-plead those claims that were dismissed without prejudice, he may submit an amended complaint in accordance with this Opinion on or before **August 10, 2015,** and this case will be reopened. Plaintiff is cautioned that if submits an amended complaint that does not address—and rectify—the deficiencies discussed in this Opinion, some or all of his claims may be dismissed with prejudice.

SO ORDERED.

2015 WL 3604242

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 3604242

**End of Document**                                   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 3113837
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Alex COLLADO, Plaintiff,
v.
Michael SPOSATO, Sheriff of
Nassau County, Defendant.

No. 12–CV–2151 (SJF)(WDW).
|
July 24, 2012.

**Attorneys and Law Firms**

Alex Collado, Corona, NY, pro se.

Pablo A. Fernandez, Mineola, NY, for Defendant.

*ORDER*

FEUERSTEIN, District Judge.

**I. Introduction**

**\*1** On April 27, 2012, *pro se* plaintiff Alex Collado ("plaintiff") filed a complaint against defendant Michael Sposato ("Sposato"), as sheriff of Nassau County, pursuant to 42 U.S.C. § 1983 ("Section 1983"), accompanied by an application to proceed *in forma pauperis.* Plaintiff's financial status, as set forth in the declaration in support of his application to proceed *in forma pauperis,* qualifies him to commence this action without prepayment of the filing fees. *See* 28 U.S.C. § 1915(a)(1). Accordingly, plaintiff's application to proceed *in forma pauperis* is granted. However, for the reasons set forth below, the complaint is *sua sponte* dismissed with prejudice pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(b).

**II. The Complaint**

In his complaint, plaintiff alleges:

> "On 3–18–12 during the Noon meal I did not receive my prescribed no onion which I'm allergic to onion's [sic] and seafood. The[y] are not providing my diet tray, in this jail."

(Compl. at ¶ IV). Plaintiff also alleges:

> "I have a stomach pain, I don't know what I got because evertime [sic] I eat the food I get pains in my stomach."

(Compl. at ¶ V). Plaintiff does not indicate what relief, if any, he is seeking in this action. *Id.*

**III. Discussion**

**A. Standard of Review**

Under both the Prison Litigation Reform Act, 28 U.S.C. § 1915A, and the *in forma pauperis* statute, 29 U.S.C. § 1915(e)(2), a district court must dismiss a complaint if it is frivolous or malicious, fails to state a claim upon which relief may be granted or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. §§ 1915A(b) and 1915(e)(2)(B). *See Abbas v. Dixon,* 480 F.3d 636, 639 (2d Cir.2007) (finding both Section 1915 and Section 1915A to be applicable to a prisoner proceeding *in forma pauperis* ).

It is axiomatic that district courts are required to read *pro se* complaints liberally, *see Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)); *Hill v. Curcione,* 657 F.3d 116, 122 (2d Cir.2011), and to construe them "to raise the strongest arguments [that they] suggest[ ]." *Jabbar v. Fischer,* 683 F.3d 54, 56 (2d Cir.2012) (quotations, alterations and citations omitted). Moreover, at the pleadings stage of the proceeding, the Court must assume the truth of "all well-pleaded, nonconclusory factual allegations in the complaint." *Harrington v. County of Suffolk,* 607 F.3d 31. 33 (2d Cir.2010); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868. 678–79. 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

Nevertheless, a complaint must plead sufficient facts "to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007). The pleading of specific facts is not required; rather a complaint need only give the defendant "fair notice of what the * * * claim is and the grounds upon which it rests." *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (quotations and citation omitted); *see also Anderson News, LLC v. American Media, Inc.,* 680 F.3d

162, 182 (2d Cir.2012) (accord). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' " *Ashcroft,* 556 U.S. at 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (quoting *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955, 167 L.Ed.2d 929). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " *Id.* (quoting *Twombly,* 550 U.S. at 557, 127 S.Ct. 1955, 167 L.Ed.2d 929); *see also Gallop v. Cheney,* 642 F.3d 364, 368 (2d Cir.2011) (accord). "Factual allegations must be enough to raise a right to relief above the speculative level, * * * on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly,* 550 U.S. at 555–56, 127 S.Ct. at 1959: *see also Starr v. Sony BMG Music Entertainment,* 592 F.3d 314, 321 (2d Cir.2010), *cert. denied,* ––– U.S. ––––, 131 S.Ct. 901, 178 L.Ed.2d 803 (2011) (accord). The plausibility standard requires "more than a sheer possibility that defendant has acted unlawfully." *Ashcroft,* 556 U.S. at 678, 129 S.Ct at 1949: *see also Wilson v. Merrill Lynch & Co., Inc.,* 671 F.3d 120, 128 (2d Cir.2011) (accord).

B. *Section 1983*

**\*2** *Section 1983* of Title 42 of the United States Code provides, in relevant part:

> "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured ...."

To state a claim under *Section 1983,* a plaintiff must allege (1) that the challenged conduct was "committed by a person acting under color of state law," and (2) that such conduct "deprived [the plaintiff] of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Cornejo v. Bell,* 592 F.3d 121, 127 f2d Cir.20101 *cert. denied sub nom Cornejo v. Monn,* ––– U.S. ––––, 131 S.Ct. 158, 178 L.Ed.2d 243 (2010) (quoting *Pitchell v. Callan,* 13 F.3d 545, 547 (2d Cir.1994)); *see also Rehberg v. Paulk,* ––– U.S. ––––, –––– – ––––, 132 S.Ct. 1497, 1501–02, 182 L.Ed.2d 593 (2012).

In addition, a *Section 1983* claim must allege the personal involvement of any individual defendant in the purported constitutional deprivation. *Farid v. Ellen,* 593 F.3d 233, 249 (2d Cir.2010) (quoting *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006)); *see also Pettus v. Morgenthau,* 554 F.3d 293, 300 (2d Cir.2009). "Personal involvement" may be established by evidence of direct participation by a supervisor in the challenged conduct, or by evidence of a supervisory official's "(1) failure to take corrective action after learning of a subordinate's unlawful conduct, (2) creation of a policy or custom fostering the unlawful conduct, (3) gross negligence in supervising subordinates who commit unlawful acts, or (4) deliberate indifference to the rights of others by failing to act on information regarding the unlawful conduct of subordinates." *Hayut v. State Univ. of New York,* 352 F.3d 733, 753 (2d Cir.2003); *see also Back v. Hastings on Hudson Union Free School District,* 365 F.3d 107, 127 (2d Cir.2004); *Johnson v. Newburgh Enlarged School District,* 239 F.3d 246, 254– 55 (2d Cir.2001). "The fact that [a defendant] was in a high position of authority is an insufficient basis for the imposition of personal liability." *Al–Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989); *see also Back,* 365 F.3d at 127; *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). A complaint based upon a violation under *Section 1983* that does not allege facts establishing the personal involvement of an individual defendant fails as a matter of law. *See Costello v. City of Burlington,* 632 F.3d 41, 48–9 (2d Cir.2011).

Plaintiff has not alleged the direct participation of Sposato, the only defendant named in the complaint, in any of the wrongdoing alleged in his complaint, nor any basis upon which to find Sposato liable in a supervisory capacity. Accordingly, the complaint is dismissed in its entirety for failure to state a claim for relief.

C. Leave to Amend

**\*3** Although "[t]he court should freely give leave [to amend] when justice so requires," Fed.R.Civ.P. 15(a)(2), "motions to amend should generally be denied in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party." *Burch v. Pioneer Credit Recovery, Inc.,* 551 F.3d 122, 126 (2d Cir.2008) (citing *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)); *see also Ruotolo v. City of New York,* 514 F.3d 184, 191 (2d Cir.2008).

2012 WL 3113837

Since any amendment to plaintiff's complaint would be futile because, *inter alia,* his allegations that he was provided a meal that contained onions on one (1) occasion and has been denied his "diet tray" while incarcerated at the Nassau County jail do not give rise to a constitutional deprivation, his complaint against Sposato is dismissed in its entirety with prejudice.

### 1. Deliberate Indifference

"A convicted prisoner's claim of deliberate indifference to his medical needs by those overseeing his care is analyzed under the Eighth Amendment because the right the plaintiff seeks to vindicate arises from the Eighth Amendment's prohibition of 'cruel and unusual punishment.' " *Caiozzo v. Koreman,* 581 F.3d 63, 69 (2d Cir.2009) (quoting *Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996)). However, "a person detained prior to conviction receives protection against mistreatment at the hands of prison officials under the Due Process Clause of the Fifth Amendment if the pretrial detainee is held in federal custody, or the Due Process Clause of the Fourteenth Amendment if held in state custody." *Id.* Regardless of whether the plaintiff is a convicted prisoner or pretrial detainee, however, "the standard for deliberate indifference is the same under the Due Process Clause of the Fourteenth Amendment [or Fifth Amendment] as it is under the Eighth Amendment." *Id.* at 70–71, 72; *see also Cuoco v. Moritsugu,* 222 F.3d 99, 106 (2d Cir.2000).

A claim for deliberate indifference has both an objective and subjective component. *See Hill,* 657 F.3d at 122; *Collazo v. Pagano,* 656 F.3d 131, 135 (2d Cir.2011). Objectively, "the alleged deprivation must be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain, exists." *Hill,* 657 F.3d at 122 (quoting *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)); *see also Johnson v. Wright,* 412 F.3d 398, 403 (2d Cir.2005). In order to determine whether an alleged deprivation was objectively serious, the court must inquire (1) whether the prison officials acted reasonably in response to the inmate's needs; and (2) what harm, if any, the inadequacy in the officials' response to the inmate's need has caused or will likely cause the inmate. *Salahuddin v. Goord,* 467 F.3d 263, 279–80 (2d Cir.2006).

"Subjectively, the official must have acted with the requisite state of mind, the 'equivalent of criminal

recklessness,' " *Collazo,* 656 F.3d at 135 (quoting *Hathaway,* 99 F.3d at 553); *see also Wilson v. Seiter,* 501 U.S. 294, 299, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) (holding that a deliberate indifference claim "mandate[s] inquiry into a prison official's state of mind."), i.e., the official must have "act[ed] or fail[ed] to act while actually aware of a substantial risk that serious inmate harm will result." *Salahuddin,* 467 F.3d at 280: *see also Jabbar,* 683 F.3d at 57 ("The prison official must know of, and disregard, an excessive risk to inmate health or safety."); *Caiozzo,* 581 F.3d at 72 (holding that the plaintiff must establish that the official "knew of and disregarded an excessive risk to [the plaintiff's] health or safety and * * * was both aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and also drew the inference." (alterations and quotations omitted)). Generally, "mere allegations of negligen[ce] * * * do not state a claim of deliberate indifference." *Hathaway,* 99 F.3d at 553; *see also Jabbar,* 683 F.3d at 57 ("[D]eliberate indifference requires more than mere negligence." (quotations and citation omitted)); *Farid,* 593 F.3d at 249 ("[N]egligence is insufficient to support an Eighth Amendment [deliberate indifference] claim.")

**\*4** Although "[p]risons have an affirmative duty to provide their inmates with nutritionally adequate food * * * [,] assuming a diet's nutritional adequacy, prison officials have the discretion to control its contents." *Word v. Croce,* 169 F.Supp.2d 219, 226 (S.D.N.Y.2001). "Absent religious or medically peculiar circumstances, a prisoner does not have a right to a specialized diet while incarcerated, vegetarian or otherwise." *Id.* (quotations, alterations and citation omitted). "Preference for certain foods and dislike of others cannot be equated with a constitutional guarantee to a custom-tailored menu." *Id.*

However, under certain circumstances, the denial of a medically required diet may constitute a constitutional violation. *See LaBounty v. Gomez,* No. 94 Civ. 3360, 1998 WL 214774, at * 2 (S.D.N.Y. May 1, 1998), *aff'd,* 175 F.3d 1008 (2d Cir. Mar. 26, 1999); *Tafari v. Weinstock,* No. 07 CV 0693, 2010 WL 3420424, at * 7 (W.D.N.Y. Aug.27, 2010); *Evans v. Albany County Correctional Facility,* No. 9:05–CV–1400, 2009 WL 1401645, at * 9 (N.D.N.Y. May 14, 2009); *Mandala v. Coughlin,* 920 F.Supp. 342, 353 (E.D.N.Y.1996). "[T]o establish a valid claim that the denial of * * * a medically proscribed diet[ ] constitutes an Eighth Amendment violation, one must establish that there was a sufficiently serious condition that resulted

from the food not being received." *Tafari,* 2010 WL 3420424, at * 7 (quotations and citations omitted); *see also Evans,* 2009 WL 1401645, at * 9 (accord). Moreover, "[m]ere negligence or inadvertent failure to provide a medically necessary diet is not a constitutional violation." *Abdush–Shahid v. Coughlin,* 933 F.Supp. 168, 180 (N.D.N.Y.1996).

Even assuming, *arguendo,* that an onion-free diet is medically indicated for plaintiff due to an allergy, plaintiff cannot state a claim of deliberate indifference because, *inter alia:* (1) the alleged failure to provide him with an onion-free diet has not resulted in a sufficiently serious condition since the only harm alleged by plaintiff is stomach pains "ever[y]time [he] eat[s] the food," (Compl., at ¶ V), *see, e.g. Sledge v. Kooi,* 564 F.3d 105, 108 (2d Cir.2009) (holding, *inter alia,* that none of the conditions of which the plaintiff complained, i.e., eczema, back pain, various stomach disorders, allergies and asthma, qualified as a "serious medical need"); *Tafari,* 2010 WL 3420424, at * 7 (finding that the plaintiff's complaints of constipation, vomiting and stomach pain were not sufficiently serious to establish an Eighth Amendment violation); *Mortimer Excell v. Fischer,* 9:08–CV–945, 2009 WL3111711, at * 4 (N.D.N.Y. Sept. 24, 2009) ("[C]onclusory allegations of heart, chest, and stomach pain, without more, do not satisfy the objective prong of the Eighth Amendment test."); *H'Shaka v. Drown,* No. 9:03–CV–937, 2007 WL 1017275, at * 18 (N.D.N.Y. Mar.30, 2007) (holding that a milk allergy does not constitute a serious illness under the Eighth Amendment); *Porter v. Coombe,* No. 97 Civ. 2394, 1999 WL 587896, at * 3 (S.D.N.Y. Aug.4, 1999) (finding the plaintiff's allergy to milk to be an insufficiently serious medical condition); *Maurice v. N.Y.C. Department of Corrections,* No. 93 Civ. 6008, 1997 WL 431078, at * 3 (S.D.N.Y. July 30, 1997) (finding that the plaintiff had not shown that he suffered from a sufficiently serious medical condition to implicate Eighth Amendment concerns where he alleged only that he suffered from stomach cramps and diarrhea as a result of eating a non-vegetarian meal); and (2) there are no factual allegations from which it may plausibly be inferred that Sposato had a sufficiently culpable state of mind, particularly since plaintiff does not allege that he ever informed Sposato that he was not receiving a medically indicated diet. *See Evans,* 2009 WL 1401645, at * 9 ("If Plaintiff is able to establish a 'sufficiently serious condition,' he must also establish that corrections personnel intentionally denied, delayed access to, or interfered with the receipt of food. * * *

In addition, a showing of deliberate indifference requires more than just vague and conclusory allegations. * * * [A] plaintiff has a duty to inform facility staff that he was not receiving his medically prescribed diet, and if he fails to do so, deliberate indifference does not exist." (quotations, alterations and citations omitted)); *Martinez v. Lape,* No. 09–cv–665, 2011 WL 4527943, at * 9 (N.D.N.Y. Mar.28, 2011), *report and recommendation adopted by* 2011 WL 4528980 (Sept. 28, 2011) (recommending dismissal of the plaintiff's Eighth Amendment claim where, *inter alia,* the plaintiff had not immediately informed prison staff that he was not receiving his prescribed dietary needs). At most, plaintiff's allegations state a claim for "negligent oversight" by unidentified individuals which does not rise to the level of a constitutional violation. *See, e.g. Evans,* 2009 WL 1401645, at * 11.

**\*5** Since plaintiff cannot establish that Sposato's conduct "deprived [him] of rights, privileges, or immunities secured by the Constitution or laws of the United States," *Cornejo,* 592 F.3d at 127, he cannot state a Section 1983 claim as a matter of law. Accordingly, any amendment to the complaint would be futile and the complaint is therefore dismissed in its entirety with prejudice.

IV. Conclusion

For the reasons set forth above, plaintiff's application to proceed *in forma pauperis* is granted and the complaint is *sua sponte* dismissed in its entirety with prejudice pursuant to 28 U.S.C. §§ 1915A and 1915(e)(2). Pursuant to Rule 77(d)(1) of the Federal Rules of Civil Procedure, the Clerk of the Court is directed to serve notice of entry of this order upon all parties, including mailing a copy of this order to plaintiff at his last known address in accordance with Rule 5(b)(2)(C).

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith and therefore *in forma pauperis* status is denied for the purpose of any appeal. *See Coppedge v. United States,* 369 U.S. 438, 444–45, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

SO ordered.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 3113837

---

**End of Document**                     © 2018 Thomson Reuters. No claim to original U.S. Government Works.

---

2005 WL 2179422
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Luis MEJIA, Plaintiff,

v.

Glenn S. GOORD, et al., Defendants.

No. Civ.A.903CV124(LEK/D.
|
Aug. 16, 2005.

**Attorneys and Law Firms**

Luis Mejia, for Plaintiff, pro se.

Hon. Eliot Spitzer, Attorney General of the State of New York, Department of Law, The Capitol, Albany, New York, for Defendants.

Kelly L. Munkwitz, Assistant Attorney General, of counsel.

REPORT AND RECOMMENDATION

PEEBLES, Magistrate J.

**\*1** Plaintiff Luis Mejia, a New York state prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this civil rights action pursuant to 42 U.S.C. § 1983, alleging violation of his constitutional rights by the Commissioner of the New York State Department of Correctional Services ("DOCS") and several of the agency's employees. In his complaint, plaintiff seeks to hold the defendants accountable under the Eighth and Fourteenth Amendments for alleged indifference to his serious medical needs, based upon their failure to provide him with an adequate low fat diet recommended for his coronary artery disease and a refusal to transfer him to a facility which could better accommodate his dietary needs. Among the relief sought by the plaintiff is a mandatory injunction directing the DOCS to transfer him to another facility and recovery of $65 billion in compensatory damages.

Currently pending before the court is a motion by the defendants seeking the entry of summary judgment dismissing plaintiff's complaint on several grounds, urging both procedural and substantive deficiencies including, *inter alia,* plaintiff's failure to state a meritorious claim under the Eighth Amendment, and neglect to exhaust available administrative remedies before commencing this action. [1] Because the record now before the court fails to disclose the existence of any genuine, triable issue of material fact and establishes, as a matter of law, that plaintiff has suffered no cognizable constitutional deprivation, I recommend that defendants' motion be granted.

I. *BACKGROUND*
The plaintiff, who is currently an inmate at the Mt. McGregor Correctional Facility, was incarcerated at the Washington Correctional Facility ("Washington") at the times relevant to his claims. Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 29) ¶ 1. Mejia alleges, and defendants acknowledge, that he suffers from coronary artery disease, a condition for which he received considerable treatment during his period of incarceration at Washington by both DOCS medical personnel and outside specialists. [2] Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 29) ¶¶ 4-5; Spitzer Aff. (Dkt. No. 29) ¶¶ 7, 9, 18.

Included among the treatment regimens afforded to Mejia while at Washington were a cardiac catheterization, performed in April of 2002, and a percutaneous intervention in May, 2002; both of those procedures were unsuccessful. Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 29) ¶ 6; Spitzer Aff. (Dkt. No. 29) ¶¶ 7, 9. Following those failed undertaking one of plaintiff's cardiac specialists, Dr. Robert J. Capone, recommended that Mejia follow a low fat diet. Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 29) ¶ 6; Spitzer Aff. (Dkt. No. 29) ¶¶ 8,9. Dr. Capone did not, however, prescribe a specific diet for the plaintiff. Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 29) ¶ 7; Spitzer Aff. (Dkt. No. 29) ¶ 9.

Under DOCS policies, inmates are provided with therapeutic diets when prescribed by a healthcare provider. [3] Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 29) ¶¶ 8-9; Walker Aff. (Dkt. No. 29) ¶¶ 7,9. Inmates at Washington who are placed on restricted diets are monitored for noncompliance, since strict adherence is considered necessary to achieve the goals of a prescribed diet. Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 29) ¶ 15; Walker Aff. (Dkt. No. 29) ¶ 6.

**\*2** Because therapeutic diets do not provide the same number of meal options as those ordinarily available in general population, inmates commonly opt out of a prescribed dietary program; accordingly, prison officials often find it more effective, in meeting unique dietary needs, to educate a particular inmate on making healthy selections from the general population diet. Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 29) ¶¶ 10-13; Spitzer Aff. (Dkt. No. 29) ¶ 9; Walker Aff. (Dkt. No. 29) ¶ 9.

Although inmates who suffer from coronary heart disease may eat safely from the general population menu, provided they make intelligent dietary intake choices, at his request plaintiff was placed on a low fat/low cholesterol diet on June 3, 2002. Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 29) ¶ 14; Spitzer Aff. (Dkt. No. 29) ¶ 11. As a result of plaintiff's failure to adhere faithfully to the restrictive diet, however, despite counseling on or about July 18, 2002, he was removed from the diet on February 21, 2003. Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 29) ¶¶ 16-17; Spitzer Aff. (Dkt. No. 29) ¶¶ 11, 13. Mejia was later returned to the restrictive diet on March 27, 2003, and remained on it until his transfer out of Washington. Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 29) ¶¶ 18-19; Spitzer Aff. (Dkt. No. 29) ¶¶ 13, 15; Walker Aff. (Dkt. No. 29) ¶ 12.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on January 29, 2003. Dkt. No. 1. Named as defendants in Mejia's complaint are Glenn S. Goord, Commissioner of the DOCS; Dr. Lester Wright, Commissioner of Health Services for the DOCS; and several DOCS employees assigned to work at Washington, including Deputy Superintendent of Administration Alfred Roberts; Food Services Administrator Francis A. Steinback; Dana Griffith, Administrator and Head Nurse; Dr. Samuel Richard Spitzer, a prison physician; and Correctional Counselors Phillip Dwyer and Norman Vadnais. Complaint (Dkt. No. 1) ¶ 3.

Following the joinder of issue and completion of pretrial discovery, on August 31, 2004 defendants moved seeking the entry of summary judgment dismissing plaintiff's complaint in its entirety. Dkt. Nos. 29-31. In their motion, *inter alia,* defendants assert that plaintiff cannot establish the existence of a serious medical need or defendants' deliberate indifference to any such need. Defendants also challenge plaintiff's assertion of their

personal involvement in the constitutional violations alleged, and claim that plaintiff has failed to comply with requirements of the Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104-134, 110 Stat. 1321 (1996), including by his failure to exhaust administrative remedies before commencing suit. Submissions by the plaintiff in opposition to defendants' motion were filed on September 29, 2004, Dkt. No. 32, and defendants have since submitted a reply memorandum addressing certain of the arguments raised in plaintiff's opposition papers as well as pointing out their procedural deficiencies, Dkt. No. 33.

**\*3** Defendants' summary judgment motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Plaintiff's Failure To Comply with Local Rule 7.1(a)(3)*

While the plaintiff has actively opposed defendants' summary judgment motion, in addition to his failure to supply the court with an affidavit controverting the assertions set forth in defendants' submissions he has not responded to defendants' statement of material facts not in dispute, as required by Northern District of New York Local Rule 7.1(a)(3). The first issue to be addressed is the legal significance, if any, of this failure to comply with the requirements of Local Rule 7.1(a)(3).

The potential consequences of plaintiff's failure to respond to defendants' Local Rule 7.1(a)(3) Statement and, by doing so, to assist the court in determining what material facts are genuinely disputed, are significant. By its terms, Local Rule 7.1(a)(3) provides that "any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party." *See* N.D.N.Y.L.R. 7.1(a)(3). Courts in this district have not hesitated to enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f), by deeming facts admitted upon an opposing party's failure to properly respond. *See, e.g., Elgamil v. Syracuse Univ.,* No. 99-CV-611, 2000 WL 1264122, at *1 (Aug. 22, 2000)* (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corrs.,* 214 F.3d 275, 292 (2d Cir.2000)* (discussing district courts' discretion to adopt local rules like 7.1(a)(3)).

Based upon the foregoing, and notwithstanding plaintiff's *pro se* status, I recommend that the court accept defendants' assertions of fact, as set forth in their Rule 7.1(a)(3) Statement, as uncontroverted. [4]

B. *Summary Judgment Standard*

Summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986). The moving party has the initial burden of demonstrating that there is no genuine issue of material fact to be decided with respect to any essential element of the nonmoving party's claim. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4. Once that burden is met, the opposing party must show, through affidavits or otherwise, that there is a material factual issue for trial. [5] Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. When deciding a summary judgment motion, the court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party. *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (citation omitted).

C. *Failure to Comply with the Prison Litigation Reform Act*

1. *Failure to Exhaust Administrative Remedies*

**\*4** One prong of defendants' PLRA argument addresses the insufficiency of plaintiff's efforts to avail himself of the internal DOCS grievance process before filing this action. Defendants' motion is based upon the fact that in his complaint Mejia asserts that while he appealed an apparently adverse local determination of a grievance filed regarding the matters now in dispute to the Central Office Review Committee ("CORC"), he had not received a response to that appeal as of the time his complaint was prepared. Complaint (Dkt. No. 1) ¶ 18. Defendants assert that the shortcoming is fatal, and should result in dismissal of Mejia's complaint based upon his failure to exhaust administrative remedies.

The PLRA altered the inmate litigation landscape considerably, imposing several restrictions on the ability of prisoners to maintain federal civil rights actions. One such restriction introduced by the PLRA requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has held that the "PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 992 (2002).

New York prison inmates are subject to an Inmate Grievance Program established by the DOCS, and recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson,* No. 96 CV 5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb. 20, 2004) (citing *Mojias v. Johnson,* 351 F.3d 606 (2003) and *Snider v. Melindez,* 199 F.3d 108, 112-13 (2d Cir.1999)). The New York Inmate Grievance Program consists of a three-step review process. First, a written grievance is submitted to the Inmate Grievance Review Committee ("IGRC") within fourteen days of the incident. [6] 7 N.Y.C.R.R. § 701.7(a). The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance. 7 N.Y.C.R.R. § 701.7(a). If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision. *Id.* § 701.7(b). The third level of the process affords the inmate the right to appeal the superintendent's ruling to the Central Office Review Committee ("CORC"), which makes the final administrative decision. *Id.* § 701.7(c). Only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in federal court. *Reyes v. Punzal,* 206 F.Supp.2d 431, 432 (W.D.N.Y.2002) (citing, *inter alia, Sulton v. Greiner,* No. 00 Civ. 0727, 2000 WL 1809284, at *3 (S.D.N.Y. Dec. 11, 2000)).

Against this backdrop, it is clear that plaintiff had not fully satisfied his PLRA exhaustion requirements until January 29, 2003, when the CORC unanimously denied

his grievance. *See* Plaintiff's Opposition Papers (Dkt. No. 32) Exh. C. As a matter of sheer coincidence, it was on that same date that this action was filed, although plainly plaintiff was unaware of the CORC's determination at the time his complaint was framed and provided to prison officials for mailing to the court.

**\*5** Given these circumstances, it is admittedly tempting to afford the plaintiff the benefit of the doubt, inasmuch as this action was technically commenced on a date when the PLRA's exhaustion requirements were satisfied. To overlook plaintiff's failure to await the CORC's determination before deciding to commence the action, however, would undermine the important policy considerations underlying the exhaustion requirement, as recognized in such cases as *Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001). Accordingly, I find that because plaintiff had not received, and thus was unaware of, the CORC's adverse determination prior to drafting and forwarding it to the court, his complaint in this action is barred by the administrative exhaustion requirements of the PLRA.

2. *Physical Injury*

The second element of defendants' PLRA defense is based upon the requirement, codified in 42 U.S.C. § 1997e(e), that a prison inmate asserting a claim for mental or emotional injury suffered while in custody must make a showing of accompanying physical injury in order to recover compensatory damages. Defendants contend that by his failure to prove a physical injury stemming from the matters now complained of, plaintiff may not maintain a claim for such damages for mental anguish and emotional distress.

42 U.S.C. § 1997e(e), a provision added by the PLRA, provides in relevant part that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e). Section 1997e(e) includes within its purview alleged constitutional violations. *Thompson v. Carter,* 284 F.3d 411, 417-18 (2d Cir.2002); *Petty v. Goord,* No. 00 Civ.803, 2002 WL 31458240, at *8-*9 (S.D.N.Y. Nov. 4, 2002).

Under section 1997e(e), claims brought by inmates pursuant to section 1983 for emotional damages unrelated to any physical injury are subject to dismissal. *Shariff*

*v. Coombe,* No. 96 Civ. 3001, 2002 WL 1392164, at *4 (S.D.N.Y. June 26, 2002). The absence of physical injury, however, does not totally bar an inmate claim under section 1983, since section 1997e(e) does not preclude recovery of nominal damages, punitive damages, or declaratory or injunctive relief even in the absence of a showing of physical injury. *Id.,* at *5 (citation omitted).

Defendants' claim that plaintiff cannot demonstrate the existence of physical injury flowing from the constitutional violations alleged in his complaint is, at least at this procedural juncture, problematic. Unquestionably-and defendants do not argue otherwise-plaintiff suffers from a serious and potentially debilitating medical coronary condition. Affording plaintiff the benefit of all inferences, as the court must at this stage, I am unable to conclude that the defendants' alleged failure to provide him with the low fat diet suggested by his coronary specialists did not result in physical injury, and that no reasonable factfinder could conclude otherwise. Accordingly, I recommend that this portion of defendants' motion be denied.

D. *Merits of Plaintiff's Deliberate Indifference Claim*
**\*6** Plaintiff's complaint in this matter asserts defendants' deliberate indifference to his serious medical needs, in violation of his rights as guaranteed by the Eighth Amendment to the United States Constitution. [7]

The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are "incompatible with the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102-103, 97 S.Ct. 285, 290 (1976) (citations and internal quotations omitted); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment " 'does not mandate comfortable prisons' ", neither does it tolerate inhumane treatment of prisoners; thus, the conditions of an inmate's confinement, including medical care, are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976 (1994) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S .Ct. 2392, 2400 (1981)).

To succeed on a claim alleging that prison conditions, including though not limited to medical care, violate

the Eighth Amendment, a plaintiff must satisfy both an objective and subjective requirement; the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must additionally demonstrate that prison officials acted subjectively with "deliberate indifference." *Farmer,* 511 U.S. at 834, 114 S.Ct. at 1977 (citations and internal quotations omitted); *see also Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.) (also citing, *inter alia, Wilson* ).

Undeniably, the Eighth Amendment's prohibition against cruel and unusual punishment extends to the food provided to prison inmates. While the Eighth Amendment does not elevate to constitutional significance an inmate's dislike for the food served or the portions received, *see, e.g., Word v. Croce,* 169 F.Supp.2d 219, 226 (S.D .N.Y.2001), it does require that prisoners be given "nutrionally adequately food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Ramos v. Lamm,* 639 F.2d 559, 571 (10th Cir.1980) (citations omitted), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759 (1981); *see also Robles v. Coughlin,* 725 F .2d 12, 15 (2d Cir.1983) (citing *Ramos* ).

Plaintiff does not contend, nor does the record support, that in general terms the diet made available to him and other inmates at Washington during the relevant time period fell below this constitutionally mandated floor, either qualitatively or quantitatively. Instead, Mejia asserts that by failing to provide him with a special diet designed to address his coronary condition, defendants were indifferent to his medical needs. Accordingly, plaintiff's Eighth Amendment claims must be reviewed under the more particularized standard applicable to such medical indifference claims.

### 1. *Serious Medical Need*

**\*7** In order to state a deliberate medical indifference claim under the Eighth Amendment, a plaintiff must allege a deprivation involving a medical need which is, in objective terms, " 'sufficiently serious' ". *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citing *Wilson,* 501 U.S. at 298, 111 S.Ct. at 2324), *cert. denied sub nom., Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct. 1108 (1995). A medical need is serious for constitutional purposes if

it presents " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain'." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (citations omitted). A serious medical need can also exist where " 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain' '-since medical conditions vary in severity, a decision to leave a condition untreated may or may not be unconstitutional, depending on the facts. *Harrison v. Barkley,* 219 F.3d 132, 136-37 (2d Cir.2000) (quoting, *inter alia, Chance* ). Relevant factors in making this determination include whether the plaintiff suffers from an injury that a " 'reasonable doctor or patient would find important and worthy of comment or treatment" ', a condition that " 'significantly affects" 'a prisoner's daily activities, or " 'chronic and substantial pain." ' *Chance,* 43 F.3d at 701 (citation omitted).

Addressing this prong of the medical indifference test, defendants assert that plaintiff has failed to establish a medical need for the diet for which he now advocates. In doing so, defendants conflate the serious medical need and the deliberate indifference elements of the relevant Eighth Amendment medical indifference standard. The record in this case is strongly suggestive of plaintiff's suffering from a coronary condition which, though medically unspecified, could qualify as a serious medical need. Defendant's Rule 7.1(a)(3) Statement (Dkt. No. 29)¶¶ 4-5; Spitzer Aff. (Dkt. No. 29) ¶¶ 7, 9, 18. In my view, the lack of any nexus between plaintiff's coronary condition and defendant's failure to provide him with the requested low fat diet are more appropriately scrutinized under the indifference prong of the governing test.

### 2. *Deliberate Indifference*

Deliberate indifference, in a constitutional sense, exists if an official knows of and disregards an excessive risk to inmate health or safety; the official must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer* ); *Waldo,* 1998 WL 713809, at *2 (same).

The record in this case fails to support plaintiff's claim of the defendants' deliberate indifference to his allegedly serious medical needs. According to the record inmates who, like Mejia, suffer from coronary heart disease can eat safely from the general population menu, provided they

make intelligent selections which take into account their medical condition. Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 29) ¶¶ 12-13; Spitzer Aff. (Dkt. No. 29) ¶¶ 9-10. In light of the availability of suitable and healthy dieting choices on the general population menu, defendants have determined it to be more productive to educate inmates with such diseases on making healthy menu choices than to afford them particularized, limited diets.

**\*8** While, with proper discipline, the plaintiff was therefore able to satisfy his dietary needs with the general population menu, at his request he was placed on the low fat/low cholesterol diet on June 3, 2002, though he was later removed from it owing to his inability to adhere to the diet's rigid food intake requirements. Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 29) ¶ 14; Spitzer Aff. (Dkt. No. 29) ¶ 11. After being off of the restricted diet for approximately one month, Mejia was returned to the requested low fat, low cholesterol diet on March 27, 2003, and remained on it until his transfer out of Washington. Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 29) ¶¶ 17-18; Spitzer Aff. (Dkt. No. 29) ¶ 13.

Significantly, defendants' submissions establish, without contradiction, that Mejia suffered no ill effects from the diet provided to him while at Washington. Throughout his stay at Washington, prison personnel continuously monitored plaintiff's LDL and cholesterol levels, which were found to be within the range of normal during the time period relevant to this claim.[8] Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 29) ¶ 20-21; Spitzer Aff. (Dkt. No. 29) ¶ 15-16. Notably, at no time did plaintiff's cardiac specialists prescribe drugs to lower his Low Density Lipoprotein ("LDL") level. Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 29) ¶ 22; Spitzer Aff. (Dkt. No. 29) ¶¶ 16-17. According to Dr. Spitzer, a prison physician, plaintiff received proper medical care while at Washington, and did not suffer from a medical condition requiring his transfer to another prison facility. Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 29) ¶¶ 22-23; Spitzer Aff. (Dkt. No. 29) ¶¶ 16-17, 20.

This case is readily distinguishable from *Johnson v. Harris,* which involved an inmate with a serious diabetic condition, requiring a therapeutic diet, who had attempted unsuccessfully to eat safely from the general population menu, and at times was forced to forgo eating entirely as a result of the unavailability of menu choices consistent with his condition. 479 F.Supp. 333, 335-36

(S.D.N.Y.1979). In *Johnson* prison medical personnel, knowing that the plaintiff was not receiving the proper diet for his condition, nonetheless failed to undertake affirmative measures to ensure that he did not eat food that was harmful to his health. *Id.* at 337. Based upon that failure of prison medical officials to remedy this perceived deficiency, the court in *Johnson* properly found a violation of the plaintiff's Eighth Amendment right to be free from cruel and unusual punishment. *Id.*

The case at hand more closely resembles the circumstances presented in *Rivera v. Dyett,* Nos. 88 Civ. 4707, 90 Civ. 3783, 1994 WL 116025 (S.D.N.Y. Mar. 28, 1994). There the plaintiff, also a diabetic, could not demonstrate deliberate indifference on the part of prison officials to his serious medical needs where he failed to show that dietary teaching was an objectively inadequate alternative form of treatment, or that he suffered any injury as a result of failure to be placed on a therapeutic diet. *Id.,* at \*8.

**\*9** Simply stated, plaintiff's claims in this action represent nothing more than his dissatisfaction with the initial decision of officials at Washington to educate him with respect to making healthy food choices from the general population menu, and to place him on the therapeutic diet menu that he was eventually offered, at his request. It is well established, however, that mere disagreement with a prescribed course of treatment, or even a claim that negligence or medical malpractice has occurred, does not provide a basis to find a violation of the Eighth Amendment. *Estelle,* 429 U.S. at 105-06, 97 S.Ct. at 201-02; *Chance,* 143 F.3d at 703; *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.), *cert. denied,* 506 U.S. 1040, 113 S.Ct. 828 (1992). Diagnostic techniques and treatments are a "classic example of a matter for medical judgment", and medical staff is vested with broad discretion to determine what method of diagnosis and/or treatment to provide its patients. *Estelle,* 429 U.S. at 107, 97 S.Ct. at 293; *Chance,* 143 F.3d at 703; *Rosales v. Coughlin,* 10 F.Supp.2d 261, 264 (W.D.N.Y.1998). Because plaintiff has failed to establish that defendants were subjectively indifferent to his serious medical need, his Eighth Amendment indifference claim lacks merit.

### D. *Personal Involvement*

As an alternative ground for their request for the entry of summary judgment, defendants assert plaintiff's failure to establish the requisite level of personal involvement by

each of the defendants necessary to sustain a claim against them.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

### 1. *Commissioner Goord*

Plaintiff's claims against defendant Goord appear to be premised in large part upon his position as a supervisor. A supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor-there is no respondeat superior liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. A supervisory official can, however, be liable in one of several ways: 1) the supervisor may have directly participated in the challenged conduct; 2) the supervisor, after learning of the violation through a report or appeal, may have failed to remedy the wrong; 3) the supervisor may have created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) the supervisor may have been grossly negligent in managing the subordinates who caused the unlawful event; or 5) the supervisor may have failed to act on information indicating that unconstitutional acts were occurring. *Richardson,* 347 F.3d at 435; *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986). "Personal involvement will be found, however, where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint." *Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002).

**\*10** Both plaintiff's complaint and the record in this case are completely devoid of any tangible connection between Commissioner Goord's actions and plaintiff's alleged injuries. *E.g., Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987) (dismissal appropriate where plaintiff does no more than allege that defendant was in charge of prison); *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985) (same). "[M]ere 'linkage in the prison chain of command'

is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." *Richardson,* 347 F.3d at 435 (citations omitted). Plaintiff's claims against defendant Goord stem solely from his position as Commissioner of the DOCS, and are based purely upon Mejia's contention that defendant Goord should have known of the constituted violations alleged, or that they should have been "obvious". Plaintiff's Opposition (Dkt. No. 32) at 7. Accordingly, there is no basis for finding liability on his part for the acts complained of, thereby providing an alterative basis for dismissal of plaintiff's complaint as against defendant Goord.

### 2. *Doctor Wright*

Plaintiff's allegations against Dr. Wright demonstrate a somewhat stronger basis for finding his involvement in the constitutional deprivations alleged by Mejia. In his complaint, plaintiff intimates that he communicated with Dr. Wright, complaining of the matters set forth in his complaint, without receiving any response. Complaint (Dkt. No. 1) ¶ 16. This allegation, even if interpreted in a light most favorable to the plaintiff, however, is insufficient to implicate Wright's personal involvement in the constitutional violations alleged absent evidence-lacking in the record before the court-that defendant Wright reviewed and acted upon plaintiff's complaints. *Johnson,* 234 F.Supp.2d at 363.

### 3. *Superintendent Rivera and Deputy Superintendent Roberts*

Plaintiff alleges that he made requests for a medical transfer and for the provision of a proper diet while at Washington to Superintendent Rivera, who later referred those requests to Deputy Superintendent Roberts. Superintendent Rivera's receipt of Mejia's letters and delegation of those letters to his subordinate provide insufficient basis to establish his personal involvement. *Gates v. Goord,* No. 99 Civ. 1378, 2004 WL 1488405, at *8-*10 (S.D.N.Y. July 1, 2004); *Johnson,* 234 F.Supp.2d at 363-64; *see also Greenwalt v. Coughlin,* No. 93 Civ. 6551, 1995 WL 232736, at *4 (S.D.N.Y. Apr. 19, 1995); *Garrido v. Coughlin,* 716 F.Supp. 98, 100 (S.D.N.Y.1989). Deputy Superintendent Roberts, on the other hand, reviewed and responded to Mejia's letter as assigned by Superintendent Rivera, potentially implicating his involvement in any resulting constitutional violation. *Johnson,* 234 F.Supp.2d at 363-64.

#### 4. *Administrator/Head Nurse Griffith*

Plaintiff's only claim against Dana Griffith, described by Mejia as administrator and head nurse at Washington, surrounds his allegation that according to defendant Griffith he was on "regional hold" and, accordingly, he could apply for transfer only to any facility within the designated region. Complaint (Dkt. No. 1) ¶ 11. Since plaintiff does not make any allegation regarding Nurse Griffith's involvement in the decision-making process with regard to plaintiff's diet or medical transfer, these allegations are insufficient to implicate her in the constitutional violations alleged.

#### 5. *Food Services Administrative Steinbach*

**\*11** In his complaint, plaintiff alleges that defendant Frank Steinbach is a regional DOCS dietician who met with him in August of 2002 and assured him that he would receive a proper diet. Complaint (Dkt. No. 1) ¶ 17. While extremely skeletal, when interpreted in a light most favorable to the plaintiff and with all inferences drawn in his favor, I am unable to say that based upon this allegation no reasonable factfinder could conclude that defendant Steinbach was personally involved in the decision regarding plaintiff's dietary intake at Washington. Accordingly, I recommend against dismissal of plaintiff's claims against this defendant on the basis of lack of personal involvement.

#### 6. *Corrections Counselor Vadnais*

Plaintiff's complaint alleges that defendant Norman Vadnais, a corrections counselor, assisted him in preparing documents including those related to his request for a therapeutic diet and for a medical transfer. There is no allegation, either in plaintiff's complaint or elsewhere, that counselor Vadnais had any role in making either of those decisions, or even the authority to participate in any such determination. As such, plaintiff's allegations regarding defendant Vadnais are insufficient to demonstrate his personal involvement in the constitutional violations alleged.

#### 7. *Dr. Spitzer*

Plaintiff's allegations regarding Dr. Spitzer's involvement in the matters set forth in his complaint surround the physician's alleged awareness of the deficiencies in his diet

and the failure of prison officials to provide him with a special diet, as well as his refusal to intercede on his behalf. Complaint (Dkt. No. 1) ¶ 6. These allegations, if founded, could support a finding of liability on the part of defendant Spitzer. *Johnson v. Harris,* 479 F.Supp. at 336-37.

#### 8. *Corrections Counsel Dwyer*

Like those against defendant Vadnais, plaintiff's allegations against defendant Dwyer, another corrections counselor at Washington, also concern Dwyer's efforts to assist the plaintiff in requesting a medical transfer and/or a proper diet. *See* Complaint (Dkt. No. 1) ¶¶ 4-5. Absent any indication of defendant Dwyer's further involvement, including any authority on his part to direct such a transfer or order such a diet, these allegations are insufficient to establish his personal involvement and constitutional violations alleged.

In sum, I recommend a finding that plaintiff's allegations against defendants Goord, Wright, Rivera, Griffith, Vadnais, and Dwyer are insufficient to implicate their personal involvement in the constitutional violations alleged, but that the allegations against the remaining defendants are sufficient to support such a finding.

### IV. *SUMMARY AND RECOMMENDATION*

Plaintiff's claims in this action stem from his dissatisfaction with the initial decision of prison officials at Washington to educate him with respect to making healthy choices from the general population menu to meet the dietary needs associated with his coronary condition, his distaste for the therapeutic diet which was made available to him at his request, and the refusal by DOCS officials to transfer him to another facility where his dietary needs could more palatably be accommodated. Despite these complaints by the plaintiff, the record now before the court firmly establishes that the defendants were not deliberately indifferent to plaintiff's serious medical needs. To the contrary, it appears that throughout his stay at Washington plaintiff received regular and meaningful health care, and prison officials there made reasonable and legally sufficient efforts to accommodate his dietary needs. Plaintiff's medical indifference claims are therefore legally deficient, and should be dismissed as a matter of law.

**\*12** In addition to being deficient on the merits, plaintiffs' claims are subject to dismissal upon the procedural basis of his failure to exhaust administrative remedies before commencing the action. Plaintiff's claims against defendants Goord, Wright, Rivera, Griffith, Vadnais and Dwyer are also subject to dismissal on the independent basis of their lack of personal involvement in the constitutional violations alleged.

Based upon the foregoing, it is hereby

RECOMMENDED, that defendants' motion for summary judgment dismissing plaintiff's complaint (Dkt. No. 29) be GRANTED, and plaintiff's complaint be DISMISSED in its entirety.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; Roldan v. Racette, 984 F.2d 85 (2d Cir.1993).

It is further ORDERED that the Clerk of the Court serve a copy of this report and recommendation upon the parties by regular mail.

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 2179422

Footnotes

1    In their motion defendants further claim entitlement to qualified immunity. In light of my recommendation on the merits, I have not separately addressed the qualified immunity issue. Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151 (2001). Defendants also challenge plaintiff's request for injunctive relief in light of his intervening transfer to another facility. Defendants argue that the transfer renders plaintiff's claim for prospective relief moot, arguing that since no officials at plaintiff's new prison are named as defendants, the issuance of injunctive relief cannot vindicate the constitutional rights now at issue. While there is some appeal to this argument, the involvement of Commissioner Goord and Deputy Commissioner Dr. Wright, who presumably would be positioned to insure that plaintiff receives a proper diet at the new facility, as defendants in the action makes an award of prospective injunctive relief at least potentially meaningful. In light of my ruling on the merits, however, I have also chosen not to address defendant's mootness argument.

2    Plaintiff's complaint is on its face limited to issues involving his menu and prior transfer request. Plaintiff's complaint does not appear to allege, nor does the record disclose evidence to suggest, that defendants were deliberately indifferent by failing to provide adequate medical care and treatment for his coronary condition.

3    The therapeutic diets made available to at Washington, which houses an average of 850 inmates at any given time, include a diabetic diet; a low cholesterol, low saturated fat diet; a low sodium diet; a low potassium diet; a gluten sensitivity diet; a high fiber diet; a low fiber/low residue diet; and a lactose intolerant diet. Walker Aff. (Dkt. No. 29) ¶ 10.

4    Defendants' notice of motion pointedly advised Mejia of the requirements of Local Rule 7.1(a)(3) and the consequences of failing to respond to their Rule 7.1(a)(3) Statement. See Dkt. No. 29.

5    A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248, 106 S.Ct. at 2510. Though pro se plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than merely "metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); Vital v. Interfaith Med. Ctr., 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether pro se plaintiff understood nature of summary judgment process).

6    The Inmate Grievance Program supervisor may waive the timeliness of the grievance submission due to "mitigating circumstances." 7 N.Y.C.R.R. § 701.7(a)(1).

7    In his complaint, plaintiff characterizes his claims as being asserted under the Americans With Disabilities Act ("ADA"), 42 U.S .C. § 12101 et seq. While Title II of the ADA does apply to services, programs and activities operated in state prisons, see Pennsylvania Dep't of Corrs. v. Yeskey, 524 U.S. 206, 212, 118 S.Ct. 1952, 1956 (1998), the defendants named by the plaintiff in his complaint may not be sued personally in their individual capacities for violation of the ADA. Garcia v. S.U.N.Y. Health Sciences Ctr. of Brooklyn, 280 F.3d 98, 107 (2d Cir.2001); Alsbrook v. City of Maumelle, 184 F.3d 999, 1005 n. 8 (8th Cir.1999). To the extent that plaintiff's complaint may represent his attempt to sue the named defendants, including particularly Commissioner Goord, in an official capacity, such allegations raise thorny questions regarding sovereign immunity. See, e.g., Garcia, 280 F.3d at 113 n. 3; see also Alsbrook, 134 F.3d at 1007. Since

defendant's responsive papers focus upon analysis of plaintiff's claims under the Eighth and Fourteenth Amendments, and plaintiff does not appear to press his ADA claims in opposition to that motion, I have considered them as having been abandoned, and will not address them in more detail. In any event, the plaintiff's claims are not particularly well suited for Title II of the ADA, which merely prohibits the denial of access to and participation in services or programs, including in a prison setting. *See* 42 U.S.C. § 13132.

8   Between 2003 and 2004, plaintiff's total cholesterol ranged from 160 to 184 mg/dl, with total cholesterol of less than 200 mg/dl being considered as normal. Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 29) ¶ 20; Spitzer Aff. (Dkt. No. 29) ¶ 15. During the same period, the plaintiff's LDL level, which is the most significant of the cholesterol subtypes, fluctuated between 83 and 98 mg/dl, again below the maximum of 100 considered as normal. Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 29) ¶ 21; Spitzer Aff. (Dkt. No. 29) ¶ 16.

---

**End of Document**                                   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.   10